UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

————————————————————————————

RONELL SHEFFIELD,

                                        Plaintiff,

v.                                                      9:22-cv-0519
                                                        (BKS/TWD)

M. COOK, et al.,

                                        Defendants.

————————————————————————————

APPEARANCES:                            OF COUNSEL:

RONELL SHEFFIELD
*Plaintiff, pro se*
23-B-4600
Elmira Correctional Facility
P.O. Box 500
Elmira, NY 14902

GOLDBERG SEGALLA, LLP                   JESSICA A. ROUNDS, ESQ.
Attorneys for Defendants
8 Southwoods Boulevard, Suite 300
Albany, NY 12211-2526

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**<u>REPORT-RECOMMENDATION AND ORDER</u>**

## I.    INTRODUCTION

This matter has been referred for a report and recommendation by the Hon. Brenda K.

Sannes, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule

72.3(c).  Plaintiff Ronell Sheffield ("Plaintiff"), a prison inmate formerly held as a pretrial

detainee at the Schenectady County Jail ("County Jail"), commenced this action pursuant to 42

U.S.C. § 1983 alleging, while he was held as a pretrial detainee, corrections officers deprived

him of his civil rights.  *See* Dkt. No. 1, Complaint.

Plaintiff's remaining claims are: (1) First Amendment retaliation and free exercise claims against Defendant Cook; and (2) Fourteenth Amendment excessive force claims against Defendants Cook and Giuliano.  Dkt. No. 4, Decision and Order, at 12.[1]  Currently before the Court is Defendants' motion for summary judgment.  Dkt. No. 16.  For the reasons set forth below, the Court recommends Defendants' motion be granted in part and denied in part.

## II.    BACKGROUND

Plaintiff was arrested by the City of Schenectady Police and entered the County Jail on February 17, 2022.  *See* Dkt. No. 16-6, Booking Sheet.  In a misbehavior report, Officer Steven Redmond noted Plaintiff "refused multiple direct orders to stand up to have proper restraints applied" to leave police court, was "argumentative[,]" made "threats towards officers[,]" and had to be restrained.  Dkt. No. 16-5 at 2.[2]  Redmond reported Plaintiff was transported to the County Jail where "he refused all intake procedures[.]"  *Id.*

Plaintiff was deposited in connection with this matter on March 20, 2023.  *See generally*, Dkt. No. 16-4, Transcript of Plaintiff's Deposition.  Plaintiff testified he received an inmate handbook when he entered the County Jail but refused to sign for it.  *Id.* at 13.  He changed from his street clothes into an orange jumpsuit "[s]omewhere down by booking."  *Id.* at 14-15.  He further testified that when he first entered the jail:

> The officer told me to hand over my clothes.  I handed him my clothes.  He told me put this on.  I turned around.  He told me turn around.  Told me spread them.  I did.  And I asked them then, I said, excuse me, I'm Muslim, can I squat.  And he said no, everybody got's to.  All right.

---

[1] Citations to the parties' submissions will refer to the pagination generated by CM/ECF, the Court's electronic filing system.

[2] Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

*Id.* at 16-17.  Plaintiff confirmed he asked "to squat rather than spread" his buttocks but the officer informed him "[e]verybody got to bend over and spread them."  *Id.* at 17.[3]

Plaintiff testified one officer and one sergeant were present for the strip search.  Dkt. No. 16-4 at 18-19.  Following the search, he was escorted upstairs to the "D block."  *Id.* at 19.  Officer Redmond confirmed Plaintiff was taken to "D-27" and placed in administrative segregation "per Covid protocol[.]"  Dkt. No. 16-5 at 2-3.

On February 19, 2022, Corrections Officer Paul Longi was serving as the constant watch officer for the County Jail D block.  Dkt. No. 16-17, Longi Affidavit, at 2.  According to Longi, "[a]t approximately 1535 hours . . . [Plaintiff] reported to me that he had ingested a heroin balloon and was concerned that it had opened in his stomach" and "started exhibiting violent behavior while in his cell which included kicking the walls."  *Id.* at 2-3.  Accordingly, Longi notified the floor Sergeant, Michael Cook.  *Id.* at 3.

Sergeant Cook and Officers Longi and Defendant Joseph Giuliano affirmed "[t]he suspected contraband plaintiff reported being in possession of created a concern for the safety of both the inmate and the jail making the search of plaintiff reasonably necessary."  Dkt. No. 16-17 at 3; Dkt. No. 16-18 at 4; Dkt. No. 16-19 at 4.  Plaintiff acknowledged in his complaint officers expressed their intent to perform a search based on the belief he had ingested/possessed contraband.  *See*, *e.g.*, Dkt. No. 1 at 7 ("[Defendants] brought plaintiff to booking in order to perform an X-ray body scan for suspected contraband.  After passing the body scan x-ray process

---

[3] *But see* Dkt. No. 16-4 at 39 (Plaintiff testified, when he arrived at the facility, staff "took me right up[stairs] . . . I never went through the screening that everybody else goes through  . . . When I first got to the jail, they took me right upstairs.  After changing my clothes, they took me upstairs and had me on one-on-one watch.").

plaintiff was ordered to a strip frisk/search of body and rectal area."). In his deposition, however, Plaintiff denied reporting he had ingested heroin. Dkt. No. 16-4 at 19-20.[4]

Sergeant Cook affirmed he learned Plaintiff had "reported he was in possession of a heroin balloon[,]" therefore, Cook "immediately" responded to the "D block where [Plaintiff] was being housed . . . with Officers Mark Nerney and Joseph Giuliano[.]" Dkt. No. 16-19, Cook Affidavit, at 2-3. Both Sergeant Cook and Officer Giuliano affirmed Plaintiff initially refused Cook's orders to place his hands behind his back but "ultimately complied" and was escorted "to the changeover room in booking." *See id.* at 3; *see also* Dkt. No. 16-18, Giuliano Affidavit, at 3.

Plaintiff faced the wall and Officer Nerney removed his handcuffs. Dkt. No. 16-18 at 3. Sergeant Cook advised him "[they] would be performing a strip search of his person for contraband." Dkt. No. 16-19 at 3. Plaintiff removed his clothing and Officers Nerney and Giuliano began performing the search. *Id.*; Dkt. No. 16-18 at 3. Defendants Cook and Giuliano affirmed Plaintiff refused to comply with the strip search procedure. Dkt. No. 16-19 at 3 ("[Plaintiff] refused to comply with multiple orders to bend over at the waist and spread his buttocks so that staff could check for the heroin balloon he reported ingesting."); Dkt. No. 16-18 at 3 ("[Plaintiff] did not comply with the strip search procedure and refused to bend and spread his buttocks after removing his clothing.").

Defendants Cook and Giuliano reported Plaintiff turned around and "became irate." Dkt. No. 16-19 at 3 ("[Plaintiff] turned off the wall towards staff in an aggressive manner and became irate."); Dkt. No. 16-18 at 3 ("[Plaintiff] became irate . . . and turned off the wall in [Giuliano's]

---

[4] *See also* Dkt. No. 24 at 13-14 (arguing "the Defendants' strip search of the Plaintiff who is/was at all times a pre-trial detainee Muslim that never claimed to be in possession of heroin, (or any drugs for that matter), was clearly unreasonable and [violated] Plaintiff's constitutional rights[.]").

direction in a menacing and aggressive manner."). Sergeant Cook deployed OC/pepper spray. Dkt. No. 16-19 at 3 ("Due to the perceived threat of violence as exhibited by [Plaintiff]'s conduct towards staff, I deployed a one second burst of OC spray."); Dkt. No. 16-18 at 3 ("Sergeant Cook deployed OC spray to gain compliance and subdue [Plaintiff]."). Officer Giuliano affirmed he and "Officer Nerney . . . attempted to place [Plaintiff] back on the wall and put handcuffs on him." Dkt. No. 16-18 at 3. Plaintiff was ordered to face the wall and place his hands behind his back but refused. Dkt. No. 16-19 at 3 ("[He] continued to refuse orders from staff. He refused to turn around and face the wall as instructed."); Dkt. No. 16-18 at 3 ("[He] continued to resist and refused to place his hands behind his back.").

Plaintiff "was brought to the ground" and Sergeant Cook called "a Code 3" over the County Jail radio. Dkt. No. 16-19 at 3; Dkt. No. 16-18 at 3. Defendants Cook and Giuliano affirmed Plaintiff continued to resist and refuse orders on the ground. Dkt. No. 16-19 at 4 ("[He] continued to resist and refused to allow staff to handcuff him while on the ground."); Dkt. No. 16-18 at 3 ("[He] continued to refuse orders to stop resisting and place his hands behind his back."). With the assistance of jail staff, Plaintiff was placed in handcuffs and escorted from the changeover room to the birdcage area. Dkt. No. 16-19 at 4; Dkt. No. 16-18 at 3. He was placed in a restraint chair where he was decontaminated and examined by RN Choquette. Dkt. No. 16-19 at 4; Dkt. No. 16-18 at 3-4.

Plaintiff testified he was in his cell when "officers come in the room, drag me out, took me downstairs to booking and told me to strip." Dkt. No. 16-4 at 20. He inquired: "strip for what?" and an officer responded another "officer said he seen you doing something . . . fumbling in your clothes and all that" then Plaintiff "said, what are you talking about." *Id*. He was instructed to strip and complied, but "asked the officer . . . yo, can I squat?" *Id*. Continuing,

Plaintiff testified the officer said "you don't tell us what to do here. And [then] they jumped on me, sprayed me, broke my ribs." *Id*.

In a subsequent portion of his deposition, Plaintiff asserted that as he turned his clothes over to an officer, he "did everything [the officer] told me to do. When he asked me to bend over and spread em, I asked, I said, excuse me, can I squat. I'm Muslim. He said, you don't tell us what to do. And from there, they just jumped on me." Dkt. No. 16-4 at 45. Plaintiff also stated he "asked the officer can I squat because there is more than one officer. They never took me to a strip room. They took me right there in booking next to the cage." *Id*. at 17.

Plaintiff stated he was sprayed with OC spray both while he was standing with his hands on the wall and as he was taken to the ground by jail staff. Dkt. No. 16-4 at 32, 37. He was not warned OC spray would be discharged and was not even aware of Defendant Cook's possession of a chemical agent. *Id*. at 47. The OC spray was discharged into the back of his head, all in his hair, and all in his face. *Id*. at 37.

Plaintiff testified "[he] was handcuffed and dragged down to booking . . . [by t]wo officers and a sergeant." Dkt. No. 16-4 at 23. He identified Sergeant Cook as one of the staff members who dragged him down to booking. *Id*. at 29. He further stated Defendant Cook sprayed him with the OC spray. *Id*. This was not the only force Defendant Cook used on him. *Id*. at 35. According to Plaintiff, Defendant Cook "started putting hands on me after he sprayed me, he helped the officers. They started beating me up." *Id*. at 31.

Plaintiff testified Defendant Giuliano was "one of the officers that was stripping me . . . [and] the one that assaulted me first." Dkt. No. 16-4 at 34; *see also* Dkt. No. 16-4 at 32 (The first person to lay hands on him was not Sergeant Cook but "[t]he officers that was stripping me.").

Plaintiff further stated that Defendant Giuliano assaulted him "[b]y grabbing my head and . . . punching on me.  He's the one that took me to the ground."  *Id*. at 34.

Plaintiff "felt multiple hands on me" therefore was unable "to say exactly where" the Defendants hit him.  Dkt. No. 16-4 at 30.  He could not identify which officer broke his ribs.  *Id*. at 34.  However, he "doubt[ed]" anyone other than Cook or Giuliano broke his ribs.  *Id*. at 37.

Plaintiff recalled a code was called and eleven or twelve officers responded to the area.  Dkt. No. 16-4 at 35.  "After they finished beating me up, they put me in a . . . restraining chair" and fastened straps around his extremities.  *Id*. at 31.  "[T]he first thing that [an officer] told me was . . . this is not Coxsackie."  *Id*.  Plaintiff explained his records would have revealed he had previously "assaulted an officer at Coxsackie."  *Id*.

Defendant Giuliano issued a misbehavior report pertaining to Plaintiff following the incident.  *See* Dkt. No. 16-8, Misbehavior Report.  Giuliano reported at approximately 15:50 on February 19, 2022, he:

> [W]as strip searching the above listed inmate for possible contraband.  I ordered inmate to bend and spread his buttocks.  Inmate refused and turned towards this officer and became argumentative.  Sgt Cook ordered inmate to turn around and inmate refused.  Inmate was OC sprayed and a code 3 was called.  Inmate resisted while being placed in handcuffs.  Inmate was then placed in the restraint chair.

*Id*. at 2.  Defendant Cook completed a chemical agent report about Plaintiff wherein he reported:

> Inmate Sheffield was in the process of being strip searched when he began to refuse orders from staff.  Inmate Sheffield became non-compliant with my orders to continue the strip search.  At this time, I deployed a 1, One Second burst of OC spray to Inmate Sheffield'[s] Facial area to gain compliance.  Inmate Sheffield continued to refuse orders from staff to get on the ground and a Code 3 was called.

Dkt. No. 16-10, Chemical Agent Report, at 2; *see also* Dkt. No. 16-15, Use of Force Report, at 2 (indicating a chemical agent was displayed and used/deployed).  Julie Choquette, RN, reported Plaintiff was decontaminated.  Dkt. No. 16-8 at 10.

In an emergency room referral document, Margaret Jackson, LPN, noted: "Patient reports he swallowed a balloon filled with heroin, amount unknown."  Dkt. No. 17, Medical Records, at 11.[5]  Modupe R. Adedoja, NP, noted he received a report from Ellis ER staff who "Gave report about p[atien]t sent to ER due to CP and swallowing of Heroin[].  Chest X-ray shows P[atien]t has a Rt Lat non-displaced Rib fracture but no breathing difficulty at this time."  *Id*. at 14.[6]  NP Adedoja further reported a "Plain Abdominal X-ray done due to hx of Ingestion of heroin[] in a ballon [sic][;]" the result was "[n]egative[;]" and the "P[atien]t claimed he believed he might have passed it in his stool because he saw a balloon in his stool[.]"  *Id*.

## III.    LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Salahuddin v. Gourd*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).  The movant may meet this

---

[5] The referral was electronically signed "on 02/19/2022 at 4:49 PM[.]"  Dkt. No. 17 at 11.
[6] The note was electronically signed "on 02/19/2022 at 10:11 PM[.]"  Dkt. No. 17 at 14.

burden by showing the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit instructs that on summary judgment motions, "'[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.'" *Jeffreys*, 426 F.3d at 554 (alteration and emphasis in original) (quoting *Anderson*, 477 U.S. at 252). In other words, "a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally,

and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks and citation omitted).

In applying the summary judgment standard, the district court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.").

## IV.   DISCUSSION

### A.   First Amendment Retaliation Claim Against Defendant Cook

"To sustain a First Amendment retaliation claim, [Plaintiff] must demonstrate . . . (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected [act] and the adverse action." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotations and citation omitted).

Plaintiff has failed to meet the first prong of the retaliation inquiry because he has failed to demonstrate he was engaged in protected speech or conduct. *See* Dkt. No. 1 at 7; Dkt. No. 24 at 16. Plaintiff has not alleged his statement or action in refusing to comply with officers' directives to submit to a body search/frisk amounted to protected conduct under the First Amendment. In any event, such an argument would be unpersuasive as refusal to obey an officer's directive does not constitute a protected act for First Amendment purposes. *Storms v.*

*Harriman*, No. 9:05-CV-1115, 2009 WL 2424131, at *9 (N.D.N.Y. Aug. 4, 2009) (finding

"nothing in the record from which a reasonable factfinder could determine that the issuance . . .

of misbehavior reports to the plaintiff was in retaliation for his having engaged in protected

activity, *as distinct from his refusal to obey legitimate directives by prison officials*" and

recommending dismissal of plaintiff's retaliation cause of action) (emphasis added), *aff'd*, 391 F.

App'x 107 (2d Cir. 2010).

Nor has Plaintiff established a causal connection between any protected speech or

conduct and Defendant Cook's alleged adverse action(s).  *See Cato v. Feliz*, No. 9:20-CV-0176

(MAD/DJS), 2022 WL 687253, at *5-6 (N.D.N.Y. Jan. 27, 2022) (recommending granting

summary judgment motion as to the plaintiff's First Amendment retaliation claim where the

plaintiff "failed to establish a causal connection between any protected activity and the allegedly

adverse action taken as a result."), *report and recommendation adopted*, 2022 WL 574972

(N.D.N.Y. Feb. 25, 2022).  On the contrary, in his deposition, Plaintiff asserted the Defendants'

execution of a strip search and subsequent "assault" were "premediated" due to Plaintiff's prior

assault of another officer.  *See* Dkt. No. 16-4 at 54 ("when I asked the question can I squat . . .

I'm Muslim.  They said, you don't tell us what to do.  You do what you're told.  And they was

already on me.  So I know that's why . . . I know that this was premediated."); *see also* Dkt. No.

16-4 at 31 (Plaintiff testified "[a]fter they finished beating me up, they put me in a chair" and

Cook told Plaintiff "this is not Coxsackie.  Because if you look on my record, I know they

looked on the records.  The first thing they said was, oh, you assaulted an officer at Coxsackie.");

Dkt. No. 16-4 at 59 (Plaintiff admitting he was convicted of charges involving the assault of an

officer in Coxsackie and explaining officers in Schenectady were aware of his conviction).

In sum, Plaintiff has failed to demonstrate a genuine dispute as to his engagement in a protected act or any connection between his conduct and Defendant Cook's alleged actions. Because there is not sufficient evidence from which a jury could conclude Cook retaliated against Plaintiff, the Court recommends granting summary judgment as to Plaintiff's First Amendment retaliation claim.[7]

### B.    First Amendment Free Exercise Claim Against Defendant Cook

In assessing Plaintiff's free exercise claim, this Court must assess: "(1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers . . . legitimate penological objectives." *Kravitz v. Purcell*, 87 F.4th 111, 128 (2d Cir. 2023) (citing *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988)) (internal quotations omitted).[8]

Plaintiff has failed to explain any sincerely held belief he has in the Muslim religion. In his complaint, Plaintiff merely stated he asked to squat rather than bend at the waist "because plaintiff is a muslim and due to . . . several John Doe officers present in the strip search area

---

[7] The Court need not address Defendant Cook's alternative qualified immunity argument as the undersigned recommends granting Defendant's motion on the merits with respect to Plaintiff's retaliation claim. *See Warren v. Corcoran*, No. 9:09-CV-1146 (DNH/ATB), 2011 WL 5599587, at *8 (N.D.N.Y. Oct. 20, 2011) ("This court need not address qualified immunity with respect to [the] plaintiff's various causes of action because . . . he has not established any alleged violations of his constitutional rights."), *report and recommendation adopted*, 2011 WL 5599620 (N.D.N.Y. Nov. 17, 2011).

[8] Previously, to succeed on a claim under the Free Exercise Clause, prisoners were required to "show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006) (citation omitted). However, in *Kravitz*, the Second Circuit "join[ed] those circuits that have held that an inmate does not need to establish a substantial burden in order to prevail on a free exercise claim under § 1983." 87 F.4th at 125 (citing *Williams v. Morton*, 343 F.3d 212, 217 (3d Cir. 2003); *Butts v. Martin*, 877 F.3d 571, 585 (5th Cir. 2017); *Shakur v. Schriro*, 514 F.3d 878, 885 (9th Cir. 2008)).

[which] was a violation of plaintiff['])s privacy, and religious rights." Dkt. No. 1 at 7. In his response to the Defendants' motion, Plaintiff reiterated his assertion he "asked to squat privately in lieu of bending over and spreading his buttocks 'in front of multiple officers' due to being a Muslim pre-trial detainee." Dkt. No. 24 at 14 (citations omitted). Plaintiff added "[his] 'interest in observing Islam's nudity taboo' outweighs the Defendants' interest in ensuring the safety of the jail and its occupants when other means are available to determine if Plaintiff is [a]ctually in possession of any suspected drugs." *Id.* (citations omitted). However, neither Plaintiff's claims he told an officer he was Muslim nor his passing mentions of the presence of multiple officers and "Islam's nudity taboo" identify a religious practice in his scheme of beliefs.

Similarly, in his deposition, Plaintiff testified he asked officers to let him squat rather than bend because he is Muslim. *See* Dkt. No. 16-4 at 16-17 (when he first entered the County Jail, Plaintiff "said, excuse me, I'm Muslim, can I squat" when asked to "spread them"); 45 (on February 19, 2022, "[w]hen [the officer] asked me to bend over and spread em, I asked, I said, excuse me, can I squat. I'm Muslim."); 54 ("It wasn't no, no, you can't squat. And then I turn around. And then, and show my, no. Soon when I asked the question can I squat, I said, can I squat. I'm Muslim. They said, you don't tell us what to do."). However, Plaintiff agreed he did not tell the County Jail staff performing the strip search "the relevance" of his "being a Muslim[.]" Dkt. No. 16-4 at 56-57.[9] Nor did Plaintiff explain, in his deposition, the relevance

---

[9] In this portion of his deposition, Plaintiff was asked the following questions and provided the following answers:

> Q.    Did you ever refuse a direct order while you were in the
>        booking room at the time of the incident?
> A.    No, I didn't.
> Q.    And when you were asked to bend, did you tell them it was
>        because you were a Muslim?

of his claimed beliefs to the performance of a strip search.  *See id*.  Additionally, Plaintiff

admitted he did not request meal, prayer, or any other accommodations based on his religion

upon his admission to the facility.  *Id*. at 45.

Because Plaintiff has failed to demonstrate he has a sincerely held religious belief, no

reasonable jury could return a verdict in Plaintiff's favor on his free exercise claim.  *See*, *e.g.*,

*Joseph v. Cnty. of Nassau*, No. 2:18-CV-2290, 2022 WL 4647867, at *6 (E.D.N.Y. Sept. 30,

2022) (noting the plaintiff's failure to "actually articulate what his religious beliefs are, whether

he is Muslim, or whether the [requested] services 'were central or important to [his] faith' . . .

constitute[d] an independent ground on which to dismiss Plaintiff's free-exercise-of-religion

claim.") (citing *Lopez v. Cipolini*, 136 F. Supp. 3d 570, 588 (S.D.N.Y. 2015)).

Even assuming Plaintiff had enumerated a sincerely held religious belief, however,

Plaintiff has not explained how Defendant Cook's performance of a strip search infringed upon

his belief(s).  Dkt. No. 1 at 7; Dkt. No. 24 at 14-15.  In his deposition, Plaintiff did not articulate

how the execution of a strip search infringed upon his beliefs, on the contrary, he solely

identified the Defendants' use of force as his "complaint" in this matter.  *See* Dkt. No. 16-4 at

27.[10]  Plaintiff insisted, on February 19, 2022, had the officers simply "told me no . . . you can't

---

A. I asked them can I squat.  I said, can I squat.  I'm Muslim. And they said, you don't tell us what to do and they jumped on me.

Q. Did you ever tell them what the relevance was about being a Muslim?

A. I didn't have a chance to.  I told you, soon as I said what I said, they jumped on me.

Dkt. No. 16-4 at 56-57.

[10] Specifically, Plaintiff was asked and answered:

Q. Is that your complaint . . . that other officers were in the room that it wasn't one-on-one?

squat, you have to bend," he "would have just spread them and went about my business." *Id*. at

48.  Indeed, as Plaintiff testified, he bent over and spread his buttocks without issue when he first

arrived at the County Jail on February 17, just two days prior.  Dkt. No. 16-4 at 16-17 ("Told me

spread them.  I did . . . I said, excuse me, I'm Muslim, can I squat.  And he said no, everybody

got's to.  All right.").  Moreover, Plaintiff stated he regularly participated in strip frisk

procedures throughout his time at the County Jail and had also done so while incarcerated in

state prison, during which he would bend as instructed.  *See id*. at 45-47.[11]

---

A.   It wasn't one-on-one.  That's why I asked them, can I squat.  He said, you don't tell us what to do and jumped on me.  That's my complaint.  *My complaint is that they broke my ribs and it was uncalled for.*

Q.   Was your complaint that there were multiple officers in the room and they didn't allow you to squat or just that there were multiple officers in the room?

A.   *No.  My complaint is that they broke my ribs, that I was assaulted.  That's my complaint.*

Dkt. No. 16-4 at 27 (emphasis added).

[11] In his deposition, Plaintiff was asked and answered questions as follows:

Q.   The entire time that you've been at the jail, the year, you've been stripped, you've been strip frisked other times?

A.   Yes.  Going to visits.

Q.   And all those times you have to bend, right, not squat?

A.   Yes.

***

Q.   And when you were in State prison, you also had to bend not squat?

A.   Yes.  Like I said, in State prison, you one-on-one behind the curtain, not out in the open, not where they have a thousand cameras at.  Not when you got five and six officers standing in back of you.  It's a one-on-one strip search.

Dkt. No. 16-4 at 45-47.  To be sure, while Plaintiff repeatedly suggested four to six County Jail staff members were present as Defendants conducted the strip search, "[c]ase law reflects that the constitutionality of a strip search is not negated by the presence of other inmates and employees of the facility . . . during the search."  *Montgomery v. Hall*, No. 1:11-CV-4645, 2013 WL 1982920, at *4 (S.D.N.Y. May 15, 2013) (collecting cases), *report and recommendation adopted*, 2013 WL 3816706 (S.D.N.Y. July 22, 2013).

In sum, Plaintiff has not shown Defendant Cook's practice of requiring him to remove his clothing, bend at the waist, and spread his buttocks infringed upon a sincerely held religious belief of his.  Because of this deficiency, dismissal of Plaintiff's free exercise claim is warranted. *See*, *e.g.*, *McQuilkin v. Cent. New York Psychiatric Ctr.*, No. 9:08-CV-00975 (TJM/DEP), 2010 WL 3765847, at *13 (N.D.N.Y. Aug. 27, 2010) (recommending dismissal on "any cause of action deemed to assert a First Amendment freedom of religion violation" where the plaintiff's complaint and response to the defendant's motion for summary judgment did not "explain how the forced administration of psychiatric medications infringe[d] upon his sincerely held religious beliefs."), *report and recommendation adopted*, 2010 WL 3765715 (N.D.N.Y. Sept. 20, 2010).

Furthermore, "[s]trip searches of pre-trial detainees . . . are constitutionally valid if they are reasonably related to a legitimate penological interest." *LaFever v. Clarke*, 525 F. Supp. 3d 305, 337-38 (N.D.N.Y. 2021) (dismissing the plaintiff's claim "she was subjected to an 'unlawful' strip search" where the defendants "offered a legitimate penological interest for conducting the search; *i.e.*, to determine whether [plaintiff] possessed . . . contraband.") (citing *Perez v. Ponte*, 236 F. Supp. 3d 590, 622-23 (E.D.N.Y. 2017)); *see also Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 322-28 (2012) (observing "[c]orrectional officials have a legitimate interest, indeed a responsibility, to ensure that jails are not made less secure by reason of what new detainees may carry in on their bodies.").  As Defendant Cook affirmed, he "was notified by . . . Longi that [Plaintiff] . . . reported he was in possession of a heroin balloon"– Dkt. No. 16-19 at 2 –which "created a concern for the safety of both [Plaintiff] and the jail[.]"  Dkt. No. 16-19 at 4.  Therefore, even if Plaintiff had properly alleged the strip search infringed upon a sincerely held religious belief, Plaintiff's reported ingestion of a balloon containing heroin justified the performance of a search in an effort to

discover contraband on Plaintiff's person. *See, e.g.*, *Jones v. City of New York*, No. 1:18-CV-1937, 2020 WL 1644009, at *16 (S.D.N.Y. Apr. 2, 2020) (a strip search that infringes on a prisoner's freedom of religion can survive First Amendment scrutiny where the search is rationally related to a legitimate penological interest) (citing *Jean-Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 324 (S.D.N.Y. 2006), *aff'd*, 461 F. App'x 18 (2d Cir. 2012)); *see also Florence*, 566 U.S. at 328 ("courts should ordinarily defer to the[] expert judgment" of correctional officials "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to" security issues such as the possession of contraband) (internal quotations and citations omitted).

Accordingly, the Court recommends granting summary judgment as to Plaintiff's First Amendment free exercise claim.[12]

### C.    Fourteenth Amendment Excessive Force Claims Against Defendants Cook and Giuliano

"[T]he right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment[.]" *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).  To succeed on a Fourteenth Amendment excessive force claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015).

Accordingly, a plaintiff must first show the defendant used force "purposefully, knowingly, or (perhaps) recklessly[.]" *Edrei v. Maguire*, 892 F.3d 525, 534 (2d Cir. 2018)

---

[12] In light of the undersigned's recommendation to grant Defendant Cook's motion on the merits with respect to this claim, the Court need not address the alternative qualified immunity argument.

(citing *Kingsley*, 576 U.S. at 395-96). Then, the plaintiff must demonstrate the force used was objectively unreasonable in light of:

> [T]he relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). These considerations are "not . . . exclusive[,]" *Kingsley*, 576 U.S. at 397, but rather "inform the ultimate Fourteenth Amendment inquiry: whether the governmental action was rationally related to a legitimate governmental objective." *Edrei*, 892 F.3d 536 (citing *Kingsley*, 576 U.S. at 398).

Plaintiff's Complaint asserts Defendant Cook's use of a chemical agent and the alleged assault by Defendants Cook and Giuliano violated the Fourteenth Amendment's prescription against the use of excessive force. *See* Dkt. No. 1; *see also* Dkt. No. 24 at 17-18. Defendants contend their "response to plaintiff's combative, aggressive and threatening behavior when being searched was [] legal, reasonable and warranted as it was at all times proportionate and intended to keep order." Dkt. No. 16-22 at 22. Therefore, Defendants aver they are entitled to summary judgment on the merits and on the basis of qualified immunity. *See id.* at 11-15, 21-23.

"Because whether a use of force was objectively unreasonable is a fact-intensive inquiry that often involves assessments of credibility and choices between conflicting versions of events—questions that must often be left for a jury to decide—granting summary judgment against plaintiffs on excessive force claims is rarely appropriate." *Vega v. Broome Cnty.*, No. 9:21-CV-0788 (BKS/DJS), 2023 WL 6318919, at *19 (N.D.N.Y. Sept. 28, 2023) (internal quotations and citations omitted). Here, several issues of fact exist concerning the need for the use of force, the amount of force used, the threat perceived by the Defendants, and Plaintiff's

resistance and injuries, all of which are relevant to the reasonableness of force used and preclude summary judgment.

For example, Plaintiff insists he complied with the strip search procedures until he was asked to bend, and merely inquired whether he could squat instead in response, while Defendants assert Plaintiff refused to comply and became irate and aggressive. *See*, *e.g.*, Dkt. No. 16-4 at 20; Dkt. No. 16-19 at 3; Dkt. No. 16-18 at 6. Plaintiff maintains he faced the wall, moving only when so instructed, but Defendants contend Plaintiff turned towards them. *See*, *e.g.*, Dkt. No. 16-4 at 27-28; Dkt. No. 16-19 at 3; Dkt. No. 16-18 at 6. Defendant Cook stated Plaintiff refused to comply with multiple orders to bend, but Plaintiff testified he was instructed to spread his buttocks once and "[as] soon as" Plaintiff asked whether he could squat, officers "jumped on" him. *See*, *e.g.*, Dkt. No. 16-19 at 3; Dkt. No. 16-4 at 26. Defendants assert Plaintiff was brought to the ground and a one second burst of OC spray was deployed while Plaintiff contends he was sprayed with a chemical agent both as he was brought to the ground and then as he was repeatedly punched. *See*, *e.g.*, Dkt. No. 16-19 at 3; Dkt. No. 16-18 at 3; Dkt. No. 16-4 at 34-37.

In sum, granting Defendants' motion for summary judgment would be inappropriate due to the parties' conflicting recitations of materials facts. *Jordan v. Fischer*, 773 F. Supp. 2d 255, 272-73 (N.D.N.Y. 2011) (collecting cases in support of the proposition that granting summary judgment for the defendants on a plaintiff's excessive force claim is not appropriate where the claim turns on issues of credibility). Summary judgment on the basis of qualified immunity is similarly inappropriate due to the remaining material factual disputes concerning the reasonableness of Defendants' use of force. *Kerman v. City of New York*, 261 F.3d 229, 240 (2d Cir. 2001) ("summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.") (citation omitted); *see*

*also Smith v. Sawyer*, 435 F. Supp. 3d 417, 435 (N.D.N.Y. 2020) (collecting cases); *Myers v. Saxton*, No. 9:20-CV-0465 (BKS/DJS), 2023 WL 2863569, at *4 n.3 (N.D.N.Y. Feb. 21, 2023) (explaining "[t]he same questions of fact that preclude summary judgment on the merits of the excessive force claim preclude summary judgment on the basis of qualified immunity."), *report and recommendation adopted*, 2023 WL 2568912 (N.D.N.Y. Mar. 20, 2023).  Accordingly, the Court recommends denying summary judgment as to Plaintiff's Fourteenth Amendment excessive force claims.

## V.    CONCLUSION

After carefully reviewing the record, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 16) be **GRANTED IN PART AND DENIED IN PART**; and it is further

**RECOMMENDED** that Plaintiff's First Amendment retaliation and free exercise claims against Defendant Cook be **DISMISSED WITH PREJUDICE**; and it is further

**RECOMMENDED** that Plaintiff's Fourteenth Amendment excessive force claims against Defendants Cook and Giuliano proceed to trial; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[13]  Such objections shall be filed with the Clerk of

---

[13] If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have

the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS**

**WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993)

(citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72.

> **IT IS SO ORDERED.**

Dated: January 23, 2024
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

seventeen days from the date the Report-Recommendation and Order was mailed to you to serve
and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a
Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day
that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Case 9:22-cv-00519-BKS-TWD    Document 29    Filed 01/23/24    Page 22 of 134

Cato v. Feliz, Not Reported in Fed. Supp. (2022)

2022 WL 574972
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jason ET CATO, Plaintiff,
v.
Gabriel FELIZ, T.A. Staff, Defendant.

9:20-CV-176 (MAD/DJS)
|
Signed 02/24/2022
|
Filed 02/25/2022

**Attorneys and Law Firms**

JASON ET CATO, 21-B-0271, Marcy Correctional Facility, P.O. Box 3600, Marcy, New York 13403, Plaintiff pro se.

OF COUNSEL: LAUREN ROSE EVERSLEY, AAG, OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL, The Capitol, Albany, New York 12224, Attorneys for Defendant.

**ORDER**

Mae A. D'Agostino, United States District Judge:

 **\*1** Plaintiff commenced this action on February 22, 2020, alleging that his constitutional rights were violated while he was a patient at the Central New York Psychiatric Center ("CNYPC"). *See* Dkt. No. 1. On October 26, 2020, Plaintiff filed an amended complaint. *See* Dkt. No. 21. Following initial review, the only remaining claims in this action are (1) a Fourteenth Amendment claim for unwanted medical treatment; (2) a First Amendment retaliation claim; and (3) state law claims, all asserted against Defendant Feliz. *See* Dkt. Nos. 20 & 21.

On May 19, 2021, Defendant moved for summary judgment on Plaintiff's remaining claims. In a Report-Recommendation and Order dated January 27, 2022, Magistrate Judge Stewart recommended that the Court grant Defendant's motion and dismiss this action in its entirety. *See* Dkt. No. 45. Specifically, as to Plaintiff's claim that he was administered unwanted medication, Magistrate Judge Stewart found that Defendant Feliz, who is a Secured Hospital Treatment Aide at CNYPC, was not personally involved in the decision

to administer medication to Plaintiff, or in the actual administration of that medication. *See id.* at 9-10. As to the First Amendment retaliation claim, Magistrate Judge Stewart first found that several of the allegations cannot support this claim because the speech or conduct at issue was protected by the First Amendment. *See id.* at 11-12. As to the speech or conduct at issue that was subject to First Amendment protection, Magistrate Judge Stewart found both that the undisputed facts established that Defendant did not take adverse action against Plaintiff and that even if adverse action had been taken, there was no causal connection between the adverse action and the protected speech. *See id.* at 13-15. Finally, Magistrate Judge Stewart recommended that the Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims of negligence and intentional infliction of emotional distress. *See id.* at 15-16.

In objections filed on February 9, 2022, Plaintiff contends that Magistrate Judge Stewart failed to consider video evidence submitted that clearly shows Defendant ordering and administering medication to Plaintiff against his will. *See* Dkt. No. 46 at 1-2. Plaintiff further contends that there was no valid reason for medication to be administered against his will since he was not a danger to himself or others, as required by New York law. *See id.* at 1-10. Finally, Plaintiff contends that he has established that Defendant has subjected him to repeated forms of harassment, which were allegedly ignored by Magistrate Judge Stewart. *See id.*

When a party files specific objections to a magistrate judge's report-recommendation, the district court "make[s] a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). However, when a party files "[g]eneral or conclusory objections, or objections which merely recite the same arguments [that he] presented to the magistrate judge," the court reviews those recommendations for clear error only. *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, \*2 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

 **\*2** A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d

Case 9:22-cv-00519-BKS-TWD    Document 29    Filed 01/23/24    Page 23 of 134

Cato v. Feliz, Not Reported in Fed. Supp. (2022)

Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56 (c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005) (quotation omitted). "However, '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.'" *Id.* (quoting *Anderson*, 477 U.S. at 252 (emphasis and alterations in original)). "To defeat summary judgment, therefore, nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts,' ... and they 'may not rely on conclusory allegations or unsubstantiated speculation.' " *Id.* (quotations omitted).

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has held that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack

a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment." *Kotler v. Fischer*, No. 9:09-CV-01443, 2012 WL 929823, *12 (N.D.N.Y. Mar. 19, 2012) (citations omitted). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Cary v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

In the present matter, the Court finds that Magistrate Judge Stewart correctly determined that the Court should grant Defendant's motion for summary judgment. As to Plaintiff's Fourteenth Amendment unwanted medical treatment claim, the undisputed facts establish that on January 4, 2020, a "red dot alarm" was activated at CNYPC due to an injury to Plaintiff's roommate, that Plaintiff was suspected to have caused. *See* Dkt. No. 31-2 at ¶¶ 7-17. During a red dot alarm, all available doctors and staff report to the ward where the alarm was activated. *See id.* at ¶ 12. Defendant and approximately four other staff members were with Plaintiff outside of a side room, where Plaintiff became increasingly agitated. *See id.* at ¶ 13. Defendant and the other staff members attempted to diffuse the situation using standard redirection techniques, but Plaintiff remained agitated. *See id.* at ¶ 14. After personally observing Plaintiff's behavior, Dr. Maghsoudalou directed that medication be given to Plaintiff to calm him down. *See id.* at ¶ 15. When Plaintiff refused to voluntarily take the medication, Dr. Maghsoudalou ordered that Plaintiff be medicated with immediate (STAT) injections of the prescribed medications. *See id.* at ¶ 17. Although Defendant was present during this incident and assisted in securing Plaintiff, in his role as a Secured Hospital Treatment Aide at CNYPC Defendant does not have the authority to order or administer medication to patients. *See* Dkt. No. 31-2 at ¶ 6; Dkt. No. 32 at ¶ 5; Dkt. No. 32-1 at ¶ 5; Dkt. No. 32-2 at ¶ 12. At his deposition, Plaintiff admits that a doctor was the individual who administered the injections, as seen on the video he references in his objections, and that Defendant and other staff simply "stood around the restraint bed" and watched. *See* Dkt. No. 31-3 at 30-31. As such, the undisputed facts establish that, since Defendant did not have the authority to order or administer medication to Plaintiff, he was not personally involved in the alleged forced medication. *See Munger v. Cahill*, No. 9:16-cv-728, 2018 WL 4635709, *13-14 (N.D.N.Y. July 23, 2018) (holding that the defendant registered nurse was not personally involved in the administration of medication to the plaintiff because she did

**Cato v. Feliz, Not Reported in Fed. Supp. (2022)**

Case 9:22-cv-00519-BKS-TWD   Document 29   Filed 01/23/24   Page 24 of 134

not have the authority to override the medication decision of the treating physician); *see also Cuoco v. Moritsugo,* 222 F.3d 99, 111 (2d Cir. 2000) (holding that summary judgment was appropriate where the non-medical professionals could not be held liable for failure to intervene in the medical decisions of a treating physician); *Smith v. Wood,* No. 9:05-cv-1439, 2008 WL 788573, *9 (N.D.N.Y. Mar. 20, 2008) (granting the defendants motion for summary judgment as to the plaintiff's medical indifference claims against a licensed clinical social worker and a psychologist because neither had any authority to override the prescribing physician's decisions).

**\*3** As to the retaliation claim, Magistrate Judge Stewart correctly determined that Defendant is entitled to summary judgment. Initially, the Court notes that it is not entirely clear from Plaintiff's submissions what he claims is the underlying protected conduct. At his deposition, Plaintiff stated that Defendant tried to retaliate against him because he "didn't know the rules of his own job." Dkt. No. 31-3 at 55. Additionally, Plaintiff stated that Defendant was jealous of him because "all the girls in the building want [Plaintiff] and because he is better looking than [Defendant]." Dkt. No. 32 at 7; *see also* Dkt. No. 31-3 at 39. As Magistrate Judge Stewart correctly determined, neither of these allegations establishes protected conduct upon which to base a claim of First Amendment retaliation. *See Garrido v. Coughlin,* 716 F. Supp. 98, 101 (S.D.N.Y. 1989) (holding that the inmate plaintiff was not engaged in protected conduct when he had a "verbal confrontation" with a correctional officer); *see also Williams v. Smith,* No. 9:11-cv-601, 2015 WL 1179339, *10 (N.D.N.Y. Mar. 13, 2015) (same).

During his deposition, Plaintiff alleges that Defendant took adverse action against him because of Plaintiff's threat to file a complaint or lawsuit against him. *See* Dkt. No. 31-3 at 39. This allegation could be considered protected conduct and Plaintiff appears to allege several possible retaliatory actions taken by Defendant. First, as discussed, Defendant was not personally involved in the administration of medication against Plaintiff's will and, therefore, it cannot serve as an adverse action in support of his retaliation claim. Moreover, the undisputed facts make clear that medication was administered to Plaintiff because it was determined that he was a danger to himself and others after he assaulted another patient. *See* Dkt. No. 32-1 at ¶ 11; Dkt. No. 32 at ¶ 12. Therefore, even if this could constitute an adverse action, Plaintiff has failed to establish a causal connection between any protected activity and the allegedly adverse action taken.

Plaintiff further contends that Defendant ordered that Plaintiff be given a roommate as retaliation. Again, the undisputed facts demonstrate that Plaintiff was receiving a roommate because he was the only patient on the unit at that time without a roommate. *See* Dkt. No. 32 at ¶ 7. Additionally, the undisputed facts establish that the decision to assign Plaintiff a roommate was the responsibility of Plaintiff's entire treatment team, not Defendant. *See* Dkt. No. 32 at 7; Dkt. No. 40 at 14. As such, Plaintiff has not and cannot establish that his "protected conduct was a substantial or motivating factor" in the decision to assign Plaintiff a roommate. *See Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir. 1996). Additionally, assigning Plaintiff a roommate, when he was the only patient in his unit with a roommate, is not conduct that would constitute an "adverse action" for purposes of his claim. *See Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir. 2004).

Plaintiff also alleges that Defendant ordered him to the "side room" in retaliation for his protected conduct. The undisputed facts clearly establish, however, that the purpose of the side room is to have confidential conversations with patients and to deescalate situations when patients become agitated. The undisputed facts demonstrate that Plaintiff was sent to the side room on occasion because his behavioral issues presented a danger to himself and others. As such, Plaintiff has failed to establish a causal connection between being sent to the side room and any protected activity. Moreover, this conduct would not deter an individual of ordinary firmness from exercising his or her constitutional rights. Accordingly, the Court finds that Magistrate Judge Stewart correctly determined that the Court should grant Defendant's motion for summary judgment as to Plaintiff's First Amendment retaliation claim.

**\*4** Finally, the Court finds that Magistrate Judge Stewart correctly determined that the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims. Since all federal claims have been dismissed before trial, the balance of factors the Court is required to consider weigh decidedly against exercising supplemental jurisdiction. *See Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988).

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Stewart's January 27, 2022 Report-Recommendation (Dkt. No. 45) and Order is **ADOPTED in its entirety** for the reasons set forth therein; and the Court further

**Cato v. Feliz, Not Reported in Fed. Supp. (2022)**

Case 9:22-cv-00519-BKS-TWD    Document 29    Filed 01/23/24    Page 25 of 134

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 31) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 574972

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 5599620
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Evan WARREN, Plaintiff,

v.

Michael CORCORAN; Sue Lennox; J. Biggar; L.
Johnson; D. Crull; C. Burgin; and J. Keiser, Defendants.

No. 9:09–CV–1146.
|
Nov. 17, 2011.

**Attorneys and Law Firms**

Evan Warren, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman Attorney General for the State of
New York, C. Harris Dague, Esq., Ass't Attorney General, of
Counsel, Albany, NY, for Defendant.

*DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiff brought this civil rights action pursuant to
42 U.S.C. § 1983. On October 20, 2011, the Honorable
Andrew T. Baxter, United States Magistrate Judge, advised,
by Report–Recommendation, that defendants' motion for
summary judgment be granted and the complaint dismissed
in its entirety. No objections to the Report–Recommendation
were filed.

Based upon a careful review of the entire file and the
recommendations of the Magistrate Judge, the Report–
Recommendation is accepted in whole. *See* 28 U.S.C. 636(b)
(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is
GRANTED; and

2. Plaintiff's complaint is DISMISSED in its entirety.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 5599620

**End of Document**                     © 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by  Amador v. Baca,   C.D.Cal.,   June 7, 2017

2013 WL 3816706
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Gentry MONTGOMERY, Plaintiff,
v.
Warden Thomas HALL, et al, Defendants.

No. 11 Civ. 4645(PAC)(GWG).
|
July 22, 2013.

*ORDER ADOPTING REPORT
AND RECOMMENDATION*

PAUL A. CROTTY, District Judge.

**\*1** On June 6, 2011, *pro se* plaintiff Gentry Montgomery brought this action under 42 U.S.C. § 1983 against Warden Thomas Hall, Correction Officer Paul Kane and Correction Officer Robert Hicks (collectively, "Defendants"), alleging a violation of his constitutional rights during a visual strip search conducted at Manhattan Detention Complex ("MDC"). (Dkt. No. 2.) On August 4, 2011, the Court referred the case to Magistrate Judge Gorenstein. (Dkt. No. 8.) On December 12, 2012, the Defendants moved for summary judgment. (Dkt. No. 31.) On May 15, 2013, Magistrate Judge Gorenstein issued a Report and Recommendation ("R & R") recommending that the Court grant summary judgment to the Defendants. (Dkt. No. 41.) No objections have been filed. For the following reasons, the Court adopts Magistrate Judge Gorenstein's R & R in its entirety and grants the Defendants' motion for summary judgment.

**BACKGROUND**

**A. Facts** [1]

[1]    All of the facts and the procedural history have been taken from the R & R unless otherwise indicated. The facts are based on Montgomery's Complaint

and assumed to be true for the purposes of this motion.

Montgomery alleges that on May 11, 2011, while exiting the MDC holding pen for a court appearance, he was forced to strip in front of other detainees and both male and female officers. When he refused, he was surrounded and threatened. One officer purportedly said: "I don't care if you are 'Muslim' you still gonna strip." (Compl. at II.D.) He contends that the experience was "humiliating and degrading your personal busisseness [sic] is out there while they are standing around laughing and making jokes." (*Id.* at V .) Montgomery seeks $5 million in damages on behalf of himself and other "victim[ ] detainees." *Id.*

**B. Magistrate Judge Gorenstein's R & R**
Magistrate Judge Gorenstein did not reach all of the bases for dismissal set forth in the Defendants' moving papers since he determined that summary judgment could be granted on the merits of Montgomery's § 1983 claim. (R & R at 5.) [2] Specifically, Magistrate Judge Gorenstein concluded that the visual strip search did not violate the plaintiff's constitutional rights under the First, Fourth, and Eighth Amendments. (*Id.* at 6–9.)

[2]    These included (1) failure to allege the personal involvement of Thomas Hall; (2) the Department of Corrections is not a suable entity; (3) the Defendants are entitled to qualified immunity; and (4) failure to exhaust. (R & R at 5; Def. SJ Mem., Dkt. No. 35.)

**DISCUSSION**

**I, STANDARD OF REVIEW**
The Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). The Court may adopt those portions of the R & R "to which no objections have been made and which are not facially erroneous." *Wilds v. United Parcel Serv., Inc.,* 262 F.Supp.2d 163, 170 (S.D.N.Y.2003) (quotations omitted). Because Petitioner is proceeding *pro se,* the Court construes his filings to raise the strongest arguments that they suggest. *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

**II. ANALYSIS**

Summary judgment is appropriate where the record demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a federal right." *Thomas v. Roach,* 165 F.3d 167, 142 (2d Cir.1999). In the context of the Fourth Amendment, the Supreme Court has noted that restrictions "on an inmate's constitutional rights must be upheld if it is reasonably related to legitimate penological interests." *Id.* at 1517. "Correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Id.* at 1517. Accordingly, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters." *Id.*

 **\*2** To demonstrate that a strip search violated an inmate's First Amendment rights, the prisoner must first show that the conduct at issue "substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006). "The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." Id (internal quotation marks and citations omitted).

A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when (1) the deprivation is objectively sufficiently serious, and (2) the official acted with a sufficiently culpable state of mind. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994).

As Magistrate Judge Gorenstein noted, strip searches of detainees as they leave prison for court appearances serve the legitimate penological interest of preventing the smuggling of contraband into and out of prisons. (R & R at 6–7.) The record contains no evidence that the search in question was an "exaggerated" response to this security concern. Further, Montgomery has failed to meet his prima facie burden of demonstrating that the strip search substantially burdened his religious beliefs. At any rate, the plaintiff has failed to show that the penological interest identified by the defendants is irrational. Finally, even construed liberally, plaintiff's papers do not suggest that the search in question was sufficiently serious to violate the Eighth Amendment. Accordingly, Magistrate Judge Gorenstein did not clearly err in his recommendation to dismiss the plaintiff's claim.

### CONCLUSION

For the foregoing reasons, the Court adopts Magistrate Judge Gorenstein's R & R in its entirety. Defendants' motion for summary judgment is GRANTED. Pursuant to 28 U.S.C.1915(a), the Court finds that any appeal from this order would not be taken in good faith. The Clerk of Court is directed to enter judgment in favor of the Defendants and close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3816706

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3765715
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Rudolph McQUILKIN, Plaintiff,
v.
CENTRAL NEW YORK PSYCHIATRIC
CENTER, J. Taylor, J. Berggren, V. Komareth,
K. Sangani, Dr. Hernandez, D. Sawyer,
S. Hanna, and G. Bodrog, Defendants.

Civil Action No. 9:08–CV–00975 (TJM/DEP).
|
Sept. 20, 2010.

**Attorneys and Law Firms**

Rudolph McQuilkin, New York, NY, pro se.

Krista A. Rock, New York State Attorney General, Peter B. Joslin, Jr., O'Connor, O'Connor Law Firm, Albany, NY, for Defendants.

### DECISION & ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. David E. Peebles, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). No objections to the Report–Recommendation and Order dated August 27, 2010 have been filed, and the time to do so has expired. Furthermore, after examining the record, this Court has determined that the Report–Recommendation and Order is not subject to attack for plain error or manifest injustice. Accordingly, the Court adopts the Report–Recommendation and Order for the reasons stated therein.

It is therefore,

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 66) is **GRANTED,** and Plaintiff's claims against the Central New York Psychiatric Center, Berggren, Hernandez, Sawyer, Hanna and Taylor are **DISMISSED** in all respects, with prejudice; and it is further

**ORDERED** that Defendant Sangani's motion to dismiss the complaint (Dkt. No. 56) is **GRANTED** and all claims against Sangani are **DISMISSED** with prejudice; and it is further

**ORDERED** that Plaintiff's claims against Defendants Komareth and Bodrog are **DISMISSED,** *sua sponte,* without prejudice.

The Office of the Clerk of the Court is instructed to close the file in this matter.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3765715

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2568912
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael MYERS, Plaintiff,

v.

Erica SAXTON, et al., Defendants.

9:20-cv-00465 (BKS/DJS)
|
Signed March 20, 2023

**Attorneys and Law Firms**

Plaintiff, pro se: Michael Myers, 13462261604, CNYPC, P.O. Box 300, Marcy, NY 13403.

For Defendants: Letitia James, Attorney General of the State of New York, Konstandinos Leris, Assistant Attorney General, The Capitol, Albany, NY 12224.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, Chief United States District Judge:

**I. INTRODUCTION**

 *1  Plaintiff Michael Myers is involuntarily civilly confined at the Central New York Psychiatric Center ("CNYPC") pursuant to Article 10 of the New York State Mental Hygiene Law. (*See generally* Dkt. No. 10). On August 20, 2020, Plaintiff commenced this civil rights action under 42 U.S.C. § 1983 asserting claims arising out of his confinement. (Dkt. Nos. 1, 10). On April 29, 2022, Defendants Saxton, Collins, and Wilkinson filed a motion for summary judgment under Federal Rule of Civil Procedure 56. (Dkt. No. 89). Plaintiff filed a response in opposition, (Dkt. No. 94), Defendants filed a reply, (Dkt. No. 95), and Plaintiff filed a sur-reply, (Dkt. No. 96). This matter was referred to United States Magistrate Judge Daniel J. Stewart who, on February 21, 2023, issued a Report-Recommendation recommending that: (1) summary judgment be granted with respect to so much of Plaintiff's Fourteenth Amendment excessive force claim as alleged that he was bounced off the elevator doors but denied as to the use of force in the side room,[1] (Dkt. No. 97, at 7–12); (2) that summary judgment be granted as to Plaintiff's Fourteenth Amendment medical indifference claim against Defendant Collins, (*id.* at 12–15); (3) that summary judgment be granted as to Plaintiff's Fourteenth Amendment

procedural due process claim against Defendant Saxton, (*id.* at 15–17); (4) that summary judgment be granted as to Plaintiff's First Amendment access to courts claim against Defendants Collins and Wilkinson, (*id.* at 18–19); and (5) that summary judgment be granted as to Plaintiff's First Amendment magazine restriction claim against Defendant Saxton, (*id.* at 19–23).

[1]     This room is also called the seclusion room.

Plaintiff and Defendants have filed timely objections to the Report-Recommendation. (Dkt. Nos. 98, 100). Plaintiff has responded to Defendants' objections. (Dkt. No. 101). For the reasons below, the Report-Recommendation is adopted.

**II. STANDARD**

This Court reviews *de novo* those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). "A proper objection is one that identifies the specific portions of the [report-recommendation] that the objector asserts are erroneous and provides a basis for this assertion." *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 296 (E.D.N.Y. 2013) (internal quotation marks omitted). Properly raised objections must be "specific and clearly aimed at particular findings" in the report. *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009). "[E]ven a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal...." *Machicote v. Ercole*, No. 06-cv-13320, 2011 WL 3809920 at *2, 2011 U.S. Dist. LEXIS 95351 (S.D.N.Y. Aug. 25, 2011) (citation omitted). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Id.*

**III. DISCUSSION**

**A. First Amendment Access to Courts Claim against Defendants Collins and Wilkinson**

 *2  Plaintiff objects to the recommended dismissal of his First Amendment claims against Collins and Wilkinson in connection with the search of his room. (Dkt. No. 98, at 1). Specifically, Plaintiff asserts that Collins and Wilkinson "never once cited security reasons why they did search my room" and that he has the "right to be protected against any unreasonable warranted searches as being a civilian in

a treatment facility." (*Id.*). However, Plaintiff's illegal room search claim was dismissed early in this action. (Dkt. No. 21, at 6–7 (Decision and Order dated Aug. 27, 2020, dismissing illegal room search claims against, inter alia, Defendants Collins and Wilkinson); *see also* Dkt. No. 3, at 7–8 (Decision and Order dated June 1, 2020 dismissing room search claim)). Plaintiff advances no other objection in connection with his First Amendment access to courts claim against Defendants Collins and Wilkinson.

Magistrate Judge Stewart found that "[w]hile Plaintiff and Defendants' version of the facts may diverge on the issue of whether any legal work was found or destroyed during the search of Plaintiff's room, this question alone is insufficient to create a material issue of fact for trial"; where, as here, Plaintiff failed to present any evidence that the destroyed legal work, which was related to an Article 10 appeal, caused "actual injury," Defendants were entitled to summary judgment. (Dkt. No. 97, at 18–19). Indeed, as Magistrate Judge Stewart noted, Plaintiff ultimately succeeded on the appeal. (*Id.* at 19); *see Oliva v. Town of Greece*, 630 F. App'x 43, 45 (2d Cir. 2015) ("To succeed on an access to courts claim, a plaintiff must show that the defendant caused the plaintiff injury or, put less succinctly, that the defendant took or was responsible for actions that had the actual effect of frustrating the plaintiff's effort to pursue a legal claim."). Accordingly, having reviewed for clear error and having found none, the Court adopts Magistrate Judge Stewart's recommendation that summary judgment be granted dismissing Plaintiff First Amendment access to courts claim against Defendants Collins and Wilkinson.

### B. First Amendment Access to Information Claim against Defendant Saxton

Plaintiff objects to dismissal of his claim that Defendant Saxton violated his First Amendment right to access information by placing him on an indefinite period of magazine restriction. (Dkt. No. 10, ¶¶ 45–53). The record indicates that Plaintiff's Individual Service Plan Method was changed to restrict his access to magazines after "altered magazines" containing "ripped and cut out pictures of pre-pubescent female and male children glued and taped to pages of the magazines" were found during a search of Plaintiff's room. (Dkt. No. 97, at 21). Magistrate Judge Stewart recommended that summary judgment be granted dismissing Plaintiff's claim:

In this case, CNYPC as a government entity was responsible for providing treatment to Plaintiff as a

civilly confined individual. Plaintiff's treatment team, in the exercise of their professional judgment, determined the magazine restriction to be necessary for treatment purposes. This restriction, which was instituted because Plaintiff altered magazines "to reflect his sexual deviance," Saxton Decl. at Ex. C, was rationally related to the stated treatment goals of the SOTP program, which is designed to reduce the risk of sexual recidivism. *See* Saxton Decl., Ex. D at p. 22. The temporary prohibition on receiving and possessing magazines was no more restrictive than necessary because Plaintiff continued to have access to both legal and religious reading materials. The restriction was eventually lifted after Plaintiff began to discuss the photographs with his treatment team. Defs.'s Rule 56.1 St. at ¶ 98. Other courts in this District have upheld similar restrictions at CNYPC involving photographs of minor children.

On this record, no reasonable factfinder could conclude that the magazine restriction imposed by Defendant Saxton and Plaintiff's treatment team resulted in a violation of his First Amendment right to access information.

**\*3** (*Id.* at 20–21). Plaintiff objects to Magistrate Judge Stewart's recommendation on the basis that both during discovery and in responding to Defendants' motion for summary judgment, he has been denied access to the allegedly "altered magazine[ ]" pages. (Dkt. No. 98, at 1). Plaintiff asserts he "was not permitted to do Counsel Discovery because defendants had access to these magazines and I was not permitted to view the pictures and magazines which the Judge base his decision making his recommendations to these magazines which was unfair because Plaintiff could not defend his self properly at all." (Dkt. No. 98, at 1).

At the discovery stage, Plaintiff moved to compel Defendants to produce the magazine clippings. (Dkt. No. 58). Defendants opposed the motion on the ground "that these photographs could not be disclosed for safety and security concerns." (Dkt. No. 60, at 2). Defendants also filed a declaration by Aaron Shupp, Psy.D., the Chief Psychologist for the Sex Offender Treatment Program at CNYPC, who stated that "there are no circumstances by which Plaintiff should be able to possess, or even view the photographs at issue" because it "would negatively impact the treatment Plaintiff is receiving for his pedophilic disorder and the treatment of other CNYPC residents who may be exposed to this material." (Dkt. No. 61, ¶ 6). Magistrate Judge Stewart issued a Decision and Order denying Plaintiff's motion to compel:

Upon review of the photographs, the Court agrees that disclosure to Plaintiff at this time would be inappropriate. The materials were confiscated by authorities at CNYPC for security reasons and so to return them to Plaintiff would be counterproductive to reasonable security concerns at the facility. Moreover, Plaintiff was in possession of these documents and so is aware of their content which minimizes any need for him to obtain copies at this stage of the proceeding.

(Dkt. No. 66, at 3). Having reviewed the photographs, the Court agrees. Moreover, Plaintiff does not argue that there is any reason to believe that the magazine clippings are not the clippings found in his room or that viewing them would alter the outcome in this case in any manner. *See Martinez v. True*, 128 F. App'x 714, 716 (10th Cir. 2005) (finding no "fundamental unfairness" to the plaintiff in not appointing counsel to review confidential prison materials, explaining "[w]e have inspected the confidential prison materials the district court reviewed in camera [on summary judgment], and find no information in them to support [the plaintiff's] claims, [and that] the summary judgment order fairly describes the information contained in the confidential materials").

As Plaintiff does not otherwise object to Magistrate Judge Stewart's ruling with respect to his First Amendment right of access to information claim, the Court has reviewed it for clear error and found none. Further, as the Court previously observed, "neither the Supreme Court nor the Second Circuit has yet articulated the 'appropriate standard to be applied when a person who is civilly committed challenges an action or policy on First Amendment grounds.' " *Myers v. Saxton*, No. 20-cv-0465, 2021 WL 149062, at *5, 2021 U.S. Dist. LEXIS 8128 (N.D.N.Y. Jan. 15, 2021) (citing *Yeldon v. Hogan*, No. 9:08-cv-769, 2010 WL 983819, at *7, 2010 U.S. Dist. LEXIS 23821, at *20 (N.D.N.Y. Mar. 15, 2010)), *report-recommendation adopted*, 2010 WL 983819, 2010 U.S. Dist. LEXIS 23825 (N.D.N.Y. Marc. 15, 2010), *aff'd*, 400 F. App'x 580 (2d Cir. 2010). The Court therefore agrees with Magistrate Judge Stewart that "qualified immunity is plainly appropriate on this claim." (Dkt. No. 97, at 23); *cf.*, *Ahlers v.*

*Rabinowitz*, 684 F.3d 53, 66 (2d Cir. 2012) (applying qualified immunity after undertaking, "for the first time ... a balancing analysis with regard to the right of a civilly committed person to be free from unreasonable seizures," explaining that " 'it was objectively reasonable for [the Defendants] to believe their acts did not violate' Ahlers's Fourth Amendment rights, or his First Amendment or procedural due process rights.") (quoting *Weyant v. Okst*, 101 F.3d 845, 857 (2d Cir. 1996)). [2]

[2]      The magazine clippings have been reviewed in camera and have not been filed on the docket in this case. Defendants are directed to maintain a copy of the magazine clippings in the event they are required in connection with any appeal filed in this matter.

**\*4**   Accordingly, Defendant Saxton is entitled to summary judgment dismissing Plaintiff's First Amendment right of access to information claim.

### C. Fourteenth Amendment Excessive Force

Defendants object to Magistrate Judge Stewart's recommendation that that their motion for summary judgment be denied as to "Plaintiff's Fourteenth Amendment excessive force claim for the incident occurring in the side room at CNYPC." (Dkt. No. 100, at 2). Specifically, Defendants argue that Magistrate Judge Stewart "did not consider Defendants' argument that the force was used [sic] *de minimis* and did not rise to the level of a constitutional violation." (*Id.* at 2) (citing Dkt. No. 89-7, at 15–16 (Defs. Mem. Of Law)).

"[C]laims for excessive force under the Fourteenth Amendment must involve force that is either 'more than *de minimis*' or 'repugnant to the conscience of mankind.' " *Lewis v. Huebner*, No. 17-cv-8101, 2020 WL 1244254, at *5, 2020 U.S. Dist. LEXIS 47200 (S.D.N.Y. Mar. 16, 2020) (citing *United States v. Walsh*, 194 F.3d 37, 48 (2d Cir. 1999)). Even if Magistrate Judge Stewart did not explicitly address whether the force at issue was "*de minimis*," his discussion of the factual issues surrounding the force used reflects his implicit determination that those factual issues precluded a conclusion that the force at issue was *de minimis*. Moreover, having reviewed this issue de novo, the Court agrees that there are questions of fact regarding Plaintiff's conduct immediately preceding Defendants' use of force and the actions Defendants took to bring Plaintiff to the ground. Thus, a determination that the force used was *de minimis* would be inappropriate at the summary judgment stage.

The video shows Plaintiff being escorted through the doorway of the seclusion room by Defendants Collins and Wilkinson, who both have their hands on Plaintiff's upper body. (DVD # 2020-042 (CS-410 Ward 404 Seclusion Room at 20:35-21:45); *see also* 89-2, ¶ 23; 89-3, ¶ 22). Collins and Wilkinson release Plaintiff and push Plaintiff into the room. (DVD # 2020-042 (CS-410 Ward 404 Seclusion Room at 20:35-21:45)). Plaintiff takes several steps forward, turns around, and backs up as five individuals, including Collins and Wilkinson, move toward him. (*Id.*). Plaintiff is outside the frame of the video. (*Id.*). Collins, Wilkinson, and a third man remove headphones and a small device with wires from Plaintiff, who is still outside the frame of the video. (*Id.*). Plaintiff is told several times to give them his watch and Plaintiff repeatedly says no. (*Id.*); *see* Dkt. No. 89-2, ¶ 25 (Wilkinson explaining that watches and headphones "are not permitted while residents are in the seclusion room"). Defendants, and two others, then move toward Plaintiff, and out of the frame of the video. (DVD # 2020-042 (CS-410 Ward 404 Seclusion Room at 20:35-21:45)). Defendants state in their declarations that when they tried to retrieve Plaintiff's watch, he flailed his arm away and he "threw a closed fist punch at" at Defendant Collins. (Dkt. No. 89-2, ¶ 28). Defendants bring Plaintiff to the ground. (Dkt. No. 89-1, at 77 (Plaintiff testifying that "everybody grabb[ed] me" and "[l]aid [me] out"). However, both Plaintiff's conduct preceding the use of force and Defendants' initiation of the force that led to Plaintiff being brought to the ground are outside the frame of the video. Further, viewing the facts in the light most favorable to Plaintiff, the force at issue in this case—Collins and Wilkinson, and two other men bringing Plaintiff to the ground after he refused to turn over his watch—the Court cannot say as a matter of law that the use of force was *de minimis*. *Cf. Virella v. Pozzi*, No. 05-cv-10460, 2006 WL 2707394, at *3, 2006 U.S. Dist. LEXIS 67359 (S.D.N.Y. Sept. 20, 2006) (granting summary judgment where the "alleged assault" by the defendant, who allegedly swung his keys at the plaintiff "making 'a little contact' with [the plaintiff's] head, and causing a bump "represents only a *de minimis* use of force that does not give rise to a constitutional claim"); *Mascuzzio v. City of New York*, No. 13-cv-4772, 2015 WL 13856994, at *3, 2015 U.S. Dist. LEXIS 196416 (E.D.N.Y. June 18, 2015) (granting summary judgment where " 'no reasonable jury could believe' it was punishment for [the defendant] to grab plaintiff's forearm in order to remove his watch for safekeeping, especially after he vociferously refused to hand it over," explaining that even though the officer "had a limited, even questionable need to obtain the gold watch, the amount of force she used was *de minimis*"). Thus, the Court agrees with Magistrate Judge Stewart that there are factual questions as to the use force in this case, and that such questions preclude a finding that the force used was *de minimis*. Accordingly, Defendants' motion for summary judgment as to the seclusion room excessive force claim is denied.

## IV. CONCLUSION

**\*5**  For these reasons, it is

**ORDERED** that the Report-Recommendation (Dkt. No. 97) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 89) based upon Fed. R. Civ. P. 56 is **GRANTED IN PART AND DENIED IN PART**, and it is further

**ORDERED** that Defendants' motion for summary judgment is denied as to Plaintiff's Fourteenth Amendment side room, excessive force claim; and it is further

**ORDERED** that Defendants' motion for summary judgment is otherwise granted and Plaintiff's Fourteenth Amendment excessive force/elevator claim, Fourteenth Amendment medical indifference claim against Defendant Collins, Fourteenth Amendment procedural due process claim, First Amendment access to courts claim against Defendants Collins and Wilkinson, and First Amendment denial of access to information claim against Defendant Saxton are **DISMISSED with prejudice;** and it is further

**ORDERED** that the Clerk is directed to terminate Erica Saxton as a defendant in this case; and it is further

**ORDERED** that Plaintiff's motion to appoint counsel for trial (Dkt. No. 99) is **GRANTED**; and it is further

**ORDERED** that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

## All Citations

Slip Copy, 2023 WL 2568912

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2424131
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Nathaniel STORMS, Plaintiff,
v.
Paul HARRIMAN, R.N.; T. Brousseau,
Inmate Grievance Supervisor; and Ms. Ratliff,
Inmate Grievance Supervisor, Defendants.

No. 9:05–CV–1115.
|
Aug. 4, 2009.

**Attorneys and Law Firms**

Nathaniel Storms, Attica, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Dean K. Higgins,. Esq., C. Harris Dague, Esq.,
Assts. Attorney General, of Counsel, Albany, NY, for State
Defendants.

### DECISION and ORDER

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Nathaniel Storms, brought this civil rights
action pursuant to 42 U.S.C. § 1983. By Report–
Recommendation dated March 31, 2009, the Honorable
David E. Peebles, United States Magistrate Judge,
recommended that defendants' motion for summary judgment
(Docket No. 56) be granted and that plaintiff's amended
complaint be dismissed in its entirety. The plaintiff has timely
filed lengthy objections to the report-recommendation.

Based upon a careful review of the entire file and the
recommendations of Magistrate Judge Peebles, the Report–
Recommendation is accepted and adopted in all respects. *See*
28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is
GRANTED;

2. The amended complaint is DISMISSED;

3. The Clerk is directed to enter judgment accordingly and
close the file.

IT IS SO ORDERED.

NATHANIEL STORMS,

Plaintiff,

vs.

PAUL HARRIMAN, et al.,

Defendants.

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Nathaniel Storms, a New York State prison inmate
who is proceeding *pro se* and *in forma pauperis,* has
commenced this action pursuant to 42 U.S.C. § 1983 against
three corrections workers employed at the facility in which
he was confined at the relevant times, alleging deprivation
of his civil rights. In his complaint plaintiff maintains
that he was subjected to harassment and retaliation, and
additionally denied pain medication over an nineteen-day
period, by defendant Paul Harriman, a registered nurse,
and that defendants T. Brousseau and Ms. Ratliff failed
to process grievances and complaints lodged by Storms
regarding Harriman's activities. Plaintiff's complaint asserts
causes of action under the First, Eighth, and Fourteenth
Amendments to the United States Constitution, and seeks
recovery of damages in the amount of $500,000 on each of
his ten claims. [1]

[1]  Plaintiff's complaint, as amended, also references
the Fourth Amendment, which prohibits
unreasonable searches and seizures, and the
Fifteenth, guarantying that the right of citizens to
vote not be denied "on account of race, color, or
previous condition or servitude." *See* U.S. Const.
Amends. 4, 15. Discerning no basis to conclude
that plaintiff's complaint asserts a cognizable claim
under either of these amendments, I have not
addressed those potential causes of action in this

report, nor for that matter have either of the parties in their briefs concerning the pending motion.

Currently pending before the court is an application by the defendants seeking the entry of summary judgment dismissing plaintiff's claims on the merits, as a matter of law. Having carefully reviewed the record now before the court in the light of the parties' arguments, I conclude that no reasonable factfinder could determine plaintiff's constitutional rights were abridged by defendants' actions. Accordingly, I recommend that their motion be granted.

## I. *BACKGROUND* [2]

[2]     In light of the procedural posture of the case the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Wells–Williams v. Kingsboro Psychiatric Ctr.,* No. 03–CV–134, 2007 WL 1011545, at *2 (E.D.N.Y. Mar. 30, 2007)* (citations omitted).

Plaintiff is a prison inmate presently serving a sentence of between sixteen years and life in the custody of the New York State Department of Correctional Services ("DOCS"). Amended Complaint (Dkt. No. 25) ¶¶ 2, 8. At the times relevant to the claims set forth in his complaint, as amended, plaintiff was designated to the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. *Id.* ¶¶ 6.

This action is an outgrowth of a disagreement arising between the plaintiff and defendant Harriman, a registered nurse at Clinton, regarding the manner in which Storms' prescribed pain medication, Ultram, was to be administered. Amended Complaint (Dkt. No. 25) ¶¶ 12–15; Harriman Aff. (Dkt. No. 56–5) ¶¶ 4–13. In accordance with established DOCS policy calculated to insure that the inmate has swallowed the medication and it is not being abused, Harriman routinely ordered Storms to submit to a mouth inspection when dispensing Ultram to him. [3] Harriman Aff. (Dkt. No. 56–5) ¶¶ 5–6. Storms maintains that beginning in or about mid–2004 defendant Harriman began implementing this policy in a harassing manner, giving Storms mouth inspection instructions which he viewed as sexually suggestive and demeaning. Amended Complaint (Dkt. No. 25) ¶¶ 12–15.

[3]     During his deposition Storms acknowledged that he was addicted to his pain medication. *See*

Defendants' Exhibits (Dkt. No. 56–21) Exh. N at p. 36.

**\*2** Plaintiff's resistence to the specified mouth inspection protocol and defendant Harriman's insistence that he comply with the prescribed procedures led plaintiff to advise Harriman he was contemplating the filing of a grievance to end the harassment. [4] Amended Complaint (Dkt. No. 25) ¶ 15. The following day plaintiff was served with an inmate misbehavior report, authored by defendant Harriman and dated March 14, 2005, charging Storms with verbal harassment (Disciplinary Rule 107.11) and failure to obey a direct order (Disciplinary Rule 106.10). See Plaintiff's Exhibits (Dkt. No. 61–4) Exh. C. A Tier II disciplinary hearing was conducted to address those charges on March 28, 2005. [5] Defendants' Exhibits (Dkt. No. 56–11) Exh. F. At the close of that hearing plaintiff was found guilty on both counts and was sentenced to twenty-one days of keeplock confinement, a penalty suspended for a period of ninety days, together with a corresponding loss of telephone, commissary packages and recreation privileges. [6] *Id* .

[4]     Plaintiff's amended complaint and supporting affidavit allege that Storms authored a written grievance regarding the matter. Amended Complaint (Dkt. No. 25) ¶ 15; Plaintiff's Memo of Law (Dkt. No. 61–3) ¶ 4. While in his affidavit plaintiff maintains that the March 14, 2005 grievance is attached as Exhibit B–2; there is no exhibit bearing that label, nor does it appear that the grievance is located elsewhere in the record. Plaintiff's March 14, 2005 grievance does not appear to have been assigned a grievance number, nor was it processed by inmate grievance personnel at the facility. *See* Brousseau Aff. (Dkt. No. 56–4) ¶¶ 5–6, 8.

[5]     The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143

F.3d 653, 655 n. 1 (2d Cir.1998), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

[6]     Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens* ); *Tinsley v. Greene,* No. 95–CV–1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). While on keeplock confinement an inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. *Id.* Keeplocked inmates can leave their cells for showers, visits, medical exams and counseling, and can have cell study, books and periodicals. *Id.* The primary difference between keeplock and the general population confinement conditions is that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.*

On March 15, 2005, plaintiff filed a formal grievance, assigned No. CL–50976–05, alleging that the issuance of a misbehavior report by defendant Harriman constituted harassment and retaliation.[7] Amended Complaint (Dkt. No. 25) ¶ 16; Defendants' Exhibits (Dkt. No. 56–8) Exh. C. This grievance was denied at the facility level (*see* Defendants' Exhibits (Dkt. No. 56–8) Exh. C) and that determination was upheld on appeal to the DOCS Central Office Review Committee ("CORC") on June 29, 2005. Plaintiff's Exhibits (Dkt. No. 61–4) Exh. R9.

[7]     Plaintiff claims to have filed this grievance on March 14, 2005. (Amended Complaint (Dkt. No. 25) ¶ 15. While the handwritten grievance is dated March 15, 2005, it is stamped as having been filed March 21, 2005. Plaintiff's Exhibits (Dkt. No 61– 4) Exh. B2.

Having obtained no relief from defendant Harriman's alleged continued harassment, on March 25, 2005 plaintiff wrote to Dale Artus, the Superintendent at Clinton, complaining of the situation, and additionally filed another grievance, designated as No. CL–51049–05, regarding the matter.[8] Defendants' Exhibits (Dkt. No 56–9) Exh. D.; *see also* Plaintiff's Exhibits (Dkt. No. 61–4) Exhs. E and F. That grievance was denied at the local facility level, and that denial was upheld by the CORC on June 22, 2005. Plaintiff's Exhibits (Dkt. No. 61– 4) Exh. R8. In its determination, the "CORC advise[d] the grievant to cooperate with medical during the distribution of 1:1 medication." *Id.*

[8]     While that handwritten grievance was dated March 25, 2005 by the plaintiff, it is stamped as "filed" on March 28, 2005. *See* Defendants' Exhibits (Dkt. No. 56–9) Exh. D.

On March 26, 2005 defendant Harriman authored a second misbehavior report regarding the plaintiff's failure to cooperate with the administering of his pain medication; that disciplinary charge, which accused plaintiff of interference (Disciplinary Rule 107.10) and failure to obey a direct order (Disciplinary Rule 106.10), was served on March 27, 2005. Plaintiff's Exhibits (Dkt. No. 61–4) Exh. G. A Tier II hearing was held to address that misbehavior report, also on March 28, 2005. Defendants' Exhibits (Dkt. No. 56–11) Exh. F. At the conclusion of that proceeding the hearing officer found Storms guilty on both counts, and imposed punishment of twenty days of keeplock confinement, with a corresponding loss of telephone, commissary package and recreation privileges. *Id.* That decision was affirmed upon plaintiff's appeal. Plaintiff's Exhibits (Dkt.61–4) Exh. J3B.

**\*3** Over the ensuing period beginning in April of 2005 and continuing through August 25, 2005, when plaintiff prepared and forwarded to the court a complaint alleging civil rights violations against defendant Harriman arising out of the events recounted, plaintiff embarked upon an intensive campaign to obtain redress of his grievances.[9] Amended Complaint (Dkt. No. 25) ¶ ¶ 22–39. Those efforts included the sending of letters to defendants Brousseau and Ratliff, both of whom serve as Inmate Grievance Program ("IGP") supervisors at Clinton, as well as Superintendent Artus and Nurse Administrator Tousignant. *Id.*

[9]     Although not specifically referenced in either his amended complaint or motion opposition papers, plaintiff claims to have filed a third grievance in March of 2005. Plaintiff's Aff. (Dkt.61) p. 2; *see also* Plaintiff's Exhibits (Dkt. No. 61–4) Exh. U1. Apparently, the IGRC did not receive the third

grievance until July 13, 2005. Plaintiff's Exhibits (Dkt.61–4) Exh. W; *see also* Ratliff Aff. (Dkt. No. 56–6) ¶ 6; Brousseau Aff. (Dkt. No. 56–4) ¶ 7. This third grievance, also complaining of harassment by Harriman, was assigned number 51614–05 and was investigated and denied. *Id.* It was noted that Harriman was interviewed and denied harassment or mistreatment of Storms, and that Storms was interviewed and had no information to add and did not request any witnesses to be interviewed. *Id.* The grievance was similarly rejected on appeal to the CORC by determination issued on August 17, 2005. Plaintiff's Exhibits (Dkt.61–5) Exh. YY–4. In its determination the CORC noted that it had found no evidence of mistreatment of the plaintiff by any DOCS employee, adding "CORC asserts that grievant's medication is administered as ordered by the FHSD and advises the grievant to cooperate with medical staff during the distribution of 1:1 medications." *Id.*

Plaintiff asserts that between September 2, 2005, when this action was commenced and September 21, 2005, defendant Harriman continued to harass him, including by refusing to provide him with his required pain medication. Amended Complaint (Dkt. No. 25) ¶¶ 37–38, 40. Plaintiff contends that the harassment resulted in the denial of pain medication, beginning on September 2, 2005. *Id.* ¶ 38. According to Storms, it was only after he wrote several letters, including to Superintendent Artus, Deputy Superintendent Turner, Dr. Wright, the facility chaplin, and various outside individuals and organizations, that prison officials once again began administering his medication on September 21, 2005. [10] *Id.* ¶¶ 39–40. Plaintiff attributes the denial of pain medication to ongoing efforts on the part of defendant Harriman to retaliate against him for engaging in protected activity. *Id.* ¶ 41.

[10]   Plaintiff's pain medication was resumed under a newly-implemented policy requiring that his medication be crushed before being administered. *See* Defendants' Exhibits (Dkt. No. 56–19) Exh. M; *see also* Harriman Aff. (Dkt. No. 56–5) ¶ 12.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on September 2, 2005, and later amended his complaint, with leave of court, on January 10, 2007. Dkt. Nos. 1, 24, 25. As defendants plaintiff's amended complaint names Registered Nurse Paul Harriman, as well as Ms. T. Brousseau and Ms. Ratliff, both of whom are

identified as IGP supervisors at Clinton, and asserts ten causes of action including six against defendant Harriman, and two each against defendants Brousseau and Ratliff.

Following joinder of issue and the close of discovery, defendants moved on June 1, 2008 for the entry of summary judgment dismissing plaintiff's claims on the merits. Dkt. No. 56. Plaintiff has since responded in opposition to the motion by the filing, on July 28, 2008, of a memorandum, statement pursuant to Local Rule 7.1(a)(3), affidavit, and exhibits. [11] Dkt. No. 61.

[11]   Plaintiff's Local Rule 7.1(a)(3) Statement fails to conform to this court's requirements in that it does not specifically address each of the facts set forth in defendants' Local Rule 7.1(a)(3) Statement by either admitting or denying those assertions. By its terms, Local Rule 7.1(a)(3) provides that *"[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." See* N .D.N.Y.L.R. 7.1(a)(3) (emphasis in original). Courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 WL 1264122, at *1 (Aug. 22, 2000)* (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). While in no way minimizing the importance of the requirement, in light of my finding that the record now before the court does not support any of plaintiff's claims, and in deference to his *pro se* status, I have chosen not to invoke this provision of Local Rule 7.1(a)(3).

Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision,

the entry of summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson, 477 U.S. at 247, 106 S.Ct. at 2509–10). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510.

**\*4** A moving party seeking the entry of summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. Anderson, 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; Security Ins., 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324, 106 S.Ct. at 2553; Anderson, 477 U.S. at 250, 106 S.Ct. at 2511. Though pro se plaintiffs are entitled to special latitude when defending against summary judgment motions, to successfully resist the entry of summary judgment they must establish more than mere "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); but see Vital v. Interfaith Med. Ctr., 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether pro se plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553; Wright v. Coughlin, 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. See Building Trades Employers' Educ. Ass'n v. McGowan, 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); see also Anderson, 477 U.S. at 250, 106 S.Ct. at 2511 (summary

judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Medical Indifference

Among plaintiff's claims in this action is his assertion that defendant Harriman was deliberately indifferent to his medical needs, based upon his actions in administering Storms' prescribed pain medication. Defendants seek dismissal of that cause of action, both based upon plaintiff's failure to establish the existence of a serious medical condition of constitutional significance and in light of the lack of evidence demonstrating Harriman's indifference.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 103, 104, 97 S.Ct. 285, 290–291 (1976) (quotations and citations omitted); see also Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, inter alia, Estelle, 429 U.S. at 103, 97 S.Ct. at 290). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; accordingly, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing, inter alia, Rhodes v. Chapman, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)). A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement; the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." See Leach v. Dufrain, 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324 (1991)); Waldo v. Goord, No. 97–CV–1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (citations omitted).

#### 1. Serious Medical Need

**\*5** Claims that prison officials have intentionally disregarded a plaintiff's medical needs are encompassed within the Eighth Amendment's prohibition of cruel and unusual punishment. In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must first allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". Hathaway v.

*Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136–37 (2d Cir.2000) (quoting, *inter alia, Chance,* 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 701 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

In this instance plaintiff has failed to offer evidence regarding the severity of the condition for which he was receiving the pain medication at the center of his claims. The limited medical records supplied by Storms reflect that at various times during the relevant period he complained of lower back pain, which was treated through physical therapy and pain medication. *See* Plaintiff's Exhibits (Dkt. No. 61–5) Exh. Z. Plaintiff's records also disclose that he was sent in November of 2003 to an outside orthopedic surgeon for evaluation of his back condition. Plaintiff's Exhibits (Dkt. No. 61–5) Exh. Z–26. As a result of that examination the outside consultant diagnosed the plaintiff as suffering from chronic low back pain, with evidence of some early degenerative changes in the lower lumbar spine, adding "I think we are dealing with Mechanical Low Back Pain." *Id.*

Having reviewed the available record, I find that plaintiff has failed to offer evidence sufficient to carry his burden of establishing that his back condition constituted a condition of urgency capable of producing degeneration or extreme pain. Accordingly, I conclude that no reasonable factfinder could determine that plaintiff suffers from a sufficiently serious medical need to qualify for protection under the Eighth Amendment. *See Sledge v. Kooi,* 556 F.3d 137, 140 (2d Cir.2009).

## 2. *Deliberate Indifference*

**\*6** In addition to establishing the existence of a serious medical condition, to prevail on his Eighth Amendment claim plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Leach v. Dufrain,* 103 F.Supp.2d at 546. Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo v. Goord,* 1998 WL 713809, at *2 (citations omitted).

It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment" and accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998) (citation omitted).

The record now before the court fails to substantiate plaintiff's claims of deliberate indifference. To the contrary, the limited medical records now before the court suggest that the plaintiff was seen with some degree of intensity by medical officials at Clinton for his back pain, and that various courses of treatment for that condition were attempted. To the extent that plaintiff complains of not receiving his prescribed pain medication on certain occasions, the record firmly establishes that the deprivation stemmed from his disagreement over Nurse Harriman's insistence on complying with DOCS procedures regarding the administration of such pain medication. *See* Harriman Aff. (Dkt. No. 56–5) ¶ 11; *see also* Defendants' Exhibits (Dkt. No. 56–17) Exhs. L and M. Because no reasonable factfinder could conclude from the evidence now before the court that defendant Harriman was deliberately indifferent to any of plaintiff's medical needs, I recommend dismissal of plaintiff's deliberate indifference claim on this additional, independent basis.

## C. *Retaliation*
In addition to claiming indifference to his medical needs, plaintiff also alleges that defendant Harriman retaliated

against him for having exercised protected rights. Amended Complaint (Dkt. No. 25) ¶¶ 16, 18–20. Plaintiff's retaliation claim centers upon Harriman's issuance of misbehavior reports, allegedly in retaliation for Storms having filed grievances concerning his actions. *Id.* at ¶¶ 16–19. In their motion, defendants also seek dismissal of this claim. Defendants' Memo of Law (Dkt. No. 56–24) pp. 10–14.

**\*7** When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F .3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two.

When such claims, which are exceedingly case specific, are alleged in only conclusory fashion and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

Plaintiff's retaliation claim centers upon Harriman's issuance of three misbehavior reports, all alleged to have falsely accused him of violating prison rules. Amended Complaint (Dkt. No. 25) ¶¶ 16, 19. Standing alone, the mere allegation that a false misbehavior report has been filed against an inmate does not implicate constitutional conduct. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273 (1988)). The further assertion that the false misbehavior report has been prompted by retaliatory animus and relates to an inmate having engaged in protected activity, however, can suffice to state a claim for retaliation. *Franco,* 854 F.2d at 589.

**\*8** When retaliation claims are grounded in the issuance of misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007). More than a conclusory allegation of retaliatory motivation is required to survive a summary judgment motion; the "types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

While it is true that in this instance the chronology of events is mildly suggestive of retaliation, it is equally indicative of the close proximity in time between plaintiff's alleged refusal to follow defendant Harriman's orders, the filing of a grievance, and the issuance of a misbehavior report in each of the instances at issue. On March 14, 2005, after an encounter with Nurse Harriman, plaintiff threatened to file a grievance. *See* Amended Complaint (Dkt. No. 25) ¶ 25; Plaintiff's Exhibits (Dkt. No. 61–4) Exh. D. An inmate misbehavior report alleging plaintiff's refusal to obey a direct order and verbal harassment was generated on that same date by Nurse Harriman, and served on plaintiff the next day. *Id.* Exh. C. Although plaintiff claims that his first grievance was filed on March 14, the handwritten grievance is dated

March 15 and stamped filed March 25, 2005. Similarly, plaintiff's second handwritten grievance is dated March 25 but stamped filed March 28, 2005. Affording plaintiff all favorable inferences, assuming the grievances were filed on the same day they were written by plaintiff, the filing of formal written grievances by plaintiff on March 15, 2005, and March 25, 2005, was followed by a second misbehavior report, authored by Nurse Harriman on March 26, 2005. Plaintiff's Exhibits (Dkt. No 61–4) Exhs. D, F, G. A letter sent by plaintiff to the Clinton Superintendent on March 27, 2005 was followed by yet another misbehavior report authored by Nurse Harriman on that same date. *Id.* Exhs. H, J.

The overwhelming evidence now in the record reveals that the sequence is symptomatic of plaintiff's disagreement and refusal to follow the procedures directed by Nurse Harriman in administration of his medication, leading ultimately to medical officials requiring that his medication be crushed when administered. *See* Defendants' Exhibits (Dkt. No. 56–17) Exh. M. In each of the three instances where rule violations were alleged, plaintiff was convicted following a Tier II disciplinary hearing of refusing to obey an order, and that determination was upheld on appeal. Defendants' Exhibits (Dkt. No. 56–11, 56–12) Exhs. F and G. Moreover, each of the grievances filed by plaintiff, alleging both harassment and retaliation on the part of Nurse Harriman, were rejected and those rejections were upheld on appeal to the CORC. Plaintiff's Exhibits (Dkt. No. 61–4, 61–5) Exhs. M2, M3, R8, R9, W, YY4.

 **\*9**  Simply stated, there is nothing in the record from which a reasonable factfinder could determine that the issuance by Nurse Harriman of misbehavior reports to the plaintiff was in retaliation for his having engaged in protected activity, as distinct from his refusal to obey legitimate directives by prison officials. I therefore recommend dismissal of plaintiff's retaliation cause of action.

### D. *Conditions of Confinement*
Plaintiff's conditions of confinement cause of action is analyzed applying the same basic Eighth Amendment principles applicable to his medical indifference claim. *Farmer,* 511 U.S. at 834.

The record in this case lacks any evidence that over the course of his incarceration at Clinton, plaintiff was subjected to prison conditions rising to a level sufficient to sustain an Eighth Amendment claim. Even assuming Storms was placed in keeplock confinement as a result of defendant Harriman's

issuance of misbehavior reports, and that he or another of the named defendants were personally responsible for having done so, it is well established that the normal conditions experienced by a keeplocked inmate are not sufficiently egregious to support an Eighth Amendment cause of action. *McDonald v. Rivera,* No. 9:06–CV–410(LEK/DEP), 2008 WL 268345, at \*8 (N.D.N.Y. Jan. 30, 2008), citing *Jackson v. Johnson,* 15. F.Supp.2d 341, 363 (S.D.N.Y.1998). Since plaintiff has offered no proof that he was subjected to any significant departure from ordinary keeplock conditions or exposed to conditions which could be viewed as potentially running afoul of the Eighth Amendment, I recommend dismissal of his cruel and unusual punishment claim.

### E. *Handling of Grievances*
At the heart of plaintiff's claims against defendants Brousseau and Ratliff is his contention that they failed to properly process and investigate his several grievances lodged by him against defendant Harriman. Amended Complaint (Dkt. No. 25) ¶¶ 23–36. In their motion, defendants also seek dismissal of this cause of action as not cognizable under section 1983. Defendants' Memo of Law (Dkt. No. 56–24) pp. 16–17.

While the DOCS has put in place a fully integrated system for handling internal grievances by prison inmates addressing the conditions of their confinement, it is well established that the process does not confer substantive rights. *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *see also Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 n. 3 (W.D.N.Y.1998). Nor is there any constitutional guaranty of access on the part of an inmate to an established grievance procedure. *Gilbert v. Goord,* No. 9:03–cv–423 (GLS/GJD), 2007 WL 3232273, at \*6 (N.D.N.Y. Oct. 31, 2007) (Sharpe, J. and DiBianco, M.J.); *see also Cancel v. Goord,* No. 00 CIV.2042, 2001 WL 303713, at \*3 (S.D.N.Y.2001). Accordingly, a claim predicated upon the alleged failure of prison officials to process or investigate grievances fails to support a claim under section 1983. Plaintiff's claims against defendants Brousseau and Ratliff are therefore subject to dismissal as a matter of law.

### III. *SUMMARY AND RECOMMENDATION*
 **\*10**  Plaintiff's complaint in this action, as amended, asserts various claims all of which have as their genesis his disagreement with defendant Harriman, a registered nurse at Clinton, regarding the procedure to be followed when plaintiff received his prescription pain medication. While plaintiff alleges that defendant Harriman was deliberately indifferent to his medical needs, engaged in harassing behavior toward

him, and retaliated against him including through the issuance of misbehavior reports in response to grievances and other protected activity, the record is wholly devoid of any evidence to support a cognizable claim against defendant Harriman. Turning to plaintiff's claims against defendants Brousseau and Ratliff, they appear to stem solely from their alleged failure to process and investigate plaintiff's grievances, a matter which does not give rise to a cognizable claim under section 1983. Accordingly, defendants' motion for summary judgment should be granted and plaintiff's complaint dismissed, making it unnecessary to address defendants' alternative argument, urging a finding of their entitlement to qualified immunity.

Based upon the foregoing it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 56) be GRANTED, and that plaintiff's amended complaint in this action be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2424131

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 687253
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jason E.T. CATO, Plaintiff,

v.

Gabriel FELIZ [1], Defendant.

[1]     The clerk is directed to correct the spelling of the
        Defendant's name on the docket.

9:20-CV-176 (MAD/DJS)
|
Signed 01/27/2022

**Attorneys and Law Firms**

JASON E.T. CATO, Plaintiff, Pro Se, 21-B-0271, P.O. Box
3600, Marcy Correctional Facility, Marcy, New York 13403.

HON. LETITIA JAMES, Attorney General of the State
of New York, LAUREN R. EVERSLEY, ESQ., Assistant
Attorney General, Attorney for Defendant, The Capitol,
Albany, New York 12224.

### REPORT-RECOMMENDATION AND ORDER

DANIEL J. STEWART, United States Magistrate Judge

 *1  Plaintiff commenced this action pursuant to 42 U.S.C.
§ 1983, alleging that his constitutional rights were violated
while he was an inpatient in the Central New York
Psychiatric Center ("CNYPC"). Dkt. No. 1, Compl. Plaintiff
subsequently made a motion to amend his complaint, which
was granted in part and denied in part by this Court. Dkt. Nos.
16 & 20. His Amended Complaint was filed on October 26,
2020. Dkt. No. 21, Pl.'s Am. Compl. Following the initial
review pursuant to 28 U.S.C. § 1915(e) and 28 U.S.C. §
1915A the only claims that remain in this action are: (1)
a Fourteenth Amendment claim for unwarranted medical
treatment; (2) a First Amendment retaliation claim; and (3)
state law claims, all asserted against Defendant Feliz. Dkt.
Nos. 6 & 21. [2]

[2]     Defendants McCulloch and Fontana were
        dismissed from the suit.

Presently before this Court is Defendant's Motion for
Summary Judgment. Dkt. No. 31. Defendants seek summary
judgment on the merits of Plaintiff's claims. Dkt. No. 31-1,
Defs.' Mem of Law. Plaintiff opposes the Motion. Dkt.
No. 40, Pl.'s Opp. For the reasons that follow, the Court
recommends that the Motion be granted as to Plaintiff's
constitutional claims and that his state law claims be
dismissed.

### I. FACTUAL BACKGROUND

Plaintiff's claims arise out of a series of incidents that took
place while he was housed at CNYPC in 2020. Pl.'s Am.
Compl. Plaintiff alleges that during his time at CNYPC,
he was administered medication against his will. *Id.* He
also alleges that he was subjected to retaliation. *Id.* As a
result of those incidents, Plaintiff initiated this lawsuit against
Defendant Gabriel Feliz, a Security Hospital Treatment Aide
at CNYPC (hereinafter, "SHTA" or "treatment aide").

Treatment aides at CNYPC are responsible for assisting
in the care of individuals diagnosed with mental illness
or with emotional or social behavior problems. Dkt. No.
32, Declaration of Gabriel Feliz ("Feliz Decl.") at ¶ 6.
Defendant Feliz's job responsibilities as an aide are focused
on maintaining the safety and security of patients within the
facility. *Id.* He does not have the authority to make medical
treatment decisions for a patient, nor the authority to order or
administer medication. *Id.* at ¶ 5; Dkt. No. 32-1, Declaration
of Dina Keator ("Keator Decl.") at ¶ 5; Dkt. No. 32-2,
Declaration of Kathleen Zielinski ("Zielinski Decl.") at ¶ 12.

### A. January 4, 2020 Incident

The first incident in question took place on January 4, 2020,
when Plaintiff became agitated after being informed that he
would be receiving a roommate. Feliz Decl. at ¶ 7. At that
time, Plaintiff was the only individual on the unit without
a roommate, and a new patient was being transferred to the
ward. *Id.* Plaintiff became upset, stating that he did not want
a roommate and asserting that he had a right to his own
room. *Id.* Defendant Feliz contacted his supervisor, non-party
Senior SHTA Randy Brown, for assistance in addressing
Plaintiff's concerns. *Id.* Plaintiff, Brown, and Feliz reached
an agreement regarding the roommate, and around 9:30 PM
Plaintiff returned to his room. *Id.* at ¶¶ 7-8.

Cato v. Feliz, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-00519-BKS-TWD   Document 29   Filed 01/23/24   Page 45 of 134

**\*2** However, just five minutes after Plaintiff returned to the shared room, Plaintiff's new roommate exited and indicated that he had been punched. Keator Decl. at ¶ 8; Feliz Decl. at ¶¶ 7-9. Defendant Feliz brought Plaintiff to a side room as he suspected, based on Plaintiff's earlier threats, that Plaintiff may have injured his roommate. Feliz Decl. at ¶ 10. The side room, also referred to as the quiet room, is generally used by CNYPC facility staff to have private discussions with patients and to attempt de-escalation of behaviors. Feliz Decl. at ¶ 24; Keator Decl. at ¶ 9. A red dot alarm was initiated due to the apparent patient injury, and doctors and staff reported to the ward. Feliz Decl. at ¶ 11. A red dot alarm at the CNYPC facility alerts staff members that an incident has occurred on a particular unit. Feliz Decl. at ¶ 11. When the alarm is triggered, all doctors and staff are to respond to the area to assist. *Id.* Defendant Feliz, along with other staff members, was present outside of the side room where Plaintiff was located. Feliz Decl. at ¶ 11. Plaintiff was observed to be in an agitated state and threatening staff members. Keator Decl. at ¶ 10. He was speaking in an abnormally loud voice, with increased psychomotor activity, and had exhibited a sudden change in mood. Keator Decl. at ¶ 10.

Although other redirection efforts and attempts to deescalate were made, non-party Dr. Maghsoudalou eventually directed that Plaintiff be given medication due to the risk he posed to himself and others. Keator Decl. at ¶ 11; Feliz Decl. at ¶ 12. 14 N.Y.C.R.R. § 527.8(c) permits facility psychiatrists to use their professional judgment to prescribe and administer medications to patients over their objections in emergency situations where the patient poses a danger to themselves or others. Keator Decl. at ¶¶ 13-14. Plaintiff was first offered the option of taking the medication by mouth, but after he refused, medication was administered via injection. Keator Decl. at ¶15; Feliz Decl. at ¶¶ 12-13. Record evidence submitted by both Plaintiff and Defendant demonstrates that Defendant Feliz did not order or administer the medication that was given to Plaintiff during this incident. Feliz Decl. at ¶ 14; Pl. Ex. B.; Keator Decl. Ex. A.

A "Patient Progress Note" entered by Nurse Dina Keator indicates that behavior management interventions for Plaintiff were ordered by Dr. Maghsoudalou, beginning with the use of seclusion and other less restrictive techniques, and ending with the administration of medication. Keator Decl. Ex. A. The medical record form entitled "Physician's Orders" shows that on January 4, 2020 the medication given to Plaintiff was ordered by Dr. Maghsoudalou. Keator Decl. Ex. B. Nurse Keator stated that Dr. Maghsoudalou was the individual who administered these medications to Plaintiff by injection on this date. Keator Decl. at ¶ 15.

**B. March 11, 2020 Incident**

On March 11, 2020, the record reflects that Plaintiff again became agitated and disruptive after receiving a violation for passing food in the dining hall. Feliz Decl. at ¶ 16. Plaintiff continued to get more upset and disruptive after returning to the day room, and "aggressively stepped closer" to Defendant Feliz and another staff member. *Id.* He refused to back up when redirected. *Id.* Defendant Feliz and other staff directed Plaintiff again and initiated a red dot alarm. Zielinski Decl. at ¶ 8; Feliz Decl. at ¶ 16. Plaintiff entered the side room voluntarily, where he was evaluated by non-party Dr. Palumbo. Zielinski Decl. at ¶ 8.

Dr. Palumbo was the individual responsible for ordering medication for Plaintiff on this date. Zielinski Decl. Ex. A. Patient Progress Notes indicate that Plaintiff accepted and voluntarily took these medications by mouth. Zielinski Decl. at ¶¶ 8-11, Ex. A; Feliz Decl. at ¶¶ 16-17. Nurse Zielinski once again noted that as a SHTA, Defendant Feliz is unable to order or administer medications at all. Zielinski Decl. at ¶ 12.

**C. April 18, 2020 Incident**

On April 18, 2020, Defendant Feliz asked Plaintiff to accompany him to the side room to discuss receiving a roommate. Feliz Decl. at ¶ 18. Plaintiff became agitated and made threatening remarks, leading staff to believe that he would attempt to hurt his potential roommate. *Id.* Plaintiff was offered medication but declined. *Id.* After speaking with a senior staff member, Plaintiff calmed down and returned to the day room. *Id.* He was not administered medication on this date. *Id.* at ¶ 19 & Ex. A.

**II. LEGAL STANDARDS**

**A. Summary Judgment Standard**

**\*3** Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving

Cato v. Feliz, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-00519-BKS-TWD   Document 29   Filed 01/23/24   Page 46 of 134

party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'Ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Furthermore, where a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## B. Rule 56.1 Statement

The Local Rules for the Northern District of New York require any motion for summary judgment to contain a Statement of Material Facts. L.R. 7.1(b)(3). This rule further states that any opposition to a motion for summary judgment shall contain a response to the Statement of Material Facts which mirrors the moving party's statements and admits or denies the movant's assertions with a citation to the record. L.R. 56.1(b).

As Defendant notes, Plaintiff's Statement of Material Facts fails to comply with these requirements. "However, a district court has broad discretion to overlook a pro se litigant's failure to fully comply with local rules." *Klein v. Fischer*, 2015 WL 5174031 at *11 (N.D.N.Y. Sept. 2, 2015) (*citing Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001)). Given this broad discretion, the Court will overlook most of the procedural defects of Plaintiff's opposition and instead address the merits of Plaintiff's claims. Nonetheless, to the extent that Plaintiff has failed to specifically respond to the properly supported facts set forth in Defendant's papers with any of his own admissible evidence, those facts will be deemed admitted.

## III. DISCUSSION

### A. Unwanted Medical Treatment Claim

**\*4** Defendant Feliz seeks summary judgment on the ground that he was not personally involved in the decision to administer medication to the Plaintiff, or in the actual administration of that medication. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F. 2d 880, 885 (2d Cir. 1991)).

The record establishes that the decision to administer medication to a patient is a medical decision that cannot be made by a treatment aide at CNYPC. Feliz Decl. at ¶ 5; Keator Decl. at ¶ 5; Zielinski Decl. at ¶ 12. Moreover, the evidence relied upon by both parties establishes that on January 4, 2020, the only date when Plaintiff was administered medication against his will, Defendant Feliz neither ordered nor administered the medication at issue. Plaintiff himself stated:

Cato v. Feliz, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-00519-BKS-TWD   Document 29   Filed 01/23/24   Page 47 of 134

> Well, Mr. Felice [sic] is a T.A. The physician and the doctor is the ones that administered the injections on camera. And the other five T.A.s stood around – stood around the restraint bed that I laid upon and they watched the doctor inject three needles in my left – left buttock ...

Dkt. No. 31-3, Plaintiff's Deposition ("Pl.'s Dep.") at pp. 30-31.

As a result, the record here clearly demonstrates that Defendant Feliz did not have the authority to order or administer medication to the Plaintiff or to any other patients and, in fact, he did not do so here. Therefore, his personal involvement in any decision to administer medication against Plaintiff's will has not been established. *See Emerson v. New York State Dep't of Corr. Svcs.*, 2011 U.S. Dist. LEXIS 116377 at *38 (N.D.N.Y. Sept. 9, 2011) (claims against defendant nurse subject to dismissal because she lacked the authority to override the medical decision of the treating physician); *accord Cuoco v. Moritsugo*, 222 F.3d 99, 111 (2d Cir. 2000) (summary judgment was appropriate where non-medical professionals could not be held liable for failure to intervene in the medical decisions of a treating physician); *Smith v. Woods*, 2008 WL 788573 at *9 (N.D.N.Y. Mar. 20, 2008) (medical indifference claims against licensed clinical social worker and psychologist failed as a matter of law because neither had any authority to override prescribing physician's decisions).

Summary judgment is appropriate on this claim.

### B. Retaliation Claim

In order to prevail on a First Amendment retaliation claim, a plaintiff must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech [or conduct] and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)). "Adverse action" for purposes of a retaliation claim has been defined as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Klein v. Fischer*, 2015 WL 5174031 at *16 (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004)).

The plaintiff bears the burden of demonstrating that "the protected conduct was a substantial or motivating factor" in the decision to take adverse action. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). A court may consider a number of factors when determining whether a causal connection exists between a plaintiff's protected activity and the adverse action taken, including: "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation." *Klein v. Fischer*, 2015 WL 5174031 at *16 (internal citations omitted). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). However, if a defendant demonstrates that he would have taken the action in the absence of the protected conduct, he may be entitled to summary judgment "[r]egardless of the presence of retaliatory motive." *Roseboro v. Gillespie*, 791 F. Supp. 353, 370 (S.D.N.Y. 2011).

**\*5** In order to prevail on a claim of retaliation against Defendant Feliz, Plaintiff must first demonstrate that he engaged in protected speech or conduct. *Holland v. Goord*, 758 F. 3d at 225. The underlying protected conduct that Plaintiff asserts as a basis is not entirely clear from his submissions. Plaintiff stated in his deposition that Defendant Feliz tried to retaliate against him because he "didn't know the rules of his own job." Pl.'s Dep. at p. 55. The record also contains evidence that on another occasion, Plaintiff accused Defendant Feliz of retaliation due to "jealousy" because "all the girls in the building want [Plaintiff] and because he is better looking than [Defendant]." Feliz Decl. Exh. A. This was also asserted by Plaintiff during his deposition.

> And then I tell him in a – I said, listen, you've got a personal problem with me, you keep calling me to this room, and take the little badge off your neck and we handle this man to man because you continue this and continue this, and let's handle this man to man. Let's get it on, man to man, because you're

Cato v. Feliz, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-00519-BKS-TWD    Document 29    Filed 01/23/24    Page 48 of 134

not going to stop. And I told him that, and I told the – and there was a senior T.A. female in the hallway with him, and I'm telling him – I'm like, why do you keep doing this? I mean, why do you keep bothering me, man? Let's get it on, man to man, and end this, the vendetta you got against me, like, you know, I'm not telling him I look better than you, or cuter than you, or making him feel real small, like this is why you're bothering me, all your female staff is stalking me, and they're not stalking you? I mean, what's the problem?

Pl.'s Dep. at p. 39.

Neither allegation establishes protected conduct upon which to base a claim of retaliation. However, Plaintiff also appeared to allege at another point in his deposition that Feliz took adverse action against him because of Plaintiff's threat to file a lawsuit.

Well, what happened that day was the Defendant – the Defendant, Mr. Felice [sic], had committed acts of retaliation because I stated to him that I was – that I was going to write him up because the rule states that I may or may not have a roommate as of choice. And he continued to force roommates on me.

Pl.'s Dep. at p. 17; p. 25 ("Stop making false accusations because I'm going to present this in a class-action 83 if you keep continuing to accuse me of things I didn't do – for nothing I didn't do.")

Plaintiff's statements regarding filing a lawsuit or a complaint against Defendant Feliz or the facility could, perhaps, establish conduct protected against retaliation, requiring the Court to proceed further. Plaintiff appears to allege several possible retaliatory actions taken by Defendant, and each will be addressed in turn.

First, Plaintiff alleges that Defendant Feliz ordered the administration of medication against his will as retaliation. *See* Pl.'s Am. Compl. at p. 7. As noted above, the record establishes that Defendant Feliz was not personally involved in the decision to order or administer medication to Plaintiff, and therefore this basis cannot establish an adverse action taken by Defendant to sustain a claim for retaliation. Feliz Decl. at ¶¶ 5, 14; Pl. Ex. B; Keator Decl. at ¶ 5 & Ex. A; Zielinski Decl. at ¶ 12.

Furthermore, the record demonstrates that Plaintiff was given medication for his own safety and that of other patients after he allegedly assaulted a patient and became aggressive towards staff. Keator Decl. at ¶ 11; Feliz Decl. at ¶ 12. Therefore, even if an adverse action were sufficiently stated, Plaintiff has failed to establish a causal connection between any protected activity and the allegedly adverse action taken as a result.

Next, Plaintiff alleges that Defendant Feliz ordered that he be given a roommate as retaliation. Pl.'s Am. Compl. at pp. 4-5. Plaintiff, however, is required to set forth more than mere allegations of retaliatory behavior in order to defeat a motion for summary judgment. He has not set forth any evidence at all showing that Defendant Feliz was even responsible for determining whether Plaintiff was given a roommate, or that such a decision was the result of a retaliatory motive. In contrast, evidence set forth by Defendant Feliz demonstrates that Plaintiff was receiving a roommate because he was the only patient on the unit at that time without a roommate. Feliz Decl. ¶ 7. Plaintiff's Treatment Plan Progress Notes also indicate that this decision was the responsibility of the overall treatment team and was not solely within Defendant Feliz's discretion. Feliz Decl., Exh. A; Pl.'s Opp. at 14, Exh. B. Plaintiff has not established that his "protected conduct was a substantial or motivating factor" in the decision to take adverse action by assigning him a roommate. *Graham v. Henderson*, 89 F.3d at 79.

**\*6** Finally, Plaintiff alleges that Defendant Feliz ordered him to the side room as retaliation. However, the purpose of the side room was not to punish patients, but rather to have confidential conversations with patients and to deescalate situations when patients became agitated. Feliz Decl. at ¶ 24. The record also contains ample evidence that Plaintiff was sent to the side room on some occasions not as punishment but rather because of his behavioral issues which presented a danger to himself and to other patients, and on other occasions

in order to have confidential conversations with staff. Keator Decl. at ¶ 9; Feliz Decl. at ¶¶ 7, 10, 18, 23, 24.

Plaintiff alleges that the side room is "not for talking, it is specifically for unruly patients and violent patients." Pl.'s Opp. at pp. 6-7. However, this conclusory allegation in no way establishes that the purpose of being sent to the side room was for punishment, rather than for the safety and privacy of everyone involved. In contrast to Plaintiff's mere allegations, Defendant has set forth admissible evidence demonstrating that Plaintiff was brought to the side room for these non-retaliatory purposes. *See* Keator Decl. at ¶ 9; Feliz Decl. at ¶¶ 7, 10, 18, 23, 24. Plaintiff cannot establish a causal connection between any protected conduct and being sent to the side room as retaliation.

To that end, being "sent to the side room" cannot plausibly establish an adverse action for purposes of a First Amendment retaliation claim. An adverse action "consists of conduct that 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.' " *Myers v. Saxton*, 2021 WL 149062 at \*7 (N.D.N.Y. Jan. 15, 2021) (quoting *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). "Vague and isolated incidents of intimidation or threats ... do not rise to the level of adverse action." *Myers v. Saxton*, 2021 WL 149062 at \*7 (collecting cases). Plaintiff has set forth no evidence of any conduct by Defendant Feliz that would deter a similarly situated individual from exercising his or her constitutional rights.

The Court therefore finds that Plaintiff has failed to demonstrate any triable question of fact as to his retaliation claim and as a result, recommends the granting of summary judgment to Defendant on this claim as well.

### C. State Law Claims

In addition to his federal claims, Plaintiff has alleged state law claims of negligence and intentional infliction of emotional distress against Defendant Feliz. A court "may decline to exercise supplemental jurisdiction over a claim ... if ... the [Court] has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Factors to be considered when determining whether to continue to maintain supplemental jurisdiction are the "familiar factors of judicial economy, convenience, fairness, and comity." *Catzin v. Thank*

*You & Good Luck Corp.*, 899 F.3d 77, 81 (2d Cir. 2018) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). When "all federal-law claims are eliminated before trial, the balance of factors to be considered ... will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. at 350.

Plaintiff's claims for negligence and intentional infliction of emotional distress arise out of the same series of events giving rise to his federal claims. Given the recommendation that summary judgment be granted on the merits of those claims, the Court finds that the continued exercise of jurisdiction over the state law claims is improper. *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 306 (2d Cir. 2003).

### IV. CONCLUSION

**\*7** For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendant's Motion for Summary Judgment (Dkt. No. 31) be **GRANTED**; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS** [3] **WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

[3]     If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the

**Cato v. Feliz, Not Reported in Fed. Supp. (2022)**

Case 9:22-cv-00519-BKS-TWD    Document 29    Filed 01/23/24    Page 50 of 134

end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2022 WL 687253

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 5599587
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Evan WARREN, Plaintiff,

v.

Michael CORCORAN, et al., Defendants.

No. 9:09–CV–1146 (DNH/ATB).
|
Oct. 20, 2011.

**Attorneys and Law Firms**

EVAN WARREN, pro se.

C. Harris Dague, Assistant Attorney General, for Defendants.

**REPORT and RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable David N. Hurd, United States District Judge. Plaintiff alleges that defendants violated his rights under the Eighth and Fourteenth Amendments. (Dkt. No. 1). Plaintiff seeks significant monetary damages. Presently before this court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56(b). (Dkt. No. 33). Plaintiff has not responded to defendants' motion. For the following reasons, the Court recommends granting defendants' motion and dismissing the complaint in is entirety.

**I. *Background***

Plaintiff is an inmate in the custody and control of the New York State Department of Correctional Services ("DOCS").[1] (Compl.¶ 1). At all times relevant to the allegations in plaintiff's complaint, he was incarcerated at Cayuga Correctional Facility (Cayuga). (Rule 7.1 Statement ¶ 2).[2]

1    On April 1, 2011, DOCS and the New York State Division of Parole were merged into one agency, named the New York State Department of

Corrections and Community Supervision. Because the events relevant to this suit occurred before the merger, I will refer to New York State's corrections agency as "DOCS."

2    More recently, he was incarcerated at Southport Correctional Facility and Clinton Correctional Facility. (Stmt. Pursuant to Local Rule 7.1(a)(3) (Rule 7.1 Statement) ¶ 1, Dkt. No. 34; Notice of Change of Address, Dkt. No. 35).

Plaintiff alleges that Defendants violated his Eighth Amendment right to adequate medical care relating to plaintiff's abdominal pain, and infringed his Fourteenth Amendment right to privacy by disclosing his HIV-positive status to two correctional officers during medical appointments. (Compl.¶¶ 10–26).

**II. *Summary Judgment–Legal Standards***

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed.R.Civ.P. 56[3]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Salahuddin v. Coughlin,* 674 F.Supp. 1048, 1052 (S.D.N.Y.1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

3    Rule 56 was extensively amended, effective December 1, 2010. As the Advisory Committee Notes indicate, "the standard for granting summary judgment remains unchanged." The revised rule explicitly adopts procedures relating to summary judgment motions "consistent with those already used in many courts."

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c)(1)(A). If the moving party satisfies its burden, the nonmoving

party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc. ,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48.

**\*2** "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (citing, *inter alia, Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest")). [4] "However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

[4]     In this case, although plaintiff received proper notice of his obligation to respond to defendant's motion in accordance with Local Rules (Dkt. No. 33–1), the plaintiff did not file a statement of undisputed material facts, or any other responsive papers, as required by Local Rule 7.1(a)(3). Consequently, the court may accept the properly supported facts contained in the defendant's Rule 7.1 statement (Dkt. No. 34) as true for purposes of this motion. *Govan v. Campbell,* 289 F.Supp.2d at 295–96. Nonetheless, the court will carefully review the entire record in determining if there are any material facts in dispute.

### III. *Deliberate Indifference to Medical Needs*

#### A. Legal Standards

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183– 84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' " *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279– 80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious, contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) and *Smith v. Carpenter,* 316 F.3d at 187 (actual medical consequences are highly relevant)).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated

in *Salahuddin,* that the defendant's believe that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin* 467 F.3d at 28.

**\*3** A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan,* 511 U.S. at 835. Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (table).

### B. Application

Plaintiff argues that defendants were deliberately indifferent to his serious medical needs while he was an inmate at Cayuga in 2007. (Compl.¶¶ 10–21). Plaintiff alleges that on January 22, 2007, correctional officers found him on the floor of his cell complaining of severe pain, nausea, and vomiting. (Compl. ¶ 11). Plaintiff was taken to Cortland Regional Medical Center, where Dr. Theresa Whitt [5] diagnosed plaintiff's abdominal pain as secondary to constipation. (Compl.¶ 12). The Ambulatory Health Record Progress Note (AHR) [6] dated January 22, 2007, indicates that plaintiff was sent to the emergency room after he was found "writhing on bunk in distress." (Keiser Aff. Ex. A p. 15). The AHR dated January 23, 2007, indicates that an abdominal x-ray showed constipation, and plaintiff was prescribed laxatives, told to increase his fluid intake, and to report any increased abdominal pain. (Keiser Aff. Ex. A p. 15; *see also* Keiser Aff. Ex. B). The AHR dated January 23, 2007, indicates that plaintiff stated he was feeling "better," and an AHR for later the same day indicates that plaintiff had bowel sounds in all four quadrants, appeared to be in no apparent distress, and that plaintiff denied having abdominal pain. (Keiser Aff. Ex. A p. 15).

[5]   Dr. Whitt is not a named defendant in this action.

[6]   The AHR is a DOCS document in which an inmate's medical care is recorded, based on the date of the services.

For the next four months, plaintiff alleges his condition failed to improve. (Compl.¶ 13). Plaintiff alleges that he continued to report his symptoms by signing up for sick call, or report them when he received his medication from defendants Registered Nurse Crull and Registered Nurse Burgin. (Compl.¶ 13). Plaintiff's AHR for January 24, 2007, indicates plaintiff denied any pain or discomfort, and he stated that he felt "okay." (Keiser Aff. Ex. A p. 14). Plaintiff's AHR for January 29, 2007, states that he requested medication for a cold, and made no mention of any abdominal symptoms. (Keiser Aff. Ex. A p. 14).

Plaintiff's AHR entries for February 1, 7, 10, 20, and 28, 2007, indicate that plaintiff reported that he was not eating well, had chapped lips, a dry throat, and was concerned about his weight, but the entries do not mention any complaints of abdominal pain. (Keiser Aff. Ex. A pp. 12–14). Plaintiff's AHR entries for March 6, 17, 22, and 31, 2007, indicate that plaintiff wanted information on his prescriptions and was concerned about his weight loss, but they do not indicate plaintiff complained of any abdominal pain. (Keiser Aff. Ex. A pp. 11–12).

**\*4** In April 2007, plaintiff alleges that he complained to Nurse Crull that his condition had worsened since January, and he had severe abdominal pain, headache, and a fever. (Compl.¶ 14). Plaintiff alleges that Nurse Crull did not examine plaintiff, but scheduled plaintiff with the doctor and prescribed Motrin or Tylenol. (Compl.¶ 14). Plaintiff alleges that the Motrin and Tylenol did not relieve his symptoms, which worsened over the next month. (Compl.¶ 14).

Plaintiff's AHR entries for April 12 and 16, 2007, do not indicate plaintiff complained of abdominal pain. (Keiser Aff. Ex. A p. 10). Plaintiff's AHR entry dated April 23, 2007, indicates that he complained of stomach pain, and Nurse Biggar's impression was that plaintiff was suffering from constipation. Plaintiff was prescribed Tylenol and Colace [7] and instructed that he should contact medical personnel if he did not have a bowel movement by the next morning or if symptoms worsened or persisted. (Keiser Aff. Ex. A p. 10). Nurse Crull stopped by plaintiff's cell the next day to encourage plaintiff to drink more water. (Keiser Aff. Ex. A p.

9). Nurse Crull noted that plaintiff stated, "I am," and Nurse Crull wrote on the AHR: "continue to monitor" plaintiff. *Id.*

7    A stool softener. (*See* Keiser Aff. ¶ 16).

Plaintiff's AHR entries indicate that he was transferred out of Cayuga on May 3, 2007, and did not return until July 5, 2007. (Keiser Aff. Ex. A pp. 7–9; *see also* Keiser Aff. ¶ 18). Plaintiff's AHR entries from Elmira Correctional Facility do not mention abdominal pain or problems. (*See* Keiser Aff. Ex. A pp. 7–9). Plaintiff's AHR entries indicate he returned to Cayuga around July 6, 2007. (Keiser Aff. Ex. A p. 6). Plaintiff's AHR entries for July 10 and 11, 2007, indicate that he complained of gas and told the nurse that his last bowel movement was five days prior. (Keiser Aff. Ex. A p. 5). Plaintiff requested over-the-counter relief and was prescribed Simethacone, Colace, and Dulcolax. [8] *Id.*

8    Simethacone is used to treat gas, Colace is a stool softener, and Dulcolax is a laxative. (*See* Keiser Aff. 19–20).

Plaintiff's AHR entries dated July 21 and 22, 2007, indicate the plaintiff complained of feeling weak, stomach pains, decreased appetite, and excessive sleep. (Keiser Aff. Ex. A p. 4). Plaintiff requested an appointment with a doctor, and he was scheduled to meet with the doctor on July 23, 2007. *Id.*

Plaintiff alleges that he saw defendant Dr. Keiser in July 2007, complaining of severe abdominal pain, high fever, nausea, vomiting and loss of appetite, and that plaintiff had been ill for over four months. (Compl.¶ 15). Dr. Keiser examined plaintiff on July 23, 2007, and the AHR indicates that Dr. Keiser noted that plaintiff had restarted his HIV antiviral medications in March 2007. (Keiser Aff. Ex. A p. 3; *see also* Keiser Aff. ¶ 22). Dr. Keiser noted that plaintiff was alert upon examination, his vital signs were normal, an abdominal exam revealed nothing abnormal, but Dr. Keiser also noted that plaintiff's weight had dropped from 131 pounds to 113 pounds in one year. (Keiser Aff. Ex. A p. 3; *see also* Keiser Aff. ¶¶ 22–23). Dr. Keiser concluded that plaintiff's abdominal distress could be the result of the antiviral medication plaintiff was taking, so Dr. Keiser referred plaintiff to the infectious disease doctor for follow up via Telemed [9] conference call. (Keiser Aff. ¶ 23). Dr. Keiser prescribed Ensure, a meal supplement drink, and scheduled plaintiff for a weigh-in two weeks later to check if the Ensure was helping plaintiff's weight. (Keiser Aff. ¶ 23; *see also* Keiser Aff. Ex. A p. 3).

9    Telemed is a video conference system used for plaintiff to conference with his infectious disease doctor who was employed by DOCS at another facility. (Keiser Aff. ¶ 24).

**\*5** Plaintiff alleges that the medication did not relieve his symptoms, and he saw defendant Registered Nurse Biggar later in July 2007. (Compl.¶ 16). Plaintiff alleges that he told Nurse Biggar that he had severe abdominal pain, nausea, and vomiting, and plaintiff alleges that Nurse Biggar refused to examine plaintiff or provide any treatment. (Compl.¶ 16). The AHR entry dated July 27, 2007, [10] states that plaintiff complained of vomiting and told the nurse he had a history of intermittent nausea and vomiting, secondary to taking antiviral drugs. (Keiser Aff. Ex. A p. 3). Nurse Biggar also noted that plaintiff stated that he was "peeing and pooping normal," with his last bowel movement being that same day. *Id.* Nurse Biggar also noted that plaintiff was eating dinner when she reached plaintiff's cell, and she instructed him to drink plenty of fluids and take his medication as directed. *Id.* Plaintiff had a doctor's appointment scheduled for August 2, 2007. *Id.*

10    The AHR entry is actually dated "7/27/06," but this appears to be inadvertent, as the dates of the other AHR entries on the same page are 2007, and Nurse Biggar's notes refer to a 7/27/07 date. The court assumes the date of the AHR entry was actually July 27, 2007.

Nurse Crull saw plaintiff on July 28, 2007, and noted on the AHR that plaintiff was complaining of severe vomiting, stating that it was occurring every other day. [11] *Id.* Nurse Crull also noted that plaintiff was in no apparent distress, did not have a fever, and had an appointment with his infectious disease doctor on July 31, 2007. *Id.*

11    Nurse Crull used the abbreviation "q.o.d.," a medical abbreviation for every other day.

On July 30, 2007, plaintiff alleges that correctional officers found him on the floor of his cell complaining of severe pain and vomiting. (Compl.¶ 17). Plaintiff's AHR entries indicate that a physician, via Telemed, instructed that plaintiff be taken to the emergency room. (Keiser Aff. Ex. A p. 2). Plaintiff was taken to Cortland Regional Medical Center, where he was diagnosed with a small bowel obstruction and possible intussusception. (Keiser Aff. Ex. F). Plaintiff was scheduled for exploratory surgery on July 31, 2007. (Keiser Aff. Ex. F). Plaintiff's AHR entry dated August 7, 2007, indicates that a

benign tumor was removed, plaintiff was doing well, and the suture line was intact. (Keiser Aff. Ex. A p. 1).

As detailed above, every time plaintiff had health issues, he received medical care. In January, he was taken to the emergency room and diagnosed with constipation. He was given laxatives and other medication, and the next day plaintiff said that he was feeling better. Plaintiff was seen by medical staff nine times in February and March 2007, getting treatment for numerous concerns, none of which were abdominal pain.

In April, plaintiff again had abdominal pain, and Nurse Biggar gave him Tylenol for his pain and a stool softener. Nurse Crull followed up the next day and encouraged plaintiff to drink plenty of water, and noted that he would be monitored. Plaintiff received medical care for his complaints.

When plaintiff returned to Cayuga in July, he was again treated when he complained of abdominal pain, as evidenced by the AHR entries discussed above. Dr. Keiser examined plaintiff and concluded that plaintiff's weight loss, but "unremarkable physical examination," could be caused by plaintiff's antiviral medication. (*See* Keiser Aff. ¶ 23). Dr. Keiser referred plaintiff to the infectious disease doctor for follow up and prescribed a meal supplement. Dr. Keiser apparently shared this conclusion with plaintiff, because plaintiff told Nurse Biggar that he had a history of intermittent nausea and vomiting, secondary to taking his antiviral medication.

**\*6** Defendants did not withhold care from plaintiff or delay his treatment.[12] Every time plaintiff complained of abdominal pain, he received treatment. Plaintiff used sick call effectively, and received care when he requested it. He obtained treatment for what the medical staff diagnosed as constipation, with varying degrees of success, as evidenced by the AHR entries for the relevant time period. It may have taken the medical personnel until July 2007 to diagnose a small bowel obstruction and perform surgery, but even if defendants' delay in diagnosis could be considered negligence[13], it would not rise to the level of a constitutional violation, and the undisputed facts in the record do not support a finding of deliberate indifference.[14] No issue of fact exists as to whether defendants were deliberately indifferent to plaintiff's serious medical needs. Accordingly, defendants should be granted summary judgment as to plaintiff's medical indifference claims.

[12]    Plaintiff's conclusory claims to the contrary, which are flatly contradicted by medical records documenting the care he received, are insufficient to create a material issue of fact with respect to his claims of deliberate indifference. *See, e.g., Benitez v. Pecenco,* 92 Civ. 7670, 1995 U.S. Dist. LEXIS 10431, 1995 WL 444352 at n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) *(citing Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")); *Brown v. White,* 9:08–CV–200, 2010 U.S. Dist. LEXIS 23818, 2010 WL 985184, at *8 (N.D.N.Y. Mar.15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record).

[13]    This court makes *no* such finding.

[14]    *See, e.g., Estelle v. Gamble,* 429 U.S. at 107 (considering the extensive scope of medical care provided to inmate plaintiff in finding that his claim that "more should have been done by way of diagnosis and treatment" may have indicated medical malpractice, but failed to state an Eighth Amendment cause of action).

## VI. *Disclosure of Medical Information*

### A. Legal Standards
The Due Process Clause of the Fourteenth Amendment protects inmates from the unwanted disclosure of health-related information, such as an inmate's HIV status. *Doe v. City of New York,* 15 F.3d 264, 267 (2d Cir.1994), *cited in Verley v. Goord,* 2004 WL 526740, 2004 U.S. Dist. LEXIS 857, at *60 (S.D.N.Y. Jan.23, 2004). With respect to the "disclosure" of medical information, the court notes that an inmate's privacy right varies with the inmate's condition, with a greater interest in preventing the disclosure of highly sensitive conditions. *Webb v. Goldstein,* 117 F.Supp.2d 289, 298 (E.D.N.Y.2000). In *Rodriguez v. Ames,* the court also held that where the information is spread through "humor or gossip," it is more likely that the inmate's right to privacy will

have been violated. 287 F.Supp.2d 213, 220 (citing *Powell,* 175 F.3d at 112). Prison officials may impinge upon that right only to the extent that their actions are "reasonably related to legitimate penological interests." *Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir.1999).

**B. Application**

Plaintiff argues that during his Telemed appointments on June 13, 2009, and July 30, 2009, unnamed correctional officers remained in the examination room while he was discussing his retroviral medications with the infectious disease doctor. (Compl.¶¶ 22–23). Because these correctional officers were in the room, plaintiff alleges that they became aware of plaintiff's HIV positive status. *Id.* Plaintiff claims that because Nurse Burgin and Nurse Johnson failed to order the correctional officers out of the room, they disclosed plaintiff's HIV status, violating his constitutional right to privacy under the Fourteenth Amendment. *Id.* at 22–26.

During the time period in which the two alleged incidents occurred, plaintiff resided in S–Block, where inmates are housed for disciplinary reasons.[15] (*See* Rich Aff. ¶¶ 7–8). Due to the security concerns attendant to inmates in disciplinary housing, medical needs for S–Block inmates are treated in the inmate's cell, if possible. If an inmate must go to the facility's medical unit, he is escorted by two or more correctional officers or sergeants. (Rich Aff. ¶ 12).

[15]  During this same time period, plaintiff's disciplinary history indicates infractions such as "flammable material," "interference," "direct order," "drug use," and "harassment." (*See* Rich Aff. Ex. B).

**\*7**  The correctional officers who were present during plaintiff's Telemed appointments are considered part of the facility's HIPAA[16] "Health Care Component."[17] These transport and health unit correctional officers, as part of their duties, receive protected health information, and are held to stringent HIPAA guidelines protecting that information. (*See* Rich Aff. ¶ 18). These guidelines are the same for the nurses and doctors. (*See* Rich Aff. Ex. C). A Health Care Component may use protected health information for health care operations that are part of its treatment activities. *See* 45 C.F.R. §§ 164.502(a)(1)(ii), 164 .506(c)(2). The Telemed appointment was an integral part of plaintiff's treatment, as only a physician, specializing in infectious diseases, could review and change retroviral medications. *See* Keiser Aff. ¶

24. Correctional officers were present in the room for security purposes during plaintiff's meeting with the infectious disease doctor via Telemed. (*See* Rich Aff. ¶¶ 11–17).

[16]  Health Insurance Portability and Accountability Act, 42 U.S.C. §§ 1320d–1320d–8.

[17]  DOCS is a "Hybrid Entity" under HIPAA, or a legal entity that performs business activities that are governed by HIPAA as well as business activities that are not governed by HIPAA. 45 C.F.R. § 164.103. Under HIPAA, Hybrid Entities designate components of themselves that, if those components were separate legal entities, they would meet the definition of covered entities. 45 C.F.R. § 164 .105(a)(2)(iii)(C). Here, the "covered entity" would be the DOCS medical unit or the "Health Care Component of DOCS." DOCS has designated "Correctional officers and their relief and supervisors assigned to: Transportation[,] Health Units[, and] Mental Health Units" as part of the Health Care Component of DOCS. (Rich Aff. Ex. C). Health Care Components must comply with the disclosure requirements of HIPAA. 45 C.F.R. § 164.105(a)(2)(ii). Under HIPAA, a covered entity may not use or disclose protected health information, as defined by 45 C.F.R. § 164.105(a)(2)(i)(C), except as permitted by 45 C.F.R. § 164.502(a) or 45 C.F.R. §§ 164.302–.318. 45 C.F.R. § 164.502(a).

Plaintiff does not allege that his health information was ever disseminated in any way to other inmates or staff, or that it was communicated through humor or gossip. This court does not find these incidents to be similar to those contemplated in *Doe* or *Powell.* There was no direct disclosure by the nurses to the correctional officers, nor was it done for humor or as gossip, as described in *Rodriguez.*

The presence of the correctional officers served a legitimate penological interest: protecting prison personnel from potential threats. *See Schuler v. Brown,* No. 07–CV937, 2009 WL 790973, 2009 U.S. Dist. LEXIS 124791, at \*34 (N.D.N.Y. February 2, 2009) (Lowe, M.J.) (adopted by *Shuler v. Brown,* 2009 WL 790973, 2009 U .S. Dist. LEXIS 23672 (N.D.N.Y. March 23, 2009) (McAvoy, S.J.) (holding that a counselor disclosing to a correctional officer that an inmate had behaved inappropriately toward her during a counseling session was legitimately related to penological purpose). Because of the heightened security threat posed by

inmates housed in S–Block, there would be more security concerns in permitting such an inmate to be in close quarters with a civilian staff member in a facility medical unit.[18] (*See* Rich Aff. ¶¶ 10–12). Thus, the correctional officers appropriately remained in the room with plaintiff and the nurse during plaintiff's Telemed appointment with the infectious disease doctor. As part of the Health Care Component that included the nurses and doctors, the officers are also obligated to maintain the confidentiality of the inmate's medical information.

[18]    Deputy Superintendent Rich has personally witnessed security incidents in a facility's medical unit resulting in injury to medical staff, security staff, or inmates. (Rich Aff. ¶ 17).

As discussed above, no infringement of plaintiff's privacy right occurred during the alleged incidents, and even if there were an impingement, it was legitimately related to a penological interest. Accordingly, I recommend granting defendants summary judgment on this basis.[19]

[19]    Plaintiff also includes Superintendent Corcoran in his confidentiality claim, alleging that Superintendent Corcoran created the policy that "authorizes correction[al] officers to obtain confidential HIV-related information in the course of providing health service[s] .... " Because the court finds that plaintiff's confidentiality claim has no merit, it need not analyze whether Superintendent Corcoran was personally involved in the alleged violations of plaintiff's constitutional rights.

**V. *Qualified Immunity***

**\*8** Defendants have asserted that they are entitled to qualified immunity in connection with some or all of plaintiff's claims. In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), modified by *Pearson v. Callahan,* 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (holding that, "while the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory" in all cases). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. This court need not address qualified immunity with respect to plaintiff's various causes of action because, as discussed above, he has not established any alleged violations of his constitutional rights.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that Defendants' motion for summary judgment (Dkt. No. 33) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b) (1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 5599587

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Joseph v. County of Nassau, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-00519-BKS-TWD    Document 29    Filed 01/23/24    Page 58 of 134

2022 WL 4647867
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Anderson JOSEPH, Plaintiff,

v.

COUNTY OF NASSAU and Nassau
Health Care Corporation, Defendants.

18-CV-2290 (PKC) (PK)
|
Signed September 30, 2022

**Attorneys and Law Firms**

Anderson Joseph, Hollis, NY, Pro Se.

Callan Wright Tauster, Nassau County Attorney's Office, Mineola, NY, for Defendant County of Nassau.

Alexander V. Sansone, Law Offices of Alexander V. Sansone, Williston Park, NY, Edward Joseph Troy, Patrick J. Morganelli, Law Office of Edward J. Troy, Greenlawn, NY, for Defendant Nassau Health Care Corporation.

**MEMORANDUM & ORDER**

PAMELA K. CHEN, United States District Judge:

 **\*1** Plaintiff Anderson Joseph, proceeding *pro se*, brings this action against Defendants County of Nassau and Nassau Health Care Corporation ("NHCC"), alleging violations of 42 U.S.C. § 1983, in connection with his incarceration at the Nassau County Correctional Center ("NCCC"). Before the Court are Defendants' motions for summary judgment. For the reasons stated below, Defendants' motions are granted in full, and this case is dismissed.

**BACKGROUND**

**I. Relevant Facts** [1]

[1]     Unless otherwise noted, a standalone citation to Defendants' 56.1 Statement or Plaintiffs' 56.1 Counterstatement, denotes that this Court has deemed the underlying factual allegation undisputed. Any citations to Defendants' 56.1 Statement or Plaintiffs' 56.1 Counterstatement

incorporate by reference the documents cited therein. Where relevant, however, the Court may cite directly to the underlying document.

**A. Plaintiff's Excessive Force Allegations**

From January 23, 2018 to May 9, 2018, Plaintiff was incarcerated at the NCCC for violating his probation. (Deposition of Anderson Joseph ("Joseph Dep."), Dkt. 105-4, at 7:20–8:18.) During his incarceration, he was moved "back and forth" between two different housing units, one a medical housing unit and the other a non-medical housing unit. (*Id.* at 10:2–11:5.) On one occasion while Plaintiff was living in the medical housing unit, a corrections officer named Officer Delpese [2] allegedly "abused" Plaintiff when Plaintiff told the nurse he did not want to take the medication she had given him. According to Plaintiff, "the nurse called the officer and tell the officer that I don't want to cooperate with them. So I tell the officer, That's my right. I don't wanna take ... the pills because when I take the pills I don't feel good, so he push me with his hand open in my stomach [or "heart area"] three times." (*Id.* at 12:9–13:25; *see also id.* at 46:3–47:4.) At the time of this incident, Plaintiff had just returned from the hospital after being treated for a heart condition, although Officer Delpese was not aware of that fact. (*Id.* at 29:13–25.) Plaintiff then asked to see the doctor but, instead, the officer sent Plaintiff, without clothes, to a "cold room" that is used for suicidal inmates. (*Id.* at 19:13–16; *see also id.* at 20–21, 24.) When a sergeant inquired as to what had occurred, the officer "lied to the sergeant" and said that Plaintiff had threatened self-harm. (*Id.* at 23:19–24:22.)

[2]     The parties have not provided Officer Delpese's first name.

While Plaintiff was in the "cold room," he asked to see a doctor "to check on [his] stomach ... [and] chest," but was instead given a "psych doctor," who could not perform a physical examination. (*Id.* at 28:13–22.) [3] Plaintiff disclosed the pushing incident to the doctor and showed the doctor where on his body the corrections officer had pushed him. (*Id.* at 27:10–29:12.) Plaintiff was kept in the "cold room" through dinner and then moved back to his cellblock. (*Id.* at 25:2–24.)

[3]     However, Plaintiff also testified at his deposition that he did eventually receive medical care for the pushing incident and the clinic prescribed him "medication." (Joseph Dep., Dkt. 105-4, at 30:2–9.)

Case 9:22-cv-00519-BKS-TWD    Document 29    Filed 01/23/24    Page 59 of 134

Joseph v. County of Nassau, Not Reported in Fed. Supp. (2022)

**\*2**  The following day, Plaintiff requested a grievance form from corrections officers "at the booth" in his cellblock to complain about Officer Delpesce's conduct. (*Id.* at 22:12–23:12.) According to Plaintiff, they "refused [him]" and "didn't give [him] the paper to fill for a grieving." (*Id.* at 22:16–18.) Since he was denied a grievance form, he used the sick call form to document his complaint. (*Id.* at 31:17–32:16 ("They refused me, but I find way to put it in the sick call because the sick call they give you a paper you can say exactly what happened, and then that's when I put exactly what happened.").) According to Plaintiff, he also called social services, and "they told [Plaintiff] ... they work separate with the jail, so whatever happen in jail is jail, so they cannot help [him]." (*Id.* at 32:17–33:3.) Plaintiff also "sent a letter to [New York State's] Mental Health Department for abusing inmates," but never received a response. (*Id.* at 33:3–10.)

**B. Plaintiff's First Amendment Allegations**

Plaintiff also alleges that he was denied access to "Muslim services" and "Muslim housing." (*Id.* at 60:16–66:15.) Specifically, the officers "didn't even let [Plaintiff] sign for Muslim services" and told Plaintiff the jail "didn't have Muslim services." (*Id.* at 61:21–23.) Plaintiff also alleges that there was "a special house for Muslim" at the NCCC that they would not transfer him to, but he also states that he "[did]n't know if they have a Muslim house or not." (*Id.* at 61:20–63:19.)

According to Plaintiff, the procedure to request to go to services each week was as follows, "I think ... they come in the lobby, ... they have the paper in their hand, one of the officer, and then they go to each cell and then they ask who want to go to Muslim services, Catholic services, ... and then they come and sign your name, and then when the day arrive and then they just come and pick you up and then go." (*Id.* at 61:8–16.) However, according to the NCCC's Inmate Handbook, "[u]pon admission to the facility, an inmate's choice of religion will be recorded, and the inmate will only be allowed to attend that service. If an inmate wishes to change their religion[,] they must contact a Chaplain and complete a change of religion form. Forms are available and can be obtained by request from Correction Officers assigned in your housing area." (Dkt. 102-9, at 9.) Plaintiff alleges that he was not asked about his religious affiliation during intake, but that he was permitted to attend Catholic services. (Joseph Dep., Dkt. 105-4, at 65:9–20.) Plaintiff did not file a change

of religion form or file a grievance in connection with these allegations. (*Id.* at 64:18–12.)[4]

[4]  In Plaintiff's opposition to Defendants' summary judgment motions, he states that his "complaint about Muslim services ... was denied." (Dkt. 103, at ECF 6 (page numbers refer to the pagination generated by the court's CM/ECF docketing system, and not the document's internal pagination).) Given Plaintiff's deposition testimony that he never filed a grievance about being denied access to Muslim services (Joseph Dep., Dkt. 105-4, at 64:18–12), the Court will not consider this allegation. *See In re Fosamax Prods. Liab. Litig.,* 707 F.3d 189, 193 (2d Cir. 2013) (holding "the sham issue of fact doctrine, which prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony" (internal quotation marks omitted)).

**C. Plaintiff's Deliberate Indifference to Medical Care Allegations**

With respect to his deliberate indifference to medical care claim, it appears that Plaintiff is alleging that he was given the wrong psychiatric medication or, alternatively, that he was given a vaccine by a non-party hospital that "messed up [his] whole system." (*Id.* at 51:9–52:8, 71:22–72:5, 75:16–21, 94:3–20; *see also id.* at 88:17–18 ("After they gave me medication, that's when I seen mental health, and that's a no-no."); Dkt. 1, at ECF 4 ("[T]he medical staff gave me wrong medication.").) At some point, Plaintiff stopped taking the medications given to him at the NCCC because they made him "feel weak" and he could only run "for two or five minutes." (Joseph Dep., Dkt. 105-4, at 74:16–75:21, 94:18–95:9.) However, at his deposition, Plaintiff testified that, after he got out of prison, his primary care physician told him that he is anemic and that is "the reason that I feel very weak, I can't run no more ... because of the weakness." (*Id.* at 79:15–80:17.)

**\*3**  Plaintiff did not file a grievance relating to his medical care because the doctor and two nurses told him, "Hey, you already in clinical so you can tell us what happened. And then I tell them exactly what happened." (*Id.* at 90:8–12.) The doctor and nurses began to "come every morning" to check on him. (*Id.* at 90:23–91:7.) It is unclear from the record whether they continued to offer him the purportedly wrong psychiatric medication or not.

Case 9:22-cv-00519-BKS-TWD    Document 29    Filed 01/23/24    Page 60 of 134

Joseph v. County of Nassau, Not Reported in Fed. Supp. (2022)

## II. Procedural History

Plaintiff filed his original complaint in this action on April 17, 2018. (Dkt. 1.) In June 2019, he amended his complaint to add a First Amendment claim relating to the "Muslim services." (Dkt. 46.)

On June 10, 2021, the Court held a conference with the parties where "[t]he Court confirmed, and the [p]arties agreed, that Plaintiff's Amended Complaint consists of the following claims under 28 U.S.C. Section 1983: (1) an excessive force claim against Correctional Officer Delpesce; (2) a deliberate indifference claim based on the alleged inadequacy of medical care against Defendant Nassau County and Defendant [NHCC]; (3) a First Amendment claim based on the alleged denial of access to 'Muslim services' or Muslim housing against Defendant Nassau County." (06/10/2021 Minute Entry.) Defendants' motions for summary judgment were fully briefed on December 1, 2021. (Dkts. 102, 105.)

### LEGAL STANDARD

Summary judgment is appropriate where the submissions of the parties, taken together, "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (The summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."). "A fact is material if it 'might affect the outcome of the suit under the governing law.' " *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021) (quoting *Anderson*, 477 U.S. at 248). "To present a 'genuine' issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence 'such that a reasonable jury could return a verdict for the nonmoving party.' " *Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d Cir. 2021) (quoting *Anderson*, 477 U.S. at 248).

"The moving party bears the burden to demonstrate the absence of any genuine issues of material fact...." *New York v. Mountain Tobacco Co.*, 942 F.3d 536, 541 (2d Cir. 2019). Once this burden is met, the burden shifts to the nonmoving party to proffer some evidence establishing the existence of a question of material fact that must be resolved at trial. *See*

*Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252; *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 143 (2d Cir. 2013). That is, "the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted); *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007).

**\*4** "[A]t the summary judgment stage, the district court is not permitted to make credibility determinations or weigh the evidence...." *Kee v. City of New York*, 12 F.4th 150, 166 (2d Cir. 2021). It must "consider the record in the light most favorable to the non-movant" and "resolve all ambiguities and draw all factual inferences in favor of the non-movant 'if there is a "genuine" dispute as to those facts.' " *Loreley*, 13 F.4th at 259 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). "[T]he district court may not properly consider the record in piecemeal fashion; rather, it must 'review all of the evidence in the record.' " *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000)).

When a *pro se* litigant is involved, "the same standards for summary judgment apply, but the pro se litigant should be given special latitude in responding to a summary judgment motion." *Williams v. Savory*, 87 F. Supp. 3d 437, 451 (S.D.N.Y. 2015) (citation and internal quotation marks omitted).

### DISCUSSION

## I. Defendant Nassau County's Motion for Summary Judgment is Granted as to Plaintiff's Excessive Force Claim.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." *U.S. Const. amend. VIII.* Courts have construed the Eighth Amendment "to protect prison inmates' right to be free from the use of excessive physical force by prison officials." *Jones v. Falco*, No. 20-CV-348, 2022 WL 3668358 (VB), at \*5 (S.D.N.Y. Aug. 25, 2022). To state a *prima facie* excessive force claim, a plaintiff must establish "an objective component and a subjective component." *Id.*

Joseph v. County of Nassau, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-00519-BKS-TWD    Document 29    Filed 01/23/24    Page 61 of 134

To establish the objective component, a plaintiff must show the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. In determining whether conduct was objectively harmful enough, courts must consider the harm done in light of contemporary standards of decency.... To establish the subjective component of an excessive-force claim, a plaintiff must show the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct.

*Id.* at 5–6 (internal citations and quotation marks omitted). However, "not every malevolent touch by a prison guard gives rise to a federal cause of action." *Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010) (internal quotation marks omitted); *id.* at 38 ("An inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." (internal quotation marks omitted)).

Here, Plaintiff's sole allegation of excessive force—that he was pushed by Officer Delpesce—"do[es] not approach an Eighth Amendment claim," particularly where Plaintiff suffered no discernable injury and "[t]he force [he] describes is not sufficiently serious or harmful to reach constitutional dimensions." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) ("[Plaintiff's] allegations of excessive force—that he was bumped, grabbed, elbowed, and pushed ... do not approach an Eighth Amendment claim."); *see also Abreu v. Nicholls*, 368 F. App'x 191, 194 (2d Cir. 2010) (summary order) ("[I]t is well accepted that a mere push or shove is not actionable under the Eighth Amendment."); *Rivera v. Connolly*, No. 18-CV-03958 (PMH), 2022 WL 1785313, at *5 (S.D.N.Y. June 1, 2022) ("According to Plaintiff, Defendant shoved Plaintiff twice. As an introductory point, years of precedent counsel that such conduct does not satisfy the objective prong of an Eighth Amendment claim.") (collecting cases). Shoves are "by their very nature *de minimis* and therefore not cognizable under the Eighth Amendment." *Rivera*, 2022 WL 1785313, at *5.

**\*5** Therefore, Defendant Nassau County's motion for summary judgment as to Plaintiff's excessive force claim is granted.

## II. Defendant Nassau County's Motion for Summary Judgment is Granted as to Plaintiff's First Amendment Claim.

Plaintiff next alleges that he was prevented from attending "Muslim services" and living in "Muslim housing," thereby violating his free exercise rights under the First Amendment. Defendant Nassau County's motion for summary judgment is granted as to this claim.

Under the Prison Litigation Reform Act ("PLRA"), "a prisoner confined in any jail, prison, or other correctional facility" may not bring an action "with respect to prison conditions ... until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). As Plaintiff was a "prisoner confined in any ... correctional facility" at the time of the events in question, his First Amendment claim is subject to the exhaustion requirements of the PLRA. *See Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 81 (2d Cir. 2021). The PLRA requires "proper exhaustion" of administrative remedies, meaning exhaustion in "compliance with an agency's deadlines and other critical procedural rules," *Woodford v. Ngo*, 548 U.S. 81, 90 (2006), "using all steps that the agency holds out, and doing so properly," *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011). As the Second Circuit has explained, "prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself," *Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012) (citation omitted), including as set forth in an inmate handbook, *Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 178 (2d Cir. 2006).

According to the NCCC's Inmate Handbook, "[u]pon admission to the facility, an inmate's choice of religion will be recorded, and the inmate will only be allowed to attend that service. If an inmate wishes to change their religion[,] they must contact a Chaplain and complete a change of religion form." (Dkt. 102-9, at ECF 9.) Here, Plaintiff's religion "upon admission" was not Muslim and he did not complete a change of religion form. (Joseph Dep., Dkt. 105-4, at 64-65.) Additionally, Plaintiff admits that he did not file a grievance "within five (5) days of the date of the act or occurrence leading to the grievance," *i.e.* the denial of his request to

Case 9:22-cv-00519-BKS-TWD    Document 29    Filed 01/23/24    Page 62 of 134

Joseph v. County of Nassau, Not Reported in Fed. Supp. (2022)

attend "Muslim services" or be in "Muslim housing," as required by the Inmate Handbook. (Dkt. 102-9, at ECF 4; *see also* Joseph Dep., Dkt. 105-4, at 64:8–12.) As Plaintiff concedes that he did not comply with the NCCC's procedural rules, his First Amendment claim fails for failure to exhaust his administrative remedies.

Even considering Plaintiff's claim on the merits, the outcome is the same. The Second Circuit has "long held that prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible" and, therefore, "[a] prisoner's first amendment right to the free exercise of his religious beliefs may only be infringed to the extent that such infringement is reasonably related to legitimate penological interests." *Young v. Coughlin*, 866 F.2d 567, 570 (2d Cir. 1989). To prevail on a First Amendment claim under § 1983, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs. The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends*, 16 F.4th at 84 (internal citations omitted). As the Second Circuit has explained, "the relevant question in determining whether [a plaintiff's] religious beliefs were substantially burdened is whether participation in [the activity] ... is considered central or important to [the plaintiff's] practice of Islam." *Ford v. McGinnis*, 352 F.3d 582, 593–94 (2d Cir. 2003).

**\*6** Here, Plaintiff has failed to meet his burden of demonstrating that (i) he has a religious belief and (ii) that it is sincerely held. *See Arrotta v. Ulster Cty. Sheriff's Dept.*, No. 22-CV-0638, 2022 WL 4235463 (GLS/TWD), at *4 (N.D.N.Y. Sept. 14, 2022) ("A religious belief is sincerely held when the plaintiff subjectively, sincerely holds a particular belief that is religious in nature."). While Plaintiff alleges that he wanted to attend "Muslim services" and live in "Muslim housing," he does not actually articulate what his religious beliefs are, whether he is Muslim, or whether the housing and religious services "were central or important to [his] faith." *Lopez v. Cipolini*, 136 F. Supp. 3d 570, 588 (S.D.N.Y. 2015) (internal quotation marks omitted). This constitutes an independent ground on which to dismiss Plaintiff's free-exercise-of-religion claim.

### III. Defendants' Motion for Summary Judgment are Granted as to Plaintiff's Deliberate Indifference to Medical Care Claim.

Plaintiff's final claim is one for deliberate indifference to his medical needs because the medical staff "gave [him] wrong medication." (Dkt. 1, at ECF 4.) Defendants Nassau County and NHCC's motions for summary judgment are granted as to this claim.

The Supreme Court has held that deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To succeed on an Eighth Amendment deliberate indifference claim, a plaintiff must satisfy two requirements: "he must show both that the danger posed by the indifference he alleges is sufficiently serious and that the defendant has acted with deliberate indifference to inmate health or safety in failing to address this danger." *Smith v. Fischer*, 500 F. App'x 59, 61 (2d Cir. 2012) (summary order) (internal quotation marks omitted).

Even assuming *arguendo* that employees of Defendant NHCC administered the wrong medication to plaintiff, there is no evidence in the record to "conclude that NHCC acted with deliberate indifference to plaintiff's medical needs, that is, there is no evidence that NHCC employees acted 'while actually aware of a substantial risk that serious inmate harm [would] result.' " *Miller v. Nassau Health Care Corp.*, No. 09-CV-5128, 2012 WL 2847565 (JFB) (AKT), at *1 (E.D.N.Y. July 11, 2012) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006)); *see also Revels v. Corr. Med. Care, Inc.*, No. 17-CV-88 (MAD/TWD), 2022 WL 1224407, at *9 (N.D.N.Y. Apr. 26, 2022) ("Cases have consistently held that the mistaken/negligent administration of incorrect medication is insufficient to support a claim of deliberate indifference under the Eighth Amendment.") (collecting cases); *Vail v. City of New York*, 68 F. Supp. 3d 412, 425 (S.D.N.Y. 2014) (dismissing deliberate indifference claim based on a medication error where defendants "both thought that [the jail's nurse] had given Plaintiff the correct medication") (collecting cases); *Long v. Lafko*, 254 F. Supp. 2d 444, 447 (S.D.N.Y. 2003) (dismissing deliberate indifference claim based on medication error where defendant's conduct was "merely negligent or unprofessional in failing to check the medication before administering it"). In fact, it appears that once Plaintiff relayed his concerns about the side effects of the medication to the NHCC doctor and nurses, they began checking on him every morning to see how

he was doing. (*See* Joseph Dep., Dkt. 105-4, at 90:23–91:7.) Therefore, even drawing all reasonable inferences in Plaintiff's favor, no rational jury could conclude that Defendants acted with deliberate indifference to Plaintiff's medical needs. Defendants' motions for summary judgment are granted as to this claim.

**CONCLUSION**

**\*7** For the reasons explained above, Defendants' motion for summary judgment is granted in full and this case is dismissed.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 4647867

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1982920
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Gentry MONTGOMERY, Plaintiff,

v.

Thomas HALL, et al., Defendants.

No. 11 Civ. 4645(PAC)(GWG).
|
May 15, 2013.

*REPORT AND RECOMMENDATION*

GABRIEL W. GORENSTEIN, United States Magistrate
Judge.

**\*1** Plaintiff Gentry Montgomery, currently incarcerated
at the Auburn Correctional Facility and proceeding *pro
se,* brings this action under 42 U.S.C. § 1983, alleging
that the defendants—Warden Thomas Hall, Correction
Officer ("CO.") Kane, and C.O. Robert Hicks (collectively,
"defendants")—violated his constitutional rights when he
conducted a strip search of him while he was a pretrial
detainee at the Manhattan Detention Complex ("MDC").
Defendants have moved for summary judgment. For the
following reasons, this motion should be granted.

I. *BACKGROUND*
On a summary judgment motion, we "view the facts and
draw reasonable inferences in the light most favorable
to the party opposing the summary judgment motion,"
*Scott v. Harris,* 550 U.S. 372, 378, 127 S.Ct. 1769, 167
L.Ed.2d 686 (2007) (citation, internal quotation marks, and
brackets omitted)—in this case, Montgomery. Montgomery's
response to the summary judgment motion is contained in
a document entitled "Affirmation in Opposition to Motion
for Summa[r]y Judgment," dated Jan. 22, 2013 (Docket
# 38) ("Pl.Aff."). This document contains no substantive
allegations or evidence regarding the incident alleged in the
complaint. But inasmuch as Montgomery's complaint was
sworn under penalty of perjury, *see* Complaint under the
Civil Rights Act, 42 U.S.C. § 1983, dated May 21, 2011
(Docket # 2) ("Compl."), we accept it as admissible evidence
in opposition to the defendants' motion.[1]

[1] We do not consider any statements contained in the
grievance, dated May 14, 2011, that Montgomery
attached to the complaint. The grievance is
unsworn and thus inadmissible. Also, it appears
that it was attached to the complaint simply as proof
that Montgomery had filed a grievance. Finally, it
does not contain any factual allegations not already
included in the complaint.

A. *Montgomery's Allegations*
On May 11, 2010, between 7:00 and 7:30 in the morning,
Montgomery was in a holding pen at the MDC awaiting
a court appearance. *Id.* ¶ II.A–C. Montgomery was told to
disrobe "in front of numerous detainee[s] with no partitions
between [the detainees] or the male or female officers out and
about carrying out their duties." *Id.* ¶ II.D. When he refused
to remove his clothes, he was "then surrounded [and] then
threatened to strip." *Id.* C .O. Kane said to Montgomery, "I
don't care if you are 'Muslim' you still gonna [sic] strip."
*Id.* Another detainee "consoled" him and told him to "just
comply and write it up later," while other detainee[s] "stood
around butt [sic] naked watching what was taking place."
*Id.* ¶ II.D. Several other inmates witnessed the incident and
underwent similar experiences "on that day or [the] day
before or after." *Id.*

Montgomery contends that the officers "d[i]srespected [him]
as a human being" and "install[ed] fear" in him. *Id.* ¶ III.
He states that "being forced to strip [and] bend over is one
thing, but in front of others is humiliating and degrading[,]
your personal busi[ ]ness is out there while they are standing
around laughing and mak[ing] jokes like we are a he[ ]rd of
cattle." *Id.* ¶ V. He requests $5 million "to compensate [him]
self and the other (victims) detainees invol[v]ed." *Id.* He also
requests "that their policy be enforce[d] and revised[,] the
constitutional rights of all detainees stop be voilated [sic], that
N.Y.C. Dept of Corr. stop abusing their authority and voilating
[sic] the color of law." *Id.*

B. *Procedural History*
**\*2** Following discovery, defendants moved for summary
judgment. *See* Notice of Motion, filed Dec. 12, 2012 (Docket
# 31); Notice to Pro Se Litigant Who Opposes a Motion
for Summary Judgment, filed Dec. 12, 2012 (Docket #
32); Defendants' Local Rule 56.1 Statement of Undisputed
Material Facts, filed Dec. 12, 2012 (Docket # 33); Declaration
of Felicia A. Yancey in Support of Defendants' Motion for
Summary Judgment, filed Dec. 12, 2012 (Docket # 34);

Memorandum of Law in Support of Defendants' Motion for Summary Judgment, filed Dec. 12, 2012 (Docket # 35) ("Def.Mem."). Montgomery filed an affirmation opposing the motion. *See* Pl. Aff. Defendants requested that this affirmation be disregarded and declined to submit a formal reply. *See* Letter from Felicia A. Yancey to the Honorable Gabriel W. Gorenstein, dated Feb. 11, 2013 (Docket # 40).

## II. *LAW GOVERNING SUMMARY JUDGMENT MOTIONS*

Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed" and the court must draw "all justifiable inferences" in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial,*' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original) (additional citation omitted) (quoting Fed.R.Civ.P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (citations omitted). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.' " *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (alteration in original) (quoting *Celotex,* 477 U.S. at 322). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo,*

100 F.3d 253, 258 (2d Cir.1996) (citing *Anderson,* 477 U.S. at 247–48).

**\*3** Because Montgomery is proceeding *pro se,* we construe his papers "liberally and interpret them to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (citation and internal quotation marks omitted). Nonetheless, "our application of this different standard does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003) (internal citation and quotation marks omitted); *accord Bennett v. James,* 737 F.Supp.2d 219, 226 (S.D.N.Y.2010) ("Notwithstanding the deference to which a *pro se* litigant is entitled, as well as the deference accorded to a non-movant on a summary judgment motion, [the non-movant] must produce specific facts to rebut the movant's showing and to establish that there are material issues of fact requiring a trial.") (internal punctuation and citations omitted), *aff'd,* 441 F. App'x 816 (2d Cir.2011).

## III. *DISCUSSION*

Defendants seek summary judgment on several grounds: (1) Montgomery failed to allege personal involvement by Warden Thomas Hall, Pl. Mem. at 4–6; (2) the New York City Department of Correction is not a suable entity, and Montgomery has failed to assert claims of municipal liability against the City of New York, *id.* at 6–7; (3) Montgomery's strip search claim fails as a matter of law because the search did not violate his First, Fourth, or Eighth Amendment rights, *id.* at 7–13; (4) defendants are entitled to qualified immunity, *id.* at 14–15; and (5) Montgomery's claims are unexhausted and therefore barred, *id.* at 15–20. Because the defendants are entitled to summary judgment on the merits of Montgomery's claim, it is unnnecessary to reach the other grounds they raise.

To state a claim under § 1983, Montgomery must show that he was denied a constitutional or federal statutory right and that the deprivation of that right occurred under color of state law. *See* 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Section 1983 does not grant any substantive rights but rather "provides only a procedure for redress for the deprivation of rights established elsewhere," such as in the Constitution or federal statutes. *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994). Here, Montgomery claims that defendants violated his constitutional rights when he was

ordered to participate in a "strip body cavity search" before he left the MDC for a court appearance. *See* Compl. ¶ II.D.

Montgomery's claim fails because the strip search he describes did not violate the federal constitution. Strip searches of pretrial detainees are constitutional when they are reasonably related to a "legitimate penological interest." *Florence v. Bd. of Chosen Freeholders,* ––– U.S. ––––, ––––, 132 S.Ct. 1510, 1515, 182 L.Ed.2d 566 (2012) (internal quotation marks omitted) (citing cases) (upholding constitutionality of strip search of detainee arrested on minor charge prior to his introduction to the general prison population). "[C]orrectional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Id.* at 1517 (internal citations omitted). Prison officials need not possess probable cause to conduct a strip search of inmates. *Jean–Laurent v. Wilkerson,* 438 F.Supp.2d 318, 323 (S.D.N.Y.2006) (citing *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Covino v. Patrissi,* 967 F.2d 73, 79 (2d Cir.1992); *Michenfelder v. Sumner,* 860 F.2d 328, 332–33 (9th Cir.1988)), *aff'd,* 461 F. App'x 18 (2d Cir.2012). In assessing the reasonableness of a strip search, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Hodges v. Stanley,* 712 F.2d 34, 35 (2d Cir.1983) (alteration in original) (quoting *Bell,* 441 U.S. at 559). "[I]n the absence of substantial evidence in the record to indicate that [prison] officials have exaggerated their response to [legitimate security] considerations courts should ordinarily defer to their expert judgment in such matters." *Florence,* 132 S.Ct. at 1517 (internal citation and quotation marks omitted).

**\*4** Under this framework, Montgomery has not met his burden of proving that the strip search he describes was unconstitutional. Requiring detainees at the MDC to submit to a strip search prior to departing the facility for a court appearance serves the legitimate penological interest of "preventing the smuggling of contraband into or out of" the MDC. *Myers v. City of N.Y.,* 2012 WL 3776707, at \*9 (S.D.N.Y. Aug.29, 2012); *accord Bell,* 441 U.S. at 558–60 (upholding strip searches of pretrial detainees following visits with outside individuals and noting that "[s]muggling of money, drugs, weapons, and other contraband [in correctional facilities] is all too common an occurrence."); *Israel v. City of N.Y.,* 2012 WL 4762082, at \*3 (S.D.N.Y. Oct.5, 2012) (finding strip searches at the MDC upon departure and return from court appearances constitutional in light

of "the legitimate interest of preventing the smuggling of contraband," and granting summary judgment to defendants).

Montgomery asserts that the particular search at issue was not "conducted properly" according to "proper strip search procedures ." Pl. Aff. at 3–4 ("[I]f the search was conducted properly and in accordance with the 4th, 1st, and 8th amendment mandates of issues of this [n]ature, ... the issue of the plaintiff feeling disrespect[ed], fearful and humiliated would have been of no consequence."). Thus, he asserts that it is "disputable ... whether or not the search ... was conducted in accordance with departmental regulations." *Id.* at 2. Montgomery does not specify, however, what regulation he contends was violated. In any event, whether the search was conducted in compliance with a department regulation is not part of the constitutional analysis. What is important is that Montgomery has provided no evidence that the strip search at issue constituted an "exaggerated" response to security concerns at the MDC. *See Florence,* 132 S.Ct. at 1517; *Malik v. City of N.Y.,* 2012 WL 3345317, at \*13 (S.D.N.Y. Aug.15, 2012) (where searches are part of routine, "institutional" searches, "[r]outine random strip searches of inmates, including body cavity inspections, do not violate the Fourth Amendment") (alteration in original) (internal citation and quotation marks omitted).

That the search was conducted without "partitions" and that there were "male or female officers out and about carrying out their duties" similarly does not show that the strip search was overly invasive or went beyond the scope of what was necessary. Case law reflects that the constitutionality of a strip search is not negated by the presence of other inmates and employees of the facility—of either sex—during the search. *See Israel,* 2012 WL 4762082, at \*3 ("The presence of other inmates and officers, males and females, does not alter th[e] determination" that the strip search of plaintiff was constitutional); *Miller v. Bailey,* 2008 WL 1787692, at \*9 (E.D.N.Y. Apr.17, 2008) ("[S]trip searches of prisoners in the presence of other inmates and staff [are] not constitutionally defective, especially in light of legitimate security concerns.") (citing cases); *accord Sattler v. Foster,* 37 F. App'x 311, 312 (9th Cir.2002) ("Occasional viewing of male prisoners by female correctional officers does not violate the Fourth Amendment right to privacy or the Eighth Amendment prohibition against cruel and unusual punishment."). As we have previously noted, "[n]ot every embarrassment, humiliation, or psychological discomfort amounts to a constitutional violation." *Arnold v. Westchester Cnty.,* 2012 WL 336129, at \*11 (S.D.N.Y.), *adopted,* 2012

WL 841484 (S.D.N.Y. Mar.13, 2012); *see also Malik,* 2012 WL 3345317, at *13 (finding strip search constitutional and granting motion to dismiss where there was no "physical or sexual abuse").

**\*5** Montgomery alleges that when he protested the strip search, C.O. Kane stated, "I don't care if you are 'Muslim' you still gonna [sic] strip." Compl. ¶ II.D. But Montgomery provides no evidence that the search occurred because of his religion. Thus, the making of this comment does not render the strip search unconstitutional. *See Malik,* 2012 WL 3345317, at *2, *13 (no constitutional violation where officers made statements such as " 'M[u]sl[i]ms gotta get naked too' " during strip search) (alterations in original). Inasmuch as Montgomery makes no mention whatsoever of his religion, he cannot be viewed as claiming that the strip search violated his right to the free exercise of religion under the First Amendment. But even if he had made such a claim, it would fail. A free exercise claim requires a showing "that the disputed conduct substantially burdens [a detainee's] sincerely held religious beliefs." *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006) (internal citation omitted). Once that showing is made, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Id.* at 275; *accord James v. Hayden,* 2010 WL 3703841, at *3 (S.D.N.Y. Sept.21, 2010). Because Montgomery has failed to make this initial showing, any free exercise claim could not withstand a motion for summary judgment. *James,* 2010 WL 3703841, at *3 (granting summary judgment in favor of defendants and upholding constitutionality of strip search where plaintiff had alleged that strip search violated his right to free exercise of religion but failed to show a specific burden on his religious rights).

IV. *CONCLUSION*
For the foregoing reasons, the defendants' motion for summary judgment (Docket # 31) should be granted.

### PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Paul A. Crotty, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Crotty. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010).

### All Citations

Not Reported in F.Supp.2d, 2013 WL 1982920

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3765847
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Rudolph McQUILKIN, Plaintiff,
v.
CENTRAL NEW YORK PSYCHIATRIC
CENTER, J. Taylor, J. Berggren, V. Komareth,
K. Sangani, Dr. Hernandez, D. Sawyer,
S. Hanna, and G. Bodrog, Defendants.

Civil Action No. 9:08–CV–00975 (TJM/DEP).
|
Aug. 27, 2010.

**Attorneys and Law Firms**

Rudolph McQuilkin, New York, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Krista A. Rock, Esq., Assistant Attorney General,
of Counsel, Albany, NY, for Defendants CNYPC, J. Taylor, J.
Berggren, V. Komareth, Dr., Hernandez, D. Sawyer, S. Hanna,
and G. Bodrog.

O'Connor, O'Connor Law Firm, Law Firm—Albany Office,
Peter Joslin, Jr., Esq., of Counsel, Albany, NY, for Defendant
K. Sangani.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Rudolph McQuilkin, a former New York State
prison inmate who is proceeding *pro se* and *in forma pauperis,*
has commenced this action pursuant to 42 U.S.C. § 1983
against the Central New York Psychiatric Center ("CNYPC
or "Center") and several Center employees as well as the
superintendent of one of the correctional facilities in which
he was previously housed, claiming that his civil rights
were violated during the course of his confinement. In his
complaint, as amended, plaintiff alleges that he was civilly
committed to CNYPC against his will and forcibly medicated
with various psychiatric drugs in retaliation for having
served a "notice of summons" on the superintendent of the
Gouverneur Correctional Facility ("Gouverneur"), without
his consent and in violation of his religious beliefs. Plaintiff

further complains of the seizure and destruction of certain of
his personal property. Plaintiff's complaint seeks injunctive
relief, elimination of any reference of being a mental health
patient from his institutional record, and an award of both
compensatory and punitive damages.

In response to plaintiff's complaint one of the defendants, Dr.
Kishor R. Sangani, a psychiatrist, has moved for dismissal
alleging that plaintiff's complaint fails to assert an actionable
claim against him. Those remaining defendants who have
been served and appeared in the action have moved for
summary judgment on a variety of grounds, both procedural
and substantive including, *inter alia,* on the basis of qualified
immunity.

Having carefully considered defendants' motions, which
McQuilkin has not opposed, I recommend that they be granted
and that the second amended complaint be dismissed in its
entirety.

I. *BACKGROUND* [1]

[1]    In light of the procedural posture of the case the
       following recitation is derived from the record now
       before the court with all inferences drawn and
       ambiguities resolved in favor of the plaintiff. *Terry
       v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

At the times relevant to the claims set forth in his second
amended complaint, plaintiff was a prison inmate entrusted
to the care and custody of the New York State Department of
Correctional Services ("DOCS"), and designated to various
DOCS prisons as well as the CNYPC, a facility located in
Marcy, New York and operated under the authority of the New
York State Office of Mental Health ("OMH"). *See generally*
Second Amended Complaint. Plaintiff was released from
DOCS custody on October 27, 2009. Waldron Aff. (Dkt. No.
66) ¶ 35 and Exh. A. [2]

[2]    Because defendants' summary judgment moving
       papers were filed traditionally, they do not appear
       on the docket but collectively have been assigned
       docket number 66.

Plaintiff was admitted into the CNYPC from the nearby
Mid–State Correctional Facility ("Mid–State"), on September
17, 2007, and was diagnosed with schizophrenia, paranoid
type. [3] *Id.* at ¶ 6, Exh. B. at P2; Defendants' Rule 7.1(a)(3)
Statement ¶ 2. Paranoid schizophrenia can cause a variety

of symptoms, the most prevalent of which are delusions, auditory hallucinations and disorganized thinking. Waldron Aff. (Dkt. No. 66) ¶ 7. Individuals who suffer from this type of schizophrenia frequently suffer from feelings of being persecuted or plotted against and may have grandiose delusions that are associated with protecting themselves from the perceived plot. Waldron Aff. (Dkt. No. 66) ¶ 7. According to his referral from Mid–State, on or about September 17, 2007, plaintiff "started to become irritable and paranoid. He displayed a thought disorder and believed that there was a plan by the mental health staff to murder him. He was refusing medication and mental health treatment." Waldron Aff. (Dkt. No. 66) Exh. B at P289.

3      The 2007 admission to the Center was plaintiff's second, the first having occurred in 1998. Waldron Aff. (Dkt. No. 66) ¶¶ 8–9. During the first admission, which lasted twenty-seven days, plaintiff was diagnosed with schizophrenia paranoid type. *Id.* The notes of that admission reflect that while at Mid–State plaintiff refused to take psychotropic medications. *Id.* at ¶¶ 8–9 and Exh. B at P289.

*2 Upon his arrival at the CNYPC, plaintiff consistently refused his medications. *Id.* at P291. Plaintiff explained the basis for that refusal by stating to CNYPC personnel "these are heterogeneous medications, work as isotopes, you know, like small nuclear bombs[,]", adding "I am a different organism, therefore under no circumstances I would take them." *Id.*

On or about October 1, 2007, Donald Sawyer, Ph. D., the Executive Director of the Center, petitioned the New York State Supreme Court, Oneida County, for an order committing plaintiff to the CNYPC for a period not to exceed six months. *Id.* at P271–272. Following a hearing regarding the petition held on October 11, 2007, Supreme Court Justice Anthony F. Shaheen issued a ruling, over plaintiff's objection, in which he determined that McQuilkin was mentally ill and a proper subject for custody and continued treatment in the CNYPC within the meaning of New York Mental Hygiene Law ("MHL") § 9.27, and therefore approved the requested retention period. [4] Waldron Aff. (Dkt. No. 66) Exh. B. at P263.

4      Pursuant to the MHL, the director of a hospital may receive and retain therein as a patient any person alleged to be mentally ill and in need of

involuntary care and treatment upon the certificates of two examining physicians, accompanied by an application for the admission of such a person. N.Y. MENTAL HYG. § 9.27(a). The examination may be conducted jointly but each examining physician must execute a separate certificate. *Id.*

Based on plaintiff's refusal to consent to the administration of medication while at the Center, and following an evaluation of his condition by CNYPC staff, on or about November 1, 2007, Sawyer once again petitioned the state courts, this time for an order authorizing OMH employees to forcibly administer psychiatric medication to McQuilkin. Waldron Aff. (Dkt. No. 66) ¶ 17 and Exh. B at P276–96. That involuntary treatment petition was granted on November 21, 2007, following a hearing and despite McQuilkin's objection, based upon a finding that plaintiff lacked the capacity to make a reasoned decision regarding his own treatment and that the administration of medication to the plaintiff was in his best interest. *Id.* at ¶¶ 19–20 and Exh. B at P318–19. The order granting the petition authorized the administration of psychiatric drugs "during the concurrent retention of Rudolph McQuilkin, and any extension thereof at [CNYPC] as well as for a period not to exceed twelve (12) months after the patient is discharged from the [CNYPC] to a psychiatric satellite unit operated by [OMH] at a New York State Correctional facility ..." *Id.* at Exh. B and P319.

Plaintiff was discharged from the CNYPC and transferred into the Clinton Correctional Facility ("Clinton") on January 4, 2008, commencing the twelve-month period of court-authorized forced medication. Waldron Aff. (Dkt. No. 66) ¶ 21. During that time, plaintiff was injected with fifty milligrams of Haldol, an antipsychotic medication, once a month. *Id.* at ¶¶ 21–22 and Exh. B. at P320–23.

From the expiration of the court-ordered psychiatric treatment period on January 4, 2009 until April of 2009, plaintiff refused to be medicated, which caused him to become symptomatic. Waldron Aff. (Dkt. No. 66) ¶ 23 and Exh. B. at P327–30. On April 8, 2009, Dr. Sohail Gillani, a psychiatrist, requested that McQuilkin be taken to the Clinton Mental Health Satellite Unit ("Satellite Unit") for evaluation as to whether an involuntary psychiatric hospitalization in the CNYPC, based upon the recommendation of two physicians, should be sought and with the intent of seeking another court order permitting involuntary psychiatric medication. Waldron Aff. (Dkt. No. 66) ¶ 24 and Exh. B at P331–32. This request was based on plaintiff's ongoing refusal to take psychiatric medication and his repeated history of subsequent psychiatric

decompensation, as well as his refusal to attend therapy sessions during which his mental status could be clinically monitored. *Id.*

**\*3** As a result of Dr. Gillani's request, plaintiff was escorted from his cell to the Mental Health Satellite unit at Clinton, where he was assigned to a residential crisis treatment program cell. *Id.* at ¶ 26. Once there, McQuilkin showed poor insight and judgment, continued to display symptoms of paranoia, and persisted in his denial of any mental health issues. *Id.* at ¶ 27. Plaintiff remained in the satellite unit for less than twenty-four hours, however, based upon his agreement to take his prescribed psychiatric medication (Haldol 50 mg). *Id.* at ¶ 28.

During the period that Haldol was administered, plaintiff complained of side effects including a rash.[5] Waldron Aff. (Dkt. No. 66) ¶ 32. The use of Haldol to address plaintiff's condition was ultimately discontinued, and Risperal was added to his prescription drug regimen on or about July 17, 2009. *Id.* at ¶ 33 and Exh. B at P336. Since then, plaintiff has not registered any further medical complaints, and reports that he "like[s] the Risperdal better." *Id.* at ¶ 34.

[5]     According to defendants' submissions, this is not a side effect ordinarily associated with Haldol. Waldron Aff. (Dkt. No. 66) ¶ 32.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on September 22, 2008, and has since twice amended his complaint. Dkt. Nos. 1, 8, and 35. As defendants, plaintiff's second amended complaint names the CNYPC; J. Taylor, the Superintendent of the Gouverneur Correctional Facility; CNYPC psychiatrists J. Berggren, V. Komareth, K. Sangani, S. Hanna, and Dr. Hernandez; D. Sawyer, the Director of the CNYPC; and G. Bodrog, whose position is not disclosed in plaintiff's complaint but who appears to be a physician involved in the October, 2007 petition to have him involuntarily committed. Dkt. No. 35; *see* Waldron Aff. (Dkt. No. 66) Exh. B at P287–88. Plaintiff's second amended complaint contains three designated causes of action requesting various forms of relief, including 1) an order prohibiting defendants from forcing McQuilkin to take psychiatric medications against his free will; 2) total expungement of any reference of being a mental health patient from plaintiff's institutional record; and 3) damages for wanton disregard of his Eighth Amendment rights as well as directing that defendants not retaliate against him for filing this proceeding. Dkt. No. 35.

In response all of the defendants, with the exception of Dr. Sangani, have answered generally denying the allegations of plaintiff's complaint and asserting eighteen separate affirmative defenses. Dkt. No. 38. For his part, Dr. Sangani has moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure seeking the dismissal of plaintiff's claims against him for failure to state a claim upon which relief may be granted. Dkt. No. 56.

On January 28, 2010, following the completion of discovery, the defendants other than Dr. Sangani moved for summary judgment dismissing plaintiff's complaint upon a variety of grounds. Dkt. No. 66. In their motion, those defendants argue that 1) all claims against the CNYPC and against the other defendants in their official capacities should be dismissed as barred by the Eleventh Amendment; 2) plaintiff's first cause of action, seeking injunctive relief, should be dismissed as moot in light of his release from DOCS custody; 3) plaintiff's claims are procedurally barred based upon his failure to exhaust administrative remedies with respect the majority of his claims; 4) plaintiff's claims surrounding his interfacility transfer lack merit since inmates do not have a constitutional right to be incarcerated at a correctional facility of their choice; 5) plaintiff's due process claim concerning the alleged seizure and destruction of his personal property is not constitutionally cognizable; 6) plaintiff is not entitled to expungement of his psychiatric records; 7) plaintiff's allegations of wrongdoing are unduly conclusory and therefore subject to dismissal; 8) plaintiff's challenges to his OMH confinement are barred by *Heck v. Humphrey* and the *Rooker–Feldman* doctrine[6]; 9) defendants are entitled to qualified immunity; and 10) plaintiff's claims surrounding disagreement with his medical care are not actionable under the Eighth Amendment.

[6]     *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); *District of Columbia v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923).

**\*4** Despite expiration of the time for responding, plaintiff has failed to offer any submissions in opposition to either of the pending motions, which are now ripe for determination and have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

McQuilkin v. Central New York Psychiatric Center, Not Reported in F.Supp.2d (2010)

## III. *DISCUSSION*

### A. *Standards of Review*

#### 1. *Motion to Dismiss*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929, ––––, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b) (6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001)

(quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted).

#### 2. *Summary Judgment Motions*

**\*5** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though pro se plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether pro se plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable

trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Assn. v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); see also Anderson, 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Plaintiff's Failure to Oppose Defendants' Summary Judgment Motion*

**\*6** Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' motions, and specifically whether that failure automatically entitles defendants to the relief sought.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed an admission that there is no opposition to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against dismissal or summary judgment motions. *See Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the consequences of Local Rule 7.1(b) (3). *Robinson v. Delgado,* No. 96–CV–169, 1998 WL 278264, at \*2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.) [7]; *Cotto v. Senkowski,* No. 95–CV–1733, 1997 WL 665551, at \*1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106–07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.). Accordingly, absent a showing of good cause defendants' unopposed motions should be granted, if determined to be facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231–32 (N.D.N.Y.2000) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545–46 (N.D.N.Y.2000) (Kahn, J.).

[7] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

It should also be noted that the plaintiff's failure to properly oppose the pending summary judgment motion is not without further consequences. By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged, thus permitting the court to deem facts set forth in the defendants' statement of material facts not in dispute to have been admitted based upon his failure to properly respond to that statement. *See Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 WL 1264122, at \*1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dept. of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

Based upon plaintiff's failure to oppose defendants' summary judgment motion, I recommend that the court review the motion for facial sufficiency, accepting defendants' assertions of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, and that the motion be granted if determined to be facially meritorious. [8]

[8] I note that defendants' notice of motion contains the required notice to plaintiff of the consequences of his failure to respond to the summary judgment motion. Dkt. No. 66; *see* N.D.N.Y.L.R. 56.2.

C. *Eleventh Amendment Immunity*
At the outset, defendants' summary judgment motion seeks dismissal of plaintiff's claims against the CNYPC as well as the individual defendants, to the extent that they are sued in their official capacities, asserting their entitlement to Eleventh Amendment immunity.

**\*7** As defendants correctly argue, "it is beyond dispute that the State of New York and its agencies have never consented to be sued in federal court." *Dube v. State Univ. of N.Y.,* 900 F.2d 587, 594–95 (2d Cir.1990), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991). [9] "The law is clear that the state, and state agencies ..., are immune from prisoner § 1983 suits because of their Eleventh Amendment sovereign immunity." *Jackson v. Johnson,* 985 F.Supp. 422, 426 (S.D.N.Y.1997).

[9]    "On the other hand, a state official acting in his [or her] official capacity may be sued in a federal forum to enjoin conduct that violates the federal Constitution, notwithstanding the Eleventh Amendment bar. *Id.* at 595 (citing *Papasan v. Allain,* 478 U.S. 265, 276–77, 105 S.Ct. 2932, 2939–40 (1986)). Insofar as plaintiff seeks injunctive relief, his claims against the CNYPC and the individual defendants in their official capacities are not barred by the Eleventh Amendment. As will be seen, however, plaintiff's request for injunctive relief is nonetheless moot in light of his release from prison. *See* pp. 21–23, *post.*

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends to both state agencies and state officials sued in their official capacities, when the essence of the claim involved is one against a state as the real party in interest. [10] *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984), (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89–91 102 S.Ct. 2325, 2328–2329 (1982)). To the extent that a state official is sued for damages in his or her official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. [11] *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer,* 502 U.S. at 25, 112 S.Ct. at 361.

[10]    In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County,* 547 U.S. 189, 193, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367 (2006).

[11]    By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under *section 1983. See Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

Because plaintiff's *section 1983* claims against the CNYPC are in reality claims against the State of New York, they typify those against which the Eleventh Amendment protects, and are therefore subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798–99 (N.D.N.Y.1984) (McCurn, J.). Additionally, to the extent that plaintiff asserts claims for damages against the defendants in their official capacities, those claims are properly regarded as claims against the state, and are likewise barred by the Eleventh Amendment. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 3107, 87 L.Ed.2d 114 (1985); *Ying Jing Gan v. City of N.Y.,* 996 F.2d 522, 529 (2d Cir.1993). Accordingly, I recommend the entry of summary judgment dismissing plaintiff's claims for damages against the CNYPC and the individual defendants in their official capacities.

### D. *Mootness*

In their motion, defendants next seek summary judgment with respect to plaintiff's first cause of action, in which he seeks "[a]n order prohibiting defendants from forcing plaintiff to take psychiatric medications against his free will." Second Amended Complaint (Dkt. No. 35) p. 9. In support of their request, defendant argues that because the plaintiff is no longer in state custody, that claim is moot.

"The mootness doctrine is derived from Article III of the Constitution, which provides that federal courts may decide only live cases or controversies. 'This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate.' " *Van Wie v. Pataki,* 267 F.3d 109, 113 (2d Cir.2001) (citations omitted). A federal court has no authority to decide an issue when the relief sought can no longer be given, or is no longer needed. *Martin– Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983). The courts have recognized a narrow exception to this rule for repetitive conduct, although only in exceptional circumstances. *City of Los Angeles v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 1669, 75 L.Ed.2d 675 (1983). The capable of repetition doctrine applies when the conduct at issue is of insufficient duration to permit it to be fully litigated and is reasonably likely to reoccur. *Spencer v. Kemna,* 523 U.S. 1, 17, 118 S.Ct. 978, 988, 140 L.Ed.2d 43 (1998) (citing and quoting *Lyons* ). This limited exception does not appear to be potentially applicable in this instance.

**\*8** The record now before the court reflects that plaintiff is no longer in state custody. *See* Dkt. No. 57; Waldron Aff. (Dkt. No. 66) Exh. A. To the extent McQuilkin seeks injunctive relief preventing the defendants from forcing him to be medicated against his will, they are no longer involved with him, and the claim is now moot. I therefore recommend dismissal of plaintiff's first cause of action on this basis.

### E. *Exhaustion*

In their motion defendants seek dismissal of certain of plaintiff's claims on the basis of his failure to exhaust available administrative remedies before commencing suit.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002) (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement, though not jurisdictional, gives rise to a defense which may affirmatively be raised by a defendant in response to an inmate suit. *Jones v. Block,* 549 U.S. 199, 212, 127 S.Ct. 910, 919, 166 L.Ed.2d 798 (2007). In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ).[12]

[12]   While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted).

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112–13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the IGRC within twenty-one days of the incident. 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the CORC which makes the final administrative decision. *Id.* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at \*3 (S.D.N.Y. Dec.11, 2000)).

**\*9** In support of their exhaustion argument, defendants submit a declaration given by Karen Bellamy, the Director of the IGP, reflecting that from a review of records maintained by the CORC it appears that only one grievance filed by the plaintiff, grievance number CL 57139–08, relating to missing personal property, was processed through to completion under the IGP. *See* Bellamy Aff. (Dkt. No. 66) ¶ 10. This, they assert, requires dismissal of all of plaintiff's remaining claim as unexhausted.

While McQuilkin does not appear to have filed grievances related to the other matters at issue in this case, including principally his treatment while at the CNYPC, and to have

processed those grievances through to completion under the IGP, he did take certain measures to complain of the treatment received while there. At the suggestion of personnel employed at the Mental Hygiene Legal Services, with whom plaintiff communicated in writing concerning his plight on multiple occasions including in February of 2008, plaintiff McQuilkin sent letters on March 28, 2008, and again on June 27, 2008, to Dr. Jonathan Kaplan, the Clinical Director of the Mental Hygiene Psychiatric Center at Marcy, New York, to whom he had been referred. [13] *See* Second Amendment Complaint (Dkt. No. 35) pp. 12–23, 26. In those letters, plaintiff requested that Dr. Kaplan review his treatment plan in light of adverse effects from which he claimed to suffer as a result of the medication being administered. *Id.* at pp. 12–13, 26. In addition, McQuilkin forwarded a letter dated February 21, 2008, to "the psychiatrist" at Clinton, again complaining of being compelled to take the drugs and of their side effects, and also that he was not being properly monitored "due to insincere motives on the original action for the court order." *See* Attachments to Second Amended Complaint (Dkt. No. 35) p. 31.

[13]   The attachments to plaintiff's Second Amended Complaint (Dkt. No. 35) are not separately marked as exhibits, nor are the pages numbered. The page numbers referred to herein are as reflected in the court's docket.

While confined at Clinton, plaintiff also filed an inmate grievance, dated April 1, 2008 and assigned grievance number CL–56924–08, complaining that he was being ordered to take psychiatric medication against his will, that he was experiencing adverse side effects from the medication, and requesting that the medication be discontinued. Attachments to Second Amended Complaint (Dkt. No. 15) p. 10. In response to plaintiff's grievance, the IGRC advised McQuilkin that pursuant to DOCS Directive No. 4040, [14] the OMH, together with its employees, policies and procedures, are not within the jurisdiction of the DOCS inmate grievance program, and he was therefore directed to address the issue of psychiatric medication with Joanne Waldron, Satellite Unit Chief. *Id.* at p. 11. Thus, in accordance with the DOCS Directive No. 4040, the matter was deemed closed, and there is no record of plaintiff having appealed this determination. *Id.*

[14]   DOCS Directive No. 4040 provides, in relevant part, that "[t]he IGRC may dismiss and close a grievance after a hearing if it determines, by

majority vote (3 of 4), that ... the grievant is seeking action with respect to any policy, regulation, rule or action of any agency not under the supervision of the Commissioner of Correctional Services (see section 701.3[f] of this Part)." 7 N .Y.C.R.R. § 701.5(b)(4)(i)(d).

On June 27, 2008, plaintiff wrote letters to Drs. Gillani and Berggren complaining of the administration of psychiatric drugs, claiming that he was being discriminated against and harassed by certain corrections officers and nurses who administered his oral medication, and requesting a meeting to discuss the possibility of receiving all of his medication once a month by injection. *See* Second Amended Complaint (Dkt. No. 15) at pp. 24–25. Plaintiff wrote a second letter to Dr. Gillani on July 16, 2008, voicing the same complaint and again requesting that he be given all his court-ordered drugs at the same time each month. *Id.* at pp. 27–28.

**\*10**   Although the plaintiff was at all relevant times an inmate in the primary care and custody of the DOCS, the conduct giving rise to his claims occurred at the CNYPC, a facility operated by the OMH. Based upon that circumstance, it is arguable that plaintiff's claims are not subject to the PLRA because they do not involve "prison life." While the court's research has not identified a case in this circuit squarely addressing the issue, it appears that even though confined to the CNYPC at the time in question, plaintiff would still qualify as a prisoner subject to the requirements of the PLRA. *See, e.g., Page v. Torrey,* 201 F.3d 1136, 1140 (9th Cir.2000) ("[W]e hold that only individuals who, at the time they seek to file their civil actions, are detained as a result of being accused of, convicted of, or sentenced for criminal offense are 'prisoners' within the definition of 42 U.S.C. § 1997e...."); *Kalinowski v. Bond,* 358 F.3d 978, 979 (7th Cir.) ("As used in this section, the term 'prisoner' means any person incarcerated or detained at any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, [or] probation ....") (quoting 28 U.S.C. § 1915(h)), *cert. denied,* 542 U.S. 907, 124 S.Ct. 2843, 159 L.Ed.2d 273 (2004). It would therefore appear that plaintiff's complaint includes a combination of claims relating to lost property, which were properly exhausted, and claims for which he failed to exhaust his administrative remedies, including those relating to his confinement to CNYPC and the forced administration of psychiatric drugs, as well as that relating to retaliation. [15]

15    Because defendants have not raised failure to exhaust administrative remedies with regard to plaintiff's claims that he was denied access to the courts and the right to practice his religion, I have not addressed exhaustion of these claims.

In a series of decisions rendered since enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d 37 at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). The test for determining whether a claim has not been properly exhausted should nonetheless be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano v. Goord,* 380 F.3d at 676–77; *Hargrove,* 2007 WL 389003, at *10. The circumstances potentially qualifying as "special" under this prong of the test can include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano* ).

Undeniably, plaintiff appears not to have pursued to completion a grievance regarding his treatment at the CNYPC. It should be noted, however, that "DOCS Directive 4040 states, *inter alia,* that '[t]he individual decisions or dispositions of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered non-grievable.' " *Giano,* 380 F.3d at 678. Indeed, as was previously noted, the IGRC response to plaintiff's grievance number CL 56924–08 requesting discontinuation of his medication specifically stated, "OMH, it's [sic] employees and policies and procedures are not with in [sic] the jurisdiction of the DOCS Inmate grievance program." *See* Attachments to Second Amended Compl. (Dkt. No. 35) p. 11. Given this response, it seems somewhat disingenuous for defendants to now contend that plaintiff failed to fully exhaust his administrative remedies as to the claims relating to his psychiatric treatment. It is true that, strictly construed, plaintiff's grievance number CL 56924–08 does not specifically complain of his CNYPC confinement; nonetheless, after having received the foregoing response from the IGRC, and being specifically advised that his grievance complaining of being forced to take the drugs was

being "closed and dismissed", it certainly would have been reasonable for plaintiff to conclude that he could not grieve either claim, and likewise that an appeal of the denial of the medication grievance would be rejected.

*11   It is also worth noting that the IGRC directed the plaintiff to the OMH, and that both before and after he was notified that his grievance was closed and dismissed, he sent numerous letters to the Clinical Director of CNYPC, both the Director and Deputy Director of Mental Hygiene Legal Services, and Drs. Gillani and Berggren complaining of his psychiatric treatment. In each instance, Mental Hygiene Legal Services referred plaintiff to the physicians and ultimately advised that they could provide no further assistance; McQuilkin's letters to the doctors received no responses at all.

In view of the foregoing, it appears that, at a minimum, issues of fact exist as to whether sufficient special circumstances are present to excuse plaintiff's failure to exhaust claims relating to his psychiatric treatment. For the going reasons, I conclude that the defendants' motion for summary judgment dismissing the plaintiff's unexhausted claims regarding his confinement in the CNYPC and involuntarily administration of psychiatric drugs against the plaintiff's wishes will be denied.

### F. Confinement At Clinton

Although not identified as a discrete cause of action, plaintiff's complaint alleges that he was "transported to the Clinton Correctional Facility against his free will and adamant refusal." Second Amended Compl. (Dkt. No. 35) ¶ 3. To the extent that plaintiff attempts to premise his section 1983 claim in part upon this prison transfer, defendants seek dismissal of that claim as failing to allege a constitutional violation.

It is well-established that convicted prisoners have no right to choose the prison they are housed in. *Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). Prison authorities are entrusted with unfettered discretion to transfer prisoners from one institution to another. *Pugliese v. Nelson,* 617 F.2d 916, 922–23 (2d Cir.1980).

In view of the foregoing, summary judgment in favor of the defendants on plaintiff's apparent claim of violation of his constitutional rights based upon his alleged involuntarily transfer to Clinton is appropriate.

### G. Due Process Claim Based on Destruction of Personal Property

Although not alleged as a distinct cause of action, in his second amended complaint plaintiff appears to claim that all of his legal work and documentation—five draft bags altogether—were seized and allegedly destroyed by employees at the Gouverneur Correctional Facility ("Gouverneur"). Second Amended Compl. (Dkt. No. 35) ¶ 2. Defendants contend that this claim also should be dismissed as failing to state a constitutionally cognizable cause of action.

Addressing inmate claims relating to stolen or lost property, the Supreme Court has held that even intentional destruction of prisoner's property may not be the basis for constitutional claims if sufficient post deprivation remedies are available to address the claim. *Hudson v. Palmer,* 468 U.S. 517, 531, 104 S.Ct. 3194, 3202, 82 L.Ed.2d 393 (1984) (citing *Parratt v. Taylor,* 451 U.S. 527, 541, 101 S.Ct. 1908, 1916, 68 L.Ed.2d 420 (1981)). As long as a meaningful post deprivation remedy is provided, the due process requirement is met and the Fourteenth Amendment is satisfied. *Howard v. Leonardo,* 845 F.Supp. 943, 947 (N.D.N.Y.1994) (citing *Parratt,* 451 U.S. at 540, 101 S.Ct. at 1916). With regard to claims of lost or stolen property, the Second Circuit has recognized that New York provides, "an adequate post deprivation remedy in the form of, *inter alia,* a Court of Claims action. *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001) (citing *Love v. Coughlin,* 714 F.2d 207, 208–09 (2d Cir.1983)).

 **\*12** In this instance plaintiff had available to him, and indeed apparently pursued, an internal DOCS process for making a claim for his lost property. Additionally, under the New York Court of Claims Act, the State provides inmates like the plaintiff with a post deprivation remedy by way of an action asserted in the New York Court of Claims for appropriation of personal property. *See* N.Y. CT. OF CLAIMS ACT §§ 8, 9(2). Thus, as a matter of law, McQuilkin was afforded adequate procedural protections and any procedural due process claim premised upon the alleged destruction of his property at Gouverneur is subject to dismissal. [16]

[16]    The availability of a post-deprivation remedy does not foreclose plaintiff's claim that he was effectively denied meaningful access to the courts as a result of the loss of his legal documents. *See Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 2179, 135 L.Ed.2d 606 (1996). As will be seen, however, that claim also lacks merit. *See* pp. 41–43, *post.*

H. *Expungement of Psychiatric Records*

Plaintiff's second cause of action seeks "total expungement from [sic] any reference of mental health patient from Plaintiff's institutional record." Second Amended Compl. (Dkt. No. 35) Second Cause of Action. In their motion, defendants request dismissal of this cause of action as not presenting a constitutional claim, and additionally because the relief sought is not available under New York law.

To state a valid claim under section 1983, a plaintiff must allege that he or she was deprived of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citing *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993)). Plaintiff has identified no cognizable constitutional right at stake with regard to his mental health records. While plaintiff complains of his involuntary commitment at the Center, it appears from the record now before the court that the commitment occurred, at least in part, based upon state court proceedings conducted pursuant to New York Correction Law § 402. [17] *See generally* Waldron Aff. (Dkt. No. 66). As such, plaintiff cannot plausibly allege the denial of procedural due process associated with that commitment.

[17]    Under that provision, upon receiving a report from a physician that an inmate is, in his or her opinion, mentally ill the superintendent of a correctional facility must apply to the court for designation of two examining physicians who, conducting a personal examination, may certify that the inmate is mentally ill and in need of care and treatment, if deemed appropriate. N.Y. Correction Law § 402. In the event that certification is made by the two examining physicians, the superintendent must then apply to an appropriate state court judge for an order of commitment, with notice to the affected inmate as well as any known relative. *Id.* § 402(3). The inmate thereafter may request a hearing, and the court additionally may request one of its own initiative. *Id.* § 402(5). In the event the court determines that the person is mentally ill and in need of care and treatment, the court may order him or her committed for a period not to exceed six months in order that the inmate may be transferred into an OMH facility. *Id.*

Nor has McQuilkin stated a claim under New York law, even assuming such a claim would be actionable under section 1983. Generally, expungement of psychiatric records is not an available form of relief in New York. *Wade v. Dep't of Mental*

*Hygiene of New York,* 49 N.Y.2d 947, 428 N.Y.S.2d 945, 406 N.E.2d 800 (1980). MHL section 33.14 does allow for the sealing of psychiatric records when

> the petitioner has demonstrated by competent medical evidence that he is not currently suffering from a mental illness, has not for a period of three years received inpatient services for the treatment of a mental illness, and the interests of the petitioner and society would best be served by sealing the petitioner's records.

N.Y. MENTAL HYG. LAW § 33.14(a)(1)(b). Plaintiff cannot avail himself of the sealing provision in this instance, however. At the outset, plaintiff cannot establish that he has not "received inpatient services for a period of three years." *Id.* Plaintiff was discharged from services on October 27, 2009 and has therefore received inpatient services within the last three years. Waldron. Aff. (Dkt. No. 66) Exh A. Additionally, plaintiff has not established, by competent medical evidence, that he is not currently suffering from a mental illness, nor has he demonstrated that both his interests and those of society would be best served by sealing his records of mental health treatment.

**\*13**  For these reasons, the defendants' motion should be granted with respect to plaintiff's second cause of action.

### I. *Religious Discrimination and Access to Court*
Plaintiff's complaint makes passing reference to abridgement of his right to "access the court of law" and his "religious rights." Second Amended Complaint (Dkt. No. 35) ¶¶ 2, 8. As defendants assert in support of their motion, plaintiff's complaint is devoid of any factual allegations to support these claims, and there is nothing in the record that would suggest that these rights are implicated.

### 1. *Religious Discrimination*
While inmates confined within prison facilities are by no means entitled to the full panoply of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that amendment does afford them at least some measure of constitutional

protection, including their right to participate in congregate religious services. *See Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) ("In the First Amendment context ... a prison inmate retains those First Amendment rights that are not inconsistent with his [or her] status as a prisoner or with the legitimate penological objectives of the corrections system."); *see also Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) ("It is well established that prisoners have a constitutional right to participate in congregate religious services.") (citing cases). The task of defining the contours of that right in a prison setting requires careful balance of the rights of prison inmates against the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987); *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003); *Salahuddin,* 993 F.2d at 308. When determining whether an action taken by prison officials impinges upon that individual's First Amendment free exercise right, the inquiry is "one of reasonableness, taking into account whether the particular [act] affecting [the] right ... is 'reasonably related to legitimate penological interests.' " *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)); *Ford,* 352 F.3d at 588; *see also Farid v. Smith,* 850 F.2d 917, 925 (2d Cir.1988) (citing, *inter alia, O'Lone,* 482 U.S. at 348, 107 S.Ct. at 2404).

In this instance, neither plaintiff's complaint nor the record before the court discloses any facts demonstrating religious discrimination or establishing that plaintiff's religious beliefs were somehow burdened by his confinement to CNYPC or the administration of psychiatric drugs against his will. Plaintiff's complaint does not identify his religion, nor does it explain how the forced administration of psychiatric medications infringes upon his sincerely held religious beliefs. Since plaintiff's religious deprivation claim is stated in wholly conclusory terms without the articulation of facts demonstrating the existence of a plausible claim, and in light of his failure to come forward with the evidence to support that claim in the face of defendants' summary judgment motion, I recommend that any cause of action deemed to assert a First Amendment freedom of religion violation be dismissed.

### 2. *Access to Courts*
**\*14**  Turning to plaintiff's reference to his deprivation of access to the courts, I note that undeniably "[p]risoners have a

constitutional right of access to the courts, which is infringed when prison officials interfere with a prisoner's preparation of legal documents." *Thomas v. Egan,* 1 Fed. App'x 52, 54 (2d Cir.2001) (citing *Lewis,* 518 U.S. at 350, 116 S.Ct. at 2179) (cited in accordance with Fed. R.App. Proc. 32.1). "To state a claim of denial of access to the courts, an inmate must allege an actual injury." *Id.* (citing *Lewis,* 518 U.S. at 349, 116 S.Ct. at 2179). Conclusory allegations are insufficient. *Id.* (citing *Lewis,* 518 U.S. at 349, 116 S.Ct. at 2179).

In this instance, plaintiff's complaint alleges that among his property confiscated and destroyed by unnamed prison workers at Gouverneur were legal documents. Second Amended Complaint (Dkt. No. 35) ¶ 2. Neither his complaint nor anything within the record now before court suggests, however, that plaintiff suffered any harm as a result of the alleged destruction of his legal documents. Plaintiff's complaint therefore fails to allege the existence of prejudice, an essential element of such a claim. *See Davidson v. Murray,* 371 F.Supp.2d 361, 366 (W.D.N.Y.2005) (citing cases) (requiring proof on access to courts claim that "a nonfrivolous legal claim had been frustrated or was being impeded due to the action or inaction" of defendants). Based upon this lack of supporting facts, I recommend that plaintiff's court access claim be dismissed.

### J. *Retaliation*

The claims set forth in plaintiff's complaint appear to be centered upon his involuntary commitment into the CNYPC and the forced administering of anti-psychotic medication, allegedly in retaliation for his filing a "notice of summons" against the DOCS. In their motion, defendants assert that plaintiff has failed to state a cognizable claim of retaliation. When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds sub nom., Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a prima facie claim under § 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*15** Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to summary judgment dismissing plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

Plaintiff alleges that he was administered antipsychotic medication "in a continuing retaliation against him for filing a claim in the International Trade Court several years ago which was against the State of New York and the Quango New York State Brokerage Mortmain Collection Department of Correctional Services." Second Amended Compl. (Dkt. No. 35) ¶ 2. Plaintiff also alleges that in retaliation for his service of a "notice of summons upon [Defendant Taylor] on July 2, 2007 and July 3, 2007 ...". defendants seized and destroyed five bags containing his property on July 18, 2007, and "wrongfully referred" him to the psychiatric department at Clinton. *Id.*

Plaintiff's complaint clearly satisfies the first element of the retaliation claim. Both the filing of a claim with the International Trade Court and service of a notice of

summons appear to qualify as constituting protected activity. *See Joseph's House and Shelter, Inc. v. City of Troy,* 641 F.Supp.2d 154, 159 n. 5 (N.D.N.Y.2009) (Scullin, S.D.J.) (citing *Dougherty v. Town of N. Hempstead,* 282 F.3d 83, 91 (2d Cir.2002) (finding lawsuit constitutionally protected activity under the First Amendment)). In addition I have assumed, solely for purposes of the instant motion, that the forced administering of drugs and the destruction of plaintiff's property could qualify as sufficiently adverse to trigger the protections of the First Amendment. *See Jones v. Harris,* 665 F.Supp.2d 384, 399 (S.D.N.Y.2009). The evidence of a connection between the two, however, is lacking in this case.

The portion of plaintiff's retaliation claim stemming from his filing of the claim in the International Trade Court is easily dispensed with. By plaintiff's own admission that claim was filed "several years ago" and does not appear to have involved any of the named defendants in this action. The bare allegation that the filing of that claim is somehow linked to the defendants' actions in forcing him to take medications, without further support, is woefully insufficient to establish the required connection between that protected activity and the adverse consequences claimed in his retaliation cause of action. *Flaherty,* 344 F.3d at 13.

Plaintiff's retaliation claim against defendant Taylor based upon service of a summons, followed by in short order by the seizure of his property, presents a closer question given the close proximity in time between the two events. In the face of a summary judgment motion, however, calling for plaintiff to lay bare his claims and the proof which supports them, however, this alone is insufficient to establish a basis upon which a reasonable factfinder could conclude that unlawful retaliation has occurred. *Vega v. Lareau,* No. 9:04–CV–0750, 2010 WL 2682307, at *10 (N.D.N.Y.2010) (Baxter, M .J.). I note, in that regard, that the record fails to support plaintiff's claim that defendant Taylor, against whom this portion of the retaliation claim is asserted, was involved in any way in the decision to admit the plaintiff into the CNYPC. Instead, the record reflects the decision was made by OMH care providers following an evaluation of plaintiff's mental status, and was authorized by a state court order.

 **\*16**  Because the record fails to support plaintiff's retaliation cause of action, I recommend that it be dismissed.

  K. *OMH Confinement and Involuntary Treatment*
Also embedded in plaintiff's complaint is a claim for violation of his Eighth and Fourteenth Amendment rights arising from

his commitment to the CNYPC as well as the drugs he was forcibly administered while there. In support of their motion, defendants argue that these claims should be dismissed as impermissibly conclusory, and further that because they are precluded under *Heck v. Humphrey* and the *Rooker–Feldman* doctrine.

  1. *Eighth Amendment*
The claims alleged in plaintiff's complaint relating to his involuntary commitment to the CNYPC and the forced administration of drugs are predicated upon alleged violation of the Eighth and Fourteenth Amendments and, in essence, are directed to the medical treatment that he received for his schizophrenia.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)). A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement—the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach,* 103 F.Supp.2d at 546 (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer); Waldo,* 1998 WL 713809, at *2 (same).

To satisfy the objective prong of an Eighth Amendment conditions of confinement claim, a plaintiff must demonstrate a deprivation of " 'the minimal civilized measure of life's necessities,' such as adequate food, clothing shelter, sanitation, medical care, and personal safety." *May v. DeJesus,* No.3:06CV1888, 2010 WL 1286800, at *4 (D.Conn. Mar.30, 2010) (quoting *Alvarez v. County of Cumberland,* Civil No. 07–346(RBK), 2009 WL 750200, at *2 (D.N.J. Mar.18, 2009) (citation omitted)). Conditions that are merely restrictive or harsh, however, do not implicate the Eighth Amendment; "they are merely part of the penalty that criminal offenders pay for their offense against society." *May,* 2010 WL 1286800, at *4 (quoting *Alvarez,* 1009 WL 750200, at *2).

 *17  Plaintiff does not claim that he was deprived of any of basic need or that his personal safety was put at risk during his confinement in the CNYPC or at Clinton. Instead, his complaint is directed to the facts that he was confined to a mental health facility and forced to undergo mental health treatment. Broadly construed, at best, plaintiff's Eighth Amendment claim can be interpreted as a challenge to his medical treatment.

Claims that prison officials have intentionally disregarded an inmate's medical needs are encompassed within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291. Here, however, even liberally construing plaintiff's allegations there is no claim, and indeed no evidence in the record to suggest that plaintiff's medical needs were disregarded. In fact, at the heart of plaintiff's claim is his contention that he did not need mental health treatment at all. It is well established, however, that "[c]harges that amount only to allegations of malpractice, and mere disagreements with respect to quality of medical care do not state an Eighth Amendment claim." *Arroyo v. City of New York,* 2003 WL 22211500, at *2 (S.D.N.Y. Sept.25, 2003) (citing *Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 292). As a result, defendants are correct in their assertion that plaintiff's Eighth Amendment challenge to his CNYPC confinement and mental health treatment must fail as a matter of law.

### 2. Heck v. Humphrey

Defendants also assert that any claim by plaintiff that he should not have been placed in the CNYPC or in an OMH Satellite Unit is barred by the rule enunciated in *Heck v. Humphrey.* In *Heck,* the United States Supreme Court addressed the types of claims for which state prisoners may seek redress in section 1983 actions. *Heck,* 512 U.S. at 480–

82, 114 S.Ct. at 2369–70. The Supreme Court specifically held that a state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if a judgment in his or her favor "would necessarily imply the invalidity of his conviction or sentence." *Heck,* 512 U.S. at 487, 114 S.Ct. at 2372. For a plaintiff to recover damages for actions

> whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

*Id.* at 486–87, 2372. "But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." *Id.* The Second Circuit has observed, however, that a section 1983 suit by a prisoner, "challenging the validity of a disciplinary or administrative sanction that does not affect the overall length of the prisoner's confinement is not barred by *[Heck]." Jenkins v. Haubert,* 179 F.3d 19, 27 (2d Cir.1999).

 *18  In this case, plaintiff is not disputing either his conviction or his confinement to prison; rather, McQuilkin is challenging his confinement to a mental health facility, which occurred in accordance with a state court order. Plaintiff additionally challenges the forced administration of psychotropic drugs, which also was court-authorized. It does not appear that these state court determinations had any effect on the length of the plaintiff's prison term. Waldron Aff. (Dkt. No. 66) Exh. B P263, P318–319. Additionally, these state court proceedings clearly were not criminal in nature, but rather were civil state mental health proceedings. As a result, it cannot be said that the instant action would affect the invalidity of a criminal judgment against the plaintiff. [18]

[18]  The fact that plaintiff has been released from custody does not alter this conclusion because "[t]his favorable termination requirement applies

to plaintiffs who are incarcerated at the time that they file their section 1983 actions, regardless of whether they are later released." *Hamm v. Hatcher,* No. 05–CV–503, 2009 WL 1322357, at \*8 n. 6 (S.D.N.Y. May 5, 2009).

For these reasons, it therefore does not appear that plaintiff's claims are precluded by the doctrine enunciated in *Heck v. Humphrey.*

### 3. *Rooker–Feldman*

Defendants further assert that plaintiff's OMH retention and involuntary treatment claims are subject to dismissal under the *Rooker–Feldman* doctrine because the plaintiff was accorded due process in the state court mental health proceedings, and the claim presents a pure question of state law that is not properly raised in a section 1983 action.

"Where a federal suit follows a state suit, the former may be prohibited by the so-called *Rooker–Feldman* doctrine in certain circumstances." *Hoblock v. Albany County Board of Elections,* 422 F.3d 77, 83 (2d Cir.2005). A federal district court "has no authority to review final judgments of state court judicial proceedings." *District of Columbia v. Feldman,* 460 U.S. 462, 482, 103 S.Ct. 1303, 1315, 75 L.Ed.2d 206 (1983). "To do so would be an exercise of appellate jurisdiction which only the Supreme Court possesses over state court judgments." *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 416, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923).

The Supreme Court of the United States reviewed and redefined the limits of the *Rooker–Feldman* doctrine in *Exxon Mobile Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). The Court limited application of the doctrine to "cases brought by state court losers complaining of injuries caused by state court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobile Corp.,* 544 U.S. at 284, 125 S.Ct. at 1521–22. In *Hoblock,* the Second Circuit established four elements that must be met before the *Rooker–Feldman* doctrine applies:

> First, the federal court plaintiff must have lost in state court. Second the plaintiff must 'complain[ ] of injuries caused by [a] state court judgment [.]' Third, the plaintiff must 'invite district court review and rejection of [that] judgment[ ].' Fourth, the state court judgment must

have been 'rendered before the district court proceedings commenced.'

*Hoblock,* 422 F.3d at 85.

 **\*19** Here, the first and fourth elements of this test are clearly satisfied. First, the plaintiff lost in the New York Supreme Court proceedings which resulted in the retention and involuntary treatment described in plaintiff's complaint. *See* Waldron Aff. (Dkt. No. 66) Exh. B at P263, P318–319. Additionally, the state court decisions at issue, dated October 11, 2007 and November 21, 2007, respectively, *see id.,* were rendered prior to the commencement of this action on September 15, 2008. *See* Dkt. No. 1.

The second and third elements of the prevailing *Rooker–Feldman* test also appear to have been established in this instance. Plaintiff's complaint is directly addressed to the injuries suffered as a result of those court determinations. Moreover, plaintiff's complaint, as amended, appears to challenge the correctness of those rulings, seeking both an order prohibiting his forced medication, despite the fact that it was accomplished pursuant to a state court order, as well as expungement of records of his treatment at the Center, also accomplished by court order. This, then, appears to present a classic case of a claim precluded under the *Rooker–Feldman* doctrine. I therefore recommend dismissal of plaintiff's confinement and administration of psychiatric drug claims on this basis.

### L. *Due Process Claims*

In their motion defendants further attack plaintiff's procedural due process claim asserted under the Fourteenth Amendment.

To successfully state a claim under 42 U.S.C. § 1983 for denial of procedural due process, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). It is undeniable that [i]nvoluntary confinement, including civil commitment, constitutes a significant deprivation of liberty, requiring due process." *Abdul–Matiyn v. Pataki,* 9:06–CV–1503, 2008 WL 974409, at \*10 (N.D.N.Y. April. 8, 2008) (Hurd, J. and Homer, M.J.) (quoting *Fisk v. Letterman,* 401 F.Supp.2d 362, 374 (S.D.N.Y.2005) (citations omitted). "When a person's liberty interests are implicated, due process requires at a

minimum notice and an opportunity to be heard." *Mental Hygiene Legal Service v. Spitzer,* 2007 WL 4115936, at *5 (S.D.N.Y. Nov.16, 2006) (citing *Hamdi v. Rumsfeld,* 542 U.S. 507, 533, 124 S.Ct. 2633, 2648, 159 L.Ed.2d 578 (2004) (plurality opinion)). The Supreme Court has approved the use of involuntary confinement where there has been a determination that the person in question currently suffers from a "mental abnormality" and is likely to pose a future danger to the public. *Abdul,* 2008 WL 974409, at *10 (citing *Kansas v. Hendricks,* 521 U.S. 346, 371, 117 S.Ct. 2072, 2086, 138 L.Ed.2d 501 (1997)).

The primary focus of plaintiff's due process claim and defendants' motion seeking its dismissal, then, is upon the sufficiency of the procedural safeguards associated with that deprivation.[19] In this instance, plaintiff was committed to the CNYPC by way of the procedures set out in the New York Corrections Law § 402.

[19]    The record does not address, and I am therefore unable to determine, whether as a result of his involuntary commitment to the CNYPC and forced medication, plaintiff suffered deprivation of a cognizable liberty interest beyond that already associated with this criminal conviction and sentence. I have nonetheless assumed, for purposes of the pending motion, that the plaintiff can demonstrate the deprivation of a cognizable liberty interest associated with those acts.

 **\*20** It is clear from the record before the court that plaintiff was retained at the CNYPC under the authority of that statute, and his retention and involuntary treatment with the antipsychotic medication were court-ordered. Section 402 provides procedures and safeguards similar to the provisions of MHL section 33.03, the general provision governing involuntary commitment, and one which "has withstood challenges that it was facially unconstitutional." *United States v. Waters,* 23 F.3d 29, 32 (2d Cir.1994) (citing *Project Release v. Prevost,* 722 F.2d 960, 971–981 (2d Cir.1983)).

Plaintiff's claims regarding involuntary medication are similarly destined to fail. The Second Circuit has held that "due process requires an opportunity for hearing and review of a decision to administer antipsychotic medication-but such a hearing need not be judicial in nature." *Project Release,* 722 F.2d at 981. Moreover, due process does not require a guarantee that a physician's assessments in their commitment

evaluation be correct. *Rodriguez City of New York,* 72 F.3d 1051, 1062 (2d Cir.1995).

Plaintiff was transferred from Mid–State to the CNYPC on September 17, 2007, after he refused medication and mental health treatment, and once admitted continued to refuse medication without any rational basis for doing so. As a result, the Executive Director of the CNYPC petitioned the court, based upon the certifications of two examining physicians, for an order committing McQuilkin for six months. McQuilkin objected to the retention petition, and a hearing was held in Oneida County Supreme Court to determine whether the plaintiff was mentally ill and a proper subject for involuntary commitment. Following the hearing, on October 11, 2007, the court ordered plaintiff's commitment to CNYPC for six months.

After the commitment order was issued, McQuilkin persisted in his refusal to consent to the administration of medication. As a result, following a similar procedure as he did for commitment, based upon the certification of two examining physicians, defendant Sawyer petitioned the court for an order authorizing the administration of the medication against McQuilkin's will. McQuilkin opposed the petition, and, after a hearing, the court determined that he lacked capacity to make a reasoned decision regarding his own treatment and granted the petition. *United States v. Waters,* 23 F.3d at 32.

Because the evidence in the record establishes that defendants followed the procedures outlined in New York Corrections Law § 402 in obtaining authorization for plaintiff's involuntary commitment, and plaintiff was afforded the constitutionally required process to which he was entitled in connection with both that determination and the court ordered forced mediation, his procedural process claim lacks merit.[20]

[20]    To the extent that plaintiff may be suggesting that defendants failed to follow the procedures outlined in the MHL, his claim would still fail. Section 1983 imposes liability for violations of rights protected by the Constitution and laws of the United States, and not for violations arising solely out of state or common law principles. *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994). "A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases). For this reason,

even if defendants had failed to follow the letter of the New York MHL provisions with regard to his confinement and treatment, that failure would not provide the basis a cognizable section 1983 claim.

For the foregoing reasons, I recommend summary judgment granting dismissal of plaintiff's due process claim arising out of his mental health confinement and treatment with psychiatric medication.

M. *Defendant Sangani's Motion to Dismiss*

**\*21** In his motion Dr. K. Sangani, who has yet to answer plaintiff's complaint, seeks its dismissal for failure to state a claim against him upon which relief may be granted. The focus of defendant Sangani's motion is upon plaintiff's failure to allege in his complaint facts showing Sangani's involvement in the constitutional deprivations alleged.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) (quoting *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006)). It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cri.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

The only mention of Dr. Sangani in plaintiff's second amended complaint is in that portion wherein it is alleged, "[t]he next day plaintiff was transferred to Marcy Psychiatric Center and petition before the court upon the application of K. Perlman and the certificates of Doctors K. Sangani and V. Komareth on 10/11/07 ..." Amended Complaint. (Dkt. No. 35) ¶ 5. It is doubtful that the mere provision of a certificate in support of an involuntary commitment petition would suffice to establish a physician's personal involvement in a claim that the involuntary commitment was either retaliatory or accomplished through lack of procedural due process. As such, it seems doubtful that plaintiff's claim against Dr. Sangani is legally plausible, given his failure to

sufficiently allege that defendant's personal involvement in a constitutional deprivation. Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991) (emphasis added); *see also* Fed. R. Civ. Proc. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). I note, however, that I have already recommended dismissal of plaintiff's claims growing out of that commitment as legally insufficient. I therefore similarly recommend that an order be entered dismissing plaintiff's claims against Dr. Sangani on this basis, without leave to replead.

N. *Defendants Komareth and Bodrog*

**\*22** Although defendants' motion does not explicitly request this relief, I have of my own initiative determined to raise the question of whether plaintiff's claims should proceed against the defendants Komareth and Bodrog, two defendants who were never served with the summons and complaint, and who, if this report and recommendation is adopted, would be the sole remaining defendants in the case.

Rule 4(m) of the Federal Rules of Civil Procedure requires that service of a summons and complaint be made within 120 days of issuance of the summons.[21] "[W]here good cause is shown, the court has no choice but to extend the time for service, and the inquiry is ended." *Panaras v. Liquid Carbonic Indus. Corp.,* 94 F.3d 338, 340 (7th Cir.1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Id.* (citing Fed.R.Civ.P. 4(m)); *Zapata v. City of New York,* 502 F.3d 192, 196 (2d Cir.2007) ("[D]istrict courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.,* 807 F.2d 309, 311 (2d Cir.1986). When examining whether to extend the specified 120 day period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *See Zapata,* 502 F.3d at 197.

[21]        That rule provides that

[i]f a defendant is not served within 120 days after the complaint is filed, the court —on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed.R.Civ.P. 4(m). This court's local rules shorten the time for service from the 120 day period under Rule 4(m) to sixty days. *See* N.D.N.Y.L.R. 4.1(b).

A plaintiff's *pro se* status entitles him or her to a certain degree of leniency insofar as service of process is concerned; courts generally favor resolution of such a case on its merits, rather than on the basis of a procedural technicality. *Poulakis v. Amtrak,* 139 F.R.D. 107, 109 (N.D.Ill.1991). When a plaintiff proceeds *in forma pauperis,* such as is the case here, the court is obligated to issue the plaintiff's process to the United States Marshal, who must in turn effect service upon the defendants, "thereby relieving [the] plaintiff of the burden to serve process once reasonable steps have been taken to identify for the court the defendants named in the complaint." *Byrd v. Stone,* 94 F.3d 217, 219 (6th Cir.1996).

I am mindful of the Second Circuit's recent decision in *Murray v. Pataki,* in which the court cautioned that

[a] *pro se* prisoner proceeding *in forma pauperis* is only required to provide the information necessary to identify the defendant, *see, e.g. Sellers,* 902 F.2d at 602, and it is "unreasonable to expect incarcerated and unrepresented prisoner-litigants to provide the current business addresses of prison-guard defendants who no longer work at the prison," *Richardson v. Johnson,* 598 F.3d 734, 739–40 (11th Cir.2010).

*Murray v. Pataki,* No. 09–1657, 2010 WL 2025613, at *2 (2d Cir. May 24, 2010) (summary order) (cited in accordance with Fed. R.App. Proc. 32.1). In this instance, however, plaintiff has failed to demonstrate the requisite vigilance in insuring service upon these defendants and, to the extent necessary, eliciting the court's assistance. Plaintiff's original complaint in this action was filed on September 15, 2008. Summonses issued for defendants Komareth and Bodrog were initially returned unexecuted on January 16, 2009. See Dkt. Nos. 18, 19. The summonses were thereafter reissued and again forwarded to the Marshals for service on April 29, 2009,

Dkt. No. 30, and yet again on May 14, 2009, Dkt. No. 36, but were, once again, returned as unexecuted on July 23, 2007 (defendant Komareth), Dkt. No. 44, and August 3, 2009 (defendant Bodrog) Dkt. No. 46. Despite the passage of more than one year, and at least one court intervention at plaintiff's request seeking an order compelling discovery, *see* Dkt. Minute Entry Dated 8/5/09, plaintiff has failed to request assistance from the court in locating and serving these defendants. On that basis I recommend dismissal of plaintiff's claims against defendants Komareth and Bodrog, without prejudice. [22]

[22]    In his complaint plaintiff alleges that defendants Komareth and Bodrog are physicians who submitted certifications in support of the applications to confine McQuilkin to the CNYPC and to require that he submit to the administration of psychiatric medication. Since I have already determined that as to the defendants Hanna and Hernandez, who also submitted certifications in support of these applications, plaintiff has failed to establish that his constitutional rights have been violated, for the same reasons I could recommend dismissal of plaintiff's against these two defendants on the merits as well.

## IV. *SUMMARY AND RECOMMENDATION*

**\*23**    Although defendants have asserted that certain of plaintiff's claims should be dismissed for failure to exhaust his administrative remedies, the record shows that special circumstances potentially exist that could justify excusing the plaintiff from the exhaustion requirement in this instance. I therefore recommend against dismissal of plaintiff's claims on this procedural basis.

Turning to the merits of plaintiff's claims, I note first that his claim for injunctive relief must be dismissed as moot, based upon his release from custody. I also recommend dismissal of all claims against the CNYPC, and plaintiff's damages claims against the defendants in their official capacities, on the basis of the immunity afforded under the Eleventh Amendment. I further find that the balance of plaintiff's claims are not supported by the record now before the court, and no reasonable factfinder could conclude that those claims are meritorious. Finally, I recommend dismissal of plaintiff's involuntary commitment and forced medication claims on the basis of the *Rooker–Feldman* doctrine, and find it unnecessary, in light of these determinations, to address

the additional, alternative basis for dismissal of qualified immunity.

Based upon the foregoing it is hereby respectfully,

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 66) be GRANTED, and that plaintiff's claims against the Central New York Psychiatric Center, Berggren, Hernandez, Sawyer, Hanna and Taylor be DISMISSED in all respects, with prejudice; and it is further

RECOMMENDED that defendant Sangani's motion to dismiss the complaint (Dkt. No. 56) be GRANTED and that all claims against that defendant be DISMISSED for failure to state a plausible civil rights claim; it is further

RECOMMENDED that plaintiff's claims against defendants Komareth and Bodrog be DISMISSED, *sua sponte,* without prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court amend the court's records to reflect the correct spelling of defendant Berggen's name; and it is further

ORDERED THAT the clerk serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3765847

---

**End of Document**  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-00519-BKS-TWD   Document 29   Filed 01/23/24   Page 87 of 134

Jones v. City of New York, Not Reported in Fed. Supp. (2020)

2020 WL 1644009
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Michael JONES, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.

18-CV-1937 (VSB)
|
Signed 04/02/2020

**Attorneys and Law Firms**

Michael Jones, Ossining, NY, Pro se Plaintiff.

Sharon Vicky Sprayregen, New York City Law Department, New York, NY, Counsel for Defendants.

**OPINION & ORDER**

VERNON S. BRODERICK, United States District Judge:

**\*1** Plaintiff Michael Jones brings this action pro se pursuant to 42 U.S.C. § 1983 against Defendants the City of New York (the "City"); Joseph A. Ponte ("Ponte"), the former Commissioner of the Department of Correction; Corizon Health, Inc. ("Corizon"); Doctor Rotislav Davydov ("Davydov"); Doctor Olga Segal ("Segal"); and ten John and Jane Doe correction officers and captains ("Doe Defendants"), asserting claims of deliberate indifference to his medical needs under the Eighth Amendment and violation of his First Amendment right to freedom of religion. Before me are (1) a motion for judgment on the pleadings filed by Defendant Segal, and (2) a motion for judgment on the pleadings filed by Defendants New York City, Corizon, Davydov, and Ponte (together, the "City Defendants"). Defendant Segal's motion is DENIED. The City Defendants' motion is GRANTED IN PART and DENIED in part. It is granted with respect to Plaintiff's Eighth Amendment claim against Defendant Ponte and denied in all other respects.

**I. Factual Background** [1]

[1]    The following factual summary is drawn from the allegations contained in Plaintiff's Complaint Pursuant to 42 U.S.C. § 1983 ("Complaint"), (Doc. 2), and Plaintiff's memorandum of law

in opposition to Defendants' motions to dismiss along with the documents attached thereto, (Doc. 62). *See L-7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 422 (2d Cir. 2011) (on a Rule 12(c) motion, "the court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case" (internal quotation marks omitted)); *Henning v. N.Y.C. Dep't of Corr.,* 14-CV-9798 (JPO), 2016 WL 297725, at *3 (S.D.N.Y. Jan. 22, 2016) ("Although this allegation appears in his opposition papers, the Court—consistent with its duty to liberally construe pro se pleadings —will credit Plaintiff's assertion in evaluating the sufficiency of his complaint."). I assume the allegations set forth in Plaintiff's submissions to be true for purposes of this motion. *See Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir. 2007); *Vega v. Hempstead Union Free Sch. Dist.,* 801 F.3d 72, 78 (2d Cir. 2015). My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

Plaintiff is currently incarcerated at Sing Sing Correctional Facility in Ossining, NY. (Compl. ¶ 5A.) [2] Since 1990, Plaintiff has been in the custody of the New York State Department of Corrections and Community Supervision ("DOC"). (*Id.* ¶ 15.) At the time of most of the events Jones relates in his Complaint, he was housed at various correctional facilities on Rikers Island. (*Id.* ¶¶ 9–10, 15.) Corizon was contracted by the DOC to provide medical services to inmates confined in New York City correctional facilities, such as Plaintiff. (*Id.* ¶ 13.)

[2]    "Compl." refers to Plaintiff's Complaint, filed on the electronic docket on March 2, 2018. (Doc. 2.)

In 2006, Plaintiff underwent a back surgery that involved a decompressive laminectomy and foraminotomy, excision of herniated discs, and fusion of certain vertebrae in his lumbar spine. (*Id.* ¶ 16; Pl.'s Opp. Ex. C, Doc. 64, at 21.) [3] As a result of that surgery, he is required to sit and lie on a special mattress to relieve pressure on his lumbar spine. (*Id.* ¶ 17.)

[3]    "Pl.'s Opp." refers to Plaintiff's Memorandum of Law in opposition to Defendants' motions for judgment on the pleadings, filed on the electronic

Case 9:22-cv-00519-BKS-TWD   Document 29   Filed 01/23/24   Page 88 of 134

Jones v. City of New York, Not Reported in Fed. Supp. (2020)

docket on June 25, 2019. (Doc. 62.) The exhibits to Plaintiff's Opposition were docketed as Document 64. Because the exhibits are included consecutively in a single document and are not individually paginated, I cite to each exhibit using the relevant ECF page numbers.

**\*2**  On May 15, 2014, Plaintiff arrived at Robert N. Davoren Center ("RNDC") and requested a special mattress. (*Id.* ¶ 18.) In support of that request, he told the intake examiner about his prior surgery and provided copies of medical records relating to his condition, including the 2006 report of his surgeon stating that he needed a special mattress. (*Id.* ¶ 18; Pl.'s Opp. 9; *id.* Exs. C–F.) The examiner told Plaintiff that Rikers Island and Corizon policy prohibited the issuance of a special mattress. (Compl. ¶ 18.) Plaintiff was then provided with "a worn down used mattress approximately one inch in thickness with rips in it causing the insulation to come out." (*Id.* ¶ 19.) As a result, Plaintiff began to experience "extreme lower and upper back pain, stiffness in his lower back, muscle spasms, shoulder pain, loss of sleep, numbness in his hipbones, and difficulty standing." (*Id.* ¶ 20.)

Subsequently, from May 19, 2014 through July 2, 2014, Plaintiff visited sick call at RNDC on seven occasions and informed the medical staff on duty about the pain being caused by his mattress. (*Id.* ¶¶ 21–25.) On each occasion, Plaintiff reports, he was told that Rikers and Corizon policy prohibited the issuance of a special mattress. (*Id.*) One staff member provided Plaintiff with ibuprofen, but others did not. (*Id.*)

On August 7, 2014, Plaintiff was transferred to the George Motchan Detention Center ("GMDC") where he was again given "a worn down used mattress approximately one inch in thickness with rips in it causing the insulation to come out." (*Id.* ¶ 26.) From August 26, 2014 through March 23, 2015, Plaintiff visited GMDC medical staff nineteen times and reported that his mattress was causing pain in his back, shoulder, and neck, and informed the staff about his prior surgery. (*Id.* ¶¶ 27–37, 39.) Each time, the staff member told him Rikers and Corizon policy prohibited the issuance of a special mattress. Plaintiff had the same experience when he visited Defendant Davydov on April 5, 2015, and when he visited Defendant Segal on April 16, 2015 and December 30, 2015. (*Id.* ¶¶ 38–39.)

On April 14, 2015, Plaintiff was set to appear in court. (*Id.* ¶ 43.) That morning, GMDC personnel conducted a strip and cavity search and had Plaintiff walk through a metal detector before transferring him to a holding pen, (*id.* ¶ 44), which was situated three feet from an officer's desk, in full view of eight to ten correction officers and captains, (Pl.'s Opp. 11.). Plaintiff and the other inmates then boarded a bus. (*Id.* ¶ 44.) The bus stopped at a "search facility." (*Id.*) A John Doe Captain and three John Doe Officers boarded the bus wearing black uniforms and gas masks, and armed with canisters of MK9, a chemical agent. (*Id.* ¶¶ 44–45.) These officers did not have identification tags. [4] (*Id.* ¶ 45.) The Captain yelled: "listen up, I want all you mother fuckers off the bus now. If you give my officers or me any shit, we will spray your ass until you fall out. Stand up walk straight off the bus and do not look back or say a word. This is the new policy handed down from the Commissioner." (*Id.*)

[4]  Since the participants were not wearing identification tags, it is not clear how Plaintiff was able to identify the ranks of officers involved in this incident; however, it appears that Plaintiff may be assuming the ranks of the officers involved in the incidents based upon their level of involvement in the incidents and whether or not they gave instructions to others.

Plaintiff and the other passengers exited the bus and saw additional John Doe officers dressed in the same way as the ones who had boarded the bus. (*Id.* ¶ 46.) Plaintiff and the other inmates were directed to stand side by side, shackled to one another. (*Id.* ¶ 47.) A Jane Doe officer led a drug-sniffing dog up and down the line of inmates while another Jane Doe officer took video. (*Id.*) Plaintiff was then directed to enter a "large open cage," where he was unshackled and ordered to strip. (*Id.* ¶ 48.) Plaintiff told the officers that he was Jewish and "was not supposed to disrobe in the presence of other inmates." (*Id.* ¶ 48.) The officer stated that "this was the new policy" and proceeded to conduct a cavity search of Plaintiff by telling Plaintiff to "place his hands on top of his head, spread his legs and bend over and cough five times, open his mouth, and run his hand between his lips, turn around and place his hand against the gate, lift up his left and right foot." (*Id.* ¶ 49.) Another officer, wearing a mask and holding a canister of MK9, told Plaintiff "if you fail to comply or say anything, I will spray you in your face." (*Id.* ¶ 50.)

**\*3**  On April 22, 2015, Plaintiff had another court appearance. (*Id.* ¶ 51.) On the return trip to GMDC, the bus Plaintiff was on was stopped at a search facility, and several John Doe captains and officers, dressed in black, with no identification tags and armed with MK9, boarded the bus.

(*Id.*) One captain said "you guys know the drill, stand up and don't say a word. Get the fuck off the bus in a straight line. This is a new policy, if there is any shit, you will be sprayed." (*Id.*) Subsequently, Plaintiff alleges, the exact same chain of events took place as they did on April 15, 2015. (*Id.* ¶¶ 52–55.) He was also inspected by a handheld metal detector. (Pl.'s Opp. 11.) When the bus returned to GMDC, Plaintiff was "subjected to another full body cavity strip-frisk-search upon entering the facility." (*Id.* ¶ 56.)

Finally, Plaintiff alleges that Defendant Ponte, then the Commissioner of the New York City Department of Corrections, instituted a policy of illegal strip searches, entered into the contract with Corizon, and failed to train his staff. (*Id.* ¶ 12.)

## II. Procedural History

Plaintiff commenced this action on February 24, 2018 by giving his Complaint to prison officials to mail out (Doc. 2), along with a request to proceed in forma pauperis ("IFP") and a prisoner authorization form, (Docs. 1, 3). These documents were filed on the electronic docket on March 3, 2018. In his Complaint, Plaintiff asserted claims under 42 U.S.C. § 1983 of (1) "violation of his serious medical needs; cruel and unusual punishment;" (2) "failure to provide adequate and wholesome food,[5] cruel and unusual punishment"; and (3) "illegal strip/cavity search/religious violation," against twenty-seven defendants, including the medical staff he met with at RNDC and GMDC, ten correction officers and captains, the City of New York, Ponte, and a food service administrator. (*See generally* Doc. 2.) On May 15, 2018, I issued an order granting Plaintiff's IFP application, (Doc. 8), as well as an Order of Service evaluating Plaintiff's Complaint pursuant to my authority under 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b), (Doc. 7.)

[5]    This claim was dismissed in my May 15, 2018, Order of Service. (Doc. 7.)

In the Order of Service, I observed that the statute of limitations for § 1983 claims is three years, so only claims that arose after February 24, 2015, three years prior to the date Plaintiff gave his Complaint to prison officials, would be timely. I dismissed as untimely the claims against fifteen individual Rikers/Corizon medical staff members without prejudice to refiling those claims with allegations showing Plaintiff would be entitled to equitable tolling of the limitations period. (Doc. 7, at 2–3.) Because Plaintiff alleged that he had met with Davydov on April 5, 2015, and with

Segal on April 16, 2015 and December 30, 2015, I did not dismiss them from the action. (*Id.* at 4 n.3.)

Finally, I directed the United States Marshal Service to assist Plaintiff in serving the remaining named Defendants, and, pursuant to *Valentin v. Dinkins*, 121 F.3d 72, 76 (2d Cir. 1997), directed the New York City Law Department to assist Plaintiff in identifying the various John and Jane Doe defendants. (*Id.* at 5–6.) The City Defendants then requested and received two extensions of time to respond to the Complaint and comply with the *Valentin* order. (Docs. 15–16, 19–20.) Defendant Segal filed her answer on September 13, 2018. (Doc. 23.)

On October 1, 2018, the City Defendants submitted a letter informing Plaintiff and the Court that after a diligent search, they had been unable to locate records sufficient to identify the Doe Defendants. (Doc. 27.) On October 14, 2018, Plaintiff submitted a letter disputing the City Defendants' assertion that he had not provided enough information to identify the officers. (Doc. 28.) On November 13, 2018, the City Defendants filed their answer. (Doc. 30.)

**\*4**   On January 10, 2019, I held a pretrial conference in this matter, and on February 27, 2019, I entered a case management plan and scheduling order. (Doc. 48.) After Defendants requested and received several extensions of the discovery deadlines, fact discovery closed on February 21, 2020, all discovery closed on March 18, 2020, and a post-discovery conference is scheduled for April 9, 2020. (*See* Docs. 83, 91.)

On January 11, 2019, Defendant Segal filed a motion for judgment on the pleadings along with a declaration, affirmations, and a memorandum of law in support. (Docs. 36–40.) After requesting and receiving an extension of time to file their motion, the City Defendants filed a motion for judgment on the pleadings and memorandum of law on April 5, 2019. (Doc. 53.) On June 25, 2019, Plaintiff filed his opposition, with a memorandum of law and exhibits, including various medical records and other documents not filed with his complaint. (Doc. 61–62, 64.) On the same day, Plaintiff also filed a Rule 60(b)(6) motion for reconsideration of my order dismissing the claims that arose outside the statute of limitations period on the ground that he had asserted a continuing violation. (Doc. 63.) On July 2, 2019, I issued an order denying that motion—which I treated as a motion to amend his complaint—based on my finding that Plaintiff had not alleged in either his Complaint or his motion any additional facts to support his claim that any of the Dismissed

Case 9:22-cv-00519-BKS-TWD   Document 29   Filed 01/23/24   Page 90 of 134

Jones v. City of New York, Not Reported in Fed. Supp. (2020)

Defendants individually committed any "non-time-barred" wrongful acts that would bring his claims within the ambit of the continuing violation doctrine. (Doc. 67.) I granted Plaintiff forty-five days "to submit a proposed amended complaint that alleviate[d] the deficiencies [I] identified ... by alleging facts showing he [wa]s entitled to equitable tolling." (*Id.* at 3.) Plaintiff submitted an amended complaint on July 19, 2019, (Doc. 68), but because he alleged no new relevant facts, I denied the motion and struck the amended complaint from the record. (Doc. 69.)

### III. **Legal Standards**

#### A. *Motion for Judgment on the Pleadings*

Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). In deciding a motion for judgment on the pleadings, a district court must "employ the same standard applicable to Rule 12(b)(6) motions to dismiss." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78 (2d Cir. 2015). This means "[a]ccepting the non-moving party's allegations as true and viewing the facts in the light most favorable to that party," and granting judgment on the pleadings "if the moving party is entitled to judgment as a matter of law." *Richards v. Select Ins. Co., Inc.*, 40 F. Supp. 2d 163, 165 (S.D.N.Y. 1999) (internal quotation marks omitted).

Under Rule 12(c), a party is entitled to judgment on the pleadings "only if it has established that no material issue of fact remains to be resolved." *Juster Assocs. v. City of Rutland, Vt.*, 901 F.2d 266, 269 (2d Cir. 1990) (internal quotation marks omitted); *see Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988) (noting that judgment on the pleadings "is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings"). "On a [Rule] 12(c) motion, the court considers 'the complaint, the answer, any written documents attached to the complaint, and any matter of which the court can take judicial notice for the factual background of the case.' " *L-7 Designs*, 647 F.3d at 422 (quoting *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009)).

#### B. *Pro Se Litigant*

**\*5** Even after *Twombly* and *Iqbal*, a "document filed *pro se* is to be liberally construed and ... must be held to less stringent standards than formal pleadings drafted by lawyers." *Bennett v. City of New York*, 425 F. App'x 79, 80 (2d Cir. 2011) (summary order) (quoting *Boykin v. KeyCorp.*, 521 F.3d 202, 214 (2d Cir. 2008)). Accordingly, pleadings of a pro se party should be read "to raise the strongest arguments that they suggest." *Kevilly v. New York*, 410 F. App'x 371, 374 (2d Cir. 2010) (summary order) (internal quotation marks omitted). In addition, the Court may consider allegations that appear in a pro se Plaintiff's opposition papers or other submissions to the court.[6] *See Henning v. N.Y.C. Dep't of Corr.*, 14-CV-9798 (JPO), 2016 WL 297725, at \*3 (S.D.N.Y. Jan. 22, 2016) ("Although this allegation appears in his opposition papers, the Court—consistent with its duty to liberally construe *pro se* pleadings—will credit Plaintiff's assertion in evaluating the sufficiency of his complaint."); *Sommersett v. City of New York*, No. 09 Civ. 5916(LTS)(KNF), 2011 WL 2565301, at \*3 (S.D.N.Y. June 28, 2011) ("[W]here a *pro se* plaintiff has submitted other papers to the Court, such as legal memoranda, the Court may consider statements in such papers to supplement or clarify the plaintiff's pleaded allegations." (citation omitted))

6   The City Defendants request that I ignore Plaintiff's allegations contained in his opposition papers, arguing that the principle that "new allegations of fact or law cannot be raised for the first time in opposition papers ... holds true for *pro se* litigants." (City Reply 2.) The City Defendants' request ignores my obligation to liberally construe Plaintiff's pleadings, and the authority the City Defendants cite is inapposite. *Id.* (citing *Cohen v. New York*, 481 F. App'x 696, 697 (2d Cir. 2012) (holding that a pro se litigant had waived an issue for appeal by not raising it in the district court below); *Williams v. Rosenblatt Sec. Inc.*, No. 14-CV-4390 (JGK), 2016 WL 4120654 (Jul. 22, 2016) (holding that it was improper for a pro se Plaintiff to attempt add new claims or parties using his opposition papers after having already amended his complaint five times)). Here, Plaintiff's opposition sets forth allegations that clarify and are consistent with the allegations made in his original complaint; they do not introduce entirely new claims or parties. "City Reply" refers to the Reply Memorandum of Law in Further Support of City Defendants'

Case 9:22-cv-00519-BKS-TWD    Document 29    Filed 01/23/24    Page 91 of 134

Jones v. City of New York, Not Reported in Fed. Supp. (2020)

Motion for Judgment on the Pleadings, filed on August 8, 2019

Nevertheless, dismissal of a pro se complaint is appropriate where a plaintiff fails to state a plausible claim supported by more than conclusory factual allegations. *See Walker v. Schult,* 717 F.3d 119, 124, 130 (2d Cir. 2013). In other words, the "duty to liberally construe a plaintiff's complaint is not the equivalent of a duty to re-write it." *Geldzahler v. N.Y. Med. Coll.,* 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (internal quotation marks omitted).

## IV. Discussion

Pursuant to § 1983, Plaintiff asserts an Eighth Amendment claim of deliberate indifference to serious medical needs against Davydov, Segal, and the City, and he asserts First and Fourth Amendment claims against the Doe Defendants, Commissioner Ponte, and the City. Plaintiff also seeks punitive damages. Defendants move to dismiss all claims.

### A. *Liability Under Section 1983*

"Section 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993). Section 1983 does not establish substantive rights, but it provides a means of redress for the deprivation of rights established elsewhere. *Id.*

Under § 1983, a plaintiff must show that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676; *see also Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir. 2006) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [§] 1983." (internal quotation marks omitted)). When a prison official is sued, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir. 2003) (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir. 1985)). The personal involvement of an individual acting as a supervisor of the primary wrongdoer may be established by demonstrating that:

**\*6** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995). [7]

[7] The Second Circuit has not addressed the impact of *Iqbal* on the *Colon* test. *See Sheldon v. Galant,* No. 18-CV-06320(NSR), 2019 WL 6702137, at \*6 (S.D.N.Y. Dec. 6, 2019). Some district courts have questioned the viability of the second, fourth, and fifth *Colon* factors, *see id.* (collecting cases), but "the majority of courts in this Circuit have continued to apply the *Colon* factors absent contrary instructions from the Court of Appeals," *Harrell v. New York State Dep't of Corr. & Cmty. Supervision,* No. 15-CV-7065(RA), 2019 WL 3821229, at \*7 (S.D.N.Y. Aug. 14, 2019). I agree with Judge Ronnie Abrams' assessment in *Harrell* that *Colon* is "good law" and accordingly apply the test here. *Id.*

A municipality or municipal corporation is liable under § 1983 "if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation." *Connick v. Thompson,* 563 U.S. 51, 60 (2011) (internal quotation marks omitted). Because the language of § 1983 makes clear that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort," a municipality "cannot be held liable *solely* because it employs a tortfeasor." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658,

Case 9:22-cv-00519-BKS-TWD    Document 29    Filed 01/23/24    Page 92 of 134

Jones v. City of New York, Not Reported in Fed. Supp. (2020)

691 (1978) (emphasis in original). In order to succeed on a claim against a municipality under § 1983, a plaintiff must show: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy [or custom] of the municipality caused the constitutional injury." *Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 636 (S.D.N.Y. 2015) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008)).

To satisfy the requirement of an official policy or custom, a plaintiff must allege either "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted). A plaintiff cannot show a "policy" or "custom" sufficient to impose municipal liability merely by providing "[p]roof of a single incident of unconstitutional activity ... unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–824 (1985); *see also Cowan*, 95 F. Supp. 3d at 637 ("Generally, a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." (internal quotation marks omitted)).

**\*7** Further, the causation prong demands that a plaintiff "prove a causal link between the policy, custom or practice and the alleged injury in order to find liability against a municipality." *Brandon*, 705 F. Supp. 2d at 277; *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

### B. *Eighth Amendment Claim of Deliberate Indifference*

#### 1. Applicable Law

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. "Although the Constitution does not require comfortable prison conditions, the conditions of confinement may not

involve the wanton and unnecessary infliction of pain." *Walker*, 717 F.3d at 125 (internal quotation marks omitted). To state an Eighth Amendment "conditions of confinement" claim, a plaintiff must provide proof of two prongs: first, that objectively, the deprivation [he] suffered was "sufficiently serious that he was denied the minimal civilized measure of life's necessities," and second, that subjectively, the defendant official acted with "deliberate indifference" to his health or safety. *Id.* (internal quotation marks omitted).

To satisfy the objective prong, a plaintiff "must show that the conditions ... pose[d] an unreasonable risk of serious damage to his health." *Id.* Where a plaintiff alleges he was deprived of medical care, he must demonstrate that (1) he "was actually deprived of adequate medical care," and (2) the "inadequacy in medical care [wa]s sufficiently serious." *Benjamin v. Pillai*, 794 F. App'x 8, 11 (2d Cir. Nov. 6, 2019) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006)). This second inquiry "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280. The "seriousness" of the medical condition is one factor in this inquiry, but it is not the only one. *Id.* For example:

> If the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious ... [but] if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.

*Id.*

Although "[t]here is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition," the Second Circuit has enunciated the following non-exhaustive list of factors: "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether

Case 9:22-cv-00519-BKS-TWD   Document 29   Filed 01/23/24   Page 93 of 134

Jones v. City of New York, Not Reported in Fed. Supp. (2020)

the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003).

In light of the facts that "sleep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment," courts have found that "[t]he condition of ... [an] inmate's mattress 'may be so inadequate as to constitute an unconstitutional deprivation.' " *Walker*, 717 F.3d at 127; *see also Rodriguez v. City of New York*, No. 15-CV-07945, 2018 WL 1276826, at *4 (S.D.N.Y. Mar. 9, 2018). "To succeed on a claim involving an alleged deficient bed, a plaintiff must allege that [he] had a medical condition requiring a non-standard bed to protect against serious damage to his future health' or 'that the medical condition was itself created by an inadequate bed or mattress.' " *Rivera v. Doe*, No. 16-CV-8809 (PAE) (BCM), 2018 WL 1449538, at *7 (S.D.N.Y. Feb. 26, 2018) (quoting *Patterson v. Ponte*, No. 16 Civ. 3156 (PAE) (JCF), 2017 WL 1194429, at *6 (S.D.N.Y. Mar. 30, 2017)), *report and recommendation adopted*, No. 16 Civ. 8809 (PAE) (BCM), 2018 WL 1441386 (S.D.N.Y. Mar. 22, 2018).

**\*8** Finally, to satisfy the subjective prong, the plaintiff must demonstrate "deliberate indifference," *Walker*, 717 F.3d at 125, meaning that "the official's state of mind need not reach the level of knowing and purposeful infliction of harm," but it must be "more than mere negligence," *Charles v. Orange County*, 925 F.3d 73, 87 (2d Cir. 2019). More specifically, the official "must know of and disregard an excessive risk to inmate health or safety; [he or she] must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Farmer*, 511 U.S. 825 at 844). Prison officials who "actually knew of a substantial risk to inmate health or safety" may ultimately be free of liability if they "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

### 2. Application

#### a. <u>Defendants Segal and Davydov</u>

Drawing all inferences in his favor, Plaintiff's allegations satisfy both the objective and subjective inquiries for his claims against Defendants Segal and Davydov.

#### i. *Objective Prong*

First, Plaintiff meets the objective prong since he has alleged that he had a specific medical condition as a result of a prior surgery that required him to sit or lie on a special mattress to support his lumbar spine. (Compl. ¶¶ 16–17; Pl.'s Opp. 9.) At the time of his surgery, the surgeon specifically required him to use such a mattress, (*id.*; Pl.'s Opp. Ex. D), demonstrating that at some point, at least one "reasonable doctor ... perceive[d] the medical need in question as important and worthy of comment or treatment." *Brock*, 315 F.3d at 162. Even years after the surgery, without the mattress, Plaintiff alleges, he experienced "extreme lower and upper back pain, stiffness in his lower back, muscle spasms, shoulder pain, loss of sleep, numbness in his hipbones, and difficulty standing," (Compl. ¶¶ 19–20); *see also* Pl.'s Opp. 8 ("[P]laintiff's inadequate mattress cause[d] extreme chronic back pain ... [and] extreme prolong[ed] shoulder pain.") Plaintiff alleges that he was provided with diagnostic imaging and physical therapy several years before the allegations in his Complaint, and that he was provided with pain medication on certain occasions during the time period described in his Complaint, (*see* Pl.'s Exs. E, F, K), but that Defendants Davydov and Segal and others declined to provide him with the mattress he had requested. (Compl. ¶ 21.)

These allegations are sufficient to demonstrate that he experienced "chronic and substantial pain" that "significantly affect[ed] daily activities," including standing and sitting, supporting his assertion that his medical condition was "sufficiently serious," *see Brock*, 315 F.3d at 162–163, and that a non-standard bed was required to avoid or mitigate the pain alleged but was not provided to him, *see Arriaga v. Gage*, No. 16-cv-1628 (NSR), 2018 WL 1750320, at *6 (S.D.N.Y. Apr. 6, 2018) (objective prong of Eighth Amendment claim met where plaintiff's cane had been confiscated from him even though he had "severe back pain [ ] result[ing] from [ ] herniated and bulging discs ... [which] is associated with extreme pain and leads to degeneration"); *Rodriguez*, 2018 WL 1276826, at *4 (objective prong of Fourteenth Amendment claim where plaintiff alleged that "due to 'an injury to the lumbar region of his spine,' he suffer[ed] from 'diagnosed chronic lower-back pain,' " and requested "a second mattress or a replacement mattress because the single mattress provided to him caused him ... exacerbated [his] pain and discomfort,"); *White v. Schriro*, No. 16 Civ. 6769 (PAE) (JCF), 2017 WL 3268202, at *3–4 (S.D.N.Y. July 31, 2017) (objective prong of Fourteenth Amendment met where

Case 9:22-cv-00519-BKS-TWD    Document 29    Filed 01/23/24    Page 94 of 134

Jones v. City of New York, Not Reported in Fed. Supp. (2020)

plaintiff alleged that a doctor had recommended he receive a firm mattress but that it was not provided; he was eventually diagnosed with sciatica as a result of the inadequate mattress; and he received physical therapy and medication to address the back pain and disrupted sleep that resulted from the inadequate mattress), *report and recommendation adopted*, No. 16 Civ 6769 (PAE) (JCF), 2018 WL 1384506 (S.D.N.Y. Mar. 16, 2018); [8] *Harris v. Moore*, No. 15 Civ. 1608, 2015 WL 10427865, at *3 (S.D.N.Y. Dec. 3, 2015) (objective prong of Eighth Amendment claim met where plaintiff's second mattress was taken from him even though he had been diagnosed with chronic back pain and "prescribed [ ] physical therapy and painkillers ... indicat[ing] [ ] the seriousness of the condition").

[8]    *Rodriguez* and *White* involved conditions of confinement claims brought by pretrial detainees, which are governed by the Fourteenth Amendment, not the Eighth Amendment. Both types of claims require satisfaction of the same objective prong, but Fourteenth Amendment claims are governed by a slightly different subjective prong. *See Walker*, 717 F.3d at 125; *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). Therefore, the holdings in both cases that the objective prong was met is applicable here, even if their findings on the subjective prong are not.

**\*9** Defendants argue that Plaintiff has failed to "plausibly link" his back pain to his mattress and cite in support four cases in which purportedly similar claims were dismissed. (*See* Segal Mem. 7–9; City Mem. 6.) [9] Those cases are not analogous because the plaintiffs there failed to show how the specific alleged deficiency in the mattress caused the specific injury alleged by the plaintiff. [10] Here, Plaintiff has alleged that he suffers from an impairment of his spine that is exacerbated by sleeping and sitting on the "worn down," "one inch in thickness" mattress he was issued. (Compl. ¶¶ 16–17.) These allegations give rise to a plausible, common-sense inference that the standard-issue mattress either exacerbates or causes Plaintiff's chronic and substantial back pain.

[9]    "Segal Mem." refers to the Memorandum of Law in Support of Defendant, Olga Segal's Motion to Dismiss, filed on January 11, 2019. (Doc. 39.) "City Mem." refers to the Memorandum of Law in Support of City Defendants' Motion for Judgment

on the Pleadings," filed on April 5, 2019. (Doc. 53-1.)

[10]    *See Daly v. City of New York*, 16 Civ. 6521 (PAE) (JCF), 2017 WL 2364360 (S.D.N.Y. May 30, 2017), *report and recommendation adopted*, No. 16 Civ. 6521 (PAE) (JCF), 2017 WL 2963502 (S.D.N.Y. July 11, 2017) (no Eighth Amendment claim where mattress was not placed on a foundation as instructed by the product; the instructions were aimed at fire safety and the plaintiffs had failed to link their pain to the lack of foundation); *Nelson v. New York City, N.Y.*, No. 16. Civ. 6354 (PAE) (JCF), 2017 WL 2983885, at *3 (S.D.N.Y. July 12, 2017), *report and recommendation adopted*, No. 16 Civ, 6354 (PAE) (JCF) 2017 WL 3207789 (S.D.N.Y. July 27, 2017); *Howard v. City of New York*, No. 12 Civ. 4069(PAE) (JCF), 2012 WL 7050623 (S.D.N.Y. Dec. 20, 2012), *report and recommendation adopted*, No. 12cv40692013 WL 504164 (S.D.N.Y. Feb. 11, 2013) (no Eighth Amendment claim based on similar allegations about a lack of foundation, or on allegation that mattress was too short where plaintiffs did not allege their heights); *Turner v. City of New York*, 16 Civ. 8864 (PAE) (RWL), 2017 WL 6942760 (S.D.N.Y. Dec. 12, 2017), *report and recommendation adopted*, 16 Civ. 8864 (PAE) (RWL), 2018 WL 401513 (S.D.N. Y January 12, 2018) (no Eighth Amendment claim based only on generalized allegations of body pain).

Defendant Segal also argues that the medical records submitted by Plaintiff, (Pl.'s Opp. Exs. B, C, D, E, F, K), cut against a finding that any deprivation was "sufficiently serious," [11] because they do not reflect any complaints of extreme pain or discussion of a mattress, and because they show that Dr. Segal "successfully" treated Plaintiff's pain through medication. (Segal Reply 4.) [12] Accepting this argument would require drawing inferences against Plaintiff which would be improper in considering Defendants' motions to dismiss.

[11]    Segal frames this argument in terms of whether Plaintiff's medical condition was "sufficiently serious to trigger Eighth Amendment consideration." (Segal Reply 4.) As discussed *supra*, Part IV.B.1, the Second Circuit has made clear that the objective prong is concerned with the

seriousness of the *deprivation*; the seriousness of the medical condition is "only one factor" in that inquiry. *Salahuddin*, 467 F.3d at 279.

12    "Segal Reply" refers to the Reply Memorandum of Law in Further Support of Defendant, Olga Segal's Motion for Judgment on the Pleadings, filed on August 8, 2019. (Doc. 76.)

### ii. *Subjective Prong*

Plaintiff has also "adequately alleged that defendants knew of and disregarded the excessive risks to his health and safety," *Walker*, 717 F.3d at 129, by pleading (1) he told Davydov and Segal "about the extreme back, shoulder, neck pain" and numbness, (2) he told them about his prior back surgery and "explained the problems and pain that his mattress was causing," and (3) that in response to Plaintiff's disclosures, Davydov and Segal each separately told him that because of Rikers and Corizon policy they could not issue a special mattress to him. (Compl. ¶¶ 16–19, 38–39.) Therefore, by "alleging that prison officials knew that the [mattress] was inadequate and likely to inflict pain and suffering, [Plaintiff] has ... sufficiently pleaded the subjective element." *Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002); *see also Walker*, 717 F.3d at 129 (finding plaintiff's allegation that he had informed various prison staff that his bed was too narrow but that they took no action, among other allegations, sufficient to demonstrate deliberate indifference); *Harris*, 2015 WL 10427865, at *4 (subjective prong met where plaintiff with lumbago whose special mattress was confiscated had attempted to show defendants his medical referral, which stated his condition and authorized the additional mattress, but defendants refused to examine the document or return the mattress).

**\*10** The City Defendants argue that Plaintiff has failed to plead that Davydov "actually knew that denying Plaintiff a special mattress would in fact lead to excessive pain; for example by pleading that Dr. [Davydov] reviewed medical records recommending a special mattress." (City Mem. 7.) In the City's view, Plaintiff's description of his symptoms was insufficient to give Davydov the knowledge required to render his mental state sufficiently culpable. (*Id.*) But the law does not require a plaintiff to plead that the prison official "actually knew" what would happen as a result of his actions; plaintiff must only plead that the prison official "kn[e]w of, and disregard[ed], an excessive *risk* to inmate health." *Walker*, 717 F.3d at 125 (emphasis added). The City Defendants cite

to no case law supporting their interpretation of the subjective prong, and I decline to apply it here.

The City Defendants also argue that Plaintiff has not sufficiently pled "that the lack of a special mattress would cause 'serious damage to his future health.' " (City Mem. 8, quoting *Santiago*, 2016 WL 680823, at *2.) I decline to take such a narrow view of the pleadings. Construing the complaint liberally, as I must, Plaintiff's allegation of extreme, chronic back pain and numbness as a result of his mattress provided to him plausibly suggests that his lumbar spine was at risk of serious damage, particularly given his prior surgical history. (Compl. ¶¶ 38–39.)

Finally, Defendant Segal argues that Plaintiff has not sufficiently alleged that she acted with the requisite mental state because the medical records he submitted show that she took reasonable steps to treat Plaintiff's pain, including by prescribing medication, reviewing imaging studies, performing a neurological examination, ordering physical therapy, and following up with orthopedics. (Segal Reply 5.) As discussed above, although it was Plaintiff who submitted the medical records, it would not be appropriate at this stage for me to take their contents as fact or to draw from the contents of those records inferences adverse to Plaintiff. Moreover, as Defendant Segal acknowledges, Plaintiff only submitted documentation of his visit to Dr. Segal on December 30, 2014. Whatever actions Dr. Segal may have taken on that date do not bear on her mental state in denying Plaintiff's request for a special mattress on April 16, 2015, March 23, 2015, and December 30, 2015. [13]

13    Defendant Segal also asserts that any claim based on the December 30, 2014 visit must ultimately be dismissed as untimely. Plaintiff's complaint only alleges that he visited Dr. Segal on December 30, 2015. To the extent that is a typo, and to the extent that his claims based on the March and April 2015 visits ultimately survive, the 2014 visit might also be an appropriate and timely basis for an Eighth Amendment claim. Under the continuing violation doctrine, when a plaintiff alleges an ongoing policy of deliberate indifference to serious medical needs as well as "some non-time-barred acts taken in furtherance of that policy," the commencement of the statute of limitations may be delayed until the last act in furtherance of the alleged policy. *Shomo*

Case 9:22-cv-00519-BKS-TWD   Document 29   Filed 01/23/24   Page 96 of 134

Jones v. City of New York, Not Reported in Fed. Supp. (2020)

*v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009).

### b. Former Defendants Jessy Liburd, Yves Gauvin, Jorge Villalobos

Finally, after reviewing Plaintiff's Complaint in connection with Defendants' motion, I note that Plaintiff's claims against Jessy Liburd, Yves Gauvin, and Jorge Villalobos may have been dismissed in error because his Complaint alleges that each of those individuals denied him a special mattress on at least one occasion within the statute of limitations, i.e. after February 24, 2015. (*See* Compl. ¶ 24 (alleging that Plaintiff met with Liburd on June 18, 2014, July 15, 2015, and August 18, 2014); ¶ 24 (alleging that Plaintiff met with Gauvin on September 3, 2014, November 25, 2014, and October 15, 2015); and ¶ 29 (alleging that Plaintiff met with Villalobos on November 18, 2014, January 5, 2015, and March 23, 2015).) These claims would likely be adequately pled for the same reasons the claims against Segal and Davydov are adequately pled, as the allegations against all five are nearly identical. However, in the proposed Amended Complaint that Plaintiff submitted, which has since been stricken, Plaintiff revised his allegations as to Gauvin and Liburd, such that he no longer claimed to have met with them on any dates after February 24, 2015. Specifically, the Amended Complaint alleged that he had met with Gauvin on October 15, 2014, not October 15, 2015, and that he met with Liburd on July 15, 2014, not July 15, 2015. If Plaintiff's revised allegations are true, any claims arising out of his meetings with Gauvin and Liburd would be outside the statute of limitations. The Amended Complaint, like the Complaint, did contain the allegation that Plaintiff met with Villalobos on March 23, 2015, which appears to be corroborated by the medical records submitted by Plaintiff as exhibits in connection with the instant motions. (Pl.'s Opp. Ex. K, Doc. 64, at 72.)

**\*11** Because of the above-listed discrepancies, I conclude that I do not have sufficient information to decide whether the claims against Gauvin, Liburd, and Villalobos were decided in error, and accordingly direct the parties to provide me with supplemental briefing. Within thirty (30) days of this Opinion & Order, Plaintiff shall submit a letter informing me whether he seeks to proceed with any or all of his claims against those Defendants specifically, and setting forth the allegations supporting those claims. Within thirty (30) days of receiving Plaintiff's letter, the City Defendants shall submit a response detailing their positions on: (1) whether the claims identified by Plaintiff should be reinstated, along with any supporting factual and legal authority; (2) whether, if those claims are reinstated, the New York City Law Department would represent the new defendants; and (3) if the Law Department intends to represent those Defendants, whether they will waive service and whether they need to take any additional discovery.

### c. Commissioner Ponte

Plaintiff has failed to sufficiently allege an Eighth Amendment claim against Defendant Ponte. Although Plaintiff states generically that Davydov and Segal told him "that Rikers Island and Corizon Health Inc., policy prohibit[ed] them from issuing any form of special mattress," nowhere in his complaint or his opposition does he allege specifically that Defendant Ponte "participated directly" in the denial of his request, that Ponte was informed of the denial but failed to rectify it, that Ponte personally created the relevant policy, that he was "grossly negligent," or that he "exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon*, 58 F.3d at 873. Accordingly, Plaintiff's Eighth Amendment claim against Defendant Ponte must be dismissed.

### d. Municipal Liability

Defendants Corizon [14] and the City of New York argue that Plaintiff fails to make any non-conclusory allegations identifying a "municipal policy or custom that caused [his] injury" that would render them liable for any constitutional violations. (City Mem. 17) (quoting *Bd. of the Cnty. Comm'rs of Bryan Cnty. Oklahoma v. Brown*, 520 U.S. 397, 403 (1997).)

---

[14]    Corizon may be treated as a municipal actor for purposes of this lawsuit and Defendants do not argue otherwise. *Grimmett v. Corizon Med. Assocs. of New York*, No. 15-CV-7351 (JPO) (SN), 2017 WL 2274485, at \*5 (S.D.N.Y. May 24, 2017); *Bess v. City of New York*, No. 11 Civ. 7604(TPG), 2013 WL 1164919, at \*2 (S.D.N.Y. Mar. 19, 2013) ("In providing medical care in prisons, Corizon performs a role traditionally within the exclusive prerogative of the state and therefore,

Case 9:22-cv-00519-BKS-TWD    Document 29    Filed 01/23/24    Page 97 of 134

Jones v. City of New York, Not Reported in Fed. Supp. (2020)

in this context, is the functional equivalent of the municipality.").

I disagree. Plaintiff has pled that his injury was the result of a "formal policy officially endorsed by the municipality," *Brandon*, 705 F. Supp. 2d at 276, by alleging that from May 15, 2014 through December 30, 2015, different members of Corizon's medical staff (1) denied his request for a special mattress and (2) told him that "Rikers Island and Corizon Health Inc., policy prohibit[ed] them from issuing any form of special mattress no matter what the problem." (Compl. ¶¶ 16–39.) Plaintiff's allegation that multiple staff reiterated that a policy constrained them from issuing a special mattress sets his claim apart from the cases in which naked, boilerplate assertions of a custom or policy have been found insufficient. *See, e.g., Triano v. Town of Harrison, NY*, 895 F. Supp. 2d 526, 535 (S.D.N.Y. 2012); *Plair v. City of New York*, 789 F. Supp. 2d 459, 469 (S.D.N.Y. 2011).

Accordingly, Plaintiff has alleged facts "demonstrate[ing] that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008).

Defendants argue that Plaintiff's claim of municipal liability fails because he has made only two relevant allegations within the statute of limitations, both of which pertain only to him. (City Mem. 18.) First, Defendants provide no authority for the assertion that I may only consider allegations within the statute of limitations in order to identify a municipal policy or custom. To the contrary, courts regularly look beyond the applicable limitations period to determine whether a municipal policy or custom existed at the time of the constitutional violation. *Cf. Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir. 2000) ("[I]t is well established that a municipal policymaker may be found to have caused subordinate officials' conduct by reason of the policymaker's acquiescence in a *longstanding* practice or custom...." (emphasis added)). For example, in *Kucharczyk v. Westchester Cty.*, Judge Kenneth Karas found that where the plaintiff had filed suit in 2014 over an alleged constitutional injury that occurred in 2012, he had sufficiently pled a municipal policy based on a relevant Department of Justice Report published in 2009, about an inspection conducted in 2008. 95 F. Supp. 3d 529, 545 (S.D.N.Y. 2015).

**\*12** Second, although courts have indeed held that "one man's experience does not make a policy," *McLaurin v. New Rochelle Police Officers*, 373 F. Supp. 2d 385, 401 (S.D.N.Y. 2005), *aff'd in relevant part, vacated on other*

*grounds*, No. 04-4849-CV, 2007 WL 247728 (2d Cir. Jan. 25, 2007), Plaintiff's satisfaction of the "official policy or custom" requirement is not based solely on the fact that he individually was denied a mattress on multiple occasions, but also on his claim that when denying his request, staff explicitly told him that they were required to do so by a formal policy established by Corizon and the City.

## C. *Fourth Amendment Claims of Improper Strip Search*

### 1. Applicable Law

#### a. Strip Searches

"The Fourth Amendment prohibits only unreasonable searches." *Myers v. City of New York*, No. 11 Civ. 8525(PAE), 2012 WL 3776707, at \*9 (S.D.N.Y. Aug. 29, 2012) (quoting *Bell v. Wolfish*, 441 U.S. 520, 558 (1979)), *aff'd*, 529 F. App'x 105 (2d Cir. 2013). "In determining the reasonableness of a search, courts must 'consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.' " *Id.* (quoting *Bell*, 441 U.S. at 559). Accordingly, strip searches of prisoners are lawful where they are "reasonably related to legitimate security interests," a determination that is generally within "the province and professional expertise of corrections officials." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 328 (2012) (citations omitted). Courts have held that a policy of conducting strip searches on the way to and from court appearances is not unconstitutional because it "serve[s] the legitimate penological purpose of preventing contraband from coming into and out of prisons and jails." *Thompson v. City of New York*, No. 16 Civ. 824 (PKC), 2017 WL 1929552, at \*2 (S.D.N.Y. May 9, 2017); *see also Pizarro v. Bd. of Correction*, No. 16-cv-2418 (RJS), 2018 WL 3462512, at \*5 (S.D.N.Y. July 17, 2018); *Smith v. City of New York*, No. 14 Civ. 5934(JCF), 2015 WL 3929621 (S.D.N.Y. June 17, 2015).

However, a strip search is unconstitutional "if it does not serve a legitimate penological goal, such as if it is meant to intimidate, harass or punish a prisoner." *Lesane v. City of New York*, No. 11 Civ. 2104(HB), 2011 WL 5242721, at \*2 (S.D.N.Y. Nov. 3, 2011) (citing *Covino v. Patrissi*, 967 F.2d 73, 80 (2d Cir. 1992) (holding that verbal and physical abuse accompanying a strip search supports a finding that the strip search is intended to harass and intimidate)). In addition, it is

Case 9:22-cv-00519-BKS-TWD   Document 29   Filed 01/23/24   Page 98 of 134

Jones v. City of New York, Not Reported in Fed. Supp. (2020)

unconstitutional to conduct a second strip search shortly after a first strip search when the inmate has been supervised for the intervening time and has had no opportunity to obtain or conceal contraband. *Hodges v. Stanley*, 712 F.2d 34, 35 (2d Cir. 1983). Such a search serves no legitimate penological or security purpose. *See Jean-Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006), *aff'd*, 461 F. App'x 18 (2d Cir. 2012) (finding that plaintiff stated a claim of unconstitutional strip search where plaintiff "was under constant supervision by [defendants] from the time of the first strip search to the second" and "he had no opportunity to acquire contraband").

## b. Qualified Immunity

Even unconstitutional strip searches may not always give rise to liability. "The doctrine of qualified immunity protects government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent ... [such] that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018). The Supreme Court has repeatedly cautioned courts "not to define clearly established law at a high level of generality," *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015), but rather to formulate the relevant legal principle with a "high degree of specificity" so that it "clearly prohibit the officer's conduct in the *particular circumstances* before him," *Wesby*, 138 S.Ct. at 589–90. (emphasis added). "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009). The applicability of qualified immunity is a fact-specific inquiry, and may only be established at the motion to dismiss stage if it is "based on facts appearing on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004).

**\*13** The Supreme Court has formulated the following two-pronged inquiry: "[Q]ualified immunity shields federal and state officials from money damages unless [the] plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Francis*, 942 F.3d at 139. The district court has discretion to tackle these two prongs in the order it deems appropriate. *Id.* at 139–140.

## 2. Application

### a. The John Doe Officers

Plaintiff's allegations with regard to the incidents of April 14, 2015 and April 22, 2015 are essentially identical. On April 14, prior to departing for a court appearance, Plaintiff was strip searched at GMDC and then placed in a holding pen in full view of several correction officers three feet away, before being boarded onto a bus. (Compl. ¶¶ 43, 44; Pl.'s Opp. 10.). On the way to court, the bus stopped at a search facility, where Plaintiff was searched again by officers who "yell[ed] in a threatening manner," shouted profanities, and threatened to spray the inmates with MK9 if they did not comply. (*Id.* ¶¶ 44–50.) On April 22, Plaintiff was first strip searched at a search facility, then placed back on a bus and strip searched again upon arrival at GMDC. (*Id.* ¶¶ 51–56.) During both incidents, Plaintiff alleges, he "was under constant view of the officer[s]." (Pl.'s Opp. 10.) These allegations establish that on two occasions, Plaintiff was subjected to a redundant strip search where he and the other inmates did not have the opportunity to secure contraband in the time since the prior strip search. *See Hodges*, 712 F.2d at 35; *Bradshaw v. City of New York*, No. 15 Civ. 4638 (ER), 2018 WL 818316, at \*6 (S.D.N.Y. Feb. 9, 2018) (denying defendant's motion for summary judgment on plaintiff's Fourth Amendment claim where plaintiff was strip searched twice on the same day, first upon leaving a state correctional facility on his way to Rikers Island, and second upon leaving Rikers Island for Bronx Court, and "under continuous surveillance during the period between searches"); *Vasquez v. Williams*, No. 13 Civ. 9127(LGS), 2015 WL 4757657, at \*5 (S.D.N.Y. Aug. 11, 2015) (denying defendant's motion for summary judgment where plaintiff was strip searched at Rikers Island and again at Bronx Supreme Court, but was restrained and continuously supervised between the searches); *Wilkerson*, 438 F. Supp. 2d at 323. Plaintiff's allegations about the aggressive and threatening language used by the corrections officers bolster the inference that the search did not have a legitimate purpose. *See Covino*, 967 F.2d at 79–80. This is sufficient to plead a violation of Plaintiff's Fourth Amendment rights by the Doe Defendants. *Hodges*, 712 F.2d at 35.

Defendants proffer a number of arguments for dismissal of this claim against the Doe Defendants, all of which are

Case 9:22-cv-00519-BKS-TWD  Document 29  Filed 01/23/24  Page 99 of 134

Jones v. City of New York, Not Reported in Fed. Supp. (2020)

unavailing. First, they argue that Plaintiff's allegations are "facially implausible" and should be disregarded as frivolous. (City Mem. 5.) While it may be implausible that events unfolded in exactly the same way on April 15 and April 22, 2015, "a complaint cannot be dismissed simply because the court finds the allegations to be improbable or unlikely," and I do not find plaintiff's allegations to "rise to the level of the irrational or the wholly incredible," as required for a finding of factual frivolousness. *Denton v. Hernandez*, 504 U.S. 25, 32–33 (1992).

**\*14** Next, Defendants argue that correction officers would only have boarded the bus in gas masks with MK9 "in response to information that one of the inmates obtained contraband;" therefore, "it is by no means 'clear that there was no possibility that [plaintiff] could have obtained and concealed contraband.' " (City Mem. 11) (emphasis in original). This argument asks that I assume facts that are not alleged in the complaint and to draw inferences against Plaintiff, neither of which is permissible at the motion to dismiss stage.

Third, Defendants argue that Plaintiff's claim against the Doe Defendants should be dismissed because he has failed to name them. But courts routinely resist dismissing suits against the John Doe defendants "until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials." *Davis v. Kelly*, 160 F.3d 917, 921 (2d Cir. 1998). Plaintiff's interest in conducting discovery is particularly pronounced here, where he is incarcerated and has little to no ability to determine the identities of the Doe officers on his own. Therefore, I decline to dismiss his claims against the Doe Defendants at this point on this ground; however, Plaintiff will ultimately be required to identify each defendant by name, so that they may be served and provided the opportunity to defend themselves. [15] *See Regeda v. City of New York*, No. 09-CV-5427 (KAM)(VVP), 2012 WL 7157703, \*8 (E.D.N.Y. Sept. 7, 2012).

[15] Any attempt to name these John Doe officers will be subject to the three-year statute of limitations applicable to § 1983 cases filed in New York. *See Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir. 2002). However, under certain circumstances, a plaintiff who initially names a defendant as a John Doe because he does not know the defendant's true identity may later substitute in a named party, even after the statute of limitations has run out. *Hogan v. Fischer*, 738 F.3d 509, 519 (2d Cir. 2013); Fed.

R. Civ. P. 15(c)(1)(A); N.Y. C.P.L.R. § 1024 (New York's John Doe procedural rule). Section 1024 provides that "A party who is ignorant, in whole or in part, of the name or identity of a person who may properly be made a party, may proceed against such person as an unknown party by designating so much of his name and identity as is known. If the name or remainder of the name becomes known all subsequent proceedings shall be taken under the true name and all prior proceedings shall be deemed amended accordingly." "New York courts have interpreted this section to permit John Doe substitutions nunc pro tunc." *Hogan*, 738 F.3d at 518–19 (collecting cases). To take advantage of § 1024, a plaintiff must (1) " 'exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name,' " and (2) "describe the John Doe party 'in such form as will fairly apprise the party that he is the intended defendant.' " *Hogan*, 738 F.3d at 519 (quoting *Bumpus v. N.Y.C. Transit Auth.,* 883 N.Y.S.2d 99, 104 (2d Dep't 2009), and finding that plaintiff satisfied the second prong by "describe[ing] with particularity the date, time, and location of the alleged spraying incident" and providing "substantial detail concerning the appearance of his alleged assailants.")

Finally, Defendants argue that the Doe Defendants are entitled to qualified immunity, but their argument and the authority they cite relate only to Plaintiff's First Amendment claim, not his Fourth Amendment claim. (*See* City Mem. 14–15.) In any event, as discussed above, it is clearly established Second Circuit law that it is unconstitutional to conduct a second strip search shortly after a first strip search, where the inmate has been supervised for the intervening time and has had no opportunity to obtain or conceal contraband. *Hodges*, 712 F.2d at 35; *Vasquez*, 2015 WL 4757657, at \*5 ("[T]he right against such a second search was clearly established" on the occasions plaintiff was subject to unreasonable redundant strip searches from 2012 to 2014). Therefore, I cannot conclude that qualified immunity should apply to bar Plaintiff's claims against the Doe Defendants at this stage, based on the facts alleged in the complaint. *See Bradshaw*, 2018 WL 818316, at \*6 n. 8 (finding on summary judgment that defendant officers who conducted redundant second strip search were not entitled to qualified immunity); *Vasquez*, 2015 WL 4757657, at \*5 (same). This finding at this stage of the litigation is not and should not be construed as a finding that as a matter of law qualified immunity does not apply.

Case 9:22-cv-00519-BKS-TWD   Document 29   Filed 01/23/24   Page 100 of 134

Jones v. City of New York, Not Reported in Fed. Supp. (2020)

### b. Commissioner Ponte

**\*15**  Plaintiff has alleged that (1) Ponte "instituted an unconstitutional Department wide policy for illegal body cavity strip-frisk-searches," (Compl. ¶ 12), and (2) that the John Doe Correction Officers, in conducting strip searches that were unlawful because they were not reasonably related to a legitimate security interest, informed Plaintiff that they were doing so pursuant to "the new policy handed down from the Commissioner," (Compl. ¶¶ 45, 51). While it is not clear from this allegation what "the new policy" required the officers to do, at the motion to dismiss stage it is reasonable to infer that the officers would have been referring to their diversion of the bus to the search facility and subsequent strip search of the inmates on the bus, while going to the courthouse from a correctional facility, here GMDC. Therefore, these non-conclusory allegations adequately plead that Defendant Ponte was personally involved in the purported Fourth Amendment violations because he "created a policy or custom under which unconstitutional practices occurred," satisfying the third factor of the *Colon* test. 58 F.3d at 873.

### c. Municipal Liability

Within the context of a *Monell* claim, "[o]fficial municipal policy includes not only the decisions of a government's lawmakers, but also the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Outlaw v. City of Hartford*, 884 F.3d 351, 372 (2d Cir. 2018) (internal quotations omitted). "Where the contention is not that the actions complained of were taken pursuant to a local policy that was formally adopted or ratified but rather that they were taken or caused by an official whose actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved." *Jeffes*, 208 F.3d at 57. This determination is made on the basis of state law. *Id.*

Defendant Ponte, as Commissioner of the Department of Corrections, was endowed with "[a]ll authority, except as otherwise provided by law, concerning the care and custody of felons, misdemeanants and violators of local laws held in the institutions under his charge." N.Y. City Charter § 623(4). He also possessed the "[s]ole power and authority concerning the care, custody and control of all court pens for the detention of prisoners while in the criminal courts of the city of New York, the family court of the state of

New York within the city of New York, the supreme court in the counties of New York, Bronx, Kings, Queens and Richmond and of all vehicles employed in the transportation of prisoners who have been sentenced, are awaiting trial or are held for any other cause." *Id.* § 623(2). Consequently, at this stage, it is plausible to infer that Defendant Ponte, as head of the Department of Corrections, was the final policymaking official with respect to strip search policies between GMDC and the courts. *Cf. Weber v. Dell*, 804 F.2d 796, 803 (2d Cir. 1986) (finding county liability for sheriff was the policy maker "as it relates to strip search" and describing *Blackburn v. Snow*, 771 F.2d 556, 571 (1st Cir. 1985) as holding that "where sheriff was responsible for promulgating security policies for correction facilities, there could hardly be a clearer case of county liability for damage caused by strip search rule" (internal quotation marks omitted)); *Francis v. City of New York*, No. 17 Civ. 1453 (LAK)(HBP), 2018 WL 4659478, at *7 (S.D.N.Y. Aug. 21, 2018) (plaintiff stated a claim against the City of New York based on a written policy of the Department of Corrections); *White v. City of New York*, No. 13 Civ. 7421(KPF), 2015 WL 4601121, at *8 (S.D.N.Y. July 31, 2015) (plaintiff stated claim of deliberate indifference against the City of New York based on allegations that "as a result of their poor training, inexperience, and inadequate supervision, correction officers at Rikers Island engaged in a practice of using excessive force against inmates in deliberate indifference of the inmates' constitutional rights").

Accordingly, by alleging that (1) he was unlawfully strip searched in violation of the Fourth Amendment (2) pursuant to a policy promulgated by Ponte, (3) that was implemented by at least two teams of corrections officers on different days, and (4) that these officers explicitly stated they were following a policy, Plaintiff has adequately pled that a formal municipal policy caused his constitutional injury.

### D. *First Amendment Claim of Improper Strip Search*

### 1. Applicable Law

**\*16**  An incarcerated person's right to free exercise of his religion must be balanced against the "interests of prison officials charged with complex duties arising from administration of the penal system." *Brandon v. Kinter*, 938 F.3d 21, 32 (2d Cir. 2019) (internal quotation marks omitted). Courts therefore assess constitutional free exercise claims brought by prisoners under a "reasonableness" test. *Id.* First, a prisoner must show "that the disputed conduct substantially

Jones v. City of New York, Not Reported in Fed. Supp. (2020)

Case 9:22-cv-00519-BKS-TWD    Document 29    Filed 01/23/24    Page 101 of 134

burdens his sincerely held religious beliefs." *Id.* (internal quotation marks omitted). If he "satisfies these threshold requirements, a defendant can still avoid liability by showing that his or her conduct is reasonably related to legitimate penological interests." *Id.* Therefore, under this framework, a strip search "that impinges on a prisoner's freedom of religion must be rationally related to a legitimate penological interest to survive First Amendment scrutiny." *Wilkerson*, 438 F. Supp. 2d 318, 324 (S.D.N.Y. 2006).

### 2. Application

Plaintiff asserts that because he "[is] registered under the Jewish faith and [is] not supposed to disrobe in the presence of other inmates," the strip searches on April 15 and 22, 2015 violated his freedom of religion under the First Amendment. (*See* Compl. ¶ 48, 53.) Defendants do not appear to dispute, and therefore concede for the purposes of this motion, *see Korova Milk Bar of White Plains, Inc. v. PRE Props., LLC*, No. 11 Civ. 3327(ER), 2013 WL 417406, at *13 (S.D.N.Y. Feb. 4, 2013), that the strip searches substantially burdened Plaintiff's sincerely held religious beliefs. (City Mem. 12.) Instead, Defendants argue only that the strip searches did not violate Plaintiff's First Amendment rights because they were "rationally related to [the] legitimate penological interest" of preventing the smuggling of contraband. (City Mem. 12.) In addition, as with Plaintiff's Fourth Amendment claim, Defendants argue that the Doe Defendants are entitled to qualified immunity, and that Plaintiff has not adequately alleged the personal involvement of Defendant Ponte or a municipal policy or custom. (*Id.* 11–16.)

### a. Doe Defendants

As I have already held, Plaintiff has adequately alleged that the second strip searches on April 15, 2015 and April 22, 2015 were not reasonable because following the first strip search, he was continuously supervised and had no opportunity to obtain contraband. Therefore, "because [Plaintiff's] second strip search as alleged furthered no legitimate penological goal, [he] has properly pled that [the officers] violated his First Amendment religious rights by conducting the second search." *Wilkerson*, 438 F. Supp. 2d at 324. For the same reason, I cannot find at this stage that Defendants are entitled to qualified immunity because "it was clearly established at the time of the alleged violations that prison officials may

not substantially burden inmates' right to religious exercise without some justification." *Salahuddin*, 467 F.3d at 275–76.

Defendants' argument that the Doe corrections officers are entitled to qualified immunity misconstrues both the nature of Plaintiff's claim and the law. Defendants contend that the officers are protected because there is no precedent clearly establishing that forcing a religious inmate to disrobe in the presence of other inmates or in the presence of female police officers violates his First Amendment rights. (City Mem. 14–15.) This is true, as far as it goes; as Defendants point out, several district courts have indeed found that qualified immunity barred First Amendment claims by religious inmates alleging that they were forced to be naked or partially naked in front of female officers. None of the cases cited by Defendants, however, addressed whether officers were liable for strip searches conducted on religious inmates that were, as a matter of law, without a legitimate penological purpose, and so they do not control here. In *Jean-Laurent v. Lawrence*, No. 12 Civ. 1502(JPO)(SN), 2013 WL 1129813, at *8 and *Woodward v. Perez*, No. 12 CV. 8671(ER), 2014 WL 4276416, at *7 (S.D.N.Y. Aug. 29, 2014), the district courts found that qualified immunity protected defendant officers because "no case law from the United States Supreme Court or the Second Circuit Court of Appeals supports the theory that it violates a Muslim inmate's constitutional rights to be searched in his underwear in the presence of a female officer." *Woodward*, 2014 WL 4276416, at *7. The district courts did not directly decide or analyze whether there was a legitimate penological purpose for the officers' actions, but they also did not recount any allegations by the plaintiff that would even arguably support such a finding. In *Holland v. City of N.Y.*, 197 F. Supp. 3d 529, 537–45 (S.D.N.Y. 2016), the district court granted qualified immunity to defendant because "there was no clearly established rule that, *during a lockdown or other exigent situation*, a correction officer is prohibited from conducting a strip search and viewing the private parts of a Muslim inmate of the opposite sex." (emphasis added). In so holding, the court observed that "the courts in this Circuit ... that have discussed the rights of Muslim inmates to not be viewed in the nude by the opposite sex suggest that emergency or exigent circumstances may provide a legitimate penological interest justifying the infringement upon the inmate's free exercise of religion." *Id.*

*17 Here, it is well established that redundant strip searches are, as a matter of law, *not* justified by a legitimate penological interest, *Hodges*, 712 F.2d at 35, and that "prison officials may not substantially burden inmates' right to religious exercise

Case 9:22-cv-00519-BKS-TWD    Document 29    Filed 01/23/24    Page 102 of 134

Jones v. City of New York, Not Reported in Fed. Supp. (2020)

without some justification." *Salahuddin*, 467 F.3d at 275–76. Therefore, because there is no dispute as to whether plaintiff's religious exercise was burdened, and "because [I] hold[ ] that plaintiff has plausibly alleged that defendants ... at this time, have not established a legitimate penological justification, defendants are not entitled to qualified immunity on the premise that their conduct did not violate clearly established law." *Rossi v. Fishcer*, No. 13-cv-3167 (PKC)(DF), 2015 WL 769551, at *18 (S.D.N.Y. Feb. 24, 2015) (concerning free exercise claims based on defendants' denial of plaintiff's requests for certain special accommodations on Rastafari holy days, the ability to hold Friday Sabbath services, and permission to wear his religious turban); *see also Diggs v. Marikah*, No. 11 Civ. 6382(PAE), 2012 WL 934523, at *5 (S.D.N.Y. Mar. 20, 2012) (qualified immunity unavailable because "[w]hether defendants ... could have reasonably believed that denying plaintiff access to congregate religious services did not violate an established constitutional right depends [ ], at this stage, on whether, on the facts alleged in the Complaint, they had a reasonable basis to believe that that denial served a legitimate penological interest.")

Therefore, because at this stage, I cannot conclude that a reasonable "officer [would have] reasonably believe[d] that his or her conduct complie[d] with the law," *Pearson*, 555 U.S. at 244, Defendants' motion to dismiss this claim on the basis of qualified immunity must be denied.

### b. Liability of Commissioner Ponte and the City of New York

In the context of Plaintiff's Fourth Amendment claim, I have already found that he has sufficiently alleged that Ponte, a final policymaker, "created a policy or custom" under which the second strip searches on April 15 and 22, 2015 occurred. *See Colon*, 58 F.3d at 873. Therefore, to the extent that these strip searches violated Plaintiff's First Amendment rights, Plaintiff has sufficiently alleged that Defendant Ponte and the City of New York are liable for them. [16]

[16]    I note again that Defendants do not argue that Plaintiff did not have a sincerely held religious belief, or that that belief was not substantially burdened. They also do not argue that Defendant Ponte should be protected by qualified immunity. Accordingly, I do not address the validity of these contentions.

### E. *Punitive Damages*

Defendants ask me to dismiss Plaintiff's request for punitive damages on the grounds that (1) punitive damages may not be awarded against individuals sued in their official capacity and (2) because even in their individual capacity, Defendants are not alleged to have acted maliciously. (City Mem. 19.)

Defendants are correct that claims against individuals sued in their official capacity are effectively claims against the governmental entity for which they serve as agent, *Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012), and punitive damages are not available against government entities, *Newport v. Fact Concerts*, 453 U.S. 247 (1981). Nevertheless, "[a] motion to dismiss is addressed to a 'claim'—not to a form of damages." *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 318 n.5 (S.D.N.Y. 2010) (citation and internal quotation marks omitted). "Because punitive damages are a form of damages, not an independent cause of action, a motion to dismiss a prayer for relief in the form of punitive damages is 'procedurally premature.' " *Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 220 (S.D.N.Y. 2019) (citation omitted).

Accordingly, Defendants' motion to dismiss Plaintiff's request for punitive damages is denied.

### F. *Dismissal Without Prejudice*

Claims brought pro se typically are dismissed without prejudice. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (unless there is no indication that the pro se plaintiff will be able to assert a valid claim giving rise to subject matter jurisdiction, leave to amend should be given). "A pro se complaint should not be dismissed without the Court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks omitted). I see no reason to deviate from the normal practice in this case.

**\*18**    Accordingly, Plaintiff's Eighth Amendment claim against Ponte is dismissed without prejudice.

### V. **Conclusion**

Case 9:22-cv-00519-BKS-TWD    Document 29    Filed 01/23/24    Page 103 of 134

Jones v. City of New York, Not Reported in Fed. Supp. (2020)

For the foregoing reasons, Defendant Segal's motion is DENIED and the City Defendants' motion is GRANTED IN PART and DENIED IN PART. Plaintiff's Eighth Amendment claim against Defendant Ponte is dismissed without prejudice. The following claims survive: Plaintiff's Eighth Amendment claim against Defendants Segal, Davydov, and the City of New York; and Plaintiff's Fourth and First Amendment claims against the John Doe correction officers, Ponte, and the City of New York.

Within thirty (30) days of this Opinion & Order, Plaintiff shall submit a letter informing me whether he seeks to proceed with any or all of his claims against those Gauvin, Liburd, and Villalobos, and setting forth the allegations supporting those claims. Within thirty (30) days of receiving that letter, the City Defendants shall submit a response detailing (1) their position on whether the claims identified by Plaintiff should be reinstated, along with any supporting factual and legal authority; (2) whether, if those claims are reinstated, the New York City Law Department would represent the new defendants; and (3) if the Law Department intends to represent those Defendants, whether they will waive service and whether they need to take any additional discovery.

The post-discovery conference currently scheduled for April 9, 2020, is adjourned sine die pending resolution of the above listed issues.

The Clerk of Court is directed to terminate the motions at Documents 36 and 53.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1644009

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 6318919
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Taej'on VEGA, Plaintiff,
v.
BROOME COUNTY, Richard Hrebin,
Corey Fowler, and Daniel Weir, Defendants.

9:21-cv-788 (BKS/DJS)
|
Signed September 28, 2023

**Attorneys and Law Firms**

For Plaintiff: Joshua T. Cotter, Samuel C. Young, Legal Services of Central New York, 221 South Warren Street, Suite 300, Syracuse, New York 13202.

For Defendants: Robert G. Behnke, Broome County Attorney, Jennifer L. Church, Joshua T. Terrell, Assistant County Attorneys II, Broome County Attorney's Office, P.O. Box 1766, 60 Hawley Street, Binghamton, New York 13902.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, Chief United States District Judge:

**I. INTRODUCTION**

**\*1** Plaintiff Taej'on Vega brings this action under 42 U.S.C. § 1983 and New York law against Defendants Broome County, Richard Hrebin, Corey Fowler, and Daniel Weir asserting violations stemming from an alleged use of excessive force and unreasonable search on February 10, 2020, when Plaintiff was a pre-trial detainee at Broome County Correctional Facility (the "Facility"). (Dkt. No. 1.) The complaint contains six causes of action: (1) excessive force in violation of the Fourteenth Amendment against Defendants Hrebin and Fowler; (2) unreasonable search in violation of the Fourth Amendment against Defendants Hrebin, Fowler, and Weir; (3) state-law battery against all Defendants; (4) state-law assault against all Defendants; (5) state-law intentional infliction of emotional distress against all Defendants; and (6) negligent supervision and training against Defendant Broome County. (*Id.* ¶¶ 40–63.) Presently before the Court are Plaintiff's motion for sanctions for spoliation of evidence, (Dkt. No. 30), and Defendants' motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, (Dkt.

No. 31). Each motion is fully briefed, (Dkt. Nos. 32, 33, 34, 36), and Defendants submitted a supplemental letter-brief at the direction of the Court to address issues raised by Plaintiff's motion for sanctions, (Dkt. No. 40). For the reasons that follow, Plaintiff's motion for sanctions is granted in part and denied in part and Defendants' motion for summary judgment is granted in part and denied in part.

**II. FACTS**

**A. The February 10, 2020, Incident** [1]

[1]     These facts and the facts relevant to Plaintiff's grievance are drawn from Defendants' Statement of Undisputed Material Facts, (Dkt. No. 31-6), Plaintiff's Response to Defendants' Statement of Material Facts, (Dkt. No. 33-1), and Plaintiff's Counterstatement of Additional Material Facts, (*id.*), to the extent they are well-supported by pinpoint citations, as well as exhibits attached thereto. The Court will not consider exhibits attached to Plaintiff's motion for sanctions, (Dkt. No. 30), or Defendants' opposition to Plaintiff's motion for sanctions, (Dkt. No. 32), in connection with Defendants' motion for summary judgment. The facts are undisputed unless otherwise noted. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *See Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007). The Court limits its consideration of Defendants' motion for summary judgment to these facts and, to the extent they are relevant, considers these facts in deciding Plaintiff's motion for sanctions.

On February 10, 2020, Plaintiff was incarcerated at the Facility. (Dkt. No. 31-10, at 33–34.) At approximately 5:30 p.m., Facility personnel conducted a planned housing unit search known as a "SERT shakedown." (Dkt. No. 33-1, ¶ 25.) The goal of a SERT shakedown is to locate contraband in housing units. (*Id.*) As part of a SERT shakedown, every inmate is told to get on the ground, handcuffed, and brought to his cell to be strip searched and for the cell to be searched. (*Id.*) During the SERT shakedown on February 10, 2020, Plaintiff admitted he talked with inmates, made sarcastic remarks, and laughed at officers and continued to do so even after officers repeatedly ordered him to be quiet during the SERT shakedown. (*Id.* ¶ 28.) The parties dispute whether Plaintiff resisted being handcuffed. [2] Defendants Hrebin and Fowler testified that Plaintiff refused to "give up his hands" to be handcuffed. (Dkt. No. 31-6, ¶ 31; Dkt. No. 31-12, at 33; Dkt.

No. 31-13, at 22.) Plaintiff testified that he did not refuse to give up his hands to be handcuffed. (Dkt. No. 33-1, ¶ 31; Dkt. No. 31-10, at 45; Dkt. No. 35, ex. B at 7:45–8:02.) Capt. Stanton and Grievance Officer Valls also stated that Plaintiff "tried to move away ... by sliding his face back and forth on the carpet." (Dkt. No. 31-4, ¶ 8; Dkt. No. 31-5, ¶ 6.) Plaintiff denies this. (Dkt. No. 35, ex. B at 9:50–10:57.) Defendant Hrebin handcuffed Plaintiff with his hands behind his back while both Defendant Hrebin and Defendant Fowler applied a "mandibular pressure point." (Dkt. No. 33-1, ¶ 33; Dkt. No. 31-12, at 33–34; Dkt. No. 31-13, at 22–23.) After Plaintiff was handcuffed, and at the instruction of Defendant Weir, Defendants Hrebin and Fowler escorted Plaintiff to his cell. (Dkt. No. 31-12, at 34–35; Dkt. No. 31-13, at 24; Dkt. No. 31-11, at 27.)

2    Plaintiff argues that under the "best evidence rule," Grievance Officer Adam Valls and Captain David Stanton's descriptions, in their affidavits, of videos from Defendant Weir's body camera, a handheld SERT camera, and housing unit surveillance cameras allegedly showing Plaintiff's noncompliance during the shakedown "cannot be used to prove the contents of the videos." (Dkt. No. 33-2, ¶ 55 (citing Fed. R. Evid. 1002).) The Court agrees. Federal Rule of Evidence 1002 requires "[a]n original ... recording ... in order to prove its content" unless the original was destroyed or another Rule of Evidence provides otherwise. See Fed. R. Evid. 1002, 1004; see also Gaft v. Mitsubishi Motor Credit of Am., No. 07-cv-527, 2009 WL 3148764, at *4, 2009 U.S. Dist. LEXIS 91052 (E.D.N.Y. Sept. 29, 2009) (disregarding statements made in the defendant's counsel's affidavit, submitted in support of a motion for summary judgment, concerning the content of a report because the statements were inadmissible evidence barred by Rule 1002); New York ex rel. Spitzer v. St. Francis Hosp., 94 F. Supp. 2d 423, 428 (S.D.N.Y. 2000) (disregarding, a witness's affidavit, submitted in support of a motion for summary judgment, concerning the contents of certain letters "because the letters themselves are the best evidence of their contents"). As discussed below with respect to Plaintiff's motion for sanctions, the Court will not consider evidence related to the spoliated body-camera video. See infra Section III. Furthermore, the handheld SERT video and the surveillance videos were

not unavailable; in fact, both parties were in possession of them. (Dkt. No. 32, ¶ 3.) Thus, the Court disregards the SERT camera video and housing unit surveillance from February 10, 2020 and statements made by Capt. Carlson about the content of the handheld SERT video and the surveillance videos in deciding Defendants' motion for summary judgment. Neither will the Court consider Capt. Carlson's statement about the recording of a video call between Plaintiff and his mother on February 12, 2020, Dkt. No. 31-4, because that video is not in the record and Defendants have not shown that that video is unavailable. See Fed. R. Evid. 1002, 1004; see also Gaft, 2009 WL 3148764, at *4 n.4, 2009 U.S. Dist. LEXIS 91052. And while Defendants did ultimately submit the handheld SERT video and the surveillance videos in reply to Plaintiff's opposition to Defendants' motion for summary judgment, (Dkt. No. 36, ¶¶ 2, 4; Dkt. No. 37), "[i]t is plainly improper to submit on reply evidentiary information that was available to the moving party at the time that it filed its motion and that is necessary in order for that party to meet its burden," Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc., 687 F. Supp. 2d 381, 387 (S.D.N.Y. 2010) (collecting cases). In any event, there are, as discussed below, genuine issues of material fact as to Plaintiff's alleged noncompliance and the events that took place in Plaintiff's cell that the videos would not resolve.

**\*2** Before Plaintiff entered his cell, he did not have any visible injuries, (Dkt. No. 31-12, at 33; Dkt. No. 31-13, at 26–27), though Plaintiff hit the top of his head on the door of his cell while entering the cell, (Dkt. No. 31-9, at 27; Dkt. No. 31-4, ¶ 9; Dkt. No. 31-5, ¶ 7). Both Defendant Hrebin and Defendant Fowler were present with Plaintiff in Plaintiff's cell, (Dkt. No. 31-12, at 35; Dkt. No. 31-13, at 24), and Plaintiff was compliant with Defendants Hrebin and Fowler while in the cell, (Dkt. No. 33-1, ¶ 42). Defendants Hrebin and Fowler searched Plaintiff's cell and Defendant Hrebin conducted a strip search of Plaintiff. (Id. ¶ 37; Dkt. No. 31-12, at 36–37; Dkt. No. 31-13, at 24–25.)

The remainder of the events in Plaintiff's cell are disputed: Plaintiff testified that, while he was handcuffed, Defendants Hrebin and Fowler hit him in the ribs and face, slapped him, threw him on the bed, punched him in the back, grabbed his chest, choked him, and called him racial slurs. (Dkt. No.

31-9, at 27–28; Dkt. No. 31-10, at 50–5, 55–56; Dkt. No. 31-15, at 1; Dkt. No. 35, ex. B at 12:10–21:00.) Plaintiff testified that he sustained scratches and bruises as a result of the incident. (Dkt. No. 31-9, at 52–54; Dkt. No. 31-10, at 79–80.) Defendants Hrebin and Fowler deny using any force on Plaintiff while in his cell. (Dkt. No. 31-12, at 38; Dkt. No. 31-13, at 26–27; Dkt. No. 31-2, ¶ 4; Dkt. No. 31-3, ¶ 4.)

Defendant Weir, who was wearing a body camera for the duration of the SERT shakedown, testified that he stopped by Plaintiff's cell and "observed [Plaintiff] facing the wall while they were searching his cell." (Dkt. No. 31-11, at 29.) Defendant Weir testified that Plaintiff "wasn't complaining" or "saying anything," so Defendant Weir "waited for a moment and continued on with [his] duties." (*Id.* at 29–31, 33–34.) The parties dispute whether any noise of distress came from Plaintiff's cell while he and Defendants Hrebin and Fowler were in it with Plaintiff. Defendant Weir testified that he did not hear any noises coming from Plaintiff's cell when Defendant Weir was in the middle of the housing unit. (Dkt. No. 31-11, at 28-29.) Plaintiff submitted statements from two inmates: one inmate stated that he heard "crys [sic] of agony" from Plaintiff's cell and "contact sounds that sounded like punches"; another inmate stated that he "heard what sounded like the officers beating on" Plaintiff. (Dkt. No. 33-3, at 2–4.) Plaintiff testified that the time between the time he got off the floor until the time all Defendants left his cell was approximately five to six minutes. (Dkt. No. 33-1, ¶ 49.)

Plaintiff has submitted a video call between Plaintiff and his mother in which bruises or scratches are visible on Plaintiff's face, neck, arms, chest, and back at about 8:30 p.m. the night of the incident. (Dkt. No. 35, ex. C.) Plaintiff did not tell anyone in the Facility about the incident until around 11:30 p.m. on the night of incident. (Dkt. No. 39, at 46.) Plaintiff admits that he told a corrections officer about either "coughing up blood" or "urinating blood" in order be seen by Facility medical personnel. (*Id.* at 46–47; Dkt. No. 31-1, at 71.) The medical records from about 8:00 a.m. the next day state that Plaintiff had "multiple linear abrasions" on his chest and the right side of his neck, a "circular abrasion and slight bruising" on the left side of his face, and "two circular superficial abrasions on mid thoracic back." (Dkt. No. 31-15, at 7.) Medical records from approximately 1:30 p.m. that same day note the scratches were "in a very odd pattern" and were "questionable [as if] self inflicted." (*Id.* at 8.) The medical records note that the scratches appeared to be from fingernails, (*id.*), and Defendants Hrebin and Fowler were wearing gloves during the incident, (Dkt. No. 31-10, at 43,

63). The medical records reflect that Plaintiff pointed to "a bruise approximately 1 inch on the right temple which [wa]s not swollen and blueish/brown." (Dkt. No. 31-15, at 8.)

### B. Plaintiff's Grievance

 **\*3**  Plaintiff received "an inmate handbook" when he entered the Facility, (Dkt. No. 31-6, ¶ 53; Dkt. No. 31-10, at 34), and filed a grievance about the incident on February 12, 2020, two days after the incident, (Dkt. No. 31-15, at 1, 12). Plaintiff wrote in the grievance that two corrections officers "took me in my cell ... handcuffed and closed the door behind them and said rac[ia]l slurs and ass[au]lted me and I have bruises on my body." (*Id.* at 1.) Plaintiff requested an investigation, including an interview of Plaintiff, and indicated he had a lawyer to file a lawsuit. (*Id.*) The grievance coordinator reviewed "video of the incident," supplementary reports from Defendants Hrebin, Fowler, and Weir, and a medical log. (*Id.* at 5.) The grievance coordinator issued a written determination denying the grievance on the merits on February 14, 2020. (*Id.* at 1–9, 12.) Plaintiff appealed this determination to the Chief Administrative Officer on February 14, 2020. (*Id.* at 10, 12.) Plaintiff was interviewed on February 19, 2020. (Dkt. No. 35, ex. B at 0:10–0:26.) The Chief Administrative Officer issued a determination on February 20, 2020, noting that he "accepted the requested action." (Dkt. No. 31-15, at 10–12.) The Chief Administrative Officer noted that Plaintiff's "request for an investigation has been granted and one is ongoing ... You have been interviewed by the supervisor of the investigation unit. No further action at this time." On February 21, 2020, Plaintiff "agree[d] to accept the decision." (*Id.*) Plaintiff filed this action on July 10, 2021. (Dkt. No. 1.)

### C. The Body-Camera Video [3]

[3]    These facts are drawn from exhibits attached to Plaintiff's motion for sanctions, (Dkt. No. 30), and Defendants' opposition to Plaintiff's motion for sanctions, (Dkt. No. 32), as well as exhibits attached to Defendants' motion for summary judgment, (Dkt. No. 31), Plaintiff's opposition to Defendants' motion for summary judgment, (Dkt. No. 33), and Defendants' reply, (Dkt. No. 36). The Court considers these facts in deciding Plaintiff's motion for sanctions but not in deciding Defendants' motion for summary judgment.

Sergeants at the Facility wear body cameras during SERT shakedowns. (Dkt. No. 31-11, at 20–21.) The body cameras

are activated for the SERT shakedowns. (*Id.* at 22.) Defendant Weir, as a sergeant, wore a body camera during the SERT shakedown on February 10, 2020. (*Id.* at 21–22, 29.) His role was to oversee the SERT shakedown. (*Id.* at 20.) Defendant Weir can be seen patrolling all areas of the housing unit during the SERT shakedown. (Dkt. No. 37, ex. A, at 17:19:37–17:54:33.) Shortly after Defendants Hrebin and Fowler brought Plaintiff to his cell, Defendant Weir walked to the door of the cell and used the body camera to record the inside of the cell for approximately eight seconds while Plaintiff and Defendants Hrebin and Fowler were in it. (Dkt. No. 31-11, at 29–31; Dkt. No. 37, ex. A at 17:23:20–17:23:28.) Defendant Weir submitted the body-camera video to an online storage system, Evidence.com, by docking his body camera after his shift, and the body-camera video was uploaded to the system that day. (Dkt. No. 32-3, at 1; Dkt. No. 32-4, at 9; Dkt. No. 31-11, at 23.)

The body-camera video was not preserved, but testimony and affidavits provided by Defendants do not provide a clear picture of how exactly the video was deleted. On February 11, 2020, the Broome County body-camera supervisor, Captain Paul Carlson, (Dkt. No. 32-1, ¶ 2), viewed the body-camera video and subsequently added then, seconds later, removed a "marker" from the online storage system.[4] (Dkt. No. 32-1, ¶ 3; Dkt. No. 32-3, at 1–2.) Capt. Carlson was aware that the body-camera video was relevant to the Facility's investigation into Plaintiff's grievance. (Dkt. No. 32-1, ¶ 9.) Grievance Officer Valls also claims to have viewed the body-camera video at some point before denying Plaintiff's grievance on February 14, 2020, Dkt. No. 31-5, although the Evidence.com audit log shows no indication that Grievance Officer Valls viewed the body-camera video, and up to that point, no one had attempted to download it, (Dkt. No. 32-3). Capt. Carlson initiated a download of the body-camera video to his computer on February 19, 2020, and attempted to save the body-camera video to the H-drive of his computer. (Dkt. No. 32-1; Dkt. No. 32-3, at 2–3.)

[4]      The record does not indicate what a "marker" is or the significance of Capt. Carlson adding and removing a "marker."

 **\*4**  Based on affidavits from Karen Andrews, Assistant Director of the Broome County Department of Information and Technology, and Lt. Benjamin Harting, the system administrator of Evidence.com for the Broome County Sheriff's Office: Patrol Division, the body-camera video could not have been downloaded from the online storage system to

the location to which Capt. Carlson asserts he downloaded it—the "H-drive"— because "[a]ny data being downloaded from Evidence.com cannot be downloaded to ... a network drive; it will only download to a hard drive of a computer," and the "H: drive is a network share ... as opposed to the individual computer's hard drive." (Dkt. No. 30-11, ¶ 6; Dkt. No. 32-1, ¶ 8; Dkt. No. 32-2, ¶ 5.) Capt. Carlson claims, however, that he did download the video to the "H-drive of [his] personal computer," and Lt. Harting similarly states that the body-camera video "was in fact downloaded to [Capt. Carlson's] computer on February 19, 2020." (Dkt. No. 32-2, ¶ 8; Dkt. No. 32-3, ¶ 11.)

Capt. Carlson states that he "was completely unaware" that data stored on the H-drive "would be automatically overwritten and deleted by the network after 30 days." (Dkt. No. 32-1, ¶ 13.) There is, however, no factual support in this record for the contention that data saved on the H-drive was automatically overwritten and deleted by the network after thirty days. Rather, data saved on the H-drive was "backed up nightly in a rolling 30-day fashion ... [so] all backup copies would be deleted and unrecoverable" after thirty days. (Dkt. No. 30-11, ¶ 6.) That is, backups of the data saved on the H-drive, not the data itself, were automatically overwritten and deleted by the network after thirty days. (*Id.*) Capt. Carlson admits, however, that he "inadvertently[ ] never copied the video over to the Broome County Sheriff's Office K-drive, the main server." (Dkt. No. 32-1, ¶ 8.)

Lt. Harting's duties included "[p]eriodically, at least twice a year, ... conduct[ing] a purge of all footage in Evidence.com." (Dkt. No. 32-2, ¶ 10.) "Law Enforcement personnel are required to add the appropriate retention categories and the Captain assigned to Corrections will remove any footage they require[;] [a]fter verification, all footage is removed," and Lt. Harting "set[s] all Corrections generated footage for deletion." (*Id.*) The body-camera video was deleted from the online storage system on July 15, 2020, (*id.* ¶ 12; Dkt. No. 32-2, ¶ 9; Dkt. No. 32-3, at 3), in accordance with Lt. Harting's assignment of a thirty-day "retention category." (Dkt. No. 32-2, ¶ 6.) The body-camera video was originally "uncategorized," meaning it would be retained indefinitely. (*Id.* ¶ 5.) When Lt. Harting added the thirty-day categorization to the body-camera video on July 8, 2020, thirty days had already elapsed, so the body-camera video was immediately deleted from Evidence.com. (*Id.* ¶ 6.)

Capt. Carlson did not know that the body-camera video was not on the H-drive after he had attempted to download

it, and Capt. Carlson's personal computer was subsequently replaced "for purposes of upgrading equipment" in Capt. Carlson's office, though Capt. Carlson did not recall the date his computer was replaced. (Dkt. No. 32-1, ¶¶ 10, 13, 15). Lt. Harting and Capt. Carlson attempted to locate the body-camera video on Capt. Carlson's computer in August 2021, after the Broome County Attorney's Office requested it, (Dkt. No. 30-11, at 12), but the body-camera video could not be recovered from Capt. Carlson's computer; Capt. Carlson "continued to look for the video on his 'H drive' and external thumb drive/hard drive." (Dkt. No. 32-2, ¶ 9.)

When counsel for Defendants requested the body-camera video around August 2021, (Dkt. No. 30-11, at 12), Capt. Carlson became aware that the video could not be recovered. (Dkt. No. 32-1, ¶¶ 11–13.) Neither Defendant Broome County nor the Facility had a formal retention policy for body-camera video footage during the time period at issue. (Dkt. No. 30-12, at 2; Dkt. No. 32-2, ¶ 8.)

### III. PLAINTIFF'S MOTION FOR SANCTIONS

**\*5** In recognition of the fact that spoliation sanctions can impact a summary judgment analysis, *see Williams v. Lane*, No. 13-cv-965, 2016 WL 4275738, at *5, 2016 U.S. Dist. LEXIS 107939 (N.D.N.Y. Aug. 15, 2016) ("In borderline cases, an inference of spoliation, in combination with some (not insubstantial) evidence for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." (quoting *Byrne v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001))), the Court turns first to Plaintiff's motion for sanctions.

#### A. Standard of Review

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). Historically, a party seeking sanctions based on the destruction of evidence was required to establish: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (quoting *Byrne*, 243 F.3d at 107–12). But in 2015, the Federal Rules of Civil Procedure

were amended to address spoliation of electronically stored information ("ESI"). *See Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 425 (W.D.N.Y. 2017). Spoliation of ESI is now governed by Rule 37(e) of the Federal Rules of Civil Procedure and is subject to a slightly different analysis as compared to spoliation of tangible evidence. *See Matthews v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 17-cv-503, 2023 WL 2664418, at *12, 2023 U.S. Dist. LEXIS 52318 (N.D.N.Y. Mar. 28, 2023). Under Rule 37(e), where a court finds that "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," the court may, upon a finding of prejudice to a party, order measures no greater than necessary to cure the prejudice, or, only upon a finding of intent to deprive another party of the ESI, presume that the ESI was unfavorable to the spoliating party; instruct the jury that it may or must presume the ESI was unfavorable to the spoliating party; or dismiss the action or enter a default judgment.

"Aside from modifying the state of mind required of a spoliator, the 2015 amendments to Rule 37(e) did not significantly alter the elements required at common law for sanctions to issue." *Ungar v. City of N.Y.*, 329 F.R.D. 8, 13 (E.D.N.Y. 2018), *aff'd*, No. 21-1384, 2022 WL 10219749, 2022 U.S. App. LEXIS 28812 (2d Cir. Oct. 18, 2022) (summary order). The party requesting spoliation sanctions "must still establish that the evidence 'should have been preserved in the anticipation or conduct of litigation,' i.e., that the spoliator had a duty to preserve the evidence, and that the evidence was 'lost because a party failed to take reasonable steps to preserve it,' i.e., that such a duty was breached." *Stanbro v. Westchester Cnty. Health Care Corp.*, No. 19-cv-10857, 2021 WL 3863396, at *5, 2021 U.S. Dist. LEXIS 163849 (S.D.N.Y. Aug. 27, 2021) (quoting Fed. R. Civ. P. 37(e)). "Furthermore, the movant must be prejudiced by the absence of the spoliated evidence to be entitled to sanctions under Rule 37(e)(1) ...." *Id.*, 2021 WL 3863396, at *5, 2021 U.S. Dist. LEXIS 163849 (citing *Ungar*, 329 F.R.D. at 13).[5]

---

[5]    Sanctions under Rule 37(e)(2), however, do not require the court to find prejudice to the party deprived of the information "because the finding of intent required by [Rule 37(e)(2)] can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing

party was prejudiced by the loss of information that would have favored its position." *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

**\*6** While in general "[t]he party seeking sanctions bears the burden of establishing all elements of a claim for spoliation of evidence," *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 120 (S.D.N.Y. 2008), Rule 37(e) "does not place a burden of proving or disproving prejudice on one party or the other ... [but rather] leaves judges with discretion to determine how best to assess prejudice in particular cases," *Ungar*, 329 F.R.D. at 16 (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). Upon a finding of prejudice, a court "is tasked with determining the 'least harsh sanction that can provide an adequate remedy.' " *Europe v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167, 175 (S.D.N.Y. 2022) (quoting *Dorchester Fin. Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D. 178, 185 (S.D.N.Y. 2014)).

**B. Discussion**

Plaintiff moves for sanctions for Defendants' spoliation of relevant ESI, namely the body-camera video from the body camera worn by Defendant Weir during the SERT shakedown of Plaintiff's housing unit on February 10, 2020. (Dkt. No. 30-13, at 3.) Specifically, Plaintiff seeks sanctions in the form of an adverse inference instruction, preclusion of evidence related to the spoliated body-camera video, and costs and fees associated with the motion for sanctions. (*Id.* at 3, 18.) Defendants argue that sanctions are not warranted because (1) Defendants were not under a duty to preserve when the body-camera video was destroyed; (2) the body-camera video was not destroyed with the requisite state of mind; and (3) Plaintiff cannot demonstrate that the body-camera video would have corroborated his claims. (Dkt. No. 32-4, at 5–10.) In their supplemental letter-brief, Defendants also argue that (1) Defendants took reasonable steps to preserve the body-camera video; (2) Plaintiff was not prejudiced by the loss of the body-camera video; and (3) Defendants did not act with the intent to deprive Plaintiff of the body-camera video. (Dkt. No. 40, at 2–6.)

As an initial matter, neither party originally premised its argument fully on the Rule 37(e) standard, which is applicable to spoliation of ESI and which, as discussed above, differs from the common-law standard applicable to tangible evidence. While Plaintiff refers to the common-law spoliation standard, he also cites Rule 37(e) and correctly notes that Rule 37(e) requires proof of intent to deprive in order to

justify imposition of an adverse inference instruction. (Dkt. No. 30-13, at 13; Dkt. No. 34, at 5.) Defendants, meanwhile, did not cite Rule 37(e) at all in their opposition to Plaintiff's motion and relied entirely on the common-law standard. However, at the Court's direction, (Dkt. No. 39), Defendants submitted a supplemental letter-brief in which they agree that the body-camera video constitutes ESI but argue that sanctions under Rule 37(e) should not be imposed. (Dkt. No. 40.)

The Court agrees with the parties that the body-camera video, which was stored and viewed electronically, (Dkt. No. 32-1, ¶¶ 3, 7–8; Dkt. No. 32-2, ¶¶ 4–5, 8; Dkt. No. 32-3; Dkt. No. 31-11, at 23), constitutes ESI. *See Stanbro*, 2021 WL 3863396, at \*9–10, 2021 U.S. Dist. LEXIS 163849 (holding that digital footage from a handheld video camera, even when stored on a DVD, constitutes ESI); *see also Ungar*, 329 F.R.D. at 14 (applying the Rule 37(e) standard to destruction of surveillance video footage); *Thomas v. Butkiewicus*, No. 13-cv-747, 2016 WL 1718368, at \*7 n.11, 2016 U.S. Dist. LEXIS 57163 (D. Conn. Apr. 29, 2016) ("There does not appear to be a question that the surveillance video footage at issue ... falls within the definition of 'electronically stored information' under Rule 37(e)."). Accordingly, the Court will analyze Plaintiff's motion under the standard imposed by Rule 37(e).

**1. Duty to Preserve ESI**

**\*7** Plaintiff argues that Defendants had a duty to preserve the body-camera video beginning on February 12, 2020, the day Plaintiff filed a grievance about the February 10, 2020, incident. (Dkt. No. 30-13, at 6–7.) Defendants argue that they were not on notice to preserve the body-camera video because Plaintiff's grievance did not request the preservation of any video evidence and the body-camera video was destroyed before Defendants received a notice of claim. (Dkt. No. 32-4, at 5–6.) Defendants also argue that because the underlying incident "was nothing of note" and "in the absence of physical injury" to Plaintiff, Defendants had no duty to preserve the body-camera video. (Dkt. No. 40, at 2–3.)

"Identifying the boundaries of the duty to preserve [ESI] involves two related inquiries: when does the duty to preserve attach, and what evidence must be preserved?" *Europe*, 592 F. Supp. 3d at 176 (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)). The duty to preserve attaches "when [a] party has notice that the evidence is

relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *See id.* (quoting *Fujitsu Ltd. v. Fed Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)). For the purposes of the duty to preserve, " 'relevance' means relevance for purposes of discovery, which is 'an extremely broad concept.' " *Orbit One Commc'ns v. Numerex Corp.*, 271 F.R.D. 429, 436–37 (S.D.N.Y. 2010). "[A] litigant has the duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Europe*, 592 F. Supp. 3d at 176 (alteration in original) (quoting *Skyline Steel, LLC v. PilePro, LLC*, 101 F. Supp. 3d 394, 407 (S.D.N.Y. 2015)).

Here, Plaintiff filed a grievance on February 12, 2020, which provided his version of the relevant events of February 10, 2020. (Dkt. No. 30-13, at 4–5.) In his grievance, Plaintiff said, "I got a lawyer to file a lawsuit." (Dkt. No. 31-15, at 1.) There is no dispute that the deleted body-camera video constituted evidence relevant to Plaintiff's potential lawsuit. Defendant Weir uploaded the body-camera video to the online storage system, and the body-camera video was one of the items that Facility personnel relied on to respond to Plaintiff's grievance. (Dkt. No. 32-1, ¶ 9; Dkt. No. 31-5, ¶ 3; Dkt. No. 31-15, at 5, 9.) At that point, the Facility "should have known" that the body camera video "may be relevant to future litigation," and the Facility had an obligation to preserve it. *See Castro v. Smith*, No. 16-cv-8147, 2023 WL 5371311, at *8, 2023 U.S. Dist. LEXIS 149515 (S.D.N.Y. Aug. 22, 2023) (quoting *Zubulake*, 220 F.R.D. at 216).

Defendants rely *Williams v. Lane* in arguing that they were not put on notice to preserve evidence relevant to future litigation when Plaintiff filed his grievance. (Dkt. No. 32-4, at 5–6.) But *Williams* is plainly distinguishable. *Williams* involved a claim of interference with non-legal mail in violation of the First Amendment. *See* 2016 WL 4275738, at *2, 2016 U.S. Dist. LEXIS 107939. Establishing a claim for mail interference with non-legal mail requires a showing of "a pattern and practice of interference that is not justified by a legitimate penological concern," *Id.* (citation omitted). Thus, in attempt to establish such a pattern or practice, the plaintiff had filed a grievance alleging that malfeasance had been occurring "for months." *Id.* The plaintiff argued that a video recording that had been destroyed would have captured a defendant's alleged verbal admission that he had been interfering with the plaintiff's mail; in rejecting the spoliation claim the Court

first noted that any such videotaped admission would not have raised a material issue of fact. *See id.*, 2016 WL 4275738, at *6, 2016 U.S. Dist. LEXIS 107939. While the court then proceeded to discuss and reject the spoliation argument, there is no indication that the grievance in *Williams* provided the defendants in that action with notice that the video recording in question "may be relevant to future litigation" or that the defendants in *Williams* were aware of a need to preserve any specific video footage. *See id.*, 2016 WL 4275738, at *2, *6, 2016 U.S. Dist. LEXIS 107939.

**\*8** Accordingly, the Court concludes that the Facility was under a duty to preserve relevant evidence at the time the body-camera video was deleted. [6]

[6]    Even if Plaintiff's grievance did not put the Facility on notice to preserve relevant evidence, Defendants' argument that the video was destroyed before they received a notice of claim is entirely unavailing because Defendants concede that the Broome County Attorney's Office received a notice of claim on April 27, 2020, (Dkt. No. 31-8; Dkt. No. 32-4, at 3, 5), and the video was not destroyed until July 15, 2020, (Dkt. No. 32-3, at 3). Thus, Facility personnel were unquestionably under a duty to preserve the video from April 27, 2020, onward. *See Hughes v. City of N.Y.*, No. 18-cv-9380, 2021 WL 4295209, at *11, 2021 U.S. Dist. LEXIS 180064 (S.D.N.Y. Sept. 21, 2021) ("Upon receipt of the Notice of Claim, Defendants should have known that [evidence related to the underlying incident] may be relevant to anticipated litigation.").

### a. Defendants' Control Over the Body-Camera Video

Defendants briefly argue that Defendants Hrebin, Fowler, and Weir cannot have culpability attributed to them because they did not have control of the body-camera video. (Dkt. No. 32-4, at 8–9.) The Court has found that the Facility was under a duty to preserve relevant evidence at the time the body-camera video was deleted, but the Court will next examine whether it is appropriate the impute that duty to Defendants Hrebin, Fowler, and Weir.

"Implicit in a party's duty to preserve evidence is the assumption that the party against whom sanctions are sought had 'control' over the missing evidence." *Stanbro*, 2021

WL 3863396, at *11, 2021 U.S. Dist. LEXIS 163849 (citations omitted). "[E]ven where a party ... lacks actual physical possession or custody of requested documents ... such party may nevertheless be found to have control of the documents ... if the party is legally entitled to the documents or has the practical ability to acquire the documents from a third-party ...." *Richard v. Dignean*, No. 11-cv-6013, 2021 WL 5782106, at *3, 2021 U.S. Dist. LEXIS 234419 (W.D.N.Y. Dec. 7, 2021) (alterations in original) (quoting *Gross v. Lunduski*, 304 F.R.D. 136, 142 (W.D.N.Y. 2014)). In assessing whether a party had the practical ability to acquire evidence from a third party, "courts look at the interrelatedness of the relationship between the party against whom sanctions are sought and the entity with custody of the evidence." *See Stanbro*, 2021 WL 3863396, at *12, 2021 U.S. Dist. LEXIS 163849 (citing *Guillory v. Skelly*, No. 12-cv-847, 2014 WL 4542468, at *8, 2014 U.S. Dist. LEXIS 128178 (W.D.N.Y. Sept. 11, 2014)). Of note, "[c]ourts in this circuit addressing the issue [of control of evidence] have routinely found that 'in suits against individual corrections officers employed by [New York State Department of Corrections and Community Supervision ("DOCCS")] ..., a sufficiently close relationship ... exists to impute DOCCS's control over evidence to the individual officers.' " *Id.*, 2021 WL 3863396, at *12, 2021 U.S. Dist. LEXIS 163849 (collecting cases); *see also Castro*, 2023 WL 5371311, at *6, 2023 U.S. Dist. LEXIS 149515 ("[C]ourts in myriad circuits have found there to be a 'special relationship' between correctional departments and individual officers, holding that the departments 'ultimately bear responsibility for preserving evidence and litigating cases filed by prisoners, and so their failure to preserve evidence may be imputed to individual officer defendants in order to avoid unfair prejudice' to litigants who are or were incarcerated." (quoting *Johns v. Gwinn*, 503 F. Supp. 3d 452, 463 (W.D. Va. 2020))).

**\*9** The Court sees no reason for this principle to differ when applied instead to a county-level correctional facility.[7] It is not disputed that Defendant Broome County had possession of the body-camera video. Furthermore, the relationship between, on the one hand, Defendants Hrebin, Fowler, and Weir and, on the other, Defendant Broome County is sufficiently interrelated such that Defendants Hrebin, Fowler, and Weir "had the practical ability to obtain" the body-camera video from Defendant Broome County. *See Stanbro*, 2021 WL 3863396, at *12, 2021 U.S. Dist. LEXIS 163849. Indeed, the Broome County Attorney's Office represents—and attempted to obtain the body-camera video from various sources on behalf of—all Defendants. (Dkt. No. 30-11, at

12; Dkt. No. 32, ¶¶ 8–9); *see Stanbro*, 2021 WL 3863396, at *12, 2021 U.S. Dist. LEXIS 163849 (citing *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007)).[8] Counsel for Defendants also produced other evidence that was in Defendant Broome County's possession, including the surveillance footage and the handheld SERT video. (Dkt. No. 32, ¶ 3.) This relationship gave Defendants Hrebin, Fowler, and Weir the practical ability to acquire the body-camera video and, therefore, control of the body-camera video. *See id.*; *see also Castro*, 2023 WL 5371311, at *6–7, 2023 U.S. Dist. LEXIS 149515 (imputing the New York City Department of Corrections' spoliation of video evidence to individual defendant corrections officers where the Department and officers were represented by the same counsel; their counsel had produced evidence in the litigation; counsel produced a declaration attempting to explain the spoliation; and the individuals were likely entitled to indemnification).

7    The Court notes that several courts have also "denied requests for sanctions against defendant corrections officers who 'had no control over the recordings, had no duty to maintain them, and were not in any way involved in the failure to preserve the evidence.' " *See Barnes v. Harling*, 368 F. Supp. 3d 573, 609 (W.D.N.Y. 2019) (quoting *Thousand v. Corrigan*, No. 15-cv-1025, 2017 WL 4480185, at *3, 2017 U.S. Dist. LEXIS 166198 (N.D.N.Y. Oct. 6, 2017)). In such cases, unlike the instant case, the party with control of the evidence at issue is generally not a party to the action. *See Barnes*, 368 F. Supp. 3d at 609; *Thousand*, 2017 WL 4480185, at *3, 2017 U.S. Dist. LEXIS 166198; *Braham v. Lantz*, No. 08-cv-1564, 2014 WL 1270096, at *7, 2014 U.S. Dist. LEXIS 40572 (D. Conn. Mar. 27, 2014); *Grant v. Salius*, No. 09-cv-21, 2011 WL 5826041, at *3, 2011 U.S. Dist. LEXIS 133248 (D. Conn. Nov. 18, 2011). And in any case, in determining that Defendants Hrebin, Fowler, and Weir had control over the body-camera video, the Court does not endorse a bright-line rule that a county's spoliation of evidence should be imputed to its corrections officers. *See Stanbro*, 2021 WL 3863396, at *7, 2021 U.S. Dist. LEXIS 163849. Rather, the Court considers "the purposes of a spoliation sanction" and the case-specific "factors for determining whether one should be imposed here." *See id.*, 2021 WL 3863396, at *7, 2021 U.S.

Dist. LEXIS 163849 (quoting *Adkins v. Wolever*, 692 F.3d 499, 506 (6th Cir. 2012)).

8   Defendants' arguments based on *Stanbro* are misplaced. (Dkt. No. 40, at 3.) In *Stanbro*, the court refused to levy sanctions against defendants who did not have direct control of video evidence that was ultimately destroyed. *See Stanbro*, 2021 WL 3863396, at *7, 2021 U.S. Dist. LEXIS 163849. Crucial to that conclusion, however, was the court's determination that the absence of the spoliated video did not prejudice the plaintiff's claims against those defendants because the spoliated video, which was taken hours after the incident at issue, was not "at the heart" of the plaintiff's claims against those defendants. *See id.* Here, however, the body-camera video would have been at the heart of Plaintiff's claims, as it was contemporaneous evidence demonstrating what happened in Plaintiff's cell for a portion of the relevant time. Furthermore, the court in *Stanbro* undertook a case-specific inquiry that did not rely on finding that the defendants lacked control. *See id.* Thus, the particular conclusion in *Stanbro* to which Defendants point is inapposite and does not support the conclusion that Defendants Hrebin, Fowler, and Weir lacked control of the body-camera video.

### 2. Reasonable Steps to Preserve ESI

**\*10** The parties dispute whether reasonable steps were taken to preserve the body-camera video. (Dkt. No. 30-13, at 14; Dkt. No. 34, at 5–6; Dkt. No. 40, at 4.) Specifically, Defendants point to Defendant Weir successfully docking his body camera, which then uploaded the body-camera video to Evidence.com, and Capt. Carlson manually downloading the video to his H-drive and "believ[ing] the video would be protected" there as the reasonable steps taken. (*Id.*)

"Once the obligation to preserve relevant ESI attaches, the party in possession of that ESI must take 'reasonable steps' to preserve it." *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 61 (S.D.N.Y. 2020) (quoting Fed. R. Civ. P. 37(e)). This obligation "requires a litigant to do more than refrain from intentionally destroying relevant evidence; the litigant must also 'take affirmative steps to prevent inadvertent spoliation.' " *Europe*, 592 F. Supp. 3d at 177 (quoting *Skyline Steel, LLC v. PilePro, LLC*,

101 F. Supp. 3d 394, 408 (S.D.N.Y. 2015)). In general, a party must "identify[ ] all sources of potentially relevant evidence and implement[ ] a 'litigation hold' suspending any routine document destruction or other processes involved in the ordinary course of business that might result in the destruction of potentially relevant evidence." *Europe*, 592 F. Supp. 3d at 177 (quoting *Skyline Steel*, 101 F. Supp. 3d at 40). "Counsel is 'obligated to "oversee compliance with [a] litigation hold, monitoring the party's efforts to retain and produce the relevant documents," and to "become fully familiar with [their] client's document retention policies, as well as the client's data retention architecture." ' " *Hughes*, 2021 WL 4295209, at *11, 2021 U.S. Dist. LEXIS 180064 (quoting *Lokai Holdings, LLC v. Twin Tiger USA LLC*, No. 15-cv-9363, 2018 WL 1512055, at *8, 2018 U.S. Dist. LEXIS 46578 (S.D.N.Y. Mar. 12, 2018)). "Where a party fails to timely institute 'a formal litigation hold and ... otherwise informally preserve ESI,' [a] [c]ourt can conclude that it did not undertake reasonable steps to preserve ESI." *Charlestown Cap. Advisors*, 337 F.R.D. at 61 (quoting *Capricorn Mgmt. Sys., Inc. v. Gov't. Employees Ins. Co.*, No. 15-cv-2926, 2019 WL 5694256, at *10, 2019 U.S. Dist. LEXIS 123723 (E.D.N.Y. July 22, 2019), *report and recommendation adopted*, 2020 WL 1242616, 2020 U.S. Dist. LEXIS 45301 (E.D.N.Y. Mar. 16, 2020)). "The 'reasonable steps' inquiry has been equated to 'roughly a negligence standard.' " *id.* (quoting *Leidig v. Buzzfeed, Inc.*, No. 16-cv-542, 2017 WL 6512353, at *10, 2017 U.S. Dist. LEXIS 208756 (S.D.N.Y. Dec. 19, 2017)); *see also Stanbro*, 2021 WL 3863396, at *13, 2021 U.S. Dist. LEXIS 163849 ("In the discovery context, negligence is a failure to conform to the standard of what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding.") (quoting *Harkabi v. SanDisk Corp.*, 275 F.R.D. 414, 418–19 (S.D.N.Y. 2010)).

Here, Defendant Weir fulfilled his obligation to properly submit the body-camera video to the online storage system by docking his body camera. (Dkt. No. 32-4, at 9; Dkt. No. 31-11, at 23.) And the body-camera video was, in fact, uploaded to that storage system. (Dkt. No. 32-3, at 1.) However, at the relevant time, Defendants did not have a formal retention policy for body-camera video. (Dkt. No. 30-12, at 2; Dkt. No. 32-2, ¶ 8.) Furthermore, although the Broome County Attorney's Office received notice of the Plaintiff's claim on April 27, 2020, there is no evidence before the Court that the Broome County Attorney's Office took steps to preserve the body-camera video until August 2021. (Dkt. No. 30-11, at 12); *see Hughes*, 2021 WL 4295209, at *10, 2021 U.S.

Dist. LEXIS 180064 ("[T]he preservation obligation runs first to counsel, who has a duty to advise his client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction.") (quoting *Herman v. City of N.Y.*, 334 F.R.D. 377, 385 (E.D.N.Y. 2020)). Nor is there evidence before the Court that the Broome County Attorney's Office instituted any sort of formal litigation hold related to the incident at issue. Though Capt. Carlson attempted unsuccessfully to informally preserve the body-camera video by downloading it, (Dkt. No. 32-1, ¶ 7–8; Dkt. No. 32-3, at 2–3), it was nevertheless lost—either because Capt. Carlson never successfully downloaded it to his H-drive or because he failed to transfer it to the Broome County Sheriff's Office K-drive—and it was deleted from the online storage system on July 15, 2020, (Dkt. No. 32-1, ¶ 12; Dkt. No. 32-2, ¶ 9; Dkt. No. 32-3, at 3). [9] Thus, Defendants and their counsel failed to take reasonable steps to preserve the video. *See Sosa v. Carnival Corp.*, No. 18-cv-20957, 2018 WL 6335178, at *19, 2018 U.S. Dist. LEXIS 204933 (S.D. Fla. Dec. 4, 2018) (finding that attempting but failing to successfully download a video to a computer drive amounts to failing to "act 'reasonably' to preserve" it). There is no dispute that the body-camera video cannot be replaced. Accordingly, the Court concludes that Defendants and their counsel failed to take reasonable steps to preserve the body-camera video and thereby breached their duty to preserve.

[9]     Defendants argue that Capt. Carlson did download the body-camera video to his H-drive but that it was "automatically overwritten and destroyed." (Dkt. No. 32-4, at 5–6.) As the Court previously noted, there is no support in the record for the contention that data on the H-drive is ever "automatically overwritten." Rather, data saved on the H-drive is "backed up nightly in a rolling 30-day fashion," and "all backup copies would be deleted and unrecoverable" after thirty days. (Dkt. No. 30-11, ¶ 6.) That is, backups of the data saved on the H-drive, not the data itself, are automatically overwritten and deleted by the network after thirty days. (*Id.*)

### 3. Prejudice

**\*11**  Plaintiff argues that destruction of the body-camera video was highly prejudicial to his case because "the footage was the only objective direct evidence to support his claim," and Plaintiff further argues that evidence that

Plaintiff lacked observable injuries before entering his cell and had observable injuries upon leaving his cell supports his position. (Dkt. No. 30-13, at 7–9.) Plaintiff also submitted, in connection with his opposition to Defendants' motion for summary judgment, two statements from inmates who were present in Plaintiff's housing unit during the incident, both of whom stated they heard sounds of an assault occurring. (Dkt. No. 33-3, at 2–4.) Defendants argue that Plaintiff has failed to corroborate his claims with other evidence. (Dkt. No. 32-4, at 9–10.) Specifically, Defendants argue that other video evidence does not show that any assault occurred, (*id.* at 10), and submit an affidavit from Capt. Carlson, who viewed the body-camera video, (Dkt. No. 32-1, ¶ 3; Dkt. No. 32-3, at 1–2), and stated that the body-camera video "showed Defendants Hrebin and Fowler searching the Plaintiff's cell on through the window of the closed door to Plaintiff's cell ... without incident" before "divert[ing] away from the door as Defendants Hrebin and Fowler begin strip searching Plaintiff which prompted Defendant Weir to turn away from the door for privacy reasons and then proceed down the stairs," (Dkt. No. 32-1, ¶¶ 4–6). Capt. Carlson further stated that the body-camera video "clearly showed our officers did not assault Mr. Vega"; that "no sounds can be heard" from Plaintiff; and that he "believe[s] the body camera video would have been entirely favorable to the defense of this action." (*Id.* ¶¶ 6, 9, 16.) Additionally, Capt. Stanton, who was also present during the SERT shakedown, "did not witness any assault of the Plaintiff ... and did not hear any calls of distress or yelling from Plaintiff's cell." (Dkt. No. 31-4, ¶ 4.)

Rule 37(e) permits a court to impose sanctions under subdivision (e)(1) "upon finding prejudice to another party from the loss of the information." But the "precise definition of prejudice for the purposes of Rule 37(e) is not clear." *Stanbro*, 2021 WL 3863396, at *14, 2021 U.S. Dist. LEXIS 213849. "The Advisory Committee Note to the 2015 Amendment merely provides that '[a]n evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation.'" *Id.* (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). Thus, "[t]wo different views of 'prejudice' may be hypothesized": (1) "'prejudice' may be taken to mean merely that the evidence is probative, similar to the concept of relevance under Fed. R. Evid. 401"; or (2) "prejudice may require proof that the evidence was not only probative, but that it would affirmatively support the movant's claim." *Ungar*, 329 F.R.D. at 15. However, "[c]ourts in this Circuit generally require some proof of prejudice in the latter sense before sanctions will issue." *Id.*

But Rule 37(e) "does not place a burden of proving or disproving prejudice on one party or the other." *Ungar*, 329 F.R.D. at 16 (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). Rather, Rule 37(e) "leaves judges with discretion to determine how best to assess prejudice in particular cases," *id.* (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment), though "the Second Circuit has cautioned district courts against 'holding the prejudiced party to too strict a standard of proof regarding the likely contents of ... destroyed evidence,' " *Moody*, 271 F. Supp. 3d at 430 (quoting *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998)); *see also Taylor v. City of N.Y.*, 293 F.R.D. 601, 614 (S.D.N.Y. 2013) (citing *Residential Funding Corp.*, 306 F.3d at 109; *Kronisch*, 150 F.3d at 130). Courts have noted that proof that destroyed ESI "would affirmatively support the movant's claim" may not be "categorically necessary in all instances" for spoliation sanctions to be warranted. *See Ungar*, 329 F.R.D. at 15.

Here, given the broad discretion provided by Rule 37(e), *see Ungar*, 329 F.R.D. at 16, the importance of the body-camera video to the litigation, *see Stanbro*, 2021 WL 3863396, at *14, 2021 U.S. Dist. LEXIS 163849, and Defendants' negligent destruction of the body-camera video, the Court finds that Plaintiff must establish that "existing evidence plausibly 'suggests' that the spoliated ESI could support" his case. *See Karsch v. Blink Health Ltd.*, No. 17-cv-3880, 2019 WL 2708125, at *21, 2019 U.S. Dist. LEXIS 106971 (S.D.N.Y. June 20, 2019) (collecting cases). This burden is appropriate given the Court's "recogni[tion] that [a] negligent party has no right to benefit from its negligence." *See Europe*, 592 F. Supp. 3d at 178 (citing *Ungar*, 329 F.R.D. at 16).

**\*12** The Court finds that, for the purposes of Rule 37(e), Plaintiff has demonstrated that existing evidence plausibly suggests that the body-camera video could have supported his claims. Plaintiff testified that he sustained injuries as a result of the incident. (Dkt. No. 31-9, at 52–54; Dkt. No. 31-10, at 79–80.) Defendant Hrebin testified that he did not recall any bruises or scratches on Plaintiff before the incident. (Dkt. No. 31-12, at 33.) Defendant Fowler testified the same. (Dkt. No. 31-13, at 26–27.) But the Facility's medical records objectively demonstrate that Plaintiff had injuries after the incident, (Dkt. No. 31-15, at 7–8), and there is video evidence demonstrating bruises and scratches on Plaintiff after the incident, (Dkt. No. 35, ex. C). Furthermore, Plaintiff has submitted statements from inmates who were present in Plaintiff's housing unit during the incident, both of whom

stated they heard sounds of an assault occurring. (Dkt. No. 33-3, at 2–4.) [10] The body-camera video was therefore very important to Plaintiff's case: it was the only objective evidence of what occurred in Plaintiff's cell, and, in light of the existing evidence to which Plaintiff points, it is plausible that it could have supported Plaintiff's claims. Thus, the destruction of the body-camera video "deprived [P]laintiff of relevant, non-cumulative, and potentially powerful evidence," *see Ransom v. Andrews*, No. 21-cv-6343, 2022 WL 16555362, at *5, 2022 U.S. Dist. LEXIS 197852 (S.D.N.Y. Oct. 31, 2022), and Plaintiff has "plausibly 'suggest[ed]' " that the body-camera video "could [have] support[ed] [his] case," *see Karsch*, 2019 WL 2708125, at *21, 2019 U.S. Dist. LEXIS 106971.

10       Defendants make the cursory observation that these statements are hearsay. (Dkt. No. 32-4, at 10.) But "[h]earsay evidence is admissible at the summary judgment stage if the contents would otherwise be admissible at trial." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 215 (S.D.N.Y. 2007) (citing *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) (per curiam)), *aff'd*, 354 F. App'x 496 (2d Cir. 2009) (summary order); *see also Smith v. City of New York*, 697 F. App'x 88, 89 (2d Cir. 2017) (summary order) ("[M]aterial relied on at summary judgment need not be admissible in the form presented to the district court. Rather, so long as the evidence in question 'will be presented in admissible form at trial,' it may be considered on summary judgment." (quoting *Santos*, 243 F.3d at 683)). Here, it is possible the other inmates will testify at trial, *see Auz v. Century Carpet, Inc.*, No. 12-cv-417, 2014 WL 199511, at *1 n.1, 2014 U.S. Dist. LEXIS 6751 (S.D.N.Y. Jan. 17, 2014). Thus, the Court finds no basis to disregard the inmates' statements in consideration of Plaintiff's motion for sanctions or Defendants' motion for summary judgment.

This conclusion is supported by the characterization that Facility personnel seek to make regarding the body-camera video and other video evidence. Capt. Carlson states that the body-camera video "clearly showed our officers did not assault" Plaintiff. (Dkt. No. 32-1, ¶ 9.) Capt. Stanton similarly states that the body-camera video, the handheld SERT video, and the surveillance footage "show[ ] Plaintiff being noncompliant with officers during the SERT shakedown ... [and] subsequently show[ ] Plaintiff being escorted into his cell by Defendants Hrebin and Fowler where Defendants

Hrebin and Fowler conducted a search of Plaintiff's cell and of Plaintiff's person without incident." (Dkt. No. 31-4, ¶ 5.) Grievance Officer Valls almost identically states that the body-camera video "shows Plaintiff being noncompliant with officers during the SERT shakedown ... [and] subsequently shows Plaintiff being escorted into his cell by Defendants Hrebin and Fowler where Defendants Hrebin and Fowler conducted a search of Plaintiff's cell and of Plaintiff's person without incident." (Dkt. No. 31-5, ¶ 3.) The Court's review of existing video evidence, however, demonstrates that neither the handheld SERT video nor the surveillance footage shows the interaction between Plaintiff and Defendants Hrebin and Fowler in Plaintiff's cell. (Dkt. No. 37, exs. A, B.) And the body-camera video would have shown eight seconds of the five- to six-minute interaction. (*Id.* ex. A at 17:23:20–17:23:28.) Thus, even if the body-camera video did not show any use of force, it would not "clearly" support the conclusion that Defendants Hrebin and Fowler "did not assault" Plaintiff, (Dkt. No. 32-1, ¶ 9), or that the interaction between Defendants Hrebin and Fowler and Plaintiff proceeded "without incident," (Dkt. No. 31-4, ¶ 5; Dkt. No. 31-5, ¶ 3). Allowing such testimony in the absence of the body-camera itself would allow "the negligent party ... to benefit from its negligence," *see Europe*, 592 F. Supp. 3d at 178, and would further prejudice Plaintiff where Plaintiff has produced some evidence supporting his allegations.

 **\*13** Defendants argue that the other video footage, which the Court previously discussed, demonstrates that the body-camera video would not have supported Plaintiff's claims, (Dkt. No. 32-4, at 10), but the Court is unpersuaded. Surveillance footage, which Defendants imply shows no inmates looking toward Plaintiff's cell, shows inmates looking around in all directions, (Dkt. No. 37, ex. A), including at Plaintiff's cell during the relevant time, (*id.* at 17:22:40–43, 17:23:07–17, 17:24:42–47). The handheld camera footage, which Defendants claim includes no sounds of yelling or slapping, does not include clear enough audio for the Court to reach the same conclusion. (*Id.* ex. B.)

Defendants also argue that the lapse in time between the incident in Plaintiff's cell and the video call between Plaintiff and his mother gave Plaintiff time to "inflict those injuries upon himself," (Dkt. No. 32-4, at 10), and the Facility's medical records do reflect that scratches on Plaintiff were "in a very odd pattern" and were "questionable [as if] self inflicted," (Dkt. No. 31-15, at 8). But requiring Plaintiff to provide more evidence of what happened between the incident in his cell and the video call with his mother than

he has already provided would be holding Plaintiff to too strict a standard of proof in light of the fact that Plaintiff has already plausibly suggested that the body-camera video could have supported his claims and that Defendants failed to take reasonable steps to preserve the apparently sole piece of evidence that would have objectively shown, at least in part, what occurred during that period. *See Moody*, 271 F. Supp. 3d at 430; *Taylor*, 293 F.R.D. at 614. Thus, Defendants' argument is unpersuasive.

The Court therefore concludes that Plaintiff has demonstrated that existing evidence plausibly suggests the body-camera video could have supported Plaintiff's case. *See Karsch*, 2019 WL 2708125, at \*21, 2019 U.S. Dist. LEXIS 106971. This is especially true given that the Court will not "hold[ ] [Plaintiff] to too strict a standard of proof regarding the likely contents of" the body-camera video. *See Moody*, 271 F. Supp. 3d at 430 (quoting *Kronisch*, 150 F.3d at 128). Accordingly, the Court finds, to the extent necessary for the purposes of Rule 37(e), that Plaintiff has established prejudice from the destruction of the body-camera video.

### 4. Intent to Deprive

Plaintiff seeks an adverse inference instruction and argues that Defendants exhibited the requisite intent to deprive Plaintiff of use of the body-camera video because the body-camera video was crucial to, if not dispositive of, Plaintiff's case, and Defendants "intentionally did not take reasonable steps to preserve" the body-camera video. (Dkt. No. 30-13, at 13–14.) Defendants argue that "the record is devoid of bad faith or a showing that a conscious effort was made to suppress the same as evidence in this matter" and that "nothing from the record suggests that the video was deliberately destroyed with the intention to deprive the Plaintiff." (Dkt. No. 32-4, at 7, 9; *see also* Dkt. No. 40, at 5–6)

An adverse inference instruction is a sanction available only under Rule 37(e)(2) when ESI is at issue. The sanctions available under Rule 37(e)(2) require a finding that the spoliating party "acted with the intent to deprive another party of the information's use in the litigation." "[T]he intent contemplated by Rule 37 is not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence." *Stanbro*, 2021 WL 3863396, at \*15, 2021 U.S. Dist. LEXIS 163849 (quoting *Charlestown Cap. Advisors*, 337 F.R.D. at 66). "This intent standard is 'stringent' and 'does not parallel other discovery standards.'

" *Moody*, 271 F. Supp. 3d at 431 (quoting *Jenkins v. Woody*, No. 15-cv-355, 2017 WL 362475, at *17, 2017 U.S. Dist. LEXIS 9581 (E.D. Va. Jan. 21, 2017)). "Courts are 'divided with respect to the appropriate standard of proof to apply to a claim of spoliation;' some courts require a showing of intent to deprive by a preponderance of the evidence, while others require clear and convincing evidence." *Id.* (quoting *Resnik v. Coulson*, 17-cv-676, 2019 WL 2256762, at *6, 2019 U.S. Dist. LEXIS 92159 (E.D.N.Y. Jan. 4, 2019)). The Court need not resolve this issue, however, because even under the less onerous preponderance of the evidence standard, Plaintiff has not demonstrated that Defendants acted with the intent to deprive him of use of the body-camera video in this action.

**\*14** Plaintiff premises his first argument—that where destroyed evidence was crucial to a party's case, courts have found intent has been shown—on *Moody v. CSX Transportation*. (Dkt. No. 30-13, at 14.) But in that case, "the affirmative act causing the loss [of ESI] [could not] be credibly explained as not involving bad faith by the reason proffered by the spoliator." *See Moody*, 271 F. Supp. 3d at 431 (quoting *Ala. Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 746 (N.D. Ala. 2017)). Here, however, Defendants' proffered reason for the destruction of the body-camera video can be credibly explained as not involving bad faith. The record indicates that Capt. Carlson tried to download the body-camera video to preserve it. (Dkt. No. 32-1, ¶¶ 7–8; Dkt. No. 32-3, at 2–3.) Capt. Carlson states that he did not know that the body-camera video was not on his computer after he attempted to download it. (Dkt. No. 32-1, ¶¶ 13, 15.) Upon realizing that the body-camera video was not on his computer, Capt. Carlson contacted the Broome County IT Department, on August 25, 2021, to attempt to recover it. (Dkt. No. 30-11, at 12.) Either Capt. Carlson's unawareness as to how to download data from Evidence.com or his inadvertent failure to copy the body-camera video to the necessary shared computer drive after downloading it is the reason for the loss of the body-camera video, and Capt. Carlson's statements to IT personnel demonstrate that he lacked the intent to deprive any party of the body-camera video. (Dkt. No. 30-11, at 5 ("There is no way I would have deleted [the body-camera video] as it protects my staff and contradicts the inmates claims."), 9 ("It is imperative that the [body-camera] video is recovered ...."), 12 ("I know I downloaded and saved [the body-camera video].").) Plaintiff, for his part, has not put forth any support for the contention that Capt. Carlson's confusion or inadvertent oversight amounted to bad faith, let alone an intent to deprive Plaintiff of the body-camera video.

Plaintiff's second argument—that "[a] party's conscious dereliction of a known duty to preserve electronic data is both necessary and sufficient to find that the party 'acted with the intent to deprive another party of the information's use' under Rule 37(e)(2),' " (Dkt. No. 30-13, at 13 (quoting *Ungar*, 329 F.R.D. at 13))—is similarly misplaced. This argument relies on the proposition that Plaintiff "intentionally did not take reasonable steps to preserve the" body-camera video. (Dkt. No. 30-13, at 14.) But only if Defendants "did not intentionally take *any* steps to preserve" the body-camera video would Plaintiff's argument hold water. *See Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 582 (S.D.N.Y. 2017) (emphasis added). Plaintiff ignores the fact that Capt. Carlson did, in fact, attempt to preserve the video by downloading it. Thus, while the Court has found that Defendants and their counsel failed to take reasonable steps to ensure that the body-camera video was preserved, Plaintiff has not demonstrated that Defendants acted with the intent to deprive him of use of the body-camera video in this action. Accordingly, sanctions authorized by Rule 37(e)(2), which include an adverse inference instruction, are unavailable.

### 5. Appropriate Sanctions

Plaintiff argues that, aside from an adverse inference instruction, preclusion of any evidence related to the body-camera video and attorney's fees associated with Plaintiff's motion for sanctions are appropriate. (Dkt. No. 30-13, at 16–17.) Defendants do not specifically argue that these sanctions are inappropriate.

Plaintiff has established that the body-camera video should have been preserved in the anticipation of litigation; the body-camera video was lost because Defendants and their counsel failed to take reasonable steps to preserve it; the body-camera video cannot be restored or replaced through additional discovery; and Plaintiff was prejudiced as a result of the destruction of the body-camera video. Thus, under Rule 37(e)(1), the Court may order measures no greater than necessary to cure the prejudice.

The Court finds that precluding any party from introducing evidence related to the spoliated body-camera video, including evidence of the existence of the body-camera video and testimony from Capt. Carlson or any other witness about what body-camera video showed, is appropriate and necessary to cure the prejudice caused by Defendants' spoliation of the body-camera video. *See Europe*, 592 F. Supp.

3d at 180 (ordering preclusion of arguments based on the content of spoliated electronic documents to "ensure[ ] that [the spoliating party] does not benefit from its negligence"); *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 502 (S.D.N.Y. 2016) (ordering preclusion of evidence related to spoliated emails to "adequately protect[ ] the [non-spoliating party] against any legal prejudice arising from the [spoliating party's] conduct"). This preclusion order does not, however, include testimony from Defendant Weir related to his observations that day. Relatedly, the Court will not consider evidence related to the spoliated body-camera video in disposition of Defendants' motion for summary judgment.

**\*15** Furthermore, Defendant Broome County and the Broome County Attorney's Office shall jointly and severally bear the reasonable attorney's fees and costs Plaintiff and his counsel incurred in connection with the spoliation of the body-camera video. *See Hughes*, 2021 WL 4295209, at \*14, 2021 U.S. Dist. LEXIS 180064; *CAT3, LLC*, 164 F. Supp. 3d at 501–02.[11] Defendants, for their part, do not specifically address Plaintiff's request for fees and costs at all. (Dkt. Nos. 32, 40.) "It is well-established that 'misconduct that causes a party to incur additional expenses is a form of prejudice that supports an award of sanctions pursuant to Rule 37(e).' " *Hughes*, 2021 WL 4295209, at \*14, 2021 U.S. Dist. LEXIS 180064 (quoting *Fashion Exch. LLC v. Hybrid Promotions, LLC*, No. 14-cv-1254, 2021 WL 1172265, at \*5, 2021 U.S. Dist. LEXIS 59661 (S.D.N.Y. Mar. 29, 2021)). Though Plaintiff is represented by attorneys from Legal Services of Central New York, and therefore has presumably not himself incurred additional expenses, his attorneys nevertheless "have been put to the burden and expense of ferreting out the malfeasance and seeking relief from the Court." *See id.* (quoting *CAT3, LLC*, 164 F. Supp. 3d at 501). Awarding fees against Defendant Broome County and the Broome County Attorney's Office "serve[s] to 'enforce compliance with the discovery rules,' " *see Charlestown Cap. Advisors*, 337 F.R.D. at 68 (quoting *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1367 (2d Cir. 1991)) and "also serves as a deterrent to future spoliation," *see CAT3, LLC*, 164 F. Supp. 3d at 502, as it should alert Broome County and the Broome County Attorney's Office to a need to reevaluate their policies and procedures involving the storage and preservation of body-camera video footage and other electronically stored information that may be relevant to future litigation.

[11]    While the Court has imputed control over the spoliated evidence to all Defendants, the Court has "wide discretion to apportion Rule 37 monetary

sanctions." *See Charlestown Cap. Advisors*, 337 F.R.D. at 69 n.19 (quoting *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, No. 16-cv-1318, 2017 WL 3671036, at \*20, 2017 U.S. Dist. LEXIS 165702 (S.D.N.Y. July 18, 2017)); *see also Hughes*, 2021 WL 4295209, at \*14–15, 2021 U.S. Dist. LEXIS 180064 (awarding attorney's fees and costs against the City of New York and its law department but not individual defendants). The Court imposes the monetary sanction against only Defendant Broome County and the Broome County Attorney's Office in recognition of the fact that Defendants Hrebin, Fowler, and Weir did not personally cause the destruction of the body-camera video and because levying the monetary sanction against Defendant Broome County and the Broome County Attorney's Office serves the purpose of sanctioning those primarily responsible for failing to ensure that Defendants' preservation obligations were met. *See id.*, 2021 WL 4295209, at \*14, 2021 U.S. Dist. LEXIS 180064 (holding that where the New York City Law Department "fail[ed] to take effective steps to ensure that ... ESI would be preserved," apportioning sanctions between the defendant City of New York and the Law Department was appropriate). The Court finds that "sanctioning [Defendant Broome County and the Broome County Attorney's Office] 'is necessary both to deter such conduct in the future as well as to compensate for the expenses [Plaintiff's counsel] w[as] forced to incur by [Defendant Broome County and the Broome County Attorney's Office's] ... disregard in ensuring that [evidence preservation] obligations were being met.' " *See id.* (fourth, fifth, and eighth alterations in original) (quoting *Fashion Exch. LLC v. Hybrid Promotions, LLC*, No. 14-cv-1254, 2019 WL 6838672, at \*9, 2019 U.S. Dist. LEXIS 218286 (S.D.N.Y. Dec. 16, 2019)).

## IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on all of Plaintiff's claims, (Dkt. No. 31, at 1; Dkt. No. 31-7, at 16), and argue that they are entitled to summary judgment because Plaintiff failed to exhaust administrative remedies and Defendants are entitled to qualified immunity, (Dkt. No. 31-7, at 4–5, 15–16). Aside from these arguments, Defendants include specific arguments only as to Plaintiff's claims for: (1) excessive

force in violation of the Fourteenth Amendment against Defendants Hrebin and Fowler; (2) unreasonable search in violation of the Fourth Amendment against Defendants Hrebin, Fowler, and Weir; (3) negligent supervision and training against Defendant Broome County; and (4) state-law battery, assault, and intentional infliction of emotional distress under the theory of respondeat superior against Defendant Broome County. (Dkt. No. 31-7, at 6–15.) Plaintiff opposes Defendants' motion, arguing that he exhausted available administrative remedies and Defendants are not entitled to qualified immunity, (Dkt. No. 33, at 5–8, 10–11), and that Defendants are not entitled to summary judgment with regard to the following claims: (1) excessive force in violation of the Fourteenth Amendment against Defendants Hrebin and Fowler; and (2) state-law battery, assault, and intentional infliction of emotional distress under the theory of respondeat superior against Defendant Broome County, (*id.* at 8–12).[12]

[12]  Plaintiff states that he "does not challenge Defendant[s'] summary judgment motion for the dismissal of his Fourth Amendment strip search claims and state law negligent hiring and supervision claim." (Dkt. No. 33, at 5 n.2.) Accordingly, the Court finds that Plaintiff has explicitly abandoned these claims, *see Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("[A] court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."), and Plaintiff's Fourth Amendment unreasonable search claim against Defendants Hrebin, Fowler, and Weir and state-law negligent hiring and supervision claim against Defendant Broome County are dismissed with prejudice. *See LaFever v. Clarke*, 525 F. Supp. 3d 305, 333 (N.D.N.Y. 2021) (dismissing claims that were abandoned on summary judgment); *Leavitt v. Ethicon, Inc.*, 524 F. Supp. 3d 360, 367 (D. Vt. 2021) (granting motion for summary judgment in light of the plaintiffs' "unequivocal abandonment of certain claims").

**A. Standard of Review**

**\*16**  Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to " 'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))). If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250, 106 S.Ct. 2505; *see also Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In ruling on a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v.*

*Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

### B. Discussion

#### 1. Exhaustion of Administrative Remedies

Defendants argue that they are entitled to summary judgment on all of Plaintiff's claims because Plaintiff failed to exhaust his administrative remedies with regard to these claims. (Dkt. No. 31-7, at 4–5.) Specifically, Defendants argue that Plaintiff, after appealing a grievance officer's denial of Plaintiff's grievance, failed to further appeal the Chief Administrative Officer's decision to the Citizen's Policy and Complaint Review Council. (*Id.* at 5.) Plaintiff argues that by timely filing a grievance and appealing a first-level denial to the Chief Administrative Officer, who "accepted" his grievance, Plaintiff had no further available administrative remedies. (Dkt. No. 33, at 6–7.) Plaintiff also argues that, because he received a favorable outcome, he was not required under the PLRA to appeal further. (*Id.* at 7.)

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, prescribes limitations on an inmate's ability to bring civil actions with respect to prison conditions. Specifically, the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004) (quoting *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)), *abrogated on other grounds by Ross v. Blake*, 578 U.S. 632, 639–42, 136 S.Ct. 1850, 195 L.Ed.2d 117 (2016).

**\*17** Proper exhaustion of administrative remedies is dependent on the rules and regulations of the prison in which the grievance is filed; that is, an inmate of a county-level correctional facility must satisfy the requirements, including procedural and substantive requirements, specifically applicable to such facilities. *See Hayes v. Dahlke*, 976 F.3d 259, 268 (2d Cir. 2020) ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper

exhaustion." (alteration in original) (quoting *Jones v. Bock*, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007))).

Failure to exhaust available administrative remedies is an affirmative defense that must be raised by the defendants. *See Jones*, 549 U.S. at 216, 127 S.Ct. 910. Therefore, the defendants "bear the initial burden of establishing the affirmative defense of non-exhaustion 'by pointing to "legally sufficient sources" such as statutes, regulations, or grievance procedures' which demonstrate that 'a grievance process exists and applies to the underlying dispute.' " *Williams v. Correction Officer Priatno*, 829 F.3d 118, 126 n.6 (2d Cir. 2016) (quoting *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015)). "If the defendants meet this initial burden, administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors ... rendered a nominally available procedure unavailable as a matter of fact." *Hubbs*, 788 F.3d at 59 (quoting *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004), *abrogated on other grounds by Ross*, 578 U.S. at 639–42, 136 S.Ct. 1850).

The regulations governing grievance procedures at county-level correctional facilities in New York provide that "the chief administrative officer of each local correctional facility shall establish, implement and maintain a formal inmate grievance program," which "shall include," among other things, "a detailed description of grievance program operations including steps, timeliness, investigative processes and available internal and external appeal procedures," N.Y. Comp. Codes R. & Regs. tit. 9, §§ 7032.1, 7032.3(b). Under any facility's program, an inmate must "file a grievance within five days of the date of the act or occurrence giving rise to the grievance." *Id.* § 7032.4(d). The chief administrative officer of the facility designates a staff member to act as a grievance coordinator, *id.* § 7032.4(e), and the regulations provide that the chief administrative officer or designee shall "ensure that each grievance is investigated to the fullest extent necessary by an impartial person who was not personally involved in the circumstances giving rise to the grievance," *id.* § 7032.4(f). Within five business days of receipt, the "grievance coordinator shall issue a written determination." *Id.* § 7032.4(i). The inmate has two business days after receipt of the grievance coordinator's determination to appeal to the chief administrative officer, *id.* § 7032.4(j), after which the chief administrative officer has five business days to issue a determination, *id.* § 7032.4(k). For "any grievance denied by the facility administrator," the inmate has three business days to indicate to the grievance coordinator that he seeks to appeal

to the State Commission of Correction, and the grievance coordinator then has three business days to submit the appeal to the Commission's Citizens' Policy and Complaint Review Council ("CPCRC"). *Id.* § 7032.5.

As an initial matter, Defendants have failed to submit any evidence of the actual grievance program that the Facility has implemented. *See Hubbs*, 788 F.3d at 62 ("The burden ... is on the defendant to establish at the outset that an administrative remedy ... existed and covered the dispute at hand."). While it is undisputed that Plaintiff received "an inmate handbook" when he entered the Facility, (Dkt. No. 31-6, ¶ 53; Dkt. No. 31-10, at 34), which presumably included the Facility's grievance procedures, Defendants do not include any indication of what those procedures were. Nor do Defendants cite any " 'statutes [or] regulations ...' which demonstrate that 'a grievance process exist[ed] and applie[d] to the underlying dispute.' " *See Williams*, 829 F.3d at 126 n.6 (2d Cir. 2016) (quoting *Hubbs*, 788 F.3d at 59). "Title 9 provides only the 'Minimum Standards and Regulations' that a county facility must implement in adopting a formal grievance program." *Dickinson v. York*, 828 F. App'x 780, 783 n.3 (2d Cir. 2020) (summary order); *see also* N.Y. Comp. Codes R. & Regs. tit. 9, § 7032.3. Thus, it is possible that the Facility's procedures are not coextensive with the Title 9 regulations. However, by failing to put forth any evidence of the Facility's specific regulations, Defendants have forfeited any argument based on those regulations. *See Dickinson*, 828 F. App'x at 783 n.3 (citing *Hemphill*, 380 F.3d at 686, 688–89). The Court will instead consider the issue of exhaustion in light of the Title 9 regulations alone. *See id.*

 **\*18** Here, it is undisputed that Plaintiff timely filed a grievance regarding the February 10, 2020 incident and timely appealed the initial denial of that grievance to the Chief Administrative Officer. (Dkt. No. 31-15, at 1, 10.) On February 20, 2020, the Chief Administrative Officer issued a determination on an inmate grievance form, checking a box that stated "Grievance Accepted." (*Id.* at 10–12.) The Chief Administrative Officer wrote that he "accepted the requested action," noting that Plaintiff's request for an investigation "has been granted and one is ongoing," Plaintiff "may call [his] lawyer at any time," and Plaintiff was interviewed regarding the incident. (*Id.*). Plaintiff "agree[d] to accept the decision." (*Id.*)

Defendants argue, however, that Plaintiff's acceptance of the Chief Administrative Officer's decision and failure to appeal the decision to CPCRC means that Plaintiff "failed to use

all the steps of the Facility's grievance policy which resulted in his failure to exhaust his administrative remedies." (Dkt. No. 31-7, at 5.) But the governing regulations provide for an appeal of grievances *denied* by the facility administrator. The relevant regulation states that "[w]ithin three business days of the receipt of the chief administrative officer's determination, any grievant may appeal any grievance *denied* by the facility administrator in whole or in part" to the CPCRC. *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 7032.5(a) (emphasis added). [13] The form on which the determination of the Chief Administrative Officer was issued similarly states that, "[p]ursuant to 9 NYCRR § 7032.5(a), any grievant may appeal any grievance DENIED by the facility administrator, in whole or in part, to the State Commission of Correction." (Dkt. No. 31-15, at 10 (emphasis in original).) The form further states that "a grievance accepted in its entirety by the Chief Administrative Officer ... may not be appealed." (Dkt. No. 31-15, at 10.)

| 13 | The grievance form provided, as an alternative to "Grievance Accepted," a determination of "Grievance Accepted in part/Denied in part." (Dkt. No. 31-15, at 10.) |
|----|----|

Defendants do not cite any support for their assertion that, even though Plaintiff followed applicable regulations by timely filing a grievance, timely appealing a denial to the Chief Administrative Officer, and ultimately having his grievance "accepted" by the Chief Administrative Officer, Plaintiff was nevertheless required to appeal that outcome to the CPCRC. *Cf. Abney v. McGinnis*, 380 F.3d 663, 669 (2d Cir. 2004) (finding that "[o]nce [a DOCCS grievant] receive[s] a favorable ruling ..., no further administrative proceedings [are] available to propel him out of stasis," and "[c]onsequently, there [is] no further 'possibility of some relief' for [the grievant]." (quoting *Booth v. Churner*, 532 U.S. 731, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001))). Defendants have not identified an available administrative remedy; under the language of the relevant regulation, Plaintiff was not permitted to appeal the "grievance accepted" determination ruling to the CPCRC.

In sum, because Plaintiff "complete[d] the administrative review process in accordance with the applicable procedural rules," which is "all that is required by the PLRA to 'properly exhaust,' " *see Jones*, 549 U.S. at 218, 127 S.Ct. 910 (quoting *Woodford v. Ngo*, 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)), Plaintiff did not fail to exhaust available administrative remedies. Accordingly, Defendants' motion

for summary judgment is denied to the extent it is premised on the argument that Plaintiff failed to exhaust administrative remedies.

### 2. Excessive Force

Defendants argue that they are entitled to summary judgment on Plaintiff's Fourteenth Amendment excessive force claim against Defendants Hrebin and Fowler because (1) any force used by Defendants Hrebin or Fowler while Plaintiff was being handcuffed was objectively reasonable due to Plaintiff's noncompliance, (2) Defendants Hrebin and Fowler did not use force on Plaintiff while he was in his cell, and (3) Plaintiff had not had any prior interactions with Defendants Hrebin and Fowler, and, therefore, neither Defendant Hrebin nor Defendant Fowler had a motive to use excessive force. (Dkt. No. 31-7, at 6–8.) Plaintiff argues that Defendants' motion should be denied with respect to Plaintiff's excessive force claim against Defendants Hrebin and Fowler because (1) there exist factual disputes about the alleged use of force, and (2) familiarity with an alleged attacker is not an element of a Fourteenth Amendment excessive force claim. (Dkt. No. 33, at 8–10.)

**\*19** The parties agree that, at the time of the events at issue, Plaintiff was a pretrial detainee at the Facility. (Dkt. No. 31-7, at 6; Dkt. No. 33, at 8.) "[T]he right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999). To succeed on a Fourteenth Amendment excessive force claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *See Kingsley v. Hendrickson*, 576 U.S. 389, 396–97, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015). That is, a plaintiff must first show that the defendant used force "purposefully, knowingly, or (perhaps) recklessly." *See Edrei v. Maguire*, 892 F.3d 525, 534 (2d Cir. 2018) (citing *Kingsley*, 576 U.S. at 395–96, 135 S.Ct. 2466). Then, the plaintiff must demonstrate that the force was objectively unreasonable in light of "such factors as 'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.' " *See Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 252 (2d Cir. 2020) (quoting *Kingsley*, 576 U.S. at 397, 135 S.Ct. 2466).

"These non-exhaustive considerations 'inform the ultimate Fourteenth Amendment inquiry: whether the governmental action was rationally related to a legitimate governmental objective.' " *Ransom v. Banks*, No. 20-cv-10232, 2022 WL 769344, at \*3, 2022 U.S. Dist. LEXIS 45005 (S.D.N.Y. Mar. 14, 2022) (quoting *Edrei*, 892 F.3d at 536).

Because whether a use of force was objectively unreasonable is a fact-intensive inquiry that often involves assessments of credibility and choices between conflicting versions of events—questions that must often be left for a jury to decide—"granting summary judgment against plaintiffs on excessive force claims is rarely appropriate." *See Taylor v. Quayyum*, No. 16-cv-1143, 2023 WL 5293383, at \*7, 2023 U.S. Dist. LEXIS 146503 (S.D.N.Y. Aug. 17, 2023) (quoting *Anderson v. City of N.Y.*, No. 16-cv-2583, 2019 WL 1426723, at \*8, 2019 U.S. Dist. LEXIS 54126 (S.D.N.Y. Mar. 28, 2019)).

Here, there exist issues of material fact that preclude summary judgment. Plaintiff claims he did not resist during the initiation of the SERT shakedown or while Defendants Hrebin and Fowler handcuffed him. (Dkt. No. 33-1, ¶¶ 31, 33; Dkt. No. 31-10, at 45.) Defendants, meanwhile, claim that Plaintiff refused to "give up his hands to be handcuffed." (Dkt. No. 31-6, ¶¶ 31, 33; Dkt. No. 33-12, at 33–34; Dkt. No. 33-13, at 22.) Furthermore, Plaintiff claims that, while he was handcuffed in his cell, Defendants Hrebin and Fowler assaulted him. (Dkt. No. 33-1, ¶ 72; Dkt. No. 31-10, at 49–52.) Defendants claim no force was used in Plaintiff's cell. (Dkt. No. 31-6, ¶ 43; Dkt. No. 31-2, ¶ 4; Dkt. No. 31-3, ¶ 4; Dkt. No. 31-12, at 38; Dkt. No. 31-13, at 25–26.)

Whether Plaintiff was resisting at the onset of the SERT shakedown, in addition to itself being a factor relevant to the objective reasonableness of an alleged use of force, also bears on the severity of the security problem at issue and the threat reasonably perceived by Defendants Hrebin and Fowler at that point, *see Kingsley*, 576 U.S. at 397, 135 S.Ct. 2466. Such a factual dispute is an issue to be decided at trial, not on a motion for summary judgment. *See Wright*, 554 F.3d at 266; *Taylor*, 2023 WL 5293383, at \*7, 2023 U.S. Dist. LEXIS 146503. And determining what occurred in Plaintiff's cell, which is wholly dependent on "assessments of credibility and choices between conflicting versions of the events," is a matter "for the jury, not for the [C]ourt on summary judgment." *See Simpson v. City of N. Y.*, 793 F.3d 259, 265 (2d Cir. 2015) (quoting *Jeffreys*, 426 F.3d at 553). Defendants' argument relying on Plaintiff's lack of "prior interactions

with any Defendant or any reason to fear any Defendant" is unavailing; neither a preexisting relationship nor motive is an element of a Fourteenth Amendment excessive force claim. *See Kingsley*, 576 U.S. at 396–97, 135 S.Ct. 2466; *Edrei*, 892 F.3d at 534.

Accordingly, Defendants' motion for summary judgment is denied with respect to Plaintiff's Fourteenth Amendment excessive force claim against Defendants Hrebin and Fowler.

### 3. Qualified Immunity

**\*20** Defendants argue that summary judgment with respect to Plaintiff's Fourteenth Amendment excessive force claim is appropriate because they are entitled to qualified immunity. (Dkt. No. 31-7, at 15–16.) Specifically, Defendants argue that no Defendant violated any clearly established law. (*Id.* at 16.) Plaintiff argues that Defendants are not entitled to qualified immunity because "factual disputes remain as to the reasonableness of [the force used]." (Dkt. No. 33, at 10–11 (alteration in original) (quoting *Smith v. Sawyer*, 435 F. Supp. 3d 417, 435 (N.D.N.Y. 2020)).)

"Qualified immunity is an affirmative defense on which the defendant has the burden of proof." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). On a motion for summary judgment, the court evaluates claims of qualified immunity using a two-part inquiry: (1) "whether the facts, '[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right,' " and (2) "whether the right in question was 'clearly established' at the time of the violation," *Tolan v. Cotton*, 572 U.S. 650, 655–56, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (alterations in original) (first quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), and then quoting *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). "Courts have discretion to decide the order in which to engage these two prongs." *Id.* at 656, 134 S.Ct. 1861 (citing *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* (citations omitted).Here, as previously discussed, material factual disputes remain as to both the reasonableness of Defendants Hrebin and Fowler's use of force while handcuffing Plaintiff and whether Defendants Hrebin and Fowler used force while in Plaintiff's cell. Because these material factual disputes remain, deciding

the issue of qualified immunity is inappropriate. *See Smith*, 435 F. Supp. 3d at 442; *see also Taravella v. Town of Wolcott*, 599 F.3d 129, 135 (2d Cir. 2010) ("Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual question must be resolved by the factfinder." (quoting *Kerman v. City of N.Y.*, 374 F.3d 93, 109 (2d Cir. 2004))); *Hemphill v. Schott*, 141 F.3d 412, 417–18 (2d Cir. 1998) (reversing the district court's finding of qualified immunity where there were factual disputes as to movements made by the plaintiff prior to the use of force and explaining that "summary judgment based either on the merits or on qualified immunity requires that no dispute about material factual issues remain"); *Picciano v. McLoughlin*, 723 F. Supp. 2d 491, 505 (N.D.N.Y. 2010) ("[I]t is impossible to 'determine whether [the defendant] reasonably believed that ... force was not excessive when several material facts [are] still in dispute, [and therefore,] summary judgment on the basis of qualified immunity [is] precluded.' " (first, fourth, fifth, and sixth alterations in original) (quoting *Thomas v. Roach*, 165 F.3d 137, 144 (2d Cir. 1999))). Accordingly, Defendants' motion for summary judgment on the basis of qualified immunity is denied.

### 4. Battery, Assault, and Intentional Infliction of Emotional Distress

Despite seeking "an Order pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing the Complaint," (Dkt. No. 31, at 1; *see also* Dkt. No. 31-7, at 16), Defendants include no argument about Plaintiff's claims for battery, assault, or intentional infliction of emotional distress against Defendants Hrebin, Fowler, and Weir in their memorandum of law in support of their motion for summary judgment. (Dkt. No. 31-7.) To the extent Defendants seek summary judgment on these claims on the grounds relied on in support of their motion with regard to Plaintiff's excessive force claim, the Court denies Defendants' motion for the reasons given above —namely, the existence of numerous issues of material fact. Otherwise, the Court construes Defendants' motion as not seeking summary judgment on Plaintiff's claims for battery, assault, or intentional infliction of emotional distress against Defendants Hrebin, Fowler, and Weir. *See 59th St. Assocs. v. Reliance Mediaworks Ltd.*, No. 14-cv-7435, 2016 WL 861212, at \*1 n.1, 2016 U.S. Dist. LEXIS 28876 (S.D.N.Y. Mar. 4, 2016) ("None of the submissions in fact state on which counts 59th Street seeks summary judgment, but 59th Street

makes no argument regarding Count Two. As we received no briefing on this claim, we assume that 59th Street does not seek judgment on it."); *Tubbs v. Venettozzi*, No. 19-cv-126, 2022 WL 7274397, at *2 n.6, 2022 U.S. Dist. LEXIS 128771 (N.D.N.Y. July 20, 2022) ("Defendant makes no argument as to why [the deliberate indifference] claim should be dismissed and so summary judgment should be denied as to it."), *report and recommendation adopted*, 2022 WL 4545542, 2022 U.S. Dist. LEXIS 176685 (N.D.N.Y. Sept. 29, 2022).

**\*21** Defendants do, however, argue that Defendant Broome County cannot be liable under the theory of respondeat superior for Plaintiff's claims of battery, assault, and intentional infliction of emotional distress and that summary judgment on these claims against Defendant Broome County is therefore warranted. (Dkt. No. 31-7, at 13–15; Dkt. No. 36-1, at 5–7.) Specifically, Defendants argue that Defendant Broome County "is not liable for the acts of its correctional officers or sergeants" because "Broome County has not adopted a local law expressly assuming responsibility for the actions of its correctional officers or sergeants." (Dkt. No. 31-7, at 13.) Plaintiff argues that Defendant Broome County is liable for these claims under the doctrine of respondeat superior. (Dkt. No. 33, at 11–12.) [14]

[14] Defendants also argue that "any § 1983 claims asserted against the County should be dismissed" because Plaintiff has failed to establish Broome County's *Monell* liability. (Dkt. No. 31-7, at 13–15.) Plaintiff notes in response that he has "not brought any Section 1983 claims" against Broome County, (Dkt. No. 33, at 5 n.2), and the Court therefore does not address Defendants' argument about *Monell* liability. *See Jackson v. Cnty. of Ulster*, No. 22-cv-148, 2022 WL 2954370, at *10, 2022 U.S. Dist. LEXIS 132123 (N.D.N.Y. July 26, 2022) ("The only [federal] claim in the [complaint] is against [an individual defendant] .... Thus, there is no reason for the Court to determine whether a *Monell* liability claim could be sustained against the County ....").

"New York law is clear that 'counties are generally not liable for tortious acts other than negligence committed by a Sheriff or his or her deputies without a legislative assumption of liability.'" *Casiano v. Ashley*, 515 F. Supp. 3d 19, 28 (W.D.N.Y. 2021) (quoting *Nolan v. Cnty. of Erie*, No. 19-cv-1245, 2021 WL 51004, at *7, 2020 U.S. Dist. LEXIS 246418 (W.D.N.Y. Jan. 6, 2021)); *see also Barr v. Albany*

*Cnty.*, 50 N.Y.2d 247, 257, 428 N.Y.S.2d 665, 406 N.E.2d 481 (1980) ("[A] county may, by legislative enactment, assume responsibility for the tortious acts of its Deputy Sheriffs as distinguished from the acts of the Sheriff himself."). Plaintiff suggests that Defendants Hrebin, Fowler, and Weir are employees of Broome County and not employees of the Broome County Sheriff. (Dkt. No. 33, at 12.) But he provides no factual support for this proposition. [15] And the caselaw Plaintiff cites does not support the proposition that corrections officers employed by a county sheriff are not agents of the sheriff. *See Smelts v. Meloni*, 306 A.D.2d 872, 762 N.Y.S.2d 467, 467–68 (2003) (finding that sheriff's deputies are not "employees" of the county for the purposes of respondeat superior liability.) In fact, the Charter and Code of the County of Broome [16] ("Broome County Code") makes clear that the Broome County Sheriff "appoint[s] corrections officers ... as may be necessary to operate the County jail facilities," Broome County Code § A2304(D), thus rendering corrections officers, as with deputies, agents of the Broome County Sheriff, *see Douglas v. Cnty. of Oswego*, 151 Misc.2d 239, 573 N.Y.S.2d 236, 237 (Sup. Ct. 1991) ("A county's immunity from vicarious liability for the negligent acts of a sheriff is extended to the negligent acts of deputy sheriffs acting in the course of their duties as well as to the employees and jail personnel employed by the sheriff ...." (citations omitted)); *cf. Wilson v. Sponable*, 81 A.D.2d 1, 439 N.Y.S.2d 549, 555 (App. Div. 1981) (explaining that, historically, "sheriff's deputies were agents of the sheriff and had no independent common law agency relationship with the county" and that that relationship formed the basis of the "effective[ ] immuniz[ation] [of] the counties from the negligent acts of the Deputy Sheriffs as well as those of the Sheriff"). Thus, Defendant Broome County could be liable for the tortious acts of Defendants Hrebin, Fowler, and Weir only if it "assume[d] responsibility for the[ir] tortious acts" by express "legislative enactment." *See Barr*, 50 N.Y.2d at 257, 428 N.Y.S.2d 665, 406 N.E.2d 481; *see also Nichols v. Rensselaer Cnty.*, 129 A.D.2d 167, 517 N.Y.S.2d 315, 317 (App. Div. 1987) ("[T]he Court of Appeals [in *Barr*] instructs us that the key factor in determining whether a county has waived its immunity for tortious acts of its Deputy Sheriffs is the county's express willingness to assume responsibility for those acts.").

[15] In fact, the record demonstrates that each of these Defendants testified that he is employed by the Broome County Sheriff's Office. (Dkt. No. 31-2, ¶ 1; Dkt. No. 31-3, ¶ 1; Dkt. No. 31-11, at 9; Dkt. No. 31-12, at 14–15; Dkt. No. 31-13, at 11,13.)

16    Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of the Charter and Code of the County of Broome, available at https://www.gobroomecounty.com/sites/default/files/dept/legis/Charter%20and%20Code/Broome%20County%20Code_v13.pdf. *See Morris Motel, LLC v. DeChance*, No. 20-cv-3350, 2023 WL 2682937, at *1 n.2, 2023 U.S. Dist. LEXIS 54101 (E.D.N.Y. Mar. 29, 2023) (collecting cases and taking judicial notice of the online version of a town code in deciding a motion for summary judgment).

**\*22**  Plaintiff argues that Defendant Broome County has done so through its "Liability and Casualty Fund," (Dkt. No. 33, at 12,) which provides payments for judgments, settlements, and expert or professional services rendered in connection with "claims ... that arise out of acts and omissions of ... employees ... of the County of Broome or the Broome County Sheriff," Broome County Code §§ 130-1, 130-4. But indemnification alone, absent an explicit waiver of immunity, is insufficient to impose liability on Defendant Broome County for the acts of Defendants Hrebin, Fowler, and Weir. *See Nichols*, 517 N.Y.S.2d at 317 ("We are unable to find any [express] assumption of responsibility [by Rensselaer County] in the instant case. Indeed, [local law] simply provides for the indemnification of County employees for the amount of judgments against them or for the amount of any settlement." (citations omitted)); *see also Saleh v. Savage*, No. 12-cv-468S, 2015 WL 1608839, at *7–8, 2015 U.S. Dist. LEXIS 47166 (W.D.N.Y. Apr. 10, 2015) (dismissing state-law claims against a county defendant where a local law "provid[ed] for the indemnification of its employees for actions taken in the course of their employment" but the record lacked any indication that the county had "expressly assume[d] liability for the acts of its sheriff and deputies"); *cf. Barr*, 50 N.Y.2d at 256, 428 N.Y.S.2d 665, 406 N.E.2d 481 (finding a county had expressly assumed liability for the acts of sheriff's deputies where local law provided that "[a]ny act or omission of any employee of the county in the office of the sheriff, done or made in the performance of an official duty shall be the act or omission of the county").

Accordingly, summary judgment as to Plaintiff's claims of battery, assault, and intentional infliction of emotional distress against Defendants Hrebin, Fowler, and Weir is denied, and summary judgment as to Plaintiff's claims of battery, assault, and intentional infliction of emotional distress against Defendant Broome County is granted.

**V. CONCLUSION**

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion for sanctions, (Dkt. No. 30), is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that the parties are precluded from introducing evidence related to the spoliated body-camera video; and it is further

**ORDERED** that Defendant Broome County and the Broome County Attorney's Office shall jointly and severally bear the reasonable attorney's fees and costs Plaintiff and his counsel incurred in connection with the spoliation of the body-camera video; and it is further

**ORDERED** that Plaintiff shall submit, by October 19, 2023, a declaration detailing the attorney's fees and costs associated with Plaintiff's motion for sanctions for which Plaintiff seeks recovery, a memorandum of law, not to exceed 15 pages, supporting Plaintiff's request, and any supporting documentation; Defendants may submit, by November 2, 2023, objections to Plaintiff's request; and it is further

**ORDERED** that Plaintiff's motion for sanctions is otherwise **DENIED**; and it is further

**ORDERED** that Defendants' motion for summary judgment, (Dkt. No. 31), is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Plaintiff's Fourth Amendment unreasonable search claim against Defendants Hrebin, Fowler, and Weir and state-law claims for negligent hiring and supervision, battery, assault, and intentional infliction of emotional distress against Defendant Broome County are **DISMISSED with prejudice**; and it is further

**ORDERED** that the Clerk is respectfully directed to terminate Defendant Broome as a party to this action; and it is further

**ORDERED** that Defendants' motion for summary judgment is otherwise **DENIED**.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 6318919

---

**End of Document**                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2863569
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael MYERS, Plaintiff,

v.

Erica SAXTON et al., Defendants.

9:20-CV-465 (BKS/DJS)
|
Signed February 21, 2023

**Attorneys and Law Firms**

MICHAEL MYERS, Plaintiff, Pro Se, 13462261604, CNYPC, P.O. Box 300, Marcy, New York 13403.

HON. LETITIA JAMES, New York State Attorney General, KONSTANDINOS LERIS, ESQ., Assistant Attorney General, Attorney for Defendants, The Capitol, Albany, New York 12224.

**REPORT-RECOMMENDATION and ORDER** [1]

[1]      This matter was referred to the undersigned for a report-recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DANIEL J. STEWART, United States Magistrate Judge

**\*1** Pro se Plaintiff Michael Myers ("Plaintiff") brought this action under 42 U.S.C. § 1983 alleging that Defendants violated his constitutional rights under the First and Fourteenth Amendments while he was civilly confined at Central New York Psychiatric Facility. Dkt. No. 1, Compl. Following initial review, United States District Judge Brenda K. Sannes ordered that Plaintiff's claim for excessive force against Defendant Collins and an unnamed Doe Defendant could proceed, in addition to claims brought against Defendant Saxton for a Fourteenth Amendment due process violation based on his placement on MOD status, and a First Amendment claim based on an indefinite period of magazine restrictions. Dkt. No. 3. Plaintiff filed an Amended Complaint on July 8, 2020. Dkt. No. 10, Am. Compl. Defendant Saxton subsequently filed a Motion to Dismiss Plaintiff's original Complaint on July 23, 2020, Dkt. No. 13, without acknowledging Plaintiff's Amended Complaint. *See* Dkt. No. 21 at p. 2. Defendant's motion to dismiss was denied

as moot, and Plaintiff's Amended Complaint was accepted for filing as to the following claims: (1) Fourteenth Amendment due process claims against Defendants Ryan Collins and Michael Wilkinson; (2) Fourteenth Amendment due process claim for denial of medical treatment against Defendant Collins; (3) First Amendment access to courts claim against Defendants Collins and Wilkinson; (4) Fourteenth Amendment due process claim against Defendant Saxton regarding his placement on MOD status; and (5) First Amendment claim against Defendant Saxton regarding the imposition of an indefinite period of magazine restriction. Dkt. No. 21 at pp. 6-11.

Defendant Saxton filed a Motion to Dismiss on October 28, 2020, seeking dismissal of Plaintiff's Fourteenth Amendment due process claim regarding his placement on MOD status and the First Amendment claim based on the magazine access restriction. Dkt. No. 36. On January 15, 2021, Chief Judge Sannes denied the Motion to Dismiss. [2] Dkt. No. 44. Defendants have now moved for summary judgment requesting that the Court dismiss all of Plaintiff's claims. Dkt. No. 89. Plaintiff filed a Response in opposition to the Motion, Dkt. No. 94, Defendants filed a Reply, Dkt. No. 95, and Plaintiff filed a Sur-Reply, Dkt. No. 96. For the following reasons, this Court recommends that the Motion for Summary Judgment be granted in part and denied in part.

[2]      That Decision also granted in part Plaintiff's First Motion to Supplement the Amended Complaint, Dkt. No. 29, to the extent that it added an additional First Amendment claim against Defendant Saxton arising from allegations that Defendant Saxton revoked Plaintiff's right to call his brother. Dkt. No. 44. This claim was later voluntarily dismissed by stipulation. Dkt. Nos. 79 & 80.

**I. BACKGROUND**

Plaintiff is civilly confined at Central New York Psychiatric Center ("CNYPC") pursuant to Article 10 of New York State's Mental Hygiene Law. Dkt. No. 89-1, Declaration of Kostas Leris ("Leris Decl."), Ex. A, Plaintiff's Deposition ("Pl.'s Dep.") at p. 13; Dkt. No. 89-6, Defs.' Rule 56.1 St. at ¶ 1. [3] The events giving rise to his claims began on March 23, 2020. *See* Am. Compl. at p. 2; Defs.' Rule 56.1 St. at ¶ 12. On that day, CNYPC staff were conducting "environmental inventories" of the resident dorm rooms on Ward 604 to ensure habitability and compliance with facility

rules. Defs' Rule 56.1 St. at ¶ 13; Dkt. No. 89-2, Declaration of Michael Wilkinson ("Wilkinson Decl.") at ¶ 9. Plaintiff became agitated during the inventory of his room and went on to cause a disruption in the day room common area. Wilkinson Decl. at ¶¶ 10-11 & 16, Ex. A; Pl.'s Dep. at p. 47; Dkt. No. 89-5, Declaration of Harry Smith ("Smith Decl.") at ¶ 22; DVD No. 2020-042 (CS-606 Ward 604 Day Room, at 17:35-18:30). Plaintiff was asked to exit the common area and go to the side room but refused to do so voluntarily. Wilkinson Decl. at ¶ 20, Ex. A; Dkt. No. 89-3, Declaration of Ryan Collins ("Collins Decl.") at ¶ 20; Pl.'s Dep. at pp. 59-60; Smith Decl. at ¶ 22, DVD #2020-042 (CS-606 Ward 604 Day Room, at 18:22-18:30). As a result, Defendants Collins and Wilkinson took Plaintiff by his arms and escorted him to the Ward 404 side room. Defs.' Rule 56.1 St. at ¶ 35. Inside the Ward 404 side room, Plaintiff was taken to the ground by staff and forcibly placed onto a restraint bed and secured in five-point restraints. Defs.' Rule 56.1 St. at ¶ 40; Wilkinson Decl. at ¶ 32, Ex. A; Smith Dec. ¶ 22, DVD # 2020-042 (CS-410 Ward 404 Seclusion Room at 23:31 – 29:00).

3    For efficiency purposes, the Court has cited to the factual allegations in Defendants' Rule 56.1 Statement which Plaintiff specifically admitted in his response.

**\*2**  Dr. Cynthia Provow, the physician on call, arrived at the side room to examine Plaintiff but he refused to speak with her and continued to be combative. Dkt. No. 90, Declaration of Cynthia Provow ("Provow Decl.") at ¶ 14; Defs.' Rule 56.1 St. at ¶ 60. Eventually, Plaintiff was administered medication by injection, was able to calm down, and was released from restraints. Provow Decl. at ¶ 25, Ex. A; Defs.' Rule 56.1 St. at ¶¶ 62-63. As a result of the events on March 23, Plaintiff was placed on Motivation on Deck ("MOD") status, which resulted in the loss of certain privileges. Defs.' Rule 56.1 St. at ¶¶ 78-79, 82. He also was subject to a magazine restriction due to inappropriate magazine cutouts of prepubescent children discovered during the eventual search of his room. Defs.' Rule 56.1 St. at ¶¶ 89-90; Saxton Decl. at ¶ 40, Ex. C.

Plaintiff asserts multiple violations of his constitutional rights arising from these events. First, he alleges that Defendants Collins and Wilkinson used excessive force by slamming him against an elevator door and slamming him on the ground and restraint bed. Am. Compl. at ¶¶ 15, 19 & 20. Second, Plaintiff asserts that Defendant Collins prevented him from receiving medical treatment after he was placed in restraints. *Id.* at ¶¶ 26-28. Third, Plaintiff asserts that his First Amendment rights to court access were violated following the search of his

room because Defendants Collins and Wilkinson destroyed his legal materials related to a pending appeal. *Id.* at ¶¶ 33-34. Fourth, Plaintiff alleges that his due process rights were violated when Defendant Saxton placed him on MOD status. *Id.* at ¶¶ 40-44. Finally, Plaintiff also asserts that Defendant Saxton violated his First Amendment rights by placing him on an indefinite period of magazine restriction. *Id.* at ¶¶ 45-53.

## II. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(C); see also *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). In considering a summary judgment motion, the Court's role "is carefully limited to discerning whether there are any genuine issues of material fact to be tried." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding pro se, the court must "read [his or her] supporting papers liberally,

and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), accord, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**\*3** "A party opposing summary judgment is required to submit admissible evidence." *Perry v. Rupert*, 2016 WL 1147829, at \*3 (N.D.N.Y. Apr. 19, 2016) (citing *Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010)).[4] "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (emphasis in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). As a result, in order to defeat summary judgment, "nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

[4]    Copies of unreported decisions are being provided to Plaintiff with this decision.

### III. DISCUSSION

#### A. Fourteenth Amendment Claims

##### 1. Excessive Force Claim against Defendants Collins and Wilkinson

Plaintiff's claim for excessive force as a civilly confined individual is governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. *Charles v. Orange Cnty.*, 925 F.3d 73, 85 (2d Cir. 2019). In *Kingsley v. Hendrickson*, the Supreme Court addressed the proper standard for evaluating excessive force claims brought under the Fourteenth Amendment by a pretrial detainee

and concluded that "courts must use an objective standard" under which the plaintiff "must show only that the force purposely or knowingly used against him was objectively unreasonable." 576 U.S. 389, 396-97 (2015). That standard applies even though Plaintiff was civilly confined, not a pretrial detainee, because "[t]he distinction *Kingsley* drew was not between pretrial detainees and non-detainees. Instead, it was between claims brought under the Eighth Amendment's Cruel and Unusual Punishment Clause and those brought under the Fourteenth Amendment's Due Process Clause." *Edrei v. Maguire*, 892 F.3d 525, 535 (2d Cir. 2018) (citing *Kingsley v. Hendrickson*, 576 U.S. at 400-01). As a result "*Kingsley* provides the appropriate standard for all excessive force claims brought under the Fourteenth Amendment." *Id.* at 537.

Assessing the objective reasonableness of any use of force necessarily depends on the facts and circumstances of each case, but relevant factors include:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley v. Hendrickson*, 135 S. Ct. at 2473 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Plaintiff's Complaint alleged that excessive force was used while he was being escorted from the Ward 604 day room to the Ward 404 side room and again while he was being restrained in the side room. Am. Compl. at ¶¶ 15, 19 & 20. Defendants Collins and Wilkinson assert that they are entitled to summary judgment on this claim because the record clearly shows that the force used was objectively reasonable under the circumstances. Dkt. No. 89-7, Defs.' Mem. of Law at pp. 9-12.

Plaintiff's own admissions demonstrate that on the day of the incident, he was in an agitated state following staff attempts to conduct an environmental inventory of his room. Pl.'s Dep. at pp. 47-49. Plaintiff refused several direct orders from staff

during this search, first by refusing to remove linen covering his furniture and then by physically blocking the entrance to his room by sitting in a chair in front of the door. Wilkinson Decl. ¶¶ 10-11, Ex. A; Pl.'s Dep., p. 47; Collins Decl. ¶¶ 10, 12, Ex. A; Smith Decl. at ¶¶ 20, 22; DVD # 2020-042 (CS-602 Ward 604 West Corridor at 4:40 – 17:13). Plaintiff was offered the opportunity to observe as the search was conducted but chose instead to walk to the unit common area. Wilkinson Decl. at ¶ 14, Ex. A; Smith Decl. at ¶ 22, DVD # 2020-042 (CS-602 Ward 604 West Corridor, at 17:13-17:22). While in the hallway, Plaintiff hit the emergency response red phone, knocking it off its base, which caused an alarm to sound and resulted in a staff response to the day room. Wilkinson Decl. at ¶ 15, Ex. A; Pl.'s Dep. at p. 53; Smith Decl. at ¶ 22, DVD # 2020-042 (CS-605 Ward 604 Day Room Corridor at 17:44). In the day room, Plaintiff began to cause a disruption in front of other residents in an effort to "protest[ ] the treatment." Pl.'s Dep. at p. 56; Wilkinson Decl. at ¶ 16, Ex. A; Smith Decl. at ¶ 22, DVD # 2020-042 (CS-606 Ward 604 Day Room at 17:35-18:30). According to the CNYPC Resident Handbook, disruptions in a public area such as the day room will require the resident to be removed from the area. Saxton Decl. Ex. D, p. 31 at ¶ 29.

**\*4** Defendants Collins and Wilkinson approached Plaintiff and informed him that he would need to go to the side room due to his noncompliant behavior. Wilkinson Decl. at ¶ 20, Ex. A; Collins Decl. at ¶ 19, Ex. A; Pl.'s Dep. at pp. 58-59; Smith Decl. at ¶ 22, DVD # 2020-042, CS-606 (Ward 604 Day Room at 17:35-18:30). Plaintiff was offered the opportunity to exit the room voluntarily, but he refused. *Id.* Defendants Collins and Wilkinson took hold of each of Plaintiff's arms to escort him to the side room. Defs.' Rule 56.1 St. at ¶ 35; Smith Decl. at ¶ 22, DVD # 2020-042 (CS-606 Ward 604 Day Room at 18:22-18:30). During the walk to the side room, Plaintiff threatened to punch Defendant Collins in the face, stated that he was going to get a chair to hit Collins over the head with, and threatened to kick Defendant Wilkinson. Defs.' Rule 56.1 St. at ¶ 36; Pl.'s Dep. at pp. 61-62; Collins Decl. at ¶ 20. Plaintiff stated that because he was upset, he continued to resist Defendants by forcing his arms in towards his body while Defendants held his arms and attempted to lead him to the side room. Pl.'s Dep. at p. 61.

Plaintiff also alleges that he was "bounced off the elevators." Pl.'s Dep. at pp. 64-65; Am. Compl. at ¶ 15. Defendants deny this allegation. *See* Collins Decl. at ¶ 23. Some, but not all, of the escort was recorded. Plaintiff's arrival at the elevator, however, is clearly recorded and demonstrates that

he was not bounced off the elevator door as he alleges in the Amended Complaint. Smith Decl. at ¶ 22, DVD # 2020-042 (CS-701, Elevator Car 2 at 19:28-20:11). Since it does not appear that Plaintiff alleges the mere escort from the day room was unreasonable force, the Court recommends that summary judgment be granted with respect to so much of Plaintiff's excessive force claim as alleged that he was bounced off the elevator doors.

Plaintiff also alleges excessive force upon his arrival at the side room. Plaintiff's staff escorts released his arms when they entered the room. Pl.'s Dep. at p. 68. Plaintiff was then asked to remove his watch and headphones, items which are not permitted while in the side room. Defs.' Rule 56.1 St. at ¶ 38; Pl.'s Dep. at p. 68; Smith Decl. at ¶ 22, DVD # 2020-042 (CS-410 Ward 404 Seclusion Room at 20:35-20:43). Plaintiff refused to turn over his watch and was immediately brought to the ground by four staff members who each took hold of one of his limbs to restrain him. Smith Decl. at ¶ 22, DVD # 2020-032 (CS-410 Ward 404 Seclusion Room at 20:35-21:25). Plaintiff admits that he continued to resist staff while being restrained on the floor. Defs.' Rule 56.1 St. at ¶ 44.

The entire incident in the side room was recorded. That video undeniably shows that force was used against Plaintiff. And while it also provides significant support for the version of events put forth by Defendants, the Court does not believe it is a basis for summary judgment. Plaintiff contends that the force was unreasonable. Consideration of some of the *Kingsley* factors leads the Court to conclude that questions of fact exist as to whether a jury could find for Plaintiff here.

Plaintiff being taken down to the ground happens almost immediately after he refuses to turn his watch over to staff. Smith Decl. at ¶ 22, DVD # 2020-042 (CS-410 Ward 404 Seclusion Room at 20:35-21:45).[5] It is not clear that other than direction being given to Plaintiff, any effort was made to "temper" the situation before force was used. It is also unclear whether Plaintiff's concededly agitated state necessitated him being taken to the floor and then forcibly secured using five point restraints. Collins Decl. at ¶ 32. Again, the record suggests a clear basis from which a jury could find that these actions were reasonable, but the record before the Court "presents quintessential fact questions that cannot be resolved on summary judgment." *McGinnis v. Crissell*, 2018 WL 4635707, at \*4 (N.D.N.Y. Apr. 18, 2018), *report and recommendation adopted*, 2018 WL 3970668 (N.D.N.Y. Aug. 20, 2018); *see also Mills v. Fenger*, 216 F. App'x 7, 9 (2d

Cir. 2006) ("factual disputes as to the degree of force actually employed and its reasonableness, including a dispute about whether any force was used at all, preclude the grant of summary judgment.") (internal citation and quotation marks omitted). [6]

5      Some of this interaction actually takes place outside the frame of the video and is not completely captured.

6      The same questions of fact that preclude summary judgment on the merits of the excessive force claim preclude summary judgment on the basis of qualified immunity.

### 2. Interference with Medical Treatment against Defendant Collins

**\*5** Plaintiff's Complaint asserted a claim against Defendant Collins stemming from allegations that Defendant Collins prevented medical providers from providing care to Plaintiff following the use of force incident on March 23, 2020. Am. Compl. at ¶¶ 26-28. Defendant Collins asserts that he is entitled to summary judgment on this claim because the record and video evidence conclusively demonstrates that he did not prevent Plaintiff from receiving any medical treatment on that date, nor is there any evidence of a sufficiently serious medical condition as required to establish this claim. Defs.' Mem. of Law at pp. 13-18.

Plaintiff's claim for medical indifference as a civilly confined individual is governed by the Due Process Clause of the Fourteenth Amendment, rather than by the Cruel and Unusual Punishments Clause of the Eighth Amendment. *Charles v. Orange Cnty.*, 925 F.3d 73, 85 (2d Cir. 2019); *Williams v. Sykes*, 2019 WL 2374116, at \*2 (N.D.N.Y. May 10, 2019), *report and recommendation adopted*, 2019 WL 2369882 (N.D.N.Y. June 5, 2019). The standard under the Due Process Clause is similar in this context to that under the Eighth Amendment, requiring the plaintiff first to satisfy "an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of [constitutional rights]" and second, to satisfy a " 'mental element prong' - showing that the officer acted with at least deliberate indifference to the challenged conditions." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017); *see also Bell v. Carson*, 2018 WL 5993686, at \*2 (N.D.N.Y. Nov. 15, 2018). Both prongs of the test are defined objectively under the

Fourteenth Amendment. *Darnell v. Pineiro*, 849 F.3d at 35. "As a general matter, non-medical personnel may be liable for deliberate indifference to medical needs where a plaintiff demonstrates that such personnel intentionally denied or delayed access to medical care or intentionally interfered with medical treatment once [it] was prescribed." *Starling v. Syracuse Police Dep't*, 2019 WL 6974731, at \*5 (N.D.N.Y. Dec. 20, 2019), *report and recommendation adopted*, 2020 WL 1140664 (N.D.N.Y. Mar. 9, 2020).

Plaintiff asserted in his Complaint that when he was restrained in the side room on March 23, 2020, a medical doctor entered the room several times "wanting to give [Plaintiff] proper medical attention and Ryan Collins ordered the doctor out of the room." Am. Compl. at ¶ 26. Plaintiff also alleged that Defendant Collins has "a duty to provide medical services" in his role at CNYPC but that Collins "ordered the medical doctor out of the room because he security." *Id.* at ¶¶ 27 & 28. Dr. Cynthia Provow [7] was the physician on duty for Wards 604 and 404 on March 23, 2020. Provow Decl. at ¶ 9. Dr. Provow stated that she was informed at approximately 9:29 AM that Plaintiff had been placed in the Ward 404 side room due to disruptive and threatening behavior. Provow Decl. at ¶¶ 10-11. At approximately 9:33 AM, Dr. Provow arrived at the Ward 404 side room to evaluate Plaintiff. Provow Decl. at ¶ 12; Smith Decl. at ¶ 22, DVD # 2020-042 (CS-410 Ward 404 Seclusion Room at 33:10-34:15).

7      Dr. Provow is not named as a party in this action.

Dr. Provow observed Plaintiff to be alert and well hydrated with no "evidence of chest pain, respiratory distress, dizziness, weakness, pain, physical discomfort, or injury." Provow Decl. at ¶ 16. Plaintiff did not complain about any injuries to Dr. Provow at that time. Defs.' Rule 56.1 Stat. at ¶ 65; Pl.'s Dep. at p. 96; Provow Decl. at ¶ 16. The video footage from the side room shows that Dr. Provow attempted to speak to Plaintiff, but Plaintiff refused to speak with her while Defendant Collins was in the room, stating "Doctor, will you please get him out of the room? I will not talk to you until he's out of the room." DVD # 2020-042 (CS-410 Ward 404 Seclusion Room at 33:10-33:30); Provow Decl. at ¶ 14. Dr. Provow explained to Plaintiff that Defendant Collins was required to stay in the room with her. Provow Decl. at ¶ 14; DVD # 2020-042 (CS-410 Ward 404 Seclusion Room at 33:10-34:15). Collins is seen on the video standing off to the side while Dr. Provow attempts to speak with Plaintiff. DVD # 2020-042 (CS-410 Ward 404 Seclusion Room at 33:10-34:15). At no point does Defendant Collins

interact with Plaintiff or order Dr. Provow not to provide medical treatment. *Id.* Instead, Plaintiff himself refused to speak with Dr. Provow and continued to exhibit threatening behavior when she made a second attempt to speak with him. Provow Decl. at ¶19; DVD # 2020-042 (CS-410 Ward 404 Seclusion Room at 40:20-41:15). Plaintiff is depicted on video continuing to make verbal threats when staff enter the room to administer medication. DVD # 2020-042 (CS-410 Ward 404 Seclusion Room at 49:44-50:30).

**\*6** The record therefore indicates that within minutes of being placed in restraints in the side room, Plaintiff was seen by a medical doctor. The record also conclusively establishes that Plaintiff refused to speak to Dr. Provow and that Defendant Collins did not prevent him in any way from receiving medical treatment. Instead, Plaintiff himself refused to interact with Dr. Provow because he wanted Defendant Collins to leave the room. Dr. Provow did not observe Plaintiff to be in any distress and did not see any visual evidence of injuries. Plaintiff has failed to set forth any evidence to demonstrate either a sufficiently serious medical condition or a denial of any medical care as required to make out a claim. Accordingly, the Court recommends summary judgment be granted as to this claim as well.

### 3. Due Process Claim against Defendant Saxton

Plaintiff's Complaint asserts a claim for violation of his Fourteenth Amendment procedural due process rights against Defendant Saxton, who placed him on MOD status following the events on March 23, 2020. Am. Compl. at ¶¶ 40-44. Defendant Saxton argues that she is entitled to summary judgment on this claim because "courts in the Second Circuit have repeatedly found that placement on MOD status at CNYPC does not implicate the due process clause" and because Plaintiff did not lose any of his substantive rights by this placement. Defs.' Mem. of Law at pp. 20-21. Notwithstanding the issue of whether Plaintiff was even entitled to due process protection under these facts, Defendant Saxton also asserts that Plaintiff received all the process he was due. *Id.*

The Court first notes that Defendant's assertion that placement on MOD status can never implicate the due process clause is inconsistent with this Court's prior holdings on the issue. Chief Judge Sannes has previously rejected such a broad interpretation of the case law, disagreeing that the line of cases cited by Defendant here "stand for the singular proposition

that placement in MOD status at the CNYPC can never implicate an individual's liberty interests." *Myers v. Saxton,* 2021 WL 149062, at *4 (N.D.N.Y. Jan. 15, 2021). That holding continues to be the law of the case. Instead, Chief Judge Sannes clarified that a CNYPC resident-plaintiff could assert "that the restrictions imposed on him by placement on MOD status "deprived him of one of his many enumerated liberty interests (for example, rights to adequate food, shelter, clothing, medical care, training, and treatment; safe, decent, and humane conditions of confinement; and freedom from undue bodily restraint)." *Id.*

Defendant Saxton indicates that Plaintiff was placed on MOD status "due to his non-compliant, verbally threatening, and aggressive behavior." Saxton Decl. at ¶ 31. While on MOD status, Plaintiff retained the right to leave his room, attend group treatment, eat meals in the mess hall, participate in recreation, acquire property from the commissary, and to take showers when he wished. Saxton Decl. at ¶ 34; Pl.'s Dep. at pp. 115-116. Plaintiff indicated in his deposition that he was subjected to a temporary loss of certain property, including his television, radio, and food purchased from the commissary, as well as the loss of privilege of participating in a work program. Pl.'s Dep. at 113-116. Similar restrictions have been found by other courts in this District not to rise to the level of a constitutional violation. *See McChesney v. Hogan,* 2010 WL 3602660, at *14 (N.D.N.Y. Aug. 17, 2010) (citing cases), *report and recommendation adopted,* 2010 WL 3584360 (N.D.N.Y. Sept. 7, 2010). Plaintiff was not subjected to any bodily restraints during his time on MOD status. Pl.'s Dep. at p. 116. The record therefore demonstrates that the actual restrictions imposed on Plaintiff as a result of the placement on MOD status did not implicate any of his constitutionally protected liberty interests.

**\*7** While the Court finds that Plaintiff was not entitled to due process protections on this record, it also notes that Plaintiff was in fact afforded an opportunity to appeal the decision. Defendant Saxton and other members of Plaintiff's treatment team met with Plaintiff on March 26, 2020 to discuss the events that took place on March 23. Saxton Decl. at ¶¶ 31 & 38, Exs. B & C. Plaintiff was informed that he was being placed on MOD status for twenty-eight days as a result of his threatening and aggressive conduct on March 23. *Id.* Several days later, Plaintiff submitted a Resident Concern Form to Risk Management in an effort to appeal his placement on MOD status. Leris Decl. at ¶ 14, Ex. B, p. 2. Alyssa Moskal, the Director of Inpatient Risk Management for the Sex Offender Treatment Program, responded to Plaintiff's

appeal by stating that he was "observed to be noncompliant and aggressive with staff on this date. There is no indication that MOD status is inappropriate or unwarranted." Leris Decl., Ex. B. The Court therefore recommends that summary judgment be granted as to this claim as well.

## B. First Amendment Claims

### 1. Access to Courts Claim against Defendants Collins and Wilkinson

Plaintiff asserts that his First Amendment rights were violated when Defendants Collins and Wilkinson searched his room and destroyed his legal work in the process. Am. Compl. at ¶¶ 33-34. Defendants move for summary judgment because they allege (1) that Defendant Collins was not personally involved in the search of Plaintiff's room; (2) that Defendant Wilkinson did not find any legal papers during the room search; and (3) that in any event, Plaintiff is unable to demonstrate any actual injury as is required to prevail on this claim. Defs.' Mem. of Law at pp. 18-20.

Civilly committed patients, "like convicted inmates, enjoy a First Amendment right of meaningful access to the courts." *McChesney v. Hogan*, 2010 WL 3602660, at *12. "[T]o state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury." *Brooks v. Hogan*, 2020 WL 5034226, at *25 (N.D.N.Y. Apr. 27, 2020) (quoting *Vega v. Artus*, 610 F. Supp. 2d 185, 201 (N.D.N.Y. 2009)). A showing of actual injury is required "[b]ecause law libraries and legal assistance programs do not represent constitutional rights in and of themselves, but only the means to ensure a reasonably adequate opportunity [to access the courts]." *Benjamin v. Fraser*, 264 F.3d 175, 185 (2d Cir. 2001) (quoting *Lewis v. Casey*, 518 U.S. 343, 351 (1996)). "A hypothetical injury is not sufficient to state a claim for violation of the right of access to the courts." *Brooks v. Hogan*, 2020 WL 5034226 at *25 (quoting *Amaker v. Haponik*, 1999 WL 76798, at *3 (S.D.N.Y. Feb. 17, 1999)). A showing of "actual injury" requires Plaintiff to demonstrate that he suffered harm due to a "lost, rejected, or impeded" nonfrivolous legal claim. *Lewis v. Casey*, 518 U.S. at 353 n.4.

The legal work that Plaintiff alleges was destroyed was related to his Article 10 appeal. Defs.' Rule 56.1 St. at ¶ 75; Pl.'s Dep. at pp. 104-105. During his deposition, Plaintiff asserted that he experienced a delay in pursuing his appeal because he had to work with his attorney to get copies of the paperwork that was destroyed. Pl.'s Dep. at p. 106. "Mere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Anthony v. Green*, 2022 WL 4939991, at *5 (N.D.N.Y. Oct. 4, 2022) (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks omitted)). Moreover, Plaintiff goes on to state that he was represented by counsel in pursuing that appeal, and that his attorney was the party responsible for filing all of the appellate paperwork. Pl.'s Dep. at p. 108. The appeal was ultimately successful. Pl.'s Dep. at p. 104. While Plaintiff and Defendants' version of the facts may diverge on the issue of whether any legal work was found or destroyed during the search of Plaintiff's room, this question alone is insufficient to create a material issue of fact for trial. The record conclusively establishes that Plaintiff did not suffer an actual injury and so the Court recommends that this claim be dismissed.

### 2. Magazine Restriction Claim against Defendant Saxton

**\*8** Plaintiff alleges that his First Amendment rights were violated by Defendant Saxton when she placed him on an indefinite period of magazine restriction. Am. Compl. at ¶¶ 45-53. Defendant Saxton asserts that she is entitled to summary judgment on this claim for two reasons. First, she asserts that Plaintiff has no constitutional right to non-religious and non-legal reading materials. Defs.' Mem. of Law at p. 22. Second, she asserts that Plaintiff's claim fails because even if he could assert a First Amendment right to access those materials, he cannot satisfy the factors enumerated in *Turner v. Safley*. Defs.' Mem. of Law at pp. 22-24 (citing *Turner v. Safley*, 482 U.S. 78 (1987)).

Defendant Saxton's first asserted basis for summary judgment, which relies on the proposition that a civilly confined resident has no constitutional right to non-religious and non-legal reading materials, appears to have been rejected by Chief Judge Sannes on an earlier motion to dismiss. *See Myers v. Saxton*, 2021 WL 149062, at *5. Chief Judge Sannes explained that "[t]here can be little doubt that civilly committed persons ... retain certain First Amendment rights, especially given the Supreme Court's declaration that involuntarily committed persons 'are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.' " *Id.* (quoting *Yeldon v. Hogan*, 2010 WL 983819,

at \*7 (N.D.N.Y. Mar. 15, 2010), *aff'd*, 400 F. App'x 580 (2d Cir. 2010)). However, at the motion to dismiss stage, without the benefit of a fully developed record, the Court was unable to determine "whether terminating [P]laintiff's access to magazines [was] legitimately related to a governmental interest if he did not alter the magazines found in his room." *Id.*

In order to determine whether a constitutional right to receive information has been violated, "a court considers (1) whether prohibiting a person from exercising a constitutional right is rationally related to a legitimate governmental interest; (2) whether there are alternative means of exercising that right; (3) what effect accommodation of the interest would have on facility staff, other residents, and the allocation of facility resources; and (4) whether there are ready alternatives available that continue to serve the facility's interest without impinging constitutional rights." *Myers v. Saxton*, 2021 WL 149062, at \*5 (citing *Turner v. Safley*, 482 U.S. at 89-90).

On March 26, 2020, Defendant Saxton informed Plaintiff that his Individual Service Plan Method ("ISP") was being updated to restrict his access to magazines. Saxton Decl. at ¶ 40; Ex. C. While Plaintiff initially denied that he had altered any magazines, the record establishes that this prohibition was put in place following the search of Plaintiff's room, during which Plaintiff was found to be in possession of "altered magazines" stored in clear plastic page protectors. Saxton Decl., Ex. C. These altered magazines "contained ripped and cut out pictures of pre-pubescent female and male children glued and taped to pages of the magazines. In addition, the faces of many of the adults on the magazine pages were covered by paper or blacked out with dark-colored marker." Saxton Decl. Ex. C. Defendant Saxton has provided the Court with copies of these altered images for an *in camera* review, which are consistent with her descriptions.

Plaintiff's treatment team found the discovery of the images particularly concerning because of the nature of Plaintiff's underlying offenses. Saxton Decl. at ¶ 38, Ex. C. The images also violated the policy contained in the CNYPC Resident Handbook. Saxton Decl. at ¶ 39; Ex. D at p. 37. Plaintiff is currently confined at CNYPC pursuant to Article 10 of the New York Mental Hygiene Law as a sex offender. Defs.' Rule 56.1 St. at ¶¶ 1-4. Plaintiff was convicted of sexual abuse in the first degree and the attempted use of a child in a sexual performance. *Id.* at ¶ 3. He served twenty years in prison and was civilly committed to CNYPC following his release. *Id.* at ¶¶ 3-4. Defendant Saxton and other members of Plaintiff's

treatment team attempted to meet with him to discuss the images. Defs.' Rule 56.1 St. at ¶ 96. In response, Plaintiff stated "I plead the fifth" and refused any further discussion. Saxton Decl. at ¶ 43, Ex. C. The restriction was eventually lifted after Plaintiff began discussing the photographs with his treatment team. Saxton Decl. at ¶ 45, Pl.'s Dep. at pp. 126, 131. Plaintiff continued to be able to receive religious magazines and newspapers while on the magazine restriction. Pl.'s Dep. at pp. 132-33.

\*9  In this case, CNYPC as a government entity was responsible for providing treatment to Plaintiff as a civilly confined individual. Plaintiff's treatment team, in the exercise of their professional judgment, determined the magazine restriction to be necessary for treatment purposes. This restriction, which was instituted because Plaintiff altered magazines "to reflect his sexual deviance," Saxton Decl. at Ex. C, was rationally related to the stated treatment goals of the SOTP program, which is designed to reduce the risk of sexual recidivism. *See* Saxton Decl., Ex. D at p. 22. The temporary prohibition on receiving and possessing magazines was no more restrictive than necessary because Plaintiff continued to have access to both legal and religious reading materials. The restriction was eventually lifted after Plaintiff began to discuss the photographs with his treatment team. Defs.'s Rule 56.1 St. at ¶ 98. Other courts in this District have upheld similar restrictions at CNYPC involving photographs of minor children. *See Yeldon v. Hogan*, 2010 WL 983819, at \*8-9.

On this record, no reasonable factfinder could conclude that the magazine restriction imposed by Defendant Saxton and Plaintiff's treatment team resulted in a violation of his First Amendment right to access information.

Moreover, to the extent that "neither the Supreme Court nor the Second Circuit has yet articulated the appropriate standard to be applied when a person who is civilly committed challenges an action or policy on First Amendment grounds," *Myers v. Saxton*, 2021 WL 149062, at \*5, qualified immunity is plainly appropriate on this claim.

Accordingly, the Court recommends that summary judgment be granted as to this claim.

## IV. CONCLUSION

For the reasons stated above, it is hereby

**RECOMMENDED**, that the Motion for Summary Judgment (Dkt. No. 89) be **DENIED as to Plaintiff's excessive force claim concerning events in the "side room"** and **GRANTED as to his remaining claims**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Slip Copy, 2023 WL 2863569

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2024 Thomson Reuters. No claim to original U.S. Government Works.  9